Lawrence H. Cooke, II
Treazure R. Johnson
Nancy R. Grunberg
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York  10020
Telephone:  (212) 307-5500
Facsimile:  (212) 307-5598
*Attorneys for Defendant Darryl A. Goldstein*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
SECURITIES AND EXCHANGE COMMISSION, :
                                                             :
            Plaintiff,                                       :
                                                             :     No. 07-cv-11275 (JGK/JCF)
            v.                                               :     ECF CASE
                                                             :
DARRYL A. GOLDSTEIN and                                      :
CHRISTOPHER L. O'DONNELL,                                    :
                                                             :
            Defendants.                                      :
-------------------------------------------------------------x

**DEFENDANT DARRYL A. GOLDSTEIN'S MEMORANDUM OF**
**LAW IN SUPPORT OF HIS MOTION TO DISMISS THE COMPLAINT**

Dated: New York, New York
        March 14, 2008

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 3

I.      THE RELEVANT LEGAL STANDARDS....................................................... 3

    A.      Rule 12(b)(6)............................................................................................ 3

    B.      Rule 9(b) .................................................................................................. 4

    C.      Securities Fraud ....................................................................................... 4

II.     THE COMPLAINT FAILS TO STATE A CLAIM FOR WHICH
    RELIEF CAN BE GRANTED ........................................................................ 5

    A.      The Complaint Fails To Adequately Allege That Mr. Goldstein
        Acted With Scienter ................................................................................ 5

        1.      The Complaint Fails To Allege That Mr. Goldstein Was Motivated
            To Commit Fraud............................................................................ 8

        2.      The Complaint Fails to Allege Sufficient Facts Constituting Strong
            Circumstantial Evidence Of Conscious Misbehavior Or Recklessness................. 9

    B.      The Complaint Fails To Adequately Allege That Mr. Goldstein Owed
        A Duty To The Mutual Funds............................................................... 14

III.    THE COMPLAINT FAILS TO PLEAD FRAUD WITH PARTICULARITY
    PURSUANT TO RULE 9(b)............................................................................ 16

    A.      The SEC Fails To Properly Allege Facts Demonstrating That
        Mr. Goldstein Made Material Misrepresentations And Omissions
        To The Mutual Funds.............................................................................. 16

    B.      The Complaint Fails To Properly Allege Facts Supporting
        The Conclusory Allegation That Mr. Goldstein Had The
        Requisite Intent To Commit Securities Fraud ...................................... 19

CONCLUSION............................................................................................................ 20

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Acito v. Imcera Group*, 47 F.3d 47 (2d Cir. 1995)..........................................................9

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 11 S. Ct. 2166,
    115 L. Ed 2d 96 (1991)...............................................................................................11

*ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .... 3, 4, 6, 16, 19

*Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990)..............................................14

*Chiarella v. U.S.*, 445 U.S. 222 (1980)........................................................................14

*Demaria v. Andersen*, 318 F.3d 170 (2d Cir. 2002) ....................................................14

*Evans v. The New York Botanical Garden*, 2002 WL 31002814
    (S.D.N.Y. Sept. 4, 2002)............................................................................................11

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ...........................................9

*Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184 (2d Cir. 1998) ...........................14

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1992).........................................9

*Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997)..........................................14

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ............14

*In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351 (S.D.N.Y. 2003)........................11

*In re NYSE Specialists Sec. Litig.*, 503 F.3d 89 (2d Cir. 2007) .....................................4

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001)....................................................passim

*Mack v. South Bay Beer Distribs.*, 798 F.2d 1279 (9th Cir. 1986)..........................11, 12

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) .........................................................7, 9

*Pension Comm. Univ. Montreal Pension Plan v. Bank of America
    Securities*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006).................................................9, 18

*Rand v. M/A-Com, Inc.*, 824 F. Supp. 242 (D. Mass. 1992)........................................14

ii

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ........................................................... 4

*SEC v. Blech*, 2000 WL 288263 (S.D.N.Y. March 20, 2000) ........................................ 7

*SEC v. Boling*, 2007 WL 2059744 (D.D.C. July 13, 2007) .......................................... 8

*SEC v. Collins*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007) ......................................... passim

*SEC v. Goldsworthy*, 2007 WL 4730345 (D. Mass. Dec. 4, 2007) ............................... 8

*SEC v. KPMG LLP*, 2003 U.S. Dist. LEXIS 14521 (S.D.N.Y. Aug. 25, 2003) ...................... 6, 16

*SEC v. Parnes*, 2001 WL 1658275 (S.D.N.Y. Dec. 26, 2001) ...................................... 7

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ..................................... 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) .................................. 6, 7, 8

*Thomas v. Westchester County Health Care Corp.*, 232 F. Supp. 2d 273 (S.D.N.Y. 2002) .. 11, 12

*Trussell v. United Underwriters, Ltd.*, 228 F. Supp. 757 (D. Colo. 1964) ................................. 15

*U.S. v. Chestman*, 947 F.2d 551 (2d Cir. 1991) .......................................................... 15

*U.S. v. Falcone*, 257 F.3d 226 (2d Cir. 2001) ............................................................ 15

**Statutes**

15 U.S.C. § 77q(a)(1)-(3) ............................................................................. 1, 4, 14

15 U.S.C. § 78j(b) ................................................................................... 1, 4, 14

17 C.F.R. § 240.10b-5 ................................................................................ 1, 5, 14

**Other Authorities**

Moore's Federal Practice 3d, Section 56.30[30][c] ....................................................... 11

RESTATEMENT (SECOND) OF TORTS § 551(2)(a) (1976) ............................................... 14, 15

DC2/935633
060815-221714

Defendant Darryl A. Goldstein ("Goldstein") respectfully submits this Memorandum of Law in support of his motion to dismiss the Plaintiff U.S. Securities and Exchange Commission's (the "SEC") Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The SEC's Complaint is deficient in several respects and each of which warrants its dismissal. Specifically, the Court should dismiss the Complaint because (1) it fails to state a claim upon which relief could be granted, and (2) fails to plead fraud with the requisite particularity.

The Complaint charges Mr. Goldstein, a former Morgan Stanley DW, Inc. ("MSDW") financial advisor ("FA"), with engaging in deceptive practices designed to defraud mutual fund companies and their shareholders. Compl. ¶ 1. Specifically, the SEC alleges that Mr. Goldstein engaged in a market-timing scheme on behalf of his two major hedge fund clients, Haidar Capital Management, LLC ("Haidar") and Millennium Partners, L.P. ("Millennium"), and that his conduct amounted to fraud under Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. Compl. ¶¶ 3, 7, 40-41; 15 U.S.C. § 78j(b); 15 U.S.C. § 77q(a)(1)-(3); 17 C.F.R. 240.10b-5.[1] The SEC alleges that mutual funds are intended as long-term investments and designed primarily for buy-and-hold investors. Compl. ¶ 17. According to the SEC, market-timing is harmful to the mutual funds and their shareholders for two (2) reasons. First, market-timing captures an arbitrage profit for a few, thereby depriving the long-term shareholders of their share; and second, market-timing increases costs to the funds. Compl. ¶¶ 20-21. As a result, some mutual funds restrict short term or excessive trading of their shares.

---

[1]  Market-timing is defined in the Complaint as a practice of rapid trading employed to take advantage of pricing inefficiencies. Compl. ¶ 9.

Compl. ¶ 22.  The SEC alleges that Mr. Goldstein's clients' use of multiple accounts within which to trade, and his and his partners' use of a number of FA identification numbers, prevented various mutual fund families from detecting market-timing trades and thereby preventing them. Compl. ¶ 4.

As the Complaint readily concedes, market-timing is not *per se* illegal.  Compl. ¶ 2.  It only runs afoul of the securities laws when it is done via fraudulent or misleading means.  As the following arguments explain, Mr. Goldstein's actions were far from fraudulent and, therefore, did not violate the federal securities laws.  First, the Complaint fails to state any causes of action upon which relief could be granted because, as a matter of law, it fails to allege all requisite elements of the securities law violations charged.  The critical elements of securities fraud include an intent to defraud, material misrepresentations or omissions, and a duty owed to those purportedly defrauded, none of which is adequately alleged in the Complaint.  For instance, the SEC has failed to sufficiently allege that Mr. Goldstein possessed the requisite intent.  Both the use of multiple FA numbers and a client's use of numerous accounts, which are the practices that the SEC relies on for its fraud claims, have legitimate purposes.  Compl. ¶¶ 34-36.  Further, Mr. Goldstein's supervisors knew the type of trades he was executing, and no policy existed at MSDW prohibiting this type of trading during the relevant period.  Compl. ¶ 5.  Once MSDW implemented a policy proscribing such trading, Mr. Goldstein did not violate it.  Compl. ¶ 6. Finally, the SEC has previously found that many of the advisors to the mutual funds specifically encouraged such trading and in some cases entered into agreements to facilitate it.  Rather than indicating fraudulent intent, a more compelling inference to be drawn from these facts is that Mr. Goldstein believed his conduct was appropriate, consistent with MSDW's compliance

2

dictates, and not unknown to the mutual funds and their shareholders – an inference that is inconsistent with an intent to defraud.

Similarly, while the Complaint alleges, in conclusory fashion, that Mr. Goldstein defrauded both the mutual funds and their shareholders, it fails *in toto* to allege that he owed any duty that was abridged. Inherent in the notion of a federal securities law violation is the concept of a breach of duty. The facts alleged cannot support the existence of any duty – no special relationship of trust or reliance existed between Mr. Goldstein and the funds or their shareholders.

Finally, not only does the Complaint fail to allege the critical elements of securities fraud, but the allegations it does set forth, in many critical instances, are lacking the requisite specificity. They fail to supply the essential "who, what, when and where" information required by Rule 9(b) to avoid dismissal.

## ARGUMENT

### I.    THE RELEVANT LEGAL STANDARDS

Three (3) legal standards govern the Court's determination of this Motion. First, the standards applicable to Rule 12(b)(6) require dismissal of a complaint for failure to state a claim upon which relief can be granted. Second, the standards applicable to Rule 9(b) require dismissal of a complaint when its fraud allegations are not plead with the requisite specificity. Finally, the standards applicable to pleading an actionable claim for securities fraud must also be met.

### A.    Rule 12(b)(6)

Rule 12(b)(6) provides that a complaint must be dismissed if it fails to state a claim upon which relief may be granted. *ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87,

3

98 (2d Cir. 2007) (plaintiff survives dismissal only if factual allegations are sufficient "to raise a right of relief above the speculative level."). When ruling on a motion to dismiss for failure to state a claim, a court must accept as true all factual allegations and draw all inferences in the light most favorable to the non-moving party. *Kalnit v. Eichler*, 264 F.3d 131, 137-38 (2d Cir. 2001). The court need not, and indeed should not, accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).

### B.    Rule 9(b)

Rule 9(b) requires that a plaintiff plead allegations of fraud, including allegations of securities fraud, with particularity. *ATSI*, 493 F.3d at 99. Generally, in order to meet this heightened pleading standard, a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements are fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quotations omitted). As a result of this heightened standard, both conclusory allegations, as well as those unsupported by factual allegations, are insufficient and a complaint relying on them should be dismissed. *ATSI*, 493 F.3d at 99.

### C.    Securities Fraud

Finally, in order to prove a violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, the SEC must ultimately establish that Mr. Goldstein: (1) engaged in fraudulent conduct, (2) in connection with the purchase or sale of securities, (3) through means or instruments of transportation or communication in interstate commerce or mails, (4) with the requisite scienter. 15 U.S.C.A. § 77q(a); 15 U.S.C.A. § 78j(b);

4

17 C.F.R. § 240.10b-5.[2]  The SEC must further establish that Mr. Goldstein engaged in the

"fraudulent conduct" by showing he (1) made untrue statements of material fact, (2) omitted

material facts as to which he had a duty to speak, or (3) committed manipulative or deceptive

acts as part of a scheme to defraud.  *SEC v. Collins*, 524 F. Supp. 2d 477, 485 (S.D.N.Y. 2007).

As the following arguments demonstrate, the application of these legal standards leads to

the inevitable conclusion that the Complaint must be dismissed.  It fails to state facts establishing

the essential elements of the violations charged, and its allegations fall short of the requisite

specificity, particularity and definitiveness.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED

The Complaint fails to adequately plead both scienter and duty.  As a result, it falls short

of establishing facts constituting securities fraud and should be dismissed.

### A.    The Complaint Fails To Adequately Allege That Mr. Goldstein Acted With Scienter

The Complaint alleges that Mr. Goldstein knew, or was reckless in not knowing, that the

mutual funds prohibited or discouraged market-timing, and that by using multiple accounts and

FA numbers, he engaged in deceptive conduct that violated their trading restrictions.  Compl. ¶

31.  As noted above, scienter is an essential element to proving violations of both Section 17(a)

of the Securities Act as well as Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  In

order to meet its burden and plead scienter properly, the SEC must allege that Mr. Goldstein

---

[2]  Rule 10b-5 states that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

5

acted with "a mental state embracing an intent to deceive, manipulate, or defraud." *SEC v. KPMG LLP*, 2003 U.S. Dist. LEXIS 14521, at *10, (S.D.N.Y. Aug. 25, 2003). The SEC can accomplish this in either of two ways: (1) by alleging facts showing that Mr. Goldstein had both motive and opportunity to commit fraud; or (2) by alleging facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *Collins*, 524 F. Supp. 2d at 487 (quoting *ATSI*, 493 F.3d at 99); *Kalnit*, 264 F.3d at 138-39. In evaluating whether a plaintiff has properly pled scienter, the court's "[i]nquiry … is whether all of the facts alleged, taken collectively, give rise to a *strong inference* of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) (emphasis added)). Here, the Complaint's allegations simply do not, in their totality, give rise to the requisite "strong inference of scienter."

In June 2007, the Supreme Court decided the seminal case *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499. In *Tellabs*, the Supreme Court prescribed the following three-part test to determine whether a strong inference exists sufficient to withstand a Rule 12(b)(6) motion to dismiss a private securities fraud claim: (1) a court must accept all factual allegations in the complaint as true; (2) a court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter"; and (3) a court must consider opposing inferences. *Id.* at 2509. While the first two parts of the test were already familiar principles, the third resolved a Circuit split on the issue of whether, and to what extent, a court must consider competing inferences when determining whether the facts alleged give rise to a strong inference of scienter. *See id.* at 2504. Rejecting the Seventh Circuit's formulation that all that is required to survive at the pleading stage are allegations from which, if true, a reasonable person could infer that the defendant acted with the required intent, the Supreme Court held that a "strong

6

inference of scienter" must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 2504-05. With respect to this last element, the Court stated:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpatory explanations for the defendant's conduct, as well as inferences favoring the plaintiff.

*Id.* at 2510.

While the *Tellabs* decision addressed securities actions brought under the Private Securities Litigation Reform Act ("PSLRA"), the same "strong inference" standard prescribed by *Tellabs* should likewise apply when judging whether the SEC has alleged scienter in an enforcement action. *See SEC v. Parnes*, 2001 WL 1658275, at *5 (S.D.N.Y. Dec. 26, 2001) (citing *SEC v. Blech*, 2000 WL 288263, at *3 (S.D.N.Y. March 20, 2000)) (noting the Second Circuit requires the SEC to meet a higher standard for securities fraud and plead facts giving rise to "a strong inference of fraudulent intent"). When Congress adopted the PSLRA, it specifically incorporated the Second Circuit's scienter requirement – a "strong inference of scienter" – because it was the most stringent standard of the various circuits. *See Collins*, 524 F. Supp. 2d at 488; *see also Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (holding that "[t]he statute effectively adopts the Second Circuit's pleading standard for scienter wholesale ..."). Given that the PSLRA and Second Circuit use the same "strong inference" standard for intent, the *Tellabs* interpretation and application of that standard should also apply to enforcement actions brought by the SEC.

Another court in this Circuit, while not deciding the issue, has certainly implied strongly that the *Tellabs* analysis applies as well to SEC enforcement actions. *See Collins*, 524 F. Supp.

7

2d at 488.  While not directly deciding the issue because it was not squarely before the court, the

court therein did note that "a plaintiff subject to Rule 9(b) must plead sufficient facts to raise a

strong inference of scienter, and such inference must be at least as strong as any competing

inference raised by the pled fact."  *Id.* at 493.  At least two other district courts have held that the

*Tellabs* analysis applies to SEC enforcement actions.  The court stated in *SEC v. Boling* that, in

evaluating a motion to dismiss concerning an SEC complaint charging a "pump and dump"

scheme, "[a] complaint will survive 'only if a reasonable person would deem the inference of

scienter cogent and at least as compelling as any opposing inference one could draw from the

facts alleged.'" 2007 WL 2059744, at *4, n.1 (D.D.C. July 13, 2007) (quoting *Tellabs*, 127

S. Ct. at 2510).  Likewise, the court in *SEC v. Goldsworthy* ruled that, when considering a

motion to dismiss in a financial fraud case, in order to be deemed strong, an inference of scienter

must be at a minimum as compelling as an inference of nonculpability that could be drawn from

the facts. 2007 WL 4730345, at *16 (D. Mass. Dec. 4, 2007) (quoting *Tellabs*, 127 S. Ct. at

2504-05).

There is simply no logical reason that the directive in *Tellabs* for determining whether a

"strong inference of scienter" has been alleged should turn on whether the plaintiff is the SEC or

a private individual.  As a result, this Court, when determining whether the SEC has adequately

plead a strong inference of scienter in this case, should consider any plausible nonculpable

inferences inconsistent with scienter that can be drawn from the facts alleged.

       1.     The Complaint Fails To Allege That Mr. Goldstein Was Motivated
              To Commit Fraud

According to the SEC, Mr. Goldstein's motive for the alleged fraud was his desire to

generate commissions and asset-based fees and, thus, increase his earnings at MSDW.  Compl.

¶ 1.  However, "[m]erely pleading motive and opportunity, regardless of the strength of the

8

inference to be drawn of scienter is not enough." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir. 1992). A conclusory and generic allegation of motive based merely on increased compensation has repeatedly and consistently been held insufficient to support a conclusion of "motive" to commit securities fraud. *See Novak*, 216 F.3d at 307-08 (noting that motives generally possessed by most corporate directors and officers are insufficient to support an inference of fraudulent behavior); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (noting motive allegations common to all corporate executives are too generalized to demonstrate scienter); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000). The reasoning behind these cases is obvious. An allegation that a defendant was motivated solely by a desire to increase his or her compensation is such a normal desire that it can be imputed to everyone and, thus, cannot support the element of scienter. *See generally Kalnit*, 264 F.3d at 140 (citing *Acito v. Imcera Group*, 47 F.3d 47, 54 (2d Cir. 1995)). A reasonable and equally plausible nonculpatory inference can be drawn from the same alleged facts—that Mr. Goldstein is just like every other financial advisor. He is in the business to make a living, and that desire does not predispose him to commit fraud.

        2.      The Complaint Fails to Allege Sufficient Facts Constituting Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness

Just as the Complaint fails to adequately allege motive, it likewise fails to adequately allege that Mr. Goldstein acted with conscious or reckless behavior. The SEC's burden is particularly heavy in this regard because if a plaintiff fails to adequately plead motive, as is the case here, "the strength of the circumstantial allegations must be correspondingly greater." *Collins*, 524 F. Supp. 2d at 487 (quoting *Kalnit*, 264 F.3d at 142); *Pension Comm. Univ. Montreal Pension Plan v. Bank of America Securities*, 446 F. Supp. 2d 163, 181 (S.D.N.Y.

9

2006). Under this theory of scienter, a plaintiff must allege facts showing that the defendant's conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142.

There are numerous facts alleged in the Complaint that, taken as a whole, undermine any theory of conscious or reckless behavior. For instance, MSDW's Mutual Fund Operations Department ("MF Ops"), MSDW's Compliance Department, and Mr. Goldstein's supervisors were all well aware of the trades Mr. Goldstein was executing for his clients Haidar and Millennium. As the Complaint expressly alleges:

> Mutual fund companies sent MSDW numerous notices that barred or imposed trading restrictions on the Defendants or specific accounts associated with the Defendants' customers. These notices were generally sent to representatives in MSDW's Mutual Fund Operation Department ("MF Ops"), who then forwarded the notices to MSDW compliance officers, the offending FA, and the offending FA's branch manager.

Compl. ¶ 5. Further, the Complaint alleges that MSDW did not prohibit market-timing until it enacted such a policy in August 2003, which was more than a year and a half after Mr. Goldstein began executing the alleged market-timing trading for Haidar and Millennium, and that once that policy was in place, he abided by it. Compl. ¶¶ 5-6, 30. Also, the SEC acknowledges in the Complaint that an FA could have legitimate reasons for trading under multiple identification numbers, *i.e.*, these numbers were "sometimes used legitimately to share commissions." Compl. ¶ 36. Also significant is the fact that, in 2007, Mr. Goldstein's main client, Haidar, settled market-timing charges on a neither admit nor deny basis for fairly inconsequential sanctions in light of what the SEC is seeking in this proceeding. *See* Order Instituting Public Administrative and Cease-and-Desist Proceedings against Haidar, Securities Act Release No. 33-8820 (July 6,

10

2007) (the "Haidar Order"), a copy of which is attached here to as Exhibit "A."[3]  Significantly,

the Haidar Order, which sets forth the SEC's findings, states that Haidar's outside counsel

provided it with an opinion addressing the use of multiple accounts in a market-timing scenario,

noting it had found no private lawsuits or enforcement actions challenging the practice.  *See*

Exhibit "A," p. 3, n. 3.

Finally, the SEC already has found that some of these same mutual fund companies and

their shareholders were defrauded by their investment advisors and other related entities who

permitted market-timing in their funds.  These mutual fund investment advisors and related

entities were subject to significant disgorgement orders and civil penalties.  *See, i.e.*, Orders

Instituting Public Administrative and Cease-and-Desist Proceedings against: (1) Aim Advisors,

et al., Exchange Act Release No. 34-50506 (Oct. 8, 2004) (the "Aim Order"); (2) Alliance

Capital Management, LP, Investment Advisors Act Release No. IA-2205 (Dec. 18, 2003) (the

"Alliance Order"); (3) Federated Investment Management, et al., Exchange Act Release. No. 34-

52839 (Nov. 28, 2005) (the "Federated Order"); (4) Janus Capital Management LLC, Investment

Advisors Act Release No. IA-2277 (Aug. 18, 2004) (the "Janus Order"); and (5) Massachusetts

Financial Services Co., et al., Investment Advisors Act Release No. IA-2213 (Feb. 5, 2004) (the

---

[3]  Since the Haidar Order is a public document, this Court can take judicial notice of it pursuant to Rule 201 of the
Federal Rules of Civil Procedure. *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 357 (S.D.N.Y. 2003)
(noting that, in deciding a motion to dismiss a securities complaint for failure to state a claim, a court may consider,
among other things, facts of which judicial notice may properly be taken under Rule 201). *See* Fed. R. Evid. 201
(permitting judicial notice of facts if facts are determinable by reference to sources whose authority cannot be
reasonably questioned); Moore's Federal Practice 3d, Section 56.30[30][c]; *Thomas v. Westchester County Health
Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002) (quoting *Evans v. The New York Botanical Garden*, 2002
WL 31002814, at *4 (S.D.N.Y. Sept. 4, 2002) (finding records of state administrative procedures are public records
and therefore may be judicially noticed); *see also Mack v. South Bay Beer Distribs.*, 798 F.2d 1279, 1282 (9th Cir.
1986) (stating a court may take judicial notice of "records and reports of administrative bodies") *overruled on other
grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 111, 11 S. Ct. 2166, 115 L. Ed 2d 96 (1991).

"MFS Order"), copies of which are attached hereto as Exhibits "B," "C," "D," "E" and "F," respectively.[4]

The Complaint alleges that Mr. Goldstein's conduct occurred from January 2002 until July 2003. Compl. ¶ 30. This timing coincides with the dates that the SEC found the above entities to be engaged in illegal market-timing. Specifically, the periods of alleged fraudulent market-timing behavior specified in the attached Orders are as follows:

| | |
|---|---|
| Aim Order | January 2001 – September 2003 |
| Alliance Order | Early 2001 – mid-2003 |
| Federated Order | March 2002 – August 2003 |
| Janus Order | November 2001 – September 2003 |
| MFS Order | Late 1999 – October 2003 |

While the specific facts of each of the Orders differ somewhat, they all have in common two (2) facts. First, according to the Orders, the fund prospectuses for the relevant funds prohibited or limited market-timing. Notwithstanding these facts, the investment advisors to the funds allowed market-timing and late trading (which is *per se* illegal and not an issue in this case) in the funds they managed. Second, all of the investment advisors benefited from the trading in their funds. As the MFS Order notes, "[a]cceptance of market timing money was profitable to MFS as it generated millions of dollars in management fees. Such fees are based on a percentage of assets under management." Exhibit "F," p. 7, para. 27. Similarly, the Alliance Order states, "Alliance Capital earned management fees from management of mutual funds based on a percentage of assets under management, generally up to one percent. Thus, to the extent timers increased assets under management, Alliance Capital earned greater fees." Exhibit "C," p. 4, para. 14.

---

[4] Just as in Footnote 3, these Orders are also public documents that may be judicially noticed under Rule 201 of the Federal Rules of Civil Procedure. *See Thomas*, 232 F. Supp. 2d. at 276; *Mack*, 798 F.2d at 1282.

In fact, not only was market-timing permitted by the advisors of some of these funds, it was encouraged. For instance, the SEC found that MFS had an internal policy permitting market-timing and actually directed known market-timers into certain funds. Exhibit "F," p. 5, para. 17. Alliance Capital actually appointed a person in 2001 to the position of "Market Timing Supervisor" to manage the relationships with the market timers. Exhibit "C," p. 4, para. 19. The fact that market-timing was permitted, and indeed encouraged, in these funds undercuts any notion of scienter on Mr. Goldstein's part. It is just as likely that he too was encouraged by the funds' advisors. If he was actually invited by the fund managers or their agents to execute market-timing trades in certain funds, or he was aware of the fact that it was apparently an often employed trading strategy, he can hardly be found to have had an intent to defraud those same funds. The description of block letters and trading, in Attachment A to the Complaint, does not detract from the analysis. For instance, it cannot be determined from the Complaint's allegations whether either Haidar or Millennium had agreements with any of the indentified mutual fund companies to market-time in their funds, as described in the Orders attached hereto. In this regard, Mr. Goldstein's trading for Millennium is instructive. *See* Attachment A to the Complaint, Part 2 of 2, p. 1 of 2. According to this Attachment, on August 2, 2002, AIM warned that "Millennium Acct. 539-041105" was permitted one more exchange in 2002. However, on August 13, 2002, less than two weeks later, AIM stated that it would permit two (2) more trades in this same account. *Id.*

Given all of the above facts, the most compelling inference to be drawn is that Mr. Goldstein believed his trading activity was acceptable because it was in compliance with MSDW's policies and his supervisors had unimpeded visibility and actual knowledge of the trading, and never told him to stop. This compelling inference is inconsistent with imputing

13

scienter to Mr. Goldstein and defeats the SEC's allegations that Mr. Goldstein was motivated to commit fraud.

**B.    The Complaint Fails To Adequately Allege That Mr. Goldstein Owed A Duty To The Mutual Funds**

The SEC alleges that Mr. Goldstein defrauded the mutual funds and their shareholders by failing to disclose certain information to the mutual funds in which he executed trades (*i.e.*, his use of multiple FA numbers and multiple accounts). *See* Compl. ¶¶ 1, 4, 44-45.[5] The Complaint fails, however, to allege that Mr. Goldstein breached a duty to disclose information concerning his use of multiple FA numbers. To state a claim under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, the SEC must allege that Mr. Goldstein made an untrue statement of, or omitted "a material fact," causing his statements to mislead the mutual funds. 15 U.S.C.A. § 77q(a); 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5. A misleading statement by means of omission, however, is only actionable if a duty exists between the parties. *Chiarella v. U.S.*, 445 U. S. 222, 228 (1980) (quoting RESTATEMENT (SECOND) OF TORTS § 551(2)(a) (1976)) ("[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so.").

"[This] duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir. 1990); *see generally Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 189 (2d Cir. 1998). A fiduciary duty, *i.e.*, a

---

[5]    The Complaint also alleges that Mr. Goldstein made false and misleading statements, consisting of these same facts – the use of multiple FA numbers and the fact that his clients were trading through more than one account. However, the trades were in fact executed via the identified FA numbers and for the specified accounts. Thus, they were literally true, and a literally true statement is not actionable under the securities laws unless it is misleading. *Demaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2002); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004) (stating "it is well settled that a complaint alleging violations of the securities laws may not rely upon statements that are true...*"); Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997); *Rand v. M/A-Com, Inc.*, 824 F. Supp. 242, 256 (D. Mass. 1992). The thrust of the SEC's allegations then must be that these literally true statements were misleading by virtue of the omission of additional information.

14

relationship of trust and confidence, exists where the heart of the relationship between the parties is one of "reliance, and *de facto* control and dominance." *U.S. v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991); *see also*, RESTATEMENT (SECOND) OF TORTS, § 551(2)(a) (1976) (a duty arises where a party has information that the other party is entitled to "because of a fiduciary or other similar relation of trust and confidence between them.").

The Complaint fails to allege that Mr. Goldstein had any fiduciary obligation or similar relationship with the mutual funds and their shareholders for a very simple reason—no such relationship ever existed. Mr. Goldstein was simply a broker, acting on behalf of his customers, in purchasing goods from a seller (the mutual funds through their advisors or other agents) in arms-length transactions. There was no special discretionary authority and dependency, which are hallmarks of a fiduciary relationship, delegated from the mutual funds or their shareholders to Mr. Goldstein. *Chestman*, 947 F.2d at 569; *U.S. v. Falcone*, 257 F.3d 226, 234 (2d Cir. 2001) ("[a] fiduciary relationship, or its functional equivalent, exists only where there is explicit acceptance of a duty of confidence or where such acceptance may be implied from a similar relationship of trust and confidence between the parties."). *See also Trussell v. United Underwriters, Ltd.*, 228 F. Supp. 757, 763 (D. Colo. 1964) (stating that no fiduciary duty of full disclosure arose where the only relationship between stock purchasers and sellers was that of purchaser to seller). Just as a customer on the street purchasing from a vendor in an arms-length transaction has not created a duty of trust and confidence between himself and the vendor, purchasing stock from a mutual fund does not create a fiduciary relationship between the parties to the transaction. In the absence of this type of relationship, Mr. Goldstein cannot be held liable for any alleged omissions to the funds or their shareholders.

15

III.    **THE COMPLAINT FAILS TO PLEAD FRAUD WITH PARTICULARITY PURSUANT TO RULE 9(b)**

Rule 9(b) requires a plaintiff to state, with particularity, the circumstances constituting fraud. In order to do so here, the Complaint must: (1) specify the statements that the SEC contends were fraudulent; (2) identify the speakers; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. *Collins*, 524 F. Supp. at 484; *SEC v. KPMG LLP*, 2003 U.S. Dist. LEXIS 14521, at *9 (S.D.N.Y. 2003). Additionally, although Rule 9(b) states that "[m]alice, intent, knowledge, and other condition of the mind of a person may be averred generally," this Circuit requires that a securities fraud complaint allege facts that "give rise to a strong inference of fraudulent intent." *Kalnit*, 264 F.3d at 138 (citation omitted). In this instance, the SEC's allegations fall far short of meeting this stringent particularity test. Throughout the Complaint, the SEC resorts to unsupported legal conclusions, rather than alleging specific facts supporting those conclusions. *ATSI*, 493 F.3d at 99 (noting allegations that are conclusory or unsupported by factual assertions do not meet the heightened pleading standards under Rule 9(b)).

A.    **The SEC Fails To Properly Allege Facts Demonstrating That Mr. Goldstein Made Material Misrepresentations And Omissions To The Mutual Funds**

The Complaint fails to allege with the requisite specificity facts demonstrating that Mr. Goldstein made any fraudulent statements or misleading omissions to the mutual funds or their shareholders. While the Complaint alleges that he used multiple FA numbers and his clients used more than one account, as explained earlier, this conduct does not necessarily constitute fraud. On the contrary, both have legitimate purposes. The Complaint does not specify what was fraudulent about Mr. Goldstein's use of legitimate FA numbers that had been processed and approved by MSDW. Instead, the SEC acknowledges that "[j]oint FA

16

identification numbers were also sometimes legitimately assigned to FAs by MSDW to facilitate the allocation of commissions among brokers for a shared customer" (Compl. ¶¶ 23 and 26); yet, it then alleges in a conclusory fashion that Mr. Goldstein did not use his and his partners' FA numbers to allocate commissions. It supports this conclusion with nothing more than additional conclusory statements, such as, that he "used many more identification numbers than would have been necessary to allocate commissions for a shared customer" (Compl. ¶ 36), that he used a retiring FA's number, and that he and his partner entered into joint production agreements with a broker in another office (Compl. ¶ 39). Without more, the SEC has failed to properly plead why joint FA numbers, which are common in the industry and had a legitimate purpose at MSDW, were fraudulent.

Further, the Complaint alleges, "[Goldstein] made false and misleading statements to mutual fund companies in the account opening process … using shell companies and other misleading names to disguise their customers' identities." Compl. ¶ 4. The SEC does not, however, specify what information is required in the account opening process and, thus, how the information provided by Mr. Goldstein ran afoul of those requirements. As noted above, the account numbers used by Mr. Goldstein's clients were legitimate, and there are no allegations to the contrary in the Complaint.

The Complaint also alleges in a conclusory fashion that Mr. Goldstein made material omissions to the mutual funds "by failing to disclose to mutual funds that the numerous accounts through which [his] customers traded actually belonged to the same customers …." Compl. ¶¶ 4, 33-35. Again, the SEC fails to specify what type of information was required by the mutual funds when opening accounts, and whether Mr. Goldstein was required to provide information describing the relationships between accounts. While the Complaint alleges that the accounts

17

were not opened to pursue different investment strategies (Compl. ¶¶ 2 and 34), and were not

opened to segregate assets (Compl. ¶ 35), the SEC fails to allege with the requisite specificity

why these two purposes are the only legitimate reasons for the use of multiple accounts. While

the Complaint does describe in general some of the transfers among accounts (*id.*), it fails to

allege specific facts to support its allegation that transfers between these accounts were

misleading.

Perhaps nowhere is the Complaint's lack of specificity more obvious than in the context

of the allegations regarding trading in variable annuities. The Complaint alleges that

Mr. Goldstein "knew, or was reckless in not knowing" that Haidar's and Millennium's variable

annuity contracts were "sham transactions." Compl. ¶ 41. Conspicuously absent from the

allegations regarding variable annuity trading, however, are any facts establishing why or how

Mr. Goldstein was or should have been aware that his clients' variable annuities were fraudulent.

The Complaint merely explains what a variable annuity is and how it works, *i.e.*, by explaining

that variable annuities are hybrid securities offered by insurance companies as long-term savings

vehicles for retirement and estate planning purposes, that each annuity has an annuitant to whom

benefits are paid, and that the annuitant has to be a natural person while the owner can be a

corporate entity. Compl. ¶¶ 26-27. The Complaint alleges that Mr. Goldstein's hedge fund

clients used one of their employees as the annuitant. Compl. ¶ 27.

The SEC then simply concludes that Mr. Goldstein knew, or was reckless in not knowing

that the hedge funds and their employees "did not need or want life insurance ..." Compl. ¶ 41.

It fails to allege any specific facts supporting this last conclusory statement. *See Pension Comm.*,

446 F. Supp. 2d at 202-03 (broker owed no duty to hedge fund investors "to monitor, verify, or

investigate the veracity of the information disseminated by" hedge fund manager). As the SEC

18

acknowledges in the Complaint, a corporate entity can properly own an annuity, and that is what

Mr. Goldstein did here – buy annuity contracts for a corporate entity. The SEC alleges no facts

suggesting why Mr. Goldstein should have suspected – let alone known – that the annuitants

were anything other than employees whose lives the corporations legitimately wanted to insure.

**B.    The Complaint Fails To Properly Allege Facts Supporting The
Conclusory Allegation That Mr. Goldstein Had The Requisite Intent
To Commit Securities Fraud**

The SEC fails to allege specific facts giving rise to a strong inference of fraudulent intent.

As described in Section II.A.1 above, the SEC has not met its burden in this regard because the

SEC relies on speculative inferences that are not at least as strong as competing inferences.

*ATSI*, 493 F.3d at 104; *Collins*, 524 F. Supp. 2d at 488. The motive the SEC alleged – that

Mr. Goldstein desired more compensation – is insufficient. Mr. Goldstein's earnest desire to

increase his compensation is a plausible, accepted, and a nonculpable explanation for his actions.

To allege otherwise, using such a conclusory allegation of motive based merely on increased

compensation, is insufficient to survive dismissal under Rule 9(b).

Moreover, with respect to conscious or reckless conduct, the facts alleged, viewed

collectively, do not rise to the level of an extreme departure from the standard of ordinary care.

*Kalnit*, 264 F.3d at 142. Indeed, there are several facts that undermine such an inference, for

example: (1) MF Ops, MSDW's Compliance Department and Mr. Goldstein's supervisors were

well aware of the alleged market-timing trades Mr. Goldstein executed at the direction of his

clients Haidar and Millennium (Compl. ¶ 5); (2) MSDW did not prohibit market-timing until

more than a year and a half after Mr. Goldstein began executing trades for his clients (Compl. ¶¶

5-6); (3) once MSDW instituted such a policy, Mr. Goldstein abided by it (Compl. ¶ 5); and

(4) the SEC acknowledges in its Complaint that an FA could have legitimate reasons for trading

19

under multiple identification numbers (Compl. ¶ 36). Thus, the Complaint fails to properly plead facts supporting its allegations that Mr. Goldstein possessed the requisite intent to commit securities fraud. The Complaint, therefore, should be dismissed for failing to meet the pleading standards of Rule 9(b).

## CONCLUSION

Because the SEC fails to state a claim against Mr. Goldstein for securities fraud and offers an insufficiently plead Complaint, Mr. Goldstein's motion to dismiss should be granted with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

Dated: New York, New York
March 14, 2008

Respectfully submitted,

   /s/ Lawrence H. Cooke II
Lawrence H. Cooke II (LC8884)
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York  10020
Telephone:  (212) 307-5500
Facsimile:  (212) 307-5598
E-mail:  lhcooke@venable.com

*Counsel for Defendant*
*Darryl A. Goldstein*

# EXHIBIT A

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 8820 / July 6, 2007

INVESTMENT ADVISERS ACT OF 1940
Release No. 2617 / July 6, 2007

INVESTEMENT COMPANY ACT OF 1940
Release No. 27883 / July 6, 2007

ADMINISTRATIVE PROCEEDING
File No. 3-12678

| | |
|---|---|
| In the Matter of<br><br>Haidar Capital Management, LLC,<br>Haidar Capital Advisors, LLC, and<br>Said N. Haidar,<br><br>Respondents. | : ORDER INSTITUTING PUBLIC<br>: ADMINISTRATIVE AND CEASE-AND-<br>: DESIST PROCEEDINGS, MAKING<br>: FINDINGS, IMPOSING A CEASE-<br>: AND-DESIST ORDER, AND<br>: IMPOSING REMEDIAL SANCTIONS,<br>: PURSUANT TO SECTION 8A OF THE<br>: SECURITIES ACT OF 1933, SECTIONS<br>: 203(e) AND (f) OF THE INVESTMENT<br>: ADVISERS ACT OF 1940, AND<br>: SECTIONS 9(b) AND (d) OF THE<br>: INVESTMENT COMPANY ACT OF<br>: 1940<br>: |

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Sections 203(e) and (f) of the Investment Advisers Act of 1940 ("Advisers Act") and  Sections 9(b) and (d) of the Investment Company Act of 1940 ("Investment Company Act") against Haidar Capital Management, LLC, Haidar Capital Advisors, LLC (collectively, Haidar Advisors), and Said N. Haidar ("Haidar").

II.

In anticipation of the institution of these proceedings, Haidar Advisors and Haidar have submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a

party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, Haidar Advisors and Haidar consent to the entry of this Order Instituting Public Administrative and Cease-and-Desist Proceedings, Making Findings, Imposing a Cease-and-Desist Order, and Imposing Remedial Sanctions, Pursuant to Section 8A of the Securities Act of 1933, Sections 203(e) and (f) of the Investment Advisers Act of 1940, and Sections 9(b) and (d) of the Investment Company Act of 1940 ("Order"), as set forth below.

### III.

On the basis of this Order and Respondents' Offer, the Commission finds[1] that:

#### Respondents

1.      Haidar Capital Management, LLC, is a single member limited liability company formed under the laws of the State of New York.  Haidar Capital Management, LLC served as the investment adviser for four private funds and is not registered with the Commission.

2.      Haidar Capital Advisors, LLC, is a single member limited liability company formed under the laws of the State of New York.  Haidar Capital Advisors, LLC was the administrative or managing member of three private funds and is not registered with the Commission.

3.      Said N. Haidar, age 45, is a resident of New York, New York.  He is the managing member and sole shareholder of Haidar Capital Management and Haidar Capital Advisors.

#### Facts

4.      From April 2001 to September 2003 (the "relevant period"), Haidar Advisors traded an average of approximately $143 million in US mutual funds and annuities through a market timing strategy that Haidar Advisors' traders executed.[2] During the relevant period, Haidar Advisors and Haidar violated Section 17(a)(3) of the Securities Act by engaging in deceptive tactics, such as using multiple accounts, utilizing broker-dealers who used multiple registered representative numbers and purchasing variable annuities, to hide Haidar Advisors' identity from mutual funds, and otherwise

---

[1] The findings herein are made pursuant to Respondents' Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2] Market timing includes: (i) frequent buying and selling of shares of the same mutual fund or (ii) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing, while not illegal *per se*, can harm other mutual fund shareholders because it can dilute the value of their shares, if the market timer is exploiting pricing inefficiencies, or disrupt the management of the mutual fund's investment portfolio and can cause the targeted mutual fund to incur costs borne by other shareholders to accommodate frequent buying and selling of shares by the market timer.

facilitate Haidar Advisors' market timing strategies.[3]  During the relevant period, Haidar Advisors earned in excess of $3.3 million in management and advisory fees from its market timing trading.

*Haidar Advisors Used Multiple Trading Entities and Accounts to Hide Their Identities*

5.     During the relevant period, Haidar Advisors, at Haidar's direction, created eight new wholly owned subsidiaries for two parent hedge funds (collectively, the "Haidar Advisors Affiliates") to execute mutual fund trades.  These wholly owned subsidiaries had unique tax identification numbers but included the same investors as the parent hedge fund and shared a bank account with the parent hedge fund.  When a mutual fund family identified Haidar Advisors or the Haidar Advisors Affiliates as a market timer and blocked them from trading, Haidar Advisors continued timing the mutual fund family through another Haidar Advisors Affiliate or account, thereby concealing its identity from the mutual fund family.  By September 2003, Haidar Advisors had opened in excess of 100 accounts at more than 20 broker-dealers.  Through these efforts, Haidar Advisors avoided detection by the mutual funds and continue executing market timing trades in mutual funds that had imposed "block notices" to restrict their market timing activities.[4]

6.     Haidar Advisors' Confidential Offering Memoranda for its various hedge funds confirm that Haidar Advisors used multiple accounts and entities and annuity contracts to execute trades in mutual funds that had previously imposed restrictions on Haidar Advisors due to market timing.  In pertinent part, the Offering Memoranda, in a section entitled "Limitations on Switching Strategies," states:

> The future success of [Haidar Advisors'] trading strategy depends on several different factors.  Primary among these factors is the continued availability of the free and unlimited switching option within a family of funds.  [Haidar Advisors] may utilize special purpose vehicles . . . and purchase annuity contracts to maintain or increase such availability.  Fund families have been slowly restricting the availability of the exchange privilege, and this trend is expected to continue.  In addition, there is no assurance that [Haidar Advisors] will be able to continue to utilize special

---

[3] On November 30, 2001, Haidar's outside counsel provided him with a research memorandum relating to his mutual fund market timing strategy.  Specifically, the memorandum addressed Haidar Advisors' use of multiple shareholder accounts under the same shareholder name and accounts for the benefit of one person but traded under separate d/b/a accounts or traded using subsidiaries.  In pertinent part, Haidar Advisors' counsel concludes that its "research has not uncovered a fact pattern whereby (i) the SEC has sought to impose a penalty against an adviser or (ii) a mutual fund has sued a shareholder, in each case for market-timing activities where a person that has been precluded from trading mutual fund shares because of market-timing then sets up an account under a new name but with the same beneficial owners."

[4] Block notices restricted market timing trading by, among other things, prohibiting future trades in specific accounts, by particular registered representatives or by broker-dealer and typically included a statement concerning the mutual fund's aversion to market timing.

purpose vehicles or annuity contracts . . . to trade mutual fund shares.

7.     Haidar managed the overall operations of Haidar Advisors, including the creation of the Haidar Advisors Affiliates and the opening of brokerage accounts and the transfer of funds among the Haidar Advisors-affiliated entities. Haidar personally signed all of the applications for new tax identification numbers, all account opening documents and all wire transfer letters authorizing Haidar Advisors' broker-dealers to move Haidar Advisors' money to accounts that had not yet been blocked by the mutual funds.

### Use of Multiple Registered Representative Numbers to Circumvent Block Notices

8.     Many mutual funds also identified market timers by tracking the number broker-dealers assigned to their registered representatives (*i.e.*, registered representative numbers). In an effort to hide their identities and circumvent block notices imposed by the mutual funds, some registered representatives at broker-dealers used by Haidar Advisors, at Haidar Advisors direction, used multiple registered representative numbers to execute Haidar Advisors' market timing trades. In setting up Haidar Advisors' accounts at various broker-dealers, Haidar Advisors' traders discussed the use of alternative registered representative numbers to evade block notices and considered the broker-dealers' ability to execute trades using multiple registered representative numbers in evaluating prospective broker-dealer relationships.

### Haidar Advisors Traded In Amounts That Were More Likely To Avoid Mutual Fund Scrutiny

9.     Haidar Advisors employed structured trading strategies to further disguise its timing activities from blocking mutual funds. Specifically, Haidar Advisors divided large trades, using the Haidar Advisors Affiliates, into several smaller trades in an effort to "fly under the radar" of mutual funds that detected timers by monitoring trades with high dollar values. Haidar Advisors monitored the dollar amount that attracted attention from the mutual fund compliance personnel and traded in dollar amounts under that threshold in order to avoid mutual fund scrutiny. In each instance, no legitimate purpose required Haidar Advisors to structure the trades in that manner because the accounts and Haidar Advisors Affiliates included the same investors and employed the same trading strategy.

### Haidar Advisors Used Variable Annuities to Disguise Their Identities

10.     Haidar Advisors conducted market timing using variable annuity contracts.[5] Variable annuities were an attractive vehicle for Haidar Advisors to use to

---

[5] Variable annuities are insurance contracts which typically invest the cash premiums in mutual fund shares and which typically offer access to multiple mutual funds. Variable annuities are securities and insurance companies offer their variable annuity products through prospectuses filed with the Commission, which may describe the insurance companies' policies on market timing. As with market timing of mutual funds, market timing through variable annuities can result in increased expense to, and cause dilution in, the underlying mutual fund portfolios. Additionally, market timing through variable annuities may harm not

4

gain market timing capacity because issuers of variable annuities aggregate trades in their contracted fund complexes and transmit the trades on a net basis. Thus, trading through variable annuity contracts can hide the identity of timers, facilitating their timing.[6]

11.    In addition to using variable annuities to conceal its identity from the mutual funds, Haidar Advisors also engaged in deceptive conduct to facilitate its variable annuity trading. Specifically, when variable annuity contracts were restricted for excessive trading, Haidar Advisors would surrender the contract and continue market timing in the same variable annuities' mutual fund sub-accounts, using a different variable annuity contract purchased in the name of a different Haidar Advisors Affiliate or using a different account number.[7]

## Violations of the Federal Securities Laws

12.    As a result of the conduct described above, Haidar Advisors and Haidar willfully committed violations of Section 17(a)(3) of the Securities Act, which prohibits engaging in any transaction, practice or course of business, in the offer or sale of securities, directly or indirectly, which would operate as a fraud or deceit upon the purchaser.[8]

## Cooperation by Haidar Advisors and Haidar

13.    In determining to accept the Offer, the Commission considered cooperation afforded the Commission staff by the Respondents.

## Undertakings

Respondents have undertaken to:

14.    Haidar Advisors shall, within 120 days of the date of this Order, retain an independent compliance consultant ("Independent Compliance Consultant"), not unacceptable to the staff of the Commission, to conduct a review of Haidar Advisors' policies and procedures reasonably designed to detect and prevent violations of the federal securities laws related to trading of open-end investment companies that are registered under the Investment Company Act of 1940 ("Mutual Funds"); (ii) recommend any additional policies and procedures which, on the basis of its review, the consultant

---

only investors holding the same variable annuity, but also other investors in the underlying mutual funds being timed, such as investors in variable annuities issued by other insurance companies.

[6] Haidar Advisors also favored annuity trading because: (i) the annuity structure enabled Haidar Advisors to switch between fund families in a single day, and (ii) Haidar Advisors believed that the annuity fund families were contractually obligated to accept the trades.

[7] Haidar Advisors purchased multiple annuity contracts, naming its own employees as annuitants, but Haidar Advisors funded the contracts, and all profits from the trading were for Haidar Advisors' benefit.

[8] "Willfully" as used in this Order means intentionally committing the act which constitutes the violation. Cf. Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000); Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965).

believes are reasonably designed to ensure that Haidar Advisors complies with federal securities laws, relating to the trading of those Mutual Funds; and (iii) submit to the Commission staff, within 30 days of the completion of the review, a report outlining the results of the Independent Compliance Consultant's review, and what recommendations, if any, the Independent Compliance Consultant made. In conjunction with the Independent Compliance Consultant's review:

(a)    Haidar Advisors shall adopt the recommendations of the Independent Compliance Consultant; provided, however, that within 60 days of the completion of the review, Haidar Advisors shall in writing advise the Independent Compliance Consultant and the staff of the Commission of any recommendations that it considers to be unnecessary or inappropriate. With respect to any recommendations that it considers to be unnecessary or inappropriate, Haidar Advisors need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose. As to any recommendation on which Haidar Advisors and the Independent Compliance Consultant do not agree, such parties shall attempt in good faith to reach an agreement within 90 days of the completion of the review. In the event that Haidar Advisors and the Independent Compliance Consultant are unable to agree on an alternative proposal acceptable to the staff of the Commission, Haidar Advisors will abide by the determinations of the Independent Compliance Consultant.

(b)    Haidar Advisors shall, after 18 months from the date of this Order, require the Independent Compliance Consultant (i) to conduct an additional review to determine whether Haidar Advisors adopted the above recommendations and whether Haidar Advisors' policies and procedures are reasonably effective in maintaining Haidar Advisors' compliance with federal and state securities laws, and (ii) submit to the Commission's staff, within 30 days of the review, a report outlining the results of the review.

(c)    The Independent Compliance Consultant's compensation and expenses shall be borne by Haidar Advisors. The Respondents shall cooperate fully with the Independent Compliance Consultant with access to their files, books, records, and personnel as reasonably requested for the reviews.

(d)    Haidar Advisors shall require that the Independent Compliance Consultant, for the period of the engagement and for a period of two years from completion of the engagement, not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Haidar Advisors, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. Haidar Advisors shall require that any firm with which the Independent Compliance Consultant is affiliated in performance of his or her duties

6

under the Order not, without prior written consent of the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Haidar Advisors, or any of Haidar Advisors' present or former affiliates, directors, officers, employees, or agents acting in the capacity as such for the period of the engagement and for a period of two years after the engagement.

15.    Respondents shall retain, within 30 days of the entry of the Order, the services of an independent distribution consultant ("Independent Distribution Consultant") not unacceptable to the staff of the Commission. Respondents shall pay up to $50,000 of the compensation and expenses of the Independent Distribution Consultant. Such compensation and expenses shall include, without limitation, (i) the compensation of a tax administrator for the preparation of tax returns and/or for seeking any IRS rulings; (ii) the payment of taxes; and (iii) the payment of any distribution or consulting services as may be reasonably required by the Independent Distribution Consultant. Thereafter, the Independent Distribution Consultant's compensation or expenses shall be deducted from any amounts of disgorgement or penalty paid by the Respondents pursuant to this Order and any investment returns or interest earned thereon. The Respondents shall cooperate fully with the Independent Distribution Consultant, including providing access to their files, books, records, and personnel as reasonably requested for the review. Respondents shall require the Independent Distribution Consultant to develop a Distribution Plan for the distribution of the total disgorgement and penalty ordered in Paragraph IV.D. of this Order, and any interest or earnings thereon, according to a methodology developed in consultation with Respondents and acceptable to the staff of the Commission.

(a)    Respondents shall require the Independent Distribution Consultant to submit to Respondents and the staff of the Commission the Distribution Plan no more than 150 days after the entry of the Order.

(b)    The Distribution Plan developed by the Independent Distribution Consultant shall be binding unless, within 210 days after the date of the entry of the Order, Respondents or the staff of the Commission, advises, in writing, the Independent Distribution Consultant of any determination or calculation from the Distribution Plan that it considers to be inappropriate and states in writing the reasons for considering such determination or calculation inappropriate.

(c)    With respect to any calculation with which Respondents or the staff of the Commission do not agree, such parties shall attempt in good faith to reach an agreement within 240 days of the date of the entry of the Order. In the event that Respondents and the staff of the Commission are unable to agree on an alternative determination or calculation, the determinations of the Independent Distribution Consultant shall be binding.

(d)    Within 175 days of the date of entry of this Order, Respondents shall require that the Independent Distribution Consultant submit the Distribution Plan for the administration and distribution of disgorgement and penalty funds pursuant to Rule 1101 [17 C.F. R. § 201.1101] of the Commission's Rules of Practice.  Following a Commission order approving a final plan of distribution, as provided in Rule 1104 [17 C.F.R. § 201.1104] of the Commission's Rules of Practice, Respondents shall require that the Independent Distribution Consultant, with Respondents, take all necessary and appropriate steps to administer the final plan for distribution of disgorgement and penalty funds.

(e)    Respondents shall require that the Independent Distribution Consultant, for the period of the engagement and for a period of two years from completion of the engagement, not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondents, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such.  Respondents shall require that any firm with which the Independent Distribution Consultant is affiliated in performance of his or her duties under the Order not, without prior written consent of the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondents, or any of Respondents' present or former affiliates, directors, officers, employees, or agents acting in the capacity as such for the period of the engagement and for a period of two years after the engagement.

16.    Respondents undertake to cooperate fully with the Commission in any and all investigations, litigations or other proceedings relating to or arising from the matters described in this Order.  In connection with such cooperation, Respondents have undertaken:

(a)    To produce, without service of a notice or subpoena, any and all documents and other information reasonably requested by the Commission's staff;

(b)    To use their best efforts to cause their employees to be interviewed by the Commission's staff at such times as the staff reasonably may direct;

(c)    To use their best efforts to cause their employees to appear and testify truthfully and completely without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be requested by the Commission's staff;

(d)    That in connection with any testimony of Haidar Advisors to be conducted at deposition, hearing or trial pursuant to a notice or subpoena, Haidar Advisors and Haidar: (i) agrees that any such notice or subpoena for Haidar Advisors employees and officers appearance and testimony

may be served by regular mail on its counsel, Ropes & Gray, LLP, attn: Richard Marshall, 1211 Avenue of the Americas, New York, NY 10036-8704; and (ii) agrees that any such notice or subpoena for Haidar Advisor appearance and testimony in an action pending in a United States District Court may be served, and may require testimony, beyond the territorial limits imposed by the Federal Rules of Civil Procedure; and

(e)     To make best efforts to produce to the Independent Distribution Consultant documents sufficient to identify all Mutual Funds (as defined in paragraph 14 above) in which Haidar Advisors executed trades in its private funds during the relevant period.

17.     For good cause shown, the Commission's staff may extend any of the procedural dates set forth above.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions specified in Respondents' Offer.

Accordingly, it is hereby ORDERED that:

A.  Respondents Haidar Capital Management and Haidar Capital Advisors are hereby censured;

B.  Respondents shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(3) of the Securities Act;

C.  Respondents shall comply with the undertakings specified in Paragraphs 14 and 15 above; and

D.  Respondents shall pay disgorgement, prejudgment interest and civil money penalties as follows:

1.  Within 30 days of the entry of this Order, Respondents, jointly and severally, shall pay disgorgement of $3,300,000, prejudgment interest of $1,180,000 and a civil penalty in the amount of $100,000.

a.      Such payments shall be: (i) made by United States postal money order, certified check, bank cashier's check or bank money order; (ii) made payable to the Securities and Exchange Commission; (iii) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (iv) submitted under cover letter that identifies Respondents, the file number of these

proceedings, a copy of which cover letter and money order or check shall be sent to Katherine Addleman, Associate Regional Administrator, Securities and Exchange Commission, Burnett Plaze, Suite 1900, 801 Cherry Street, Unit 18, Fort Worth, Texas 76107.

b.      Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund shall be established for the funds described in Section IV.D.1 above. Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that they shall not, after offset or reduction in any Related Investor Action based on Respondent's payment of disgorgement in this action, further benefit by offset or reduction of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts that are the subject of the Commission's Findings in the Order.

By the Commission.

Nancy M. Morris
Secretary

10

# EXHIBIT B

Invesco Funds Group, Inc., AIM Advisors, Inc. and AIM Distributors, Inc., Admin. Proc. Rel. No. 34-50... Page 1 of 18

Case 1:07-cv-11275-JGK    Document 30-5    Filed 03/14/2008    Page 2 of 19

## U.S. Securities and Exchange Commission

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

Securities Exchange Act of 1934
Release No. 50506 / October 8, 2004

INVESTMENT ADVISERS ACT OF 1940
Release No. 2311 / October 8, 2004

INVESTMENT COMPANY ACT OF 1940
Release No. 26629 / October 8, 2004

Admin. Proc. File No. 3-11701

| | |
|---|---|
| In the Matter of<br><br>Invesco Funds Group, Inc., AIM Advisors, Inc., and AIM Distributors, Inc.,<br><br>Respondents. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 15(b) OF THE SECURITIES EXCHANGE ACT OF 1934, SECTIONS 203(e) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

**I.**

The United States Securities and Exchange Commission (the "Commission") deems it appropriate and in the public interest that administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Invesco Funds Group, Inc., AIM Advisors, Inc., and AIM Distributors, Inc. ("IFG," "AIM Advisors," and "ADI," respectively, or individually, "Respondent"; collectively, "Respondents").

**II.**

In anticipation of the institution of these proceedings, the Respondents have submitted an Offer of Settlement (the "Offer") that the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or in which the Commission is a party, and without admitting or denying the findings, except those findings pertaining to the jurisdiction of the Commission over Respondents and the subject matter of these

proceedings, the Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Sections 203(e) and 203(k) of the Investment Advisers Act of 1940, and Sections 9(b) and 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order") as set forth below.

### III.

On the basis of this Order and Respondents' Offer, the Commission finds[1] that:

### OVERVIEW

1. This is a proceeding against IFG, AIM Advisors, and ADI based on market timing agreements that allowed certain individuals and entities to make frequent trades in the Invesco Funds advised by IFG and AIM Mutual Funds advised by AIM Advisors. Market timing includes (a) frequent buying and selling of shares of the same mutual fund or (b) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing, while not illegal per se, can harm other mutual fund shareholders because it can dilute the value of their shares, if the market timer is exploiting pricing inefficiencies, or disrupt the management of the mutual fund's investment portfolio and can cause the targeted mutual fund to incur costs borne by other shareholders to accommodate frequent buying and selling of shares by the market timer.

### RESPONDENTS AND RELATED ENTITY

2. AMVESCAP PLC is a United Kingdom holding company whose American Depository Receipts trade on the New York Stock Exchange. IFG, AIM Advisors and ADI are now, and at all times relevant to this Order were, wholly-owned subsidiaries of AMVESCAP.

3. IFG, a Delaware corporation headquartered in Denver, and its predecessors have been registered with the Commission as investment advisers since 1957. During the time period relevant to this Order, IFG served as an investment adviser to eight registered open-ended investment companies, consisting of over forty-five series or mutual funds ("Invesco Funds"). AIM Advisors began assuming responsibility for serving as investment adviser to the Invesco Funds in 2003. IFG intends to voluntarily withdraw its registration with the Commission as an investment adviser as soon as it is practicable. On December 2, 2003, the Commission filed an action against IFG and its former chief executive officer ("CEO") in federal district court in connection with the matters described herein. SEC v. IFG et al., Civil Action No. 03-N-2421 (PAC).

4. AIM Advisors, a Delaware corporation headquartered in Houston, has been registered with the Commission as an investment adviser since November 1976. In 2003 and 2004, but after the conduct that is the subject of this order, the Invesco and AIM fund complexes became fully integrated and are now overseen by a single board of directors. AIM Advisors currently serves as an investment adviser to 14 registered open-ended investment companies, consisting of approximately eighty-seven series or mutual funds ("AIM Funds"). Five of these registered investment companies were a part of the Invesco complex, and the individual series within these registered investment companies continue to carry the Invesco name.

5. ADI, a Delaware corporation headquartered in Houston, has been registered with the Commission as a broker-dealer since February 1977. ADI is the primary distributor and principal underwriter for AIM Funds.

## FACTS

### IFG Overview

6. IFG entered into negotiated, but undisclosed, market timing agreements with over 40 individuals and entities (the "market timers" or "timers") which allowed them to "market time" certain Invesco Funds, while representing to other shareholders that it did not permit frequent trading in those funds.

7. Under the agreements, which existed from at least 2001 through July 2003, IFG permitted the market timers to make excessive exchanges and redemptions totaling approximately $58 billion in select Invesco Funds. Some of the timing agreements were entered into with the understanding that the market timer would make long-term investments, so-called "sticky assets," in certain non-timed Invesco Funds. IFG also tolerated market-timing activities by other shareholders with whom it did not have timing agreements from at least 2000 through July 2003 (the "relevant time period.").

8. The market timing agreements financially benefited IFG in that IFG realized additional advisory fees from the timed funds and sticky assets under its management. Because IFG had reason to believe that the assets brought to the Invesco Funds under the market timing agreements, while serving to increase IFG's advisory fees, could be traded in a manner detrimental to the Invesco Funds, IFG had a conflict of interest with the Invesco Funds. IFG failed to disclose the conflict of interest to the board of directors and shareholders of the affected Invesco Funds, thereby breaching IFG's fiduciary duty to the Invesco Funds.

9. The market timing agreements were also inconsistent with the disclosures made in the Invesco Funds' prospectuses. The prospectuses stated that shareholders could make up to four exchanges out of each fund per twelve-month period. The market timing agreements provided for more than the disclosed number of exchanges. Furthermore, while the prospectuses also disclosed that each fund reserved the right to modify the exchange policy if such a modification was determined to be in the best interests of the fund, IFG failed to make a determination that each proposed market timing agreement was in the best interest of the fund before entering into the agreement. In the aggregate, the market timing trades made under the agreements were detrimental to the Invesco Funds' shareholders for the reasons set forth in paragraph 1 above.

### IFG's Market Timing Agreements

10. During the relevant time period, IFG experienced a dramatic and prolonged decline in its assets under management. IFG entered into the market timing agreements to lessen this decline.

11. At their height, the market timers held over $1 billion of the assets invested in the Invesco Funds, and during the relevant time period, made excessive exchanges and redemptions totaling approximately $58 billion. Frequent trading by investors who timed the Invesco Funds caused dilution to the affected funds.

Invesco Funds Group, Inc., AIM Advisors, Inc. and AIM Distributors, Inc./Admin Proc. File No. 3-450... Page 4 of 18

Case 1:07-cv-02677-JSR   Document 90-8   Filed 03/14/2008   Page 5 of 9

12. IFG, through its CEO, established an internal organizational structure by which it entered into agreements with market timers. In most cases, the head of what was known as IFG's "market timing desk" would receive proposals from investors seeking to market time the Invesco Funds. After obtaining information from an investor about its proposed frequent trading model, the head of the market timing desk would then orally present that proposal to IFG's chief investment officer ("CIO"). The CIO then approved or rejected the proposed agreement. By design, none of the market timing agreements was reduced to writing.

13. Furthermore, IFG's commission structure for its salespeople provided for a separate and distinct payout for investments made in the Invesco Funds pursuant to the market timing agreements. Although this commission payout was lower than the payout for ordinary long-term investments, the fact that commission payouts on market timing investments were separately designated shows that IFG institutionalized the practice of entering into market timing agreements. Furthermore, this commission structure created an incentive for salespeople to bring market timing proposals to IFG, and the commission structure had that effect. Members of IFG's senior management knew about and approved this structure.

14. On several occasions, issues arose within IFG relating to the harmful and disruptive trading activities of the market timers. Primarily in response to complaints made by Invesco Fund managers, IFG's CEO, CIO, national sales manager, and the head of the market timing desk met to respond to the complaints while continuing the operation of IFG's market timing program.

15. With all market timers, IFG required that they keep their timed monies within the Invesco Fund complex when exchanging out of a fund approved for timing. With some market timers, IFG also required that they maintain sticky assets within the Invesco Fund complex in exchange for their ability to engage in frequent trading. IFG received additional fees from these assets under management.

16. IFG knew that the assets brought to the Invesco Funds under the market timing agreements, while serving to increase IFG's advisory fees, could be traded in a manner detrimental to the Invesco Funds, thereby placing IFG in a conflict of interest situation with the Invesco Funds. IFG breached its fiduciary duty to the Invesco Funds subject to the timing agreements by failing to disclose this conflict of interest to the board of directors of the Invesco Funds or to the Invesco Fund shareholders and obtain the board members' consent to the agreements.

### IFG's Largest Timer

17. According to an internal memorandum, between August 2001 and February 2003, IFG's single largest timer, Canary Capital Partners LLC ("Canary"), was permitted to make up to 52 exchanges per year within ten Invesco Funds, with a total trading capacity of $304 million in those funds.

18. In February 2003, IFG's CIO informed other members of IFG's senior management that Canary's market timing activities were negatively affecting his ability to manage a particular Invesco Fund and costing that fund's "legitimate" shareholders. Due to these activities, the CIO and another IFG fund manager recommended that IFG terminate Canary's market timing privileges. However, rather than terminating its relationship

Invesco Funds Group, Inc., AIM Advisors, Inc. and AIM Distributors, Inc., Admin. Proc. Rel. No. 34-50... Page 5 of 18

Case 1:07-cv-11275-JGK    Document 30-3    Filed 03/14/2008    Page 5 of 15

with Canary, IFG simply reduced Canary's trading capacity and confined Canary's trading activities to five particular Invesco Funds. Thereafter, Canary continued to make frequent trades in these funds until July 2003.

19. During 2002, IFG also introduced Canary to Invesco's European offshore fund complex. IFG did so with the knowledge and understanding that Canary intended to market time the offshore complex's funds, and that IFG would receive additional fees as a result of this agreement. Ultimately, IFG assisted the offshore complex in negotiating a final agreement with Canary, and IFG subsequently received various fees for Canary's trading activities in the offshore funds.

### The Invesco Funds' Prospectuses Prohibited Market Timing and Frequent Trading in the Funds at the Same Time IFG Allowed Investors to Market Time the Funds

20. During the same period that IFG entered into agreements with market timers, the prospectuses for the Invesco Funds represented that IFG discouraged frequent trading by investors by attempting to limit the number of exchanges a shareholder could make in each Invesco Fund. To that end, these prospectuses disclosed that shareholders could "make up to four exchanges out of each fund per twelve-month period." The prospectuses further disclosed that "[e]ach Fund reserves the right to reject any exchange request, or to modify or terminate the exchange policy, if it is in the best interests of the Fund."

21. IFG prepared these prospectuses, provided them to shareholders and prospective shareholders in the Invesco Funds, and filed registration statements containing these prospectuses with the Commission.

22. IFG knew that its agreements with market timers were inconsistent with the Invesco Funds' prospectus disclosure. Specifically, IFG knew that the market timers were being allowed to make more than four exchanges out of certain Invesco Funds in a twelve-month period. IFG also knew that a determination that each proposed market timing agreement was in the best interest of the fund was not being made before it entered into the agreement. In fact, IFG knew that the timing activities were harming the Invesco Funds and their shareholders.

23. IFG also knew that its agreements with market timers were inconsistent with earlier representations IFG had made to the Invesco Funds' board of directors about how IFG would discourage market timing activities within the Invesco Funds. Specifically, in 1997, IFG represented to the board that IFG would strictly enforce the prospectus language by allowing a maximum of four exchanges or redemptions by an investor in an Invesco Fund over a twelve-month period. Despite this representation, IFG subsequently entered into agreements with market timers without informing the board of IFG's unilateral change to the Invesco Funds' market timing policy.

24. Furthermore, in or about January 2003, the attorney who served as IFG's chief compliance officer prepared a memorandum concerning IFG's market timing activities. In the memorandum, the chief compliance officer discussed how IFG's tolerance of market timers might not be in the best interests of the Invesco Funds and their shareholders, and explained a number of the potentially detrimental effects of market timing, including the portfolio managers' increased need for cash positions, lower returns in the timed funds, capital gain taxes unfairly paid by long-term shareholders, and negative impacts to the portfolio managers' abilities to carry out their

Invesco Funds Group, Inc., AIM Advisers, Inc. and AIM Distributors, Inc.: Admin. Proc. Rel. No. 34-50... Page 6 of 18

Case 1:07-cv-11275-JGK    Document 30-3    Filed 03/14/2008    Page 7 of 19

investment strategies. Ultimately, the chief compliance officer recommended that IFG either enforce the existing prospectus language, modify the prospectus language to disclose IFG's actual practices, or adopt a new policy to limit market timing. The chief compliance officer gave the memorandum to IFG's CEO in January 2003. IFG's CEO did not circulate the chief compliance officer's memorandum to the board of directors of the Invesco Funds, nor did he follow any of the chief compliance officer's recommendations.

### IFG Tolerated Frequent Trading by Investors With Whom It Did Not Have a Specific Agreement

25. In addition to entering into the market timing agreements described above in paragraphs 10 through 19, IFG typically did not take action to restrict the trading of Invesco Fund shareholders whom IFG knew were trading in excess of the four-exchange limit set forth in the Invesco Funds' prospectuses. The frequent trading by these shareholders also resulted in substantial dilution in the affected Invesco Funds.

### AIM Advisors and ADI Overview

26. Between January 2001 and September 2003 (the "relevant period"), AIM Funds' Commission-filed prospectuses contained a disclosure (the "disclosure") that shareholders were limited to 10 exchanges per calendar year. High level personnel of AIM Advisors participated in the drafting or review of the disclosure prior to the filing of the prospectuses with the Commission.

27. AIM Advisors entered into 10 negotiated, but undisclosed, market timing agreements with individuals and entities (the "market timers" or "timers"), allowing the timers to exceed the per-year 10-exchange limit, and to make trades, valued collectively at tens of millions of dollars, within AIM Funds. One of the timing agreements was entered into with the understanding that the market timer would make a long-term investment, or invest so-called "sticky assets," in certain AIM Funds.

28. The market timing agreements financially benefited AIM Advisors in that AIM Advisors realized additional advisory fees from the timed assets. The fact that AIM Advisors had reason to believe that the assets brought to AIM Funds under the market timing agreements, while effectively increasing AIM Advisors' advisory fees, could be traded in a manner detrimental to AIM Funds, gave rise to a conflict of interest between AIM Advisors and AIM Funds. AIM Advisors failed to disclose the conflict of interest to the board of trustees or shareholders of AIM Funds, thereby breaching AIM Advisors' fiduciary duty to AIM Funds and the AIM Funds shareholders.

29. The market timing agreements were also inconsistent with the AIM Funds' prospectus disclosure, which stated that shareholders are limited to 10 exchanges within each AIM Funds portfolio per twelve-month period. The market timing agreements provided for more than 10 exchanges.

30. Specifically, the disclosure in the AIM Funds prospectuses stated:

> You are limited to a maximum of 10 exchanges per calendar year, because excessive short-term trading or market timing activity can hurt fund performance. If you exceed that limit, or if an AIM Fund or the distributor determines, in its sole discretion, that your short-term

Invesco Funds Group, Inc., AIM Advisors, Inc. and AIM Distributors, Inc., Admin. Proc. Rel. No. 34-50... Page 7 of 18

Case 1:07-cv-11275-JGK    Document 30-3    Filed 03/14/2008    Page 8 of 19

trading is excessive or that you are engaging in market timing activity, it may reject any additional exchange orders. An exchange is the movement out of (redemption) one AIM Fund and into (purchase) another AIM Fund.

The disclosure expressly linked the rationale for the per-year 10-exchange limit to the potential harm to the performance of AIM Funds posed by excessive short-term trading and market timing generally. Consequently, it is implied in the disclosure that AIM Advisors would not allow trading it had identified as market timing, unless AIM Advisors had concluded, after sufficient analysis, that the proposed market timing would not harm the performance of AIM Funds. In fact, AIM Advisors failed to conduct analysis sufficient to determine whether the proposed market timing agreements would harm, or whether the actual agreements were harming, the performance of AIM Funds. In the aggregate, the market timing trades conducted pursuant to the timing agreements were harmful to the performance of AIM Funds for the reasons set forth in paragraph 1 above.

31. AIM Advisors' chief equity officer during the relevant period ("AIM Advisors Officer") and the highest ranking ADI officer during the relevant period ("ADI Officer") jointly or individually approved the market timing agreements. The ADI Officer negotiated and approved the sticky asset agreement. ADI received a financial benefit from the market timing agreements.

32. During the relevant period, the AIM Funds trustees were led to believe, by AIM Advisors and ADI, that AIM Advisors was diligently, and for the most part successfully, enforcing the per-year 10-exchange limit, and preventing market timing within AIM Funds.

### AIM Advisors' Market Timing Agreements

33. AIM Advisors delegated to an affiliated entity serving as transfer agent ("transfer agent") to AIM Funds the duty of monitoring and enforcing compliance with the AIM Funds per-year 10-exchange limit. The transfer agent also processed proposals for market timing agreements, by conveying the terms of screened proposals to the Aim Advisors Officer and ADI Officer for determination by them, individually or jointly, as to whether AIM Advisors would accept or reject the proposal. The approved timing agreements typically included an agreed maximum number of exchanges or "round trips" allowed within a given time frame, a maximum dollar amount permitted for each exchange, and a stipulation as to which AIM Funds portfolios could be timed.

34. Once the market timing agreements were reached, employees of AIM Advisors' transfer agent entered the timing agreements' terms into a central database. In this manner, the employees, who were generally responsible for monitoring compliance with the 10-exchange prospectus limit, were apprised to take no action against an approved market timer for exceeding 10 exchanges. On several occasions, the transfer agent employees failed to detect that timers had violated the terms of their timing agreements, either by exceeding the exchange-number limit, the timed amount limit, or the stipulation as to which portfolios could be timed.

35. One of the 10 timing agreements included a provision that the prospective timer would maintain approximately $26 million in sticky assets. This sticky assets agreement was approved by the ADI Officer.

Invesco Funds Group Inc., AIM Advisors, Inc. and AIM Distributors, Inc., Admin. Proc. Rel. No. 34-50... Page 8 of 18

Case 1:07-cv-11275-JGK   Document 50-3   Filed 03/14/2008   Page 9 of 19

36. In addition to the advisory fees it received from assets invested in AIM Funds for timing purposes, AIM Advisors also received advisory fees in connection with the sticky assets agreement.

37. AIM Advisors knew that the assets deposited with AIM Funds pursuant to the market timing agreements, while effectively increasing AIM Advisors' advisory fees, could be traded in a manner detrimental to AIM Funds, giving rise thereby to a conflict of interest between AIM Advisors and AIM Funds. AIM Advisors breached its fiduciary duty to AIM Funds and its shareholders by failing to disclose this conflict of interest to the board of trustees of AIM Funds or to the AIM Funds shareholders, and by failing to obtain the board members' consent to the timing agreements.

**AIM Advisors' Efforts to Control Market Timing Activity**

38. Notwithstanding the conduct described above, AIM Advisors, through the efforts of the transfer agent and others, generally tried to detect, deter, and prevent market timing in AIM Funds. AIM Advisors rejected far more proposals from market timers than it accepted, and most of the rejected proposals involved more money and more exchanges than the money and exchanges provided for in the market timing agreements. AIM Advisors also implemented, through the transfer agent and others, policies and practices designed to combat market timing, including the daily monitoring of trading activity, the placing of stop codes on accounts that reached or exceeded 10 exchanges within a year, the blocking of trades by traders with a pattern of market timing activity, and the withholding or rolling back of commission payments to wholesalers on certain timing assets.

**AIM Advisors' Largest Timers**

39. AIM Advisors permitted a market timer to trade up to $30 million per exchange, in up to 20 exchanges per year, between the AIM Funds Cash Reserve Fund and its International Equity Fund, one of the most heavily timed international portfolios at AIM Funds. The market timer actually exceeded the parameters of his timing agreement: between January 2, 2002, and June 25, 2002, the timer moved assets in and out of the International Equity Fund 12 times, or a total of 24 exchanges - four more than the agreed 20 exchanges.

40. AIM Advisors permitted a market timer to trade up to an aggregate $13 million, in up to 24 exchanges per year, in certain AIM Funds portfolios. AIM Advisors' agreement with the timer contained a provision that the timer would maintain $26 million in other AIM Funds portfolios (the sticky assets arrangement). The agreement also allowed the timer to transfer up to $30 million, in up to 12 exchanges per year, in another group of accounts. The ADI Officer negotiated and unilaterally approved this sticky assets agreement and both AIM Advisors and ADI received a financial benefit from the agreement.

**Although AIM Funds' Prospectuses Implicitly Prohibited Market Timing, Absent a Determination That It Would Not Harm AIM Funds' Performance, AIM Advisors Approved Market Timing Without Having Made Such A Determination**

41. Throughout the relevant period, AIM Funds' public prospectuses contained the above-quoted disclosure expressly linking market timing to potential harm to the performance of AIM Funds, implying thereby that AIM Advisors would not allow a trader to exceed the per-year 10-exchange

limit, unless it had determined, after sufficient analysis, that the activity in question would not harm the performance of AIM Funds.

42. Between January 2001 and September 2003, AIM Advisors provided to AIM Funds shareholders and prospective shareholders the prospectuses containing the market timing disclosure and filed with the Commission registration statements containing the prospectuses.

43. AIM Advisors delegated to the transfer agent employees the task of monitoring compliance with the per-year 10-exchange limit, and halting exchanges by traders in violation of the prospectus limit. At the same time it was policing the 10-exchange limit with respect to the general population of AIM Funds shareholders, AIM Advisors allowed the market timers, pursuant to the timing agreements, to exceed the 10-exchange limit.

44. Beginning in 2001, AIM Advisors portfolio managers informed AIM Advisors that they believed market timing within AIM Funds was having a deleterious impact on the performance of certain AIM Funds portfolios. On at least three occasions, the portfolio manager of the most frequently timed international AIM Funds portfolio sent e-mails apprising AIM Advisors of his belief and concern that market timing was harming the performance of the portfolios he managed. Despite these warnings and their knowledge of the harm, the AIM Advisors Officer and the ADI Officer continued to authorize market timing agreements.

45. From 1998 through 2003, the board of trustees of AIM Funds was informed at various times of the negative impact of market timing and of efforts to reduce market timing in AIM Funds. In June of 2002, the ADI Officer informed the board that the assets of a known market timer had been expelled from AIM Funds, but the ADI Officer failed to disclose to the board that AIM Advisors had entered into a market timing agreement with the timer, and with other timers, allowing them to conduct per-year exchanges in excess of the prospectus limit.

## VIOLATIONS

46. As a result of the conduct described above, IFG and AIM Advisors willfully violated Sections 206(1) and 206(2) of the Advisers Act in that, while each acted as an investment adviser, it employed devices, schemes, or artifices to defraud clients or prospective clients, and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients. Specifically, IFG and AIM Advisors entered into market timing agreements, which created a conflict of interest that IFG and AIM Advisors knowingly or recklessly failed to disclose to the board of directors or shareholders of their respective funds, and which were inconsistent with the funds' prospectus disclosures.

47. As a result of the conduct described above, ADI willfully aided and abetted, and caused, AIM Advisors' violations of Sections 206(1) and 206 (2) of the Advisers Act, in that ADI negotiated and approved market timing agreements, provided materially misleading information about AIM Advisors' market timing monitoring and prevention efforts to the board of trustees of AIM Funds, and financially benefited from the timing agreements.

48. As a result of the conduct described above, IFG, AIM Advisors and ADI, each an affiliated person of its respective timed funds, willfully violated

Invesco Funds Group, Inc., AIM Advisors, Inc. and AIM Distributors, Inc.: Admin Proc. Rel. No. 34-9... Page 10 of 18

Case 1:04-cv-11279-JGK    Document 30-9    Filed 03/14/2008    Page 10 of 19

Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder, in that, while acting as a principal, each participated in and effected transactions in connection with joint arrangements in which their respective funds were participants without filing an application with the Commission and obtaining a Commission order approving the transactions.

49. As a result of the conduct described above, IFG and AIM Advisors willfully violated Section 34(b) of the Investment Company Act in that each made an untrue statement of material fact in a registration statement, application, report, account, record, or other document filed or transmitted pursuant to the Investment Company Act, or omitted to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

## UNDERTAKINGS

50. In determining to accept the Offer, the Commission has considered the following efforts voluntarily undertaken by AIM Advisors:

    a. AIM Advisors will use its best efforts to cause AIM Funds to operate in accordance with the following governance policies and practices, which the AIM Funds have represented are currently in effect, or, in the case of subparagraph ii below, will be in effect no later than 60 days after issuance of this Order:

        i. no more than 25 percent of the members of the board of directors of AIM Funds will be persons who either (a) were directors, officers or employees of IFG or AIM Advisors at any point during the preceding 10 years or (b) are interested persons, as defined in the Investment Company Act, of the subject funds or of IFG or AIM Advisors. In the event that the board of directors fails to meet this requirement at any time due to the death, resignation, retirement or removal of any independent board member, the independent members will take such steps as may be necessary to bring the board in compliance within a reasonable period of time;

        ii. no chairman of a board of directors of AIM Funds will either (a) have been a director, officer or employee of IFG or of AIM Advisors at any point during the preceding 10 years or (b) be an interested person, as defined in the Investment Company Act, of AIM Funds or of IFG or AIM Advisors; and

        iii. any person who acts as counsel to the independent board members of AIM Funds will be an "independent legal counsel" as defined by Rule 0-1 under the Investment Company Act.

    b. No action will be taken by a board of directors or by any committee thereof unless such action is approved by a majority of the members of that board of directors or of such committee, as the case may be, who are neither (i) persons who were directors, officers of employees of IFG or AIM Advisors at any point during the preceding 10 years nor (ii) interested persons, as defined in the Investment Company Act, of AIM Funds or of IFG or AIM Advisors. In the event that any action proposed to be taken by and approved by a vote of a majority of the independent directors of AIM Funds is not approved by the board of directors, AIM Funds will disclose such proposal and the related board vote in its shareholder report for such period.

Invesco Funds Group, Inc., AIM Advisors, Inc. and AIM Distributors, Inc./Admin Proc. Rel. No. 34-... Page 11 of 18

Case 1:07-cv-11275-JGK   Document 30-9   Filed 03/14/2008   Page 12 of 19

c. Commencing in 2008 and not less than every fifth calendar year thereafter, AIM Funds will each hold a meeting of shareholders at which a board or boards of directors will be elected.

51. Ongoing Cooperation. In determining to accept the Offer, the Commission has considered the following efforts voluntarily undertaken by IFG, AIM Advisors and ADI. IFG, AIM Advisors and ADI shall cooperate fully with the Commission in any and all investigations, litigations or other proceedings relating to or arising from the matters described in the Order. In connection with such cooperation, IFG, ADI and AIM Advisors have undertaken:

a. To produce, without service of a notice or subpoena, any and all documents and other information reasonably requested by the Commission's staff;

b. To use their best efforts to cause its employees to be interviewed by the Commission's staff at such times as the staff reasonably may direct;

c. To use their best efforts to cause their employees to appear and testify truthfully and completely without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be requested by the Commission's staff; and

d. That in connection with any testimony of IFG, ADI or AIM Advisors to be conducted at deposition, hearing or trial pursuant to a notice or subpoena, IFG, ADI or AIM Advisors:

   i. Agrees that any such notice or subpoena for: IFG's appearance and testimony may be served by regular mail on its attorneys, Robert N. Shwartz, Esq., Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022, or Daniel F. Shea, Esq., Hogan & Hartson L.L.P., 1200 Seventeenth Street, Denver, Colorado 80202; and ADI's and AIM Advisors' appearance and testimony may be served by regular mail on its attorney, Jeremy Feigelson, Esq., Debevoise & Plimpton LLP, 919 Third Avenue, New York, NY 10022; and

   ii. Agrees that any such notice or subpoena for IFG's, ADI's or AIM Advisors' appearance and testimony in an action pending in a United States District Court may be served, and may require testimony, beyond the territorial limits imposed by the Federal Rules of Civil Procedure.

52. Compliance and Ethics Oversight Structure. AIM Advisors shall maintain a compliance and ethics oversight infrastructure having the following characteristics:

a. AIM Advisors shall maintain an internal controls committee (the "Committee") which shall be chaired by a senior AIM Advisors executive and shall also comprise at least AIM Advisors' chief compliance officer ("CCO"), senior representatives from the other internal control functions of AIM Advisors, and AIM Advisors senior business executives responsible for the conduct of AIM Advisors' investment advisory services for AIM Funds. The Committee shall

meet at least quarterly and notice of all of its meetings shall also be given to the chief compliance officer appointed by AIM Funds (if different from the CCO), who (in such circumstance) shall be invited to attend and participate at such meetings.

b.  The Committee shall consider and review compliance issues and related policy in respect of the discharge of AIM Advisors' responsibilities to AIM Funds, including AIM Advisors' compliance with its Code of Ethics, the handling of any conflicts of interest and compliance with its policies and procedures established to address compliance issues under the Advisers Act and the Investment Company Act. Breaches of AIM Advisors' Code of Ethics or other compliance policies and procedures relating to its responsibilities to AIM Funds shall be reported to the Committee, and any such serious compliance matter about which AIM Funds' board of directors would reasonably expect to be informed without delay shall promptly be brought to the attention of the chief compliance officer of the AIM Funds (if different from the CCO) and the independent members of AIM Funds' board of directors (or a committee comprised solely of such independent members established for such purpose). Quarterly reports on the activities of the Committee, including violations and other compliance matters considered, recommendations made, and actions taken, shall also be provided to the board of directors of AIM Funds.

c.  The AIM Advisors CCO shall provide or otherwise make available to the chief compliance officer of AIM Funds (if different from the CCO) such AIM Advisors compliance information as reasonably required by the chief compliance officer of AIM Funds in connection with his or her role in monitoring, on behalf of the board of directors of AIM Funds, compliance by AIM Advisors with its Code of Ethics, relevant rules, regulations and procedures applicable to the discharge of its investment advisory services to AIM Funds.

d.  AIM Advisors shall require the CCO of AIM Advisors to report to the independent board members of AIM Funds any breach of fiduciary duty and/or the federal securities laws of which he or she becomes aware in the course of carrying out his or her duties, with such frequency as the independent board members may instruct, and in any event at least quarterly, provided however that any material breach (i.e., any breach that would be important, qualitatively or quantitatively, to a reasonable board member) shall be reported promptly (and may be reported to a committee comprised solely of such independent members established for such purpose).

e.  AIM Advisors shall retain an ombudsman to whom its employees may convey concerns about business matters that they believe implicate matters of ethics or questionable practices. AIM Advisors shall establish procedures to investigate matters brought to the attention of the ombudsman, and these procedures shall be presented for review and approval by the independent board members of AIM Funds. AIM Advisors shall also review matters brought to the attention of the ombudsman, along with any resolution of such matters, with the independent board members of AIM Funds with such frequency as the independent board members of the funds may instruct.

53. Independent Compliance Consultant. AIM Advisors shall retain, within

Invesco Funds Group, Inc., AIM Advisors, Inc., and AIM Distributors, Inc., Admin. Proc. Rel. No. 34-... Page 13 of 18

Case 1:07-cv-01275-JSR    Document 30-3    Filed 03/14/2008    Page 14 of 19

60 days of the date of entry of the Order, the services of an Independent Compliance Consultant not unacceptable to the staff of the Commission and a majority of the independent board members of AIM Funds. The Independent Compliance Consultant's compensation and expenses shall be borne exclusively by AIM Advisors or its affiliates. AIM Advisors shall require the Independent Compliance Consultant to conduct a comprehensive review of their supervisory, compliance, and other policies and procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by AIM Advisors and its employees. This review shall include, but shall not be limited to, a review of their market timing controls across all areas of business, a review of AIM Funds' pricing practices that may make those funds vulnerable to market timing, a review of AIM Funds' utilization of short term trading fees and other controls for deterring excessive short term trading, and a review of AIM Advisors' policies and procedures concerning conflicts of interest, including conflicts arising from advisory services to multiple clients. IFG and AIM Advisors shall cooperate fully with the Independent Compliance Consultant and shall provide the Independent Compliance Consultant with access to their files, books, records, and personnel as reasonably requested for the review.

   a. AIM Advisors shall require that, at the conclusion of the review, which in no event shall be more than 180 days after the date of entry of the Order, the Independent Compliance Consultant shall submit a Report to AIM Advisors, the board of directors of AIM Funds, and the staff of the Commission. The Report shall address the issues described in paragraph 54 of these undertakings, and shall include a description of the review performed, the conclusions reached, the Independent Compliance Consultant's recommendations for changes in or improvements to policies and procedures of AIM Advisors and AIM Funds, and a procedure for implementing the recommended changes in or improvements to AIM Advisors' policies and procedures.

   b. AIM Advisors shall adopt all recommendations with respect to AIM Advisors contained in the Report of the Independent Compliance Consultant; provided, however, that within 210 days after the date of entry of the Order, AIM Advisors shall in writing advise the Independent Compliance Consultant, the board of directors of AIM Funds and the staff of the Commission of any recommendations that it considers to be unnecessary or inappropriate. With respect to any recommendation that AIM Advisors considers unnecessary or inappropriate, AIM Advisors need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose.

   c. As to any recommendation with respect to AIM Advisors' policies and procedures on which AIM Advisors and the Independent Compliance Consultant do not agree, such parties shall attempt in good faith to reach an agreement within 240 days of the date of entry of the Order. In the event AIM Advisors and the Independent Compliance Consultant are unable to agree on an alternative proposal acceptable to the staff of the Commission, AIM Advisors will abide by the determinations of the Independent Compliance Consultant.

   d. AIM Advisors (i) shall not have the authority to terminate the Independent Compliance Consultant, without the prior written approval of the majority of the independent board members and the staff of the Commission; (ii) shall compensate the Independent Compliance Consultant, and persons engaged to assist the

Independent Compliance Consultant, for services rendered pursuant to the Order at their reasonable and customary rates; and, (iii) shall not be in and shall not have an attorney-client relationship with the Independent Compliance Consultant and shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Compliance Consultant from transmitting any information, reports, or documents to the board members or the Commission.

e.  AIM Advisors shall require that the Independent Compliance Consultant, for the period of the engagement and for a period of two years from completion of the engagement, shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with AIM Advisors, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. AIM Advisors shall require that any firm with which the Independent Compliance Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the independent board members and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with AIM Advisors, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

54. Periodic Compliance Review. Commencing in 2007, and at least once every other year thereafter, AIM Advisors shall undergo a compliance review by a third party, who is not an interested person, as defined in the Investment Company Act, of AIM Advisors. At the conclusion of the review, the third party shall issue a report of its findings and recommendations concerning AIM Advisors' supervisory, compliance, and other policies and procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by AIM Advisors and their employees in connection with their duties and activities on behalf of and related to AIM Funds. Each such report shall be promptly delivered to AIM Advisors' Internal Compliance Controls Committee and to the independent members of the AIM Funds board of directors.

55. Independent Distribution Consultant. AIM Advisors shall retain, within 90 days of the date of entry of the Order, the services of an Independent Distribution Consultant not unacceptable to the staff of the Commission and the independent board members of AIM Funds. The Independent Distribution Consultant's compensation and expenses shall be borne exclusively by AIM Advisors. IFG and AIM Advisors shall cooperate fully with the Independent Distribution Consultant and shall provide the Independent Distribution Consultant with access to IFG's and AIM Advisors' files, books, records, and personnel as reasonably requested for the review. AIM Advisors shall require that the Independent Distribution Consultant develop a Distribution Plan for the distribution of the monies ordered to be paid in paragraphs IV.E.1. and 2. of the Order and a separate distribution plan for the monies ordered to be paid in paragraph IV.E.3. of the Order, and any interest or earnings thereon, according to a methodology developed in consultation with AIM Advisors and acceptable to the staff of the Commission and the independent board members of AIM Funds. The Distribution Plans shall provide for investors to receive, from the monies available for distribution in order of priority, (i) their proportionate share of losses suffered by the fund due to market timing, and (ii) a proportionate share of advisory fees paid by funds that suffered such losses during the

Invesco Funds Group, Inc., AIM Advisors, Inc., and AIM Distributors, Inc., Admin. Proc. Rel. No. 34-9.   Page 15 of 18

Case 1:01-cv-11273-JGK   Document 30-3   Filed 03/14/2008   Page 15 of 9

period of such market timing.

a. AIM Advisors shall require that the Independent Distribution Consultant submit the Distribution Plans to AIM Advisors and the staff of the Commission no more than 160 days after the date of entry of the Order.

b. The Distribution Plans developed by the Independent Distribution Consultant shall be binding unless, within 190 days after the date of entry of the Order, AIM Advisors or the staff of the Commission advises, in writing, the Independent Distribution Consultant of any determination or calculation from the Distribution Plans that it considers to be inappropriate and states in writing the reasons for considering such determination or calculation inappropriate.

c. With respect to any determination or calculation with which AIM Advisors or the staff of the Commission do not agree, such parties shall attempt in good faith to reach an agreement within 220 days of the date of entry of the Order. In the event that AIM Advisors and the staff of the Commission are unable to agree on an alternative determination or calculation, the determinations and calculations of the Independent Distribution Consultant shall be binding.

d. Within 235 days of the date of entry of this Order, AIM Advisors shall require that the Independent Distribution Consultant submit the Distribution Plans for the administration and distribution of disgorgement and penalty funds pursuant to Rule 1101 [17 C.F.R. § 201.1101] of the Commission's Rules Regarding Disgorgement and Fair Fund Plans. Following a Commission order approving a final plan of disgorgement, as provided in Rule 1104 [17 C.F.R. § 201.1104] of the Commission's Rules Regarding Disgorgement and Fair Fund Plans, AIM Advisors shall require that the Independent Distribution Consultant, with AIM Advisors, take all necessary and appropriate steps to administer the final plan for distribution of disgorgement and penalty funds.

e. AIM Advisors shall require that the Independent Distribution Consultant, for the period of the engagement and for a period of two years from completion of the engagement, not enter into any employment, consultant, attorney-client, auditing or other professional relationship with AIM Advisors or any of their present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. AIM Advisors shall require that any firm with which the Independent Distribution Consultant is affiliated in performance of his or her duties under the Order not, without prior written consent of a majority of the independent board members and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with AIM Advisors or any of their present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

56. *Excess recovery*. AIM Advisors shall also undertake to disgorge and pay to the Commission all amounts in excess of $235 million that it, IFG, ADI or their affiliates obtain, through settlement, final judgment or otherwise, from individuals or entities based on allegations of substantially the same facts as alleged in the Order instituted by the Commission in this

Invesco Funds Group, Inc., AIM Advisors, Inc., and AIM Distributors, Inc., Admin. Proc. Rel. No. 34-9. Page 16 of 18

Case 1:07-cv-12175-JGK   Document 30   Filed 03/14/2008   Page 16 of 19

proceeding. Such amounts shall be distributed pursuant to the distribution plans referenced in paragraph 55 above.

57. *Certification*. No later than twenty-four months after the date of entry of the Order, the chief executive officer(s) of IFG and AIM Advisors shall certify to the Commission in writing that IFG and AIM Advisors have fully adopted and complied in all material respects with the undertakings set forth in paragraphs 52 through 58 and with the recommendations of the Independent Compliance Consultant or, in the event of material non-adoption or non-compliance, shall describe such material non-adoption and non-compliance (it being understood that the chief executive officer of AIM Advisors may issue such certification for both IFG and AIM Advisors in the event that IFG ceases to exist as a corporate entity).

58. *Recordkeeping*. IFG and AIM Advisors shall preserve for a period not less than six years from the end of the fiscal year last used, the first two years in an easily accessible place, any record of IFG's and AIM Advisors' compliance with the undertakings set forth in paragraphs 52 through 58.

59. *Deadlines*. For good cause shown, the Commission's staff may extend any of the procedural dates set forth above.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in the Offer of Settlement of IFG, AIM Advisors and ADI. Accordingly, pursuant to Section 15(b) of the Exchange Act, Sections 203(e) and 203(k) of the Advisers Act and Sections 9(b) and 9(f) of the Investment Company Act, it is hereby ORDERED that:

A. IFG, AIM Advisors and ADI are hereby censured.

B. IFG and AIM Advisors shall cease and desist from committing or causing any violations and any future violations of Sections 206(1) and 206(2) of the Advisers Act and Sections 17(d) and 34(b) of the Investment Company Act and Rule 17d-1 thereunder.

C. ADI shall cease and desist from committing or causing any violations and any future violations of Sections 206(1) and 206(2) of the Advisers Act and Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder.

D. IFG, ADI and AIM Advisors shall comply with the undertakings set forth in paragraphs 52 through 58 above.

E. Disgorgement and Civil Money Penalties

1. Respondents AIM Advisors and ADI shall pay, jointly and severally, within 30 days of the entry of this Order, disgorgement in the total amount of $20 million.

2. Respondent AIM Advisors shall pay, within 30 days of the entry of this Order, a civil money penalty in the amount of $25 million, and Respondent ADI shall pay, within 30 days of the entry of this Order, a civil money penalty in the amount of $5 million.

3. Respondent IFG shall pay a civil money penalty in the amount of $110 million and disgorgement in the amount of $215 million, for a total payment of $325 million. Respondent AIM Advisors, as the

Invesco Funds Group, Inc., AIM Advisors, Inc., and AIM Distributors, Inc.: Admin. Proc. Rel. No. 34-... Page 17 of 18

Case 1:07-cv-11275-JSR Document 30-3 Filed 03/14/2008 Page 18 of 19

successor adviser to IFG, shall pay these penalty and disgorgement amounts ordered against IFG. Of the $325 million total payment, a total of $162.5 million, which includes the penalty amount of $55 million and $107.5 million of the disgorgement amount, shall be paid on or before December 31, 2004 ("First Payment"). The remaining penalty amount of $55 million and the remaining disgorgement amount of $107.5 million shall be paid on or before December 31, 2005 ("Second Payment"). The First Payment and the Second Payment shall be accompanied by AIM Advisors' payment of post-judgment interest from the date of thirty days following the entry of this Order through the date of payment, applying the quarterly Internal Revenue Service tax underpayment rates as set forth in Section 6621(a)(2) of the Internal Revenue Code, 26 U.S.C. 6621(a)(2), for the periods of non-payment to all outstanding amounts owed.[2]

4. Respondents IFG, AIM Advisors, and ADI agree that if the full amount of the payments described in paragraphs E.1. through 3. above are not made within ten (10) days following the dates the payments are required by this Order, the entire amount of disgorgement and civil penalties, plus post-judgment interest minus payments made, if any, are due and payable immediately without further application.

5. There shall be, pursuant to Section 308(a) of the Sarbanes Oxley Act of 2002, a Fair Fund established for the funds described in paragraphs IV.E.1. and 2. and a separate Fair Fund for the funds described in paragraph IV.E.3. Regardless of whether any distribution is made from such Fair Funds, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalties, Respondents IFG, AIM Advisors and ADI agree that they shall not, after offset or reduction in any Related Investor Action based on either IFG's, AIM Advisors' or ADI's payment of disgorgement in this action, further benefit by offset or reduction of any part of IFG, AIM Advisors' or ADI's payment of civil penalties in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, IFG, AIM Advisors and ADI agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalties imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against IFG, AIM Advisors, ADI or their affiliates, or all of them, by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding. Furthermore, AIM Advisors shall be required to pay any Penalty Offset attributable to IFG.

6. Pursuant to an escrow agreement not unacceptable to the staff of the Commission, IFG, AIM Advisors and ADI shall make the payments described in paragraphs IV.D.1. through 3. into an escrow account. The escrow agreement shall, among other things: (1) require that all funds in escrow be invested as soon as reasonably possible and to the extent practicable in U.S. Treasury securities with maturities not to exceed six months; (2) name an escrow agent who shall be

appropriately bonded; and (3) provide that escrowed funds be disbursed only pursuant to an order of the Commission. AIM Advisors shall be responsible for all costs associated with the escrow agreement and the Fair Fund distributions.

F. *Other Obligations and Requirements.* Nothing in this Order shall relieve IFG, AIM Advisors, ADI or AIM Funds of any other applicable legal obligation or requirement, including any rule adopted by the Commission subsequent to this Order.

By the Commission.

Jonathan G. Katz
Secretary

## Endnotes

[1] The findings herein are made pursuant to the Respondents' Offer and are not binding on any other person or entity in this or any other proceeding.

[2] Based on IFG's and AIM Advisors' financial condition as represented to the staff of the Commission, the Commission is not ordering monetary relief in an amount greater than $325 million against IFG and is ordering the payment schedule outlined above.

*http://www.sec.gov/litigation/admin/34-50506.htm*

**EXHIBIT C**

Case 1:07-cv-11275-JGK    Document 30-4    Filed 03/14/2008    Page 2 of 20



## U.S. Securities and Exchange Commission

**United States of America**
**Before the**
**Securities and Exchange Commission**

Investment Advisers Act of 1940
Release No. 2205 / December 18, 2003

Investment Company Act of 1940
Release No. 26312 / December 18, 2003

Administrative Proceeding File No.3-11359

| | |
|---|---|
| In the Matter of<br><br>ALLIANCE CAPITAL<br>MANAGEMENT, L.P.,<br><br>Respondent. | : ORDER INSTITUTING ADMINISTRATIVE AND<br>: CEASE-AND-DESIST PROCEEDINGS<br>: PURSUANT TO SECTIONS 203(e) AND 203(k)<br>: OF THE INVESTMENT ADVISERS ACT OF 1940<br>: AND SECTIONS 9(b) AND 9(f) OF THE<br>: INVESTMENT COMPANY ACT OF 1940, MAKING<br>: FINDINGS, AND IMPOSING REMEDIAL<br>: SANCTIONS AND A CEASE-AND-DESIST<br>: ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in public interest that administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act"), against Alliance Capital Management, L.P. ("Alliance Capital" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 and Sections 9(b) and 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, as set forth below.

**III.**

Alliance Capital Management, L.P., Admin. Proc. Rel. No. IA-2205; IC-26312, December 18, 2003          Page 2 of 19

Case 1:07-cv-11275-JGK     Document 30-4     Filed 03/14/2008     Page 3 of 20

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

## Summary

1. This proceeding concerns Alliance Capital's negotiated, but undisclosed, arrangements with market timers -- arrangements that benefited Alliance Capital to the detriment of investors in mutual funds managed by Alliance Capital. In those arrangements, Alliance Capital provided "timing capacity" in mutual funds to known timers in return for or in connection with the timers' investments of "sticky assets" in Alliance Capital managed hedge funds, mutual funds and other investment vehicles, from which Alliance Capital earned management fees. Alliance Capital's single biggest timer received at its height $220 million in timing capacity in Alliance Capital mutual funds in return for investments at agreed ratios in hedge funds managed by some of the same portfolio managers. The prospectuses for these mutual funds gave the misleading impression that Alliance Capital sought to prevent timing in these mutual funds. Alliance Capital failed to disclose that, in fact, it negotiated agreements to permit timing in return for the sticky assets. At their height in 2003, Alliance Capital had over $600 million in approved timing in its mutual funds. Alliance Capital permitted these arrangements despite awareness of the harmful effects timing can have on mutual funds and the ability to detect and prevent inappropriate timing in mutual funds. By entering into these arrangements, Alliance Capital breached its fiduciary duty to the mutual funds in which it arranged the timing.

2. In addition to the arrangements, Alliance Capital accommodated timers through other means. In part in order to enable the portfolio manager of one mutual fund to deal with the effects of timers in his fund, rather than simply prohibit timing in the fund, Alliance Capital obtained approval of the mutual fund's board and shareholders to lift a restriction on futures trading in the fund. Alliance Capital failed to disclose to the fund's board or shareholders that one of the reasons for recommending the proposal was to accommodate better the Alliance Capital-approved timers.

3. Finally, Alliance Capital provided material nonpublic information about the portfolio holdings of certain mutual funds to at least one of the timers. This disclosure enabled that timer to profit from market timing in declining markets.

## Respondent

4. Alliance Capital, a Delaware limited partnership located in New York, New York, is an investment adviser registered with the Commission under the Advisers Act. It is an investment adviser to several mutual funds. Alliance Capital provides investment advisory services to the Funds, and for these services, the Funds pay Alliance Capital a fee as a percentage of average daily net assets held by the Funds. As of November 30, 2003, Alliance Capital had approximately $456 billion in assets under management.

## Facts

A. Market Timing and Its Adverse Effects on Mutual Funds

5. Mutual fund "market timing" refers to the practice of short-term investing in mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing can dilute the value of mutual fund shares to

the extent that a timer is permitted to buy, sell, or exchange shares rapidly and repeatedly to take advantage of arbitrage opportunities. In addition, timing raises transaction and opportunity costs for mutual funds, such as taxes and trading costs, by, for example, requiring the sale of securities to meet redemptions.

6. Alliance Capital was aware of the potential adverse effects of market timing. In September 1999, an internal Alliance Capital memorandum, circulated among mutual fund sales employees, noted the adverse impact that market timers had on mutual funds, which included: (1) an increase in capital gains taxes caused by sale of stocks to cover redemptions by timers; (2) an increase in trading costs; and (3) lower returns.

7. Similarly, in February 2001, in a memorandum concerning fund performance, the Chief Executive Officer ("CEO") of Alliance Capital noted that in a certain Alliance Capital sub-advised fund, market timers "probably cost 400 basis points before it was controlled" by prohibiting all market timing in that fund. 8. On occasions when Alliance Capital canceled or blocked trades by unapproved market timers, Alliance Capital notified the timer that it had canceled the trade because "short-term trading is detrimental to the mutual fund."

9. Due to the adverse effects market timers may have on a mutual fund, advisers to mutual funds often maintain policies and procedures to detect and prevent timing. Alliance Capital had the ability to detect market timing and, at times, acted to prevent timers from trading in certain Alliance Capital mutual funds.

10. For example, in 1998 and 1999, Alliance Capital monitored market timing in its international equity and municipal bond funds, and acted to prohibit such market timing. Periodic memoranda to the sales force identified the funds that were restricted from timers and explained the restriction in terms of risk to long-term shareholders: "Alliance goes to great lengths to minimize excessive exchange activity/market timing. This type of activity exposes both our funds and our funds' shareholders to unnecessary financial risk."

11. In order to avoid paying excessive commission costs to salespersons for frequent sales to timers, Alliance Capital devised a system of identifying certain market timing trades and backing them out of the sales levels upon which commissions to the sales force were based. Similarly, Alliance Capital stopped accepting manual trade orders from identified timers in order to reduce its risk of liability for errors on manual orders.

B. Dealing With Timers: Conflicts of Interest Led Alliance Capital to Advance Its Own Interests Over the Interests of Mutual Fund Shareholders

12. As an investment adviser, Alliance Capital owes a fiduciary duty to its mutual fund advisory clients — a duty of utmost good faith and full and fair disclosure of all material facts and material conflicts of interest. This fiduciary duty requires Alliance Capital to act for the benefit of its mutual fund clients and not to use its clients' assets to benefit itself.

13. In dealing with timers, Alliance Capital was subject to conflicts of interest and at times advanced its own interests over those of its mutual fund clients, without disclosure of all material facts to the mutual fund boards or shareholders.

Alliance Capital Management, L.P. - Admin. Proc. Rel. No. IA-2205, IC-26312 / December 18, 2003    Page 4 of 19

Case 1:07-cv-11275-JGK    Document 30-4    Filed 03/14/2008    Page 5 of 20

14. The fee structure through which Alliance Capital earned management fees meant that Alliance Capital earned fees from the timing relationships at the expense of long-term shareholders. First, Alliance Capital earned fees from management of mutual funds based on a percentage of assets under management, generally up to one percent. Thus, to the extent timers increased assets under management, Alliance Capital earned greater fees.

15. Second, Alliance Capital also sponsored and managed hedge funds. In some cases a single portfolio manager managed both a mutual fund and a hedge fund. The hedge funds are a potentially lucrative source of income, both to Alliance Capital and the portfolio managers. In addition to receiving a fee based on a percentage, generally one percent, of assets under management, Alliance Capital and the portfolio managers also receive a performance fee based on a percentage, generally 20 percent, of net return on investment.

16. Alliance Capital permitted certain of its mutual funds to be timed by agreement with certain timers, and with brokers acting on behalf of timers. In return for this "timing capacity," Alliance Capital solicited, at various times and in varying proportions, timers to make long-term investments, so-called "sticky assets," in hedge funds, mutual funds, and other investment products managed by Alliance Capital. In particular, with respect to certain timers, Alliance Capital permitted timing in certain mutual funds in return for sticky asset investments in hedge funds managed by the same portfolio managers. Thus, Alliance Capital used timing capacity in its mutual funds to obtain investments in its hedge fund products.

17. By virtue of these arrangements, the representations in the mutual fund prospectuses concerning short-term trading were misleading. Representations in the mutual funds' prospectuses gave investors the misleading impression that Alliance sought to restrict timing in the mutual funds. The prospectuses for each of the mutual funds state: "You should consider an investment in the Fund as a long-term investment." Regarding the purchase and sales of shares of the mutual funds, the prospectuses state: "A Fund may refuse any order to purchase shares. In particular, the Funds reserve the right to restrict purchases of shares (including through exchanges) when there appears to be evidence of a pattern of frequent purchases and sales made in response to short-term considerations."

18. In fact, Alliance Capital permitted certain of its mutual funds to be timed by agreement with certain timers in return for or in connection with sticky asset investments in hedge funds, mutual funds, and other investment products managed by Alliance Capital.

C. Timing at Alliance

19. In early 2001, Alliance Capital appointed a sales support employee to be a "Market Timing Supervisor" to manage the relationships between Alliance Capital and market timers.

20. By early 2003, Alliance Capital had extensive relationships with approved timers. Alliance Capital permitted over $600 million in timing capacity in Alliance mutual funds. According to a list created by the Market Timing Supervisor in 2003, Alliance Capital's "Top 10 Timers" had collectively $543 million in timing capacity in Alliance Capital mutual funds.

*Alliance Capital's Biggest Timer — Daniel Calugar*

Alliance Capital Management, L.P., Admin. Proc. Rel. No. IA-2205; IC-26312 / December 18, 2003    Page 5 of 19

Case 1:07-cv-11275-JGK    Document 30-4    Filed 03/14/2008    Page 6 of 20

21. Alliance Capital's single largest timer was Daniel Calugar, the owner and president of Security Brokerage, Inc., a registered broker-dealer in Las Vegas, Nevada. At his height in 2003, Calugar had $220 million in timing capacity in Alliance Capital mutual funds. Alliance Capital accommodated Calugar's market timing activity in its mutual funds in exchange for the fees derived from Calugar's timing assets and the assets Calugar invested in certain Alliance Capital hedge funds.

22. In April 2001, hedge fund sales executives at Alliance Capital negotiated an agreement with Calugar providing market timing capacity in the AllianceBernstein Technology Fund ("Tech Fund") and the AllianceBernstein Growth Fund ("Growth Fund") in exchange for Calugar's investments in Alliance Capital hedge funds in a ratio of 10:1 mutual fund timing capacity to hedge fund investment. Calugar summarized the terms of this agreement in a note to an Alliance Capital representative:

> I very much appreciate the $10 million timing position that was given to me in Alliance Technology (ALTFX) and Alliance Growth (AGRFX). ... You indicated that the managers of these two funds also run hedge funds at Alliance. I have been an active investor in timing mutual funds for 15 years, and have never invested in a hedge fund or similar investment, however, I am willing to make an investment in Alliance hedge funds equal to 10% of the timing allocation that I maintain in your mutual funds. I will keep the hedge fund position as long as I have the timing allocation in the mutual funds. My understanding is that you would be able to give me an exit opportunity from the hedge funds at the end of any month, however, I would not exercise that opportunity as long as I continue to have the timing allocation on the mutual fund side.

23. Shortly thereafter, Calugar began timing the Tech Fund and the Growth Fund, and invested in Alliance Capital hedge funds, including a hedge fund managed by the Tech Fund portfolio managers. As a hedge fund sales executive later explained in an email, "Calugar would only invest in our hedge funds if we provided him with market-timing space within our [mutual funds]."

24. In June 2001, Alliance Capital agreed to increase Calugar's market timing capacity to $100 million in the Tech Fund and $20 million in the AllianceBernstein Premier Growth Fund ("Premier Growth Fund") with four round trips per month in return for a 20% investment in Alliance Capital hedge funds.

25. Members of senior management at Alliance Capital were aware of the arrangement with Calugar. In June 2001, notification of the arrangement with Calugar was conveyed through a series of emails from hedge fund sales personnel to mutual fund management, including the then President and Chief Operating Officer ("COO") of Alliance Capital, who also served as the Chairman and President of the mutual funds at issue here. In particular, senior management at Alliance Capital received a forwarded email describing aspects of the Calugar arrangement: The Tech Fund portfolio managers "did indeed authorise [sic] up to $100 million of market timing money for Dan Calugar in the Tech fund. Dan has subsequently subscribed to [the portfolio managers'] hedge fund for 20% of the underlying assets as of June 1 in anticipation of this."

26. Later in 2001, Alliance Capital increased Calugar's market timing capacity in the Tech Fund to $150 million with the understanding that

Alliance Capital Management, L.P., Admin. Proc. Rel. No. IA-2205, IC-26312 / December 18, 2003    Page 6 of 19

Case 3:07-cv-11275-JCR    Document 30-4    Filed 03/14/2008    Page 7 of 20

Calugar would make long-term investments in Alliance Capital hedge funds in a ratio of 5:1 mutual fund capacity to hedge fund investment. Throughout the latter part of 2001, Calugar continued to make additional investments in Alliance Capital hedge funds consistent with the agreed ratios.

27. In January 2002, Calugar made a large exchange in the Tech Fund that evoked a complaint from the portfolio manager. Thereafter, Calugar and Alliance Capital representatives had further discussions concerning the terms of his timing capacity in Alliance Capital mutual funds. At the time, one member of Alliance Capital senior management remarked that he would not want to read about these matters on the front page of the newspaper. Nevertheless, certain members of senior management at Alliance Capital discussed the continuation of Calugar's timing trading at Alliance Capital on renegotiated terms.

28. The COO received the following email from an Alliance Capital executive vice president ("EVP"), reviewing the details of Calugar's timing arrangement and noting the potential for a renegotiated agreement:

> Following our telephone conversation, I spoke with [the head of hedge fund sales and the Tech Fund portfolio manager] to get the latest on Dan Calugar who has placed roughly $150 million of "timer" money into the Tech Fund and $30 million into the Tech Hedge Fund. Calugar also placed $55 million into Premier Growth as an offset to $17 million into Alpha 20 and $4 million in the Muni Hedge Fund. Apparently the original ratio of "timer" money to Hedge Fund investments was negotiated at 5 to 1 . . . .. This deal was negotiated outside the system that [the head of domestic mutual fund sales] set up ... which generally discourages "timers" altogether, but controls the few we do have.

> [The head of hedge fund sales] has spoken to Calugar, and thinks he can negotiate a better deal for Alliance. [The head of hedge fund sales] is also going to speak with [the Market Timing Supervisor] to set up better controls over the round trips in order to protect the fund shareholders. According to [the Tech Fund portfolio manager], this has not been an issue except for a brief volatile period in January when he was forced to reduce his cash position from 6% to 4% in order to cover a redemption....

> Obviously, [the Tech Fund portfolio manager and the head of hedge fund sales] and presumably the other portfolio managers want to keep the relationship. According to [the head of hedge fund sales,] [the CEO] is OK with this. From a purely Mutual Funds standpoint, we get very little out of this, and would not be disappointed to see Calugar go away. As you know, he has made a lot of money on this deal by trading the funds. [The head of hedge fund sales] points out that the Hedge Funds appear to be virtual loss leaders for his timing practice.

29. In an email reply, the COO noted the financial benefit to Alliance Capital from the relationship with Calugar in the form of increased management fees: "Assuming the assets stay in [t]he funds for a year our fund management fees come out to about $1.8 million per year. Assuming no impact on our shareholders and no unique operational issues it is beneficial to our funds group by retaining 55% of the fees."

30. The head of hedge fund sales then negotiated with Calugar the terms of his timing arrangement and sent an email to the COO and others describing

the new arrangement, including: (1) "ratios are reset from 5:1 mutual to hedge investment to 4:1 for Premier Growth and 3:1 for Tech;" (2) "Calugar's mutual fund trades will be made in $10MM `blocks';" and (3) Calugar "will redeem all hedge fund positions" annually.

31. The renegotiated terms primarily benefited Alliance Capital. The new ratios meant more money for the hedge funds for the same timing capacity. The annual redemption of Calugar's hedge fund positions also benefited Alliance Capital. By Calugar agreeing to redeem and reinvest his hedge fund positions annually, Alliance Capital increased its opportunity to profit from Calugar's hedge fund investments. Each time Calugar redeemed, Alliance Capital would be eligible to earn performance fees from any increase in value, without having first to earn back any prior losses.

32. In or about July 2002, Alliance Capital increased Calugar's timing capacity in the Premier Growth Fund from $17 million to $57 million. In or about September 2002, Alliance Capital granted Calugar $56 million timing capacity in the Growth & Income Fund, and Calugar invested in a hedge fund managed by the same portfolio manager.

33. Despite the impact Calugar's trading had on its mutual funds, Alliance Capital made substantial efforts to accommodate and retain Calugar's business. Thus, when a portfolio manager complained about Calugar's trading, Alliance Capital reduced Calugar's timing capacity in that mutual fund, only to increase his timing capacity in other Alliance Capital mutual funds. For example, in early 2003, the portfolio manager for the Premier Growth Fund complained about Calugar's trading in his mutual fund. Thereafter, Alliance Capital decreased Calugar's timing capacity in the Premier Growth Fund by $20 million and *increased* his timing in the Growth & Income Fund and the Tech Fund by the same amount. As the head of hedge fund sales explained in an email to Calugar: "In order further to reduce your exchanges in Premier Growth Fund from $70MM to $50MM ... [the Growth & Income Fund portfolio manager] has agreed to increase your exchange limit on Growth & Income from $43MM to $53MM and [the Tech Fund portfolio manager] has agreed to increase your exchange limit on Tech from $100MM to $110MM."

34. The head of hedge fund sales then forwarded that email to others at Alliance Capital, noting: Calugar "is an important relationship for this organization and extremely cooperative."

35. Calugar was an "important relationship" because of his investments in Alliance hedge funds. By early 2003, Calugar's investments in the Alliance Capital hedge funds became such a large percentage of the hedge fund assets that the hedge funds could not survive without Calugar. The head of hedge fund sales noted at the time that Calugar's investments were important to the continued survival of the hedge funds. In a meeting with certain members of Alliance Capital management in or about January 2003, the head of hedge fund sales explained Calugar's investments in the hedge funds and the importance as a percentage of total fund assets:

| Hedge Fund | Calugar Investment | Total Hedge Fund Assets | Percentage |
|---|---|---|---|
| Tech Partners | $37.4MM | $42.5MM | 88% |
| Research Partners | $7.7MM | $15.0MM | 51% |

Alliance Capital Management, L.P.- Admin. Proc. Rel. No. IA-2205-IC-26312 / December 18, 2003    Page 8 of 19

Case 1:07-cv-11275-JGK    Document 30-4    Filed 03/14/2008    Page 9 of 20

| Muni NY | $5.0MM | $6.0MM | 83% |
| Muni Nat'l | $10.3MM | $12.7MM | 81% |

In an email in February 2003, the head of hedge fund sales wrote, Calugar "now is almost single-handedly supporting our domestic Tech Hedge, Research and Muni Funds."

36. In or about February 2003, following discussions regarding Calugar's market timing, members of Alliance Capital senior management were advised that the linkage between Calugar's timing activity and hedge fund investments was improper. Thereafter, the EVP sent an email to the head of hedge fund sales and others explaining "we have to officially `de-link' the mutual funds activity so as to not in any way suggest that it is conditional on hedge fund participation or vice versa." The head of hedge fund sales responded: "Agreed." In fact, Calugar's timing of Alliance Capital mutual funds and his investment in Alliance Capital hedge funds continued.

37. Alliance Capital also changed an investment restriction in the Tech Fund to add futures trading capability in order, among other things, to accommodate Calugar and other market timers. Such a change required approval of the Tech Fund board and shareholders. In obtaining these approvals, Alliance Capital did not disclose that one of the reasons was to accommodate timers in the Tech Fund.

38. In the summer of 2002, the Tech Fund portfolio manager sought to trade futures in order to increase liquidity to accommodate Alliance Capital's approved timers. At that time, the portfolio manager explained that, among other things, futures trading would provide a more liquid vehicle for dealing with what are highly volatile fund flows from market timers. At the same time, the portfolio manager reduced Calugar's market timing capacity in the Tech Fund to $50 million until the Tech Fund board approved the futures trading.

39. Alliance Capital did not act on the futures trading at that point. In or about December 2002, Alliance Capital increased Calugar's timing capacity in the Tech Fund to $100 million "subject to satisfaction of the usual agreed conditions."

40. The issue of using futures trading to accommodate market timers in the Tech Fund arose again in early 2003 after a meeting of certain members of Alliance Capital senior management concerning the arrangement with Calugar. In an email, the head of hedge fund sales notified Calugar that Alliance Capital would seek approval to permit futures trading in the Tech Fund and that this would "better accommodate increasing your Tech Fund exchanges in the future."

41. Permitting futures trading required approval of both the Tech Fund board and the shareholders. An initial draft of the memorandum to the board recommended approval because, among other things, "the Fund's investment strategies may be affected by cash flows due to substantial purchases or redemptions of the Fund's shares resulting from, among other things, market timers because it may be unable to sell or purchase ... thinly traded securities on a timely basis."

42. Ultimately, the Tech Fund board was not advised that the request for approval of futures trading was related to Alliance Capital's accommodation of market timing in the Tech Fund. The final version of the memorandum to

Alliance Capital Management, L.P., Admin. Proc. Rel. No. IA-2205; IC-26312 / December 18, 2003          Page 9 of 19

Case 1:07-cv-11275-JGK          Document 30-4          Filed 03/14/2008          Page 10 of 20

the board omitted the reference to market timing and instead referred to the benefit of futures because "the fund frequently experiences significant cash flow changes."

43. The Tech Fund board voted to recommend to the shareholders the amendment to permit futures trading. The Tech Fund filed with the Commission a proxy statement that recommended approval of the amendment, in relevant part, because trading futures would "enable the fund to manage cash flows even more efficiently...." The proxy statement did not disclose the fact that one of the reasons for removing the restriction of futures trading was to accommodate Alliance Capital-approved timers in the Tech Fund. The Tech Fund shareholders approved the amendment.

44. Timers harmed the Tech Fund. In July 2003, at a meeting of the Tech Fund board of directors, the portfolio manager gave a presentation on performance of the Tech Fund. In a chart titled, "Impact From Market Timers," the portfolio manager stated his belief that, the performance of the Tech Fund was diminished by 1.4 percent during the first six months of 2003 due to market timers.

45. In contrast, Calugar benefited from the relationship. From 2001 to 2003, Calugar generated approximately $64 million in profits from timing Alliance Capital mutual funds, including the Tech Fund. During the same period, the net asset value ("NAV") of the Tech Fund declined substantially.

*Canary*

46. Alliance Capital's second-largest market timer (after Calugar) was a group of entities affiliated with Canary Investment Management, LLC and controlled by Edward J. Stern (collectively, "Canary"). By the end of its relationship with Alliance Capital in July 2003, Canary had approximately $110 to $120 million in timing assets in Alliance Capital mutual funds. Canary obtained this timing capacity in exchange for investing in Alliance Capital hedge funds, other Alliance Capital mutual funds, and Alliance Capital private capital management accounts from which Alliance Capital earned fees.

47. In the summer of 2001, Canary considered investing in an Alliance Capital hedge fund. When making the commitment to the hedge fund, Canary asked Alliance Capital for market timing capacity in the AllianceBernstein Mid-Cap Fund ("Mid-Cap Fund"). Thereafter, Alliance Capital provided to Canary two dollars of market timing capacity in the Mid-Cap Growth Fund for each dollar invested in the hedge fund. Canary used its market timing capacity in the Mid-Cap Fund until June 2003, when the portfolio manager prohibited Canary from market timing that mutual fund.

48. In April 2003, Alliance Capital offered Canary $30 million in market timing capacity across several Alliance Capital mutual funds, for which Alliance Capital required a $3 million "sticky asset" investment in the Premier Growth Fund.

49. Alliance Capital had a practice of generally maintaining as confidential the specific securities and their weighted value owned by Alliance mutual funds. Except at certain times during the year, Alliance Capital did not disclose this information to the public.

50. On more than one occasion, Alliance Capital released this information to Canary in contravention of its practice of confidentiality. For example, in

Alliance Capital Management L.P.: Admin. Proc. Rel. No. IA-2205; IC-26312 / December 18, 2003    Page 10 of 19

Case 1:07-cv-11275-JGK    Document 30-4    Filed 03/14/2008    Page 11 of 20

May 2003, a Canary representative asked the Market Timing Supervisor to provide Canary updated portfolios for the certain mutual funds. The Market Timing Supervisor requested and received the information from the mutual fund portfolio managers or their assistants. On May 29, 2003, the Market Timing Supervisor sent an email to the Canary representative, which contained lists of all securities owned (and their weighted value in the portfolio) as of May 28, 2003, by five of the Funds: the Growth Fund, the Mid-Cap Growth Fund, Growth and Income Fund, the Premier Growth Fund, and the Quasar Fund.

51. Canary used this information to purchase a complex transaction that allowed it to establish a synthetic short position on these funds. This enabled Canary to profit from market timing during falling markets.

52. By releasing its portfolio holdings to Canary on a selective basis, Alliance Capital failed to establish, maintain, and enforce policies and procedures against the misuse of such confidential information.

*Alliance Capital's Timing Arrangements with Other Brokers*

53. In addition to its direct relationships with market timers such as Calugar and Canary, from 2001 to July 2003, Alliance Capital negotiated timing capacity with approximately 18 brokers. Brokers seeking timing capacity for their clients typically communicated with the Market Timing Supervisor to negotiate timing capacity in the mutual funds. The Market Timing Supervisor negotiated with the brokers the particular Alliance Capital mutual fund, the number of "round trips" (i.e., number of exchanges into and out of a fund) allowed within a given time frame, and the maximum dollar amount per exchange. The Market Timing Supervisor typically communicated with the Alliance Capital portfolio team to obtain approval of the market timing capacity agreement. Typically, when the portfolio team approved the timer's request, the Market Timing Supervisor informed the approved broker of the final terms of the agreement.

54. During 2001 to 2003, Alliance Capital provided capacity to market timers in the following Funds: Tech Fund, Growth Fund, Growth & Income Fund, Premier Growth Fund, Mid-Cap Fund, Quasar Fund, Small Cap Value Fund, High-Yield Fund, Disciplined Value Fund, and Americas Government Income Trust Fund.

55. In 2003, in exchange for or in connection with providing market timing capacity in its mutual funds, the Market Timing Supervisor asked approved timers, or approved timers offered, to invest an amount typically equal to 10 percent of the timing assets into another investment vehicle managed by Alliance Capital. In order to promote such arrangements, Alliance Capital began paying commissions to its wholesalers on the sticky assets received in exchange for timing capacity. Sales personnel referred to the sticky assets as "legit assets." The Market Timing Supervisor maintained a schedule of "legit assets" as they were received. During the first three quarters of 2003, Alliance Capital received $45 million in "legit assets" from timers.

Violations

56. As a result of the conduct described in Section III above, Alliance Capital willfully violated Sections 206(1) and 206(2) of the Advisers Act in that it, while acting as an investment adviser, employed devices, schemes, or artifices to defraud clients or prospective clients; and engaged in

Alliance Capital Management, L.P., Admin. Proc. Rel. No. IA-2205; IC-26312 / December 18, 2003    Page 11 of 19

Case 1:07-cv-11275-JGK    Document 30-4    Filed 03/14/2008    Page 12 of 20

transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients. Specifically, Alliance Capital knowingly, recklessly, and/or negligently entered into arrangements with certain investors and brokers whereby those investors or brokers were allowed to time mutual funds it managed in exchange for fees on sticky assets in Alliance Capital hedge funds, mutual funds, or other investment products, including hedge funds run by the same portfolio managers as the mutual funds being timed. Alliance Capital failed to disclose these arrangements to the mutual funds' directors or shareholders.

57. As a result of the conduct described in Section III above, Alliance Capital willfully violated Section 204A of the Advisers Act in that it, while acting as an investment adviser, failed to establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such investment adviser's business, to prevent the misuse of material, nonpublic information by such investment adviser or any person associated with such investment adviser, by releasing material, nonpublic information concerning the Funds' weighted portfolio holdings to select timers in the Funds.

58. As a result of the conduct described in Section III above, Alliance Capital willfully violated Section 20(a) of the Investment Company Act and Rule 20a-1 thereunder, in that it solicited a proxy in respect of a security of which a registered investment company was the issuer by engaging in conduct prohibited by Rule 14a-9 under the Securities Exchange Act of 1934. Specifically, Alliance Capital, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, made, in connection with a proxy solicitation by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, or which omitted to state material facts necessary in order to make statements therein not false and misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading.

59. As a result of the conduct described in Section III above, Alliance Capital, an affiliated person of the Funds, willfully violated Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder, in that it, while acting as a principal, participated in and effected transactions in connection with joint arrangements in which the Funds were participants without filing an application and without a Commission order approving the transactions.

60. As a result of the conduct described in Section III above, Alliance Capital willfully violated Section 34(b) of the Investment Company Act in that it made an untrue statement of material fact in a registration statement, application, report, account, record, or other document filed or transmitted pursuant to the Investment Company Act, or omitted to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

61. In determining to accept the Offer, the Commission considered the cooperation afforded the Commission Staff by Alliance Capital during its investigation. This cooperation included reporting its discovery of possible misconduct to the Commission promptly, conducting a thorough and independent internal investigation, sharing the results of that investigation

with the Staff, obtaining the resignations of certain supervisory personnel and others, and implementing certain remedial actions.

**Certain Remedial Efforts and Undertakings by Alliance Capital**

62. In determining to accept the Offer, the Commission further considered the following efforts voluntarily undertaken by Alliance Capital:

a. The Alliance Capital mutual funds will operate in accordance with the following governance policies and practices, which the funds have represented are currently in effect:

i. no more than 25 percent of the members of the board of directors of any Alliance Capital fund will be persons who either: (a) were directors, officers or employees of Alliance Capital at any point during the preceding 10 years; or (b) are interested persons, as defined in the Investment Company Act, of the fund or of Alliance Capital, provided that no current director shall be removed before January 1, 2005 for failure to meet the 10-year requirement. In the event that the board of directors fails to meet this requirement at any time due to the death, resignation, retirement or removal of any independent director, the independent directors will take such steps as may be necessary to bring the board in compliance within a reasonable period of time;

ii. no chairman of the board of directors of any Alliance Capital fund will either: (a) have been a director, officer or employee of Alliance Capital at any point during the preceding 10 years; or (b) be an interested person, as defined in the Investment Company Act, of the fund or of Alliance Capital; and

iii. any person who acts as counsel to the independent directors of any Alliance Capital fund will be an "independent legal counsel" as defined by Rule 0-1 under the Investment Company Act and will not have any employment, consultant, attorney-client, auditing or other professional relationship with Alliance Capital.

b. No action will be taken by the board of directors of any fund or by any committee thereof unless such action is approved by a majority of the members of the board of directors or of such committee, as the case may be, who are not either: (i) persons who were directors, officers of employees of Alliance Capital at any point during the preceding 10 years; or (ii) interested persons, as defined in the Investment Company Act, of the fund or of Alliance Capital. In the event that any action proposed to be taken by and approved by a vote of a majority of the independent directors of a fund is not approved by the full board of directors, the fund will disclose such proposal and the related board vote in its shareholder report for such period.

c. Commencing in 2005 and not less than every fifth calendar year thereafter, each Alliance Capital fund will hold a meeting of shareholders at which the board of directors will be elected.

d. Each Alliance Capital fund will designate an independent compliance officer reporting to its board of directors as being responsible for assisting the board of directors and any of its committees in monitoring compliance by Alliance Capital with the federal securities laws, its fiduciary duties to fund shareholders and its Code of Ethics in all

matters relevant to the operation of the Alliance Capital funds. The duties of this person will include reviewing all compliance reports furnished to the board of directors or its committees by Alliance Capital, attending meetings of Alliance Capital's Internal Compliance Controls Committee to be established pursuant to Alliance Capital's undertakings set forth in Section IV below, serving as liaison between the board of directors and its committees and the Chief Compliance Officer of Alliance Capital, making such recommendations to the board of directors regarding Alliance Capital's compliance procedures as may appear advisable from time to time, and promptly reporting to the board of directors any material breach of fiduciary duty, breach of the Code of Ethics and/or violation of the federal securities laws of which he or she becomes aware in the course of carrying out his or her duties.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions specified in Respondent Alliance Capital's Offer.

Accordingly, it is hereby ORDERED that:

A. Pursuant to Section 203(k) of the Advisers Act and Section 9(f) of the Investment Company Act, Respondent Alliance Capital shall cease and desist from committing or causing any violations and any future violations of Sections 204A, 206(1), and 206(2) of the Advisers Act and Sections 17 (d), 20(a), and 34(b) of the Investment Company Act and Rules 17d-1 and 20a-1 thereunder.

**Undertakings**

B. *General Compliance*. Alliance Capital shall comply with the following undertakings:

1. Alliance Capital shall maintain a compliance and ethics oversight infrastructure having the following characteristics:

    a. Alliance Capital shall maintain a Code of Ethics Oversight Committee having responsibility for all matters relating to issues arising under the Alliance Capital Code of Ethics. The Code of Ethics Oversight Committee shall be comprised of senior executives of Alliance Capital's operating businesses. Alliance Capital shall hold at least quarterly meetings of the Code of Ethics Oversight Committee to review violations of the Code of Ethics, as well as to consider policy matters relating to the Code of Ethics. Alliance Capital shall report on issues arising under the Code of Ethics to the extent relating to fund business, including all violations thereof, to the Audit Committee of the directors of the Alliance Capital funds with such frequency as the Audit Committee may instruct, and in any event at least quarterly, provided however that any material violation shall be reported promptly to the Audit Committee of Alliance Capital.

    b. Alliance Capital shall establish an Internal Compliance Controls Committee to be chaired by Alliance Capital's Chief Compliance Officer, which Committee shall have as its members senior executives of Alliance Capital's operating businesses. Notice of all meetings of the Internal Compliance Controls Committee shall be given to the independent staff of the directors of the Alliance Capital funds, who

shall be invited to attend and participate in such meetings provided that the involvement of the independent staff shall be limited to compliance issues relating to the Alliance Capital funds. The Internal Compliance Controls Committee shall review compliance issues throughout the business of Alliance Capital, endeavor to develop solutions to those issues as they may arise from time to time, and oversee implementation of those solutions. The Internal Compliance Controls Committee shall provide reports on internal compliance matters to the Audit Committee of the directors of the Alliance Capital funds with such frequency as the independent directors of such funds may instruct, and in any event at least quarterly. Alliance Capital shall also provide to the Audit Committee of AXA Financial, Inc. the same reports of the Code of Ethics Oversight Committee and the Internal Compliance Controls Committee that it provides to the Audit Committee of the Alliance Capital funds.

1. Alliance Capital shall establish and staff a full-time senior-level position whose responsibilities shall include compliance matters related to conflicts of interests. This officer will report directly to the Chief Compliance Officer of Alliance Capital.

2. Alliance Capital shall require that Alliance Capital's Chief Compliance Officer or a member of his or her staff review compliance with the policies and procedures established to address compliance issues under the Investment Advisers Act and Investment Company Act and that any violations be reported to the Internal Compliance Controls Committee;

3. Alliance Capital shall require the Chief Compliance Officer of Alliance Capital to report to the independent directors of the Alliance Capital funds any breach of fiduciary duty and/or the federal securities laws to the extent relating to fund business of which he or she becomes aware in the course of carrying out his or her duties, with such frequency as the independent directors may instruct, and in any event at least quarterly, provided however that any material breach (i.e., any breach that would be important, qualitatively or quantitatively, to a reasonable director) shall be reported promptly;

4. Alliance Capital shall establish a corporate ombudsman to whom Alliance Capital employees may convey concerns about Alliance Capital business matters that they believe implicate matters of ethics or questionable practices. Alliance Capital shall establish procedures to investigate matters brought to the attention of the ombudsman, and these procedures shall be presented for review and approval by the independent directors of the Alliance Capital funds. Alliance Capital shall also review matters to the extent relating to fund business brought to the attention of the ombudsman, along with any resolution of such matters, with the independent directors of the Alliance Capital funds with such frequency as the independent directors of such funds may instruct.

C. *Distribution of Disgorgement and Penalty.* Alliance Capital shall also comply with the following undertakings:

1. Alliance Capital shall retain, within 30 days of the date of entry of the Order, the services of an Independent Distribution Consultant acceptable to the staff of the Commission and the independent directors of the Alliance Capital funds. The Independent Distribution Consultant's compensation and expenses shall be borne exclusively by Alliance Capital. The Independent Distribution Consultant shall develop a Distribution Plan for the distribution

Alliance Capital Management, L.P., Admin. Proc. Rel. No. IA-2205; IC-26312 / December 18, 2003    Page 15 of 19

Case 1:07-cv-11275-JGK    Document 30-4    Filed 03/14/2008    Page 16 of 20

of all of the $250 million in disgorgement and penalty to the mutual funds and their shareholders to compensate fairly and proportionately the funds' shareholders for losses attributable to market timing trading activity by market timers with whom Alliance Capital entered into timing arrangements between January 1, 2001 and September 30, 2003, according to a methodology developed in consultation with Alliance Capital and the independent directors of the affected Alliance Capital funds and acceptable to the staff of the Commission. The Distribution Plan shall provide for fund investors to receive, in order of priority, (i) their aliquot share of losses suffered by the fund due to market timing, and (ii) a proportionate share of advisory fees paid by such fund during the period of such market timing. In the event that full satisfaction of item (i) would require a payment of more than $200 million, Alliance Capital agrees that it will increase the disgorgement portion of its payment obligation by the amount that item (i) exceeds $200 million. Alliance Capital shall cooperate fully with the Independent Distribution Consultant and shall provide the Independent Distribution Consultant with access to its files, books, records, and personnel as reasonably requested for the review.

2. The Independent Distribution Consultant shall submit to Alliance Capital and the staff of the Commission the Distribution Plan no more than 120 days after the date of entry of the Order.

3. With respect to any determination or calculation of the Independent Distribution Consultant with which Alliance Capital or the staff of the Commission does not agree, such parties shall attempt in good faith to reach an agreement within 150 days of the date of entry of the Order. In the event that Alliance Capital and the staff of the Commission are unable to agree on an alternative determination or calculation, within 180 days of the date of entry of the Order, they shall each advise, in writing, the Independent Distribution Consultant of any determination or calculation from the Distribution Plan that it considers to be inappropriate and state in writing the reasons for considering such determination or calculation inappropriate.

4. Within 195 days of the date of entry of this Order, the Independent Distribution Consultant shall submit the Distribution Plan for the administration and distribution of disgorgement and penalty funds pursuant to Rule 610 [17 C.F.R. § 201.610] of the Commission's Rules of Practice. Following notice and opportunity for comment, as provided in Rule 612 [17 C.F.R. § 201.612] of the Commission's Rules of Practice, and a Commission order approving a final plan of disgorgement, as provided in Rule 613 [17 C.F.R. § 201.613] of the Commission's Rules of Practice, the Independent Distribution Consultant and Alliance Capital shall take all necessary and appropriate steps to administer the final plan for distribution of disgorgement and penalty funds.

5. The Independent Distribution Consultant, for the period of the engagement and for a period of two years from completion of the engagement, shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Alliance Capital, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. Any firm with which the Independent Distribution Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the independent directors and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Alliance Capital, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for

Alliance Capital Management, L.P., Admin. Proc. Rel. No. IA-2205, IC-263...December 18, 2003    Page 16 of 19

Case 1:07-cv-11275-JSR    Document 30-4    Filed 03/14/2008    Page 17 of 20

the period of the engagement and for a period of two years after the engagement. .

D. *Independent Compliance Consultant*. Alliance Capital shall also comply with the following undertakings:

1. Alliance Capital shall retain, within 30 days of the date of entry of the Order, the services of an Independent Compliance Consultant acceptable to the staff of the Commission and the independent directors of the Alliance Capital funds. The Independent Compliance Consultant's compensation and expenses shall be borne exclusively by Alliance Capital or its affiliates. The Independent Compliance Consultant shall conduct a comprehensive review of Alliance Capital's supervisory, compliance, and other policies and procedures designed to prevent and detect conflicts of interest, breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by Alliance Capital and its employees. This review shall include, but shall not be limited to, a review of Alliance Capital's market timing controls across all areas of its business, a review of the Alliance Capital funds' pricing practices that may make those funds vulnerable to market timing, a review of the Alliance Capital funds' utilization of short term trading fees and other controls for deterring excessive short term trading, a review of possible governance changes in the Alliance Capital fund boards to include committees organized by market sector or other criteria so as to improve compliance, and a review of Alliance Capital's policies and procedures concerning conflicts of interest, including conflicts arising from advisory services to multiple clients. Alliance Capital shall cooperate fully with the Independent Compliance Consultant and shall provide the Independent Compliance Consultant with access to its files, books, records, and personnel as reasonably requested for the review.

2. At the conclusion of the review, which in no event shall be more than 120 days after the date of entry of the Order, the Independent Compliance Consultant shall submit a Report to Alliance Capital, the directors of the Alliance Capital funds, and the staff of the Commission. The Report shall address the issues described in subparagraph IV.D.1 of these undertakings, and shall include a description of the review performed, the conclusions reached, the Independent Compliance Consultant's recommendations for changes in or improvements to policies and procedures of Alliance Capital and the Alliance Capital funds, and a procedure for implementing the recommended changes in or improvements to Alliance Capital's policies and procedures.

3. Alliance Capital shall adopt all recommendations with respect to Alliance Capital contained in the Report of the Independent Compliance Consultant; provided, however, that within 150 days after the date of entry of the Order, Alliance Capital shall in writing advise the Independent Compliance Consultant, the directors of the Alliance Capital funds and the staff of the Commission of any recommendations that it considers to be unnecessary or inappropriate. With respect to any recommendation that Alliance Capital considers unnecessary or inappropriate, Alliance Capital need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose.

4. As to any recommendation with respect to Alliance Capital's policies and procedures on which Alliance Capital and the Independent Compliance Consultant do not agree, such parties shall attempt in good faith to reach an agreement within 180 days of the date of entry of the Order. In the event Alliance Capital and the Independent Compliance Consultant are

Alliance Capital Management, L.P.: Admin. Proc. Rel. No. IA-2205; IC-26312 / December 18, 2003    Page 17 of 19

Case 1:07-cv-11275-JGK    Document 30-4    Filed 03/14/2008    Page 18 of 20

unable to agree on an alternative proposal acceptable to the staff of the Commission, Alliance Capital will abide by the determinations of the Independent Compliance Consultant.

5. Alliance Capital: (i) shall not have the authority to terminate the Independent Compliance Consultant, without the prior written approval of the independent directors and the staff of the Commission; (ii) shall compensate the Independent Compliance Consultant, and persons engaged to assist the Independent Compliance Consultant, for services rendered pursuant to the Order at their reasonable and customary rates; and (iii) shall not be in and shall not have an attorney-client relationship with the Independent Compliance Consultant and shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Compliance Consultant from transmitting any information, reports, or documents to the directors or the Commission.

6. The Independent Compliance Consultant, for the period of the engagement and for a period of two years from completion of the engagement, shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Alliance Capital, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. Any firm with which the Independent Compliance Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the independent directors of Alliance Capital's Board of Directors and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Alliance Capital, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

E. *Periodic Compliance Review*. Commencing in 2005, and at least once every other year thereafter, Alliance Capital shall undergo a compliance review by a third party, who is not an interested person, as defined in the Investment Company Act, of Alliance Capital. At the conclusion of the review, the third party shall issue a report of its findings and recommendations concerning Alliance Capital's supervisory, compliance, and other policies and procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by Alliance Capital and its employees in connection with their duties and activities on behalf of and related to the Alliance Capital funds. Each such report shall be promptly delivered to Alliance Capital's Internal Compliance Controls Committee and to the Audit Committee of the board of directors of each Alliance Capital fund.

F. *Certification*. No later than twenty-four months after the date of entry of the Order, the chief executive officer of Alliance Capital shall certify to the Commission in writing that Alliance Capital has fully adopted and complied in all material respects with the undertakings set forth in this section IV and with the recommendations of the Independent Compliance Consultant or, in the event of material non-adoption or non-compliance, shall describe such material non-adoption and non-compliance.

G. *Recordkeeping*. Alliance Capital shall preserve for a period not less than six years from the end of the fiscal year last used, the first two years in an easily accessible place, any record of Alliance Capital's compliance with the undertakings set forth in this section IV.

Alliance Capital Management, L.P., Admin. Proc. Rel. No. IA-2205 (December 18, 2003)    Page 18 of 19

Case 1:07-cv-11275-JGK    Document 30-4    Filed 03/12/2008    Page 19 of 20    Page 18 of 19

H. *Deadlines*. For good cause shown, the Commission's staff may extend any of the procedural dates set forth above.

I. *Ongoing Cooperation*. Alliance Capital shall cooperate fully with the Commission in any and all investigations, litigations or other proceedings relating to or arising from the matters described in the Order. In connection with such cooperation, Alliance Capital has undertaken:

1. To produce, without service of a notice or subpoena, any and all documents and other information requested by the Commission's staff;

2. To use its best efforts to cause its employees to be interviewed by the Commission's staff at such times as the staff reasonably may direct;

3. To use its best efforts to cause its employees to appear and testify truthfully and completely without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be requested by the Commission's staff; and

4. That in connection with any testimony of Alliance Capital to be conducted at deposition, hearing or trial pursuant to a notice or subpoena, Alliance Capital:

   a. Agrees that any such notice or subpoena for Alliance Capital's appearance and testimony may be served by regular mail on its attorney, John Carroll, Esq., Clifford Chance US LLP, 200 Park Avenue, New York, NY 10166-0153; and

   b. Agrees that any such notice or subpoena for Alliance Capital's appearance and testimony in an action pending in a United States District Court may be served, and may require testimony, beyond the territorial limits imposed by the Federal Rules of Civil Procedure.

J. *Other Obligations and Requirements*. Nothing in this Order shall relieve Alliance Capital or any Alliance Capital fund of any other applicable legal obligation or requirement, including any rule adopted by the Commission subsequent to this Order.

## Disgorgement and Civil Money Penalty

K. Alliance Capital shall, within 30 days of the entry of this Order, pay $150,000,000 in disgorgement plus a civil money penalty in the amount of $100,000,000 for a total of payment of $250,000,000. Such payment shall be: (A) made by wire transfer, United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) wired, hand-delivered, or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22132; and (D) submitted under cover letter that identifies Alliance Capital as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter, wire transfer instruction, money order, or check shall be sent to Mark K. Schonfeld, Associate Regional Director, Securities and Exchange Commission, Division of Enforcement, Northeast Regional Office, 233 Broadway, New York, NY, 10279. Such civil money penalty may be distributed pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 ("Fair Fund distribution"). Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be

treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that it shall not, in any Related Investor Action, benefit from any offset or reduction of any investor's claim by the amount of any Fair Fund distribution to such investor in this proceeding that is proportionately attributable to the civil penalty paid by Respondent ("Penalty Offset"). If the court in any Related Investor Action grants such an offset or reduction, Respondent agrees that it shall, within 30 days after entry of a final order granting the offset or reduction, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed against Respondent in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order in this proceeding.

By the Commission.

> Jonathan G. Katz
> Secretary

### Endnotes

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

*http://www.sec.gov/litigation/admin/ia-2205.htm*

**EXHIBIT D**

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No.   52839 / November 28, 2005

INVESTMENT ADVISERS ACT OF 1940
Release No. 2448 / November 28, 2005

INVESTMENT COMPANY ACT OF 1940
Release No. 27167 / November 28, 2005

ADMINISTRATIVE PROCEEDING
File No. 3-12111

| | |
|---|---|
| In the Matter of<br><br>**FEDERATED INVESTMENT MANAGEMENT COMPANY, FEDERATED SECURITIES CORP. and FEDERATED SHAREHOLDER SERVICES COMPANY,**<br><br>       **Respondents.** | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTIONS 15(b)(4) AND 17A(c)(3) OF THE SECURITIES EXCHANGE ACT OF 1934, SECTIONS 203(e) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940** |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 15(b)(4) and 17A(c)(3) of the Securities Exchange Act of 1934 ("Exchange Act"), Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Federated Investment Management Company, Federated Securities Corp. and Federated Shareholder Services Company (collectively, the "Respondents").

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Sections 15(b)(4) and 17A(c)(3) of the Securities Exchange Act of 1934, Sections 203(e) and 203(k) of the Investment Advisers Act of 1940, and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

A.    **<u>Summary</u>**

1.    This is a proceeding against three registered subsidiaries of Federated Investors, Inc., one of the largest mutual fund managers in the United States, involving undisclosed market timing arrangements and late trading. Federated Investment Management Company ("FIMC"), a registered investment adviser to mutual funds in the Federated mutual fund complex (the "Federated Funds"), and Federated Securities Corp. ("FSC"), a registered broker-dealer and distributor for the Federated Funds, violated the Advisers Act and Investment Company Act by approving, but not disclosing, three market timing arrangements, or the associated conflict of interest between FIMC and the funds involved in the arrangements, either to other Federated Fund shareholders or to the funds' Boards of Trustees.[2] In addition, Federated Shareholder Services Company ("FSSC"), formerly a registered transfer agent, allowed a customer and a Federated employee to late trade.

2.    At the time they entered into the market timing arrangements, FIMC and FSC recognized that certain types of market timing could be generally detrimental to certain of the Federated Funds and could, among other things, compromise the investment strategies of portfolio managers and increase costs for long-term shareholders. From March 2002 through August 2003, notwithstanding prospectus disclosure and internal procedures designed to prevent market timing, FIMC and FSC provided approved "timing capacity" in certain mutual funds to three entities, one of which was Canary Capital Partners LLC, and never disclosed these arrangements to other

---

[1]    The findings herein are made pursuant to Respondents' Offers and are not binding on any other person or entity in this or any other proceeding.

[2]    The "Boards of Trustees" refer, collectively, to the trustees of Federated Funds organized as business trusts and the directors of Federated Funds organized as corporations.

Federated Fund shareholders.  In return, Canary made a separate investment of non-timed assets, so-called "sticky assets," in a Federated fund.  Both the timed assets and the "sticky assets" produced advisory and other fees for FIMC, FSC and FSSC.

**B.      Respondents and Related Entity**

3.      Federated Investors, Inc., headquartered in Pittsburgh, Pennsylvania, is a publicly traded company listed on the New York Stock Exchange and is one of the largest mutual fund managers in the United States.  As of June 30, 2005, Federated Investors managed approximately $205 billion in assets.  FIMC, FSC and FSSC are wholly owned subsidiaries of FII Holdings, Inc., a subsidiary of Federated Investors.

4.      Federated Investment Management Company is a Delaware business trust headquartered in Pittsburgh, Pennsylvania, and an investment adviser registered with the Commission since 1989.  During the relevant time, FIMC provided investment advisory services to Federated Funds that invest primarily in securities traded in the United States.

5.      Federated Securities Corp. is a Pennsylvania corporation headquartered in Pittsburgh, and is a broker-dealer registered with the Commission since 1970.  It serves as the principal underwriter and distributor for the Federated Funds.  FSC distributes the Federated Funds primarily through intermediaries such as broker-dealers, banks, investment advisers, and other institutions.

6.      Federated Shareholder Services Company is a Delaware business trust headquartered in McCandless, Pennsylvania, and was a transfer agent registered with the Commission until July 1, 2005, when it withdrew its registration.  During the relevant period, FSSC served as the transfer agent for all Federated Funds.[3]

**C.      Facts**

**Market Timing and Late Trading**

7.      Market timing includes (a) frequent buying and selling of shares of the same mutual fund or (b) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing.  Market timing, while not illegal per se, can harm other mutual fund shareholders because it can dilute the value of their shares.  Market timing can also disrupt the management of the mutual fund's investment portfolio and cause the targeted mutual fund to incur costs borne by other shareholders to accommodate frequent buying and selling of shares by the market timer.

8.      Rule 22c-1(a) under the Investment Company Act requires registered investment companies issuing redeemable securities, their principal underwriters and dealers, and any person designated in the fund's prospectus as authorized to consummate transactions in securities issued by the fund to sell and redeem fund shares at a price based on the current net asset value ("NAV")

---

[3]      FSSC no longer processes trades for the Federated Funds, but continues to provide other shareholder services.

next computed after receipt of an order to buy or redeem. Mutual funds generally determine the daily price of mutual fund shares as of 4:00 p.m. ET. The relevant Federated Funds' prospectuses state that orders received before 4:00 p.m. are executed at the price determined as of 4:00 p.m. that day, and orders received after 4:00 p.m. are executed at the price determined as of 4:00 p.m. the next trading day. In addition, at the time of the conduct described below, the prospectuses authorized the purchase, redemption, and exchange of shares through FSSC.

9.      "Late trading" refers to the practice of placing orders to buy or redeem mutual fund shares after the time as of which a mutual fund has calculated its NAV (usually as of the close of trading at 4:00 p.m. ET), but receiving the price based on the prior NAV already determined as of 4:00 p.m. Late trading enables the trader to profit from market events that occur after 4:00 p.m. but that are not reflected in that day's price. In particular, the late trader obtains an advantage – at the expense of the other shareholders of the mutual fund – when he learns of market moving information and is able to purchase (or redeem) mutual fund shares at prices set *before* the market moving information was released. Late trading violates Rule 22c-1(a) under the Investment Company Act and harms other shareholders when late trading dilutes the value of their shares.

## Respondents' Timing Policies

10.      At all times during the existence of the approved timing arrangements, FIMC, FSC and FSSC had internal procedures designed to identify and prevent market timing in the Federated Funds. As early as 1998, FIMC and FSC recognized the harmful effects that market timing had on certain funds. Within FIMC, the harm from market timing was expressly acknowledged and documented in internal memoranda and other communications. In response to the awareness of the potential harm from allowing market timers to invest in funds, beginning in late 1998 the prospectuses of Federated Funds that permitted exchanges disclosed that:

> The Fund may modify or terminate the exchange privilege at any time. The Fund's management or Adviser may determine from the amount, frequency and pattern of exchanges that a shareholder is engaged in excessive trading that is detrimental to the Fund and other shareholders. If this occurs, the Fund may terminate the availability of exchanges to that shareholder and may bar that shareholder from purchasing other Federated funds.

11.      This prospectus disclosure told shareholders, in effect, that FIMC or the Federated Fund's management was making a determination concerning whether such activities were causing damage to shareholders and, if so, terminating a shareholder's ability to trade in Federated Funds. In fact, as outlined below, FIMC and FSC specifically allowed certain investors to market time certain funds without sufficient regard to whether the trading was "detrimental" to the particular fund or its other shareholders, and without disclosing the market timing arrangement.

12.      FIMC and FSC formalized their policy not to solicit market timers in 1999. Thereafter, certain employees of FSSC were designated to act as "timing police" in order to monitor trading and address FIMC and FSC's concerns about market timers. Although the prospectuses of funds without an exchange privilege did not contain any disclosures regarding

4

frequent trading or market timing, the "timing police" enforced the timing policy irrespective of the prospectus disclosure of a particular fund.

13.    The Respondents' efforts to address market timing culminated in procedures designed to identify and stop market timing in the Federated Funds, which were fully implemented by the end of 2000. The written procedures defined the patterns of trading that would ordinarily be treated as detrimental market timing. The Respondents enhanced the procedures as they gained experience in combating market timing. If a market timer was identified, a stop was placed on the account and on all associated accounts, thereby preventing subsequent exchanges or purchases, regardless of whether timing activity was found in the associated accounts. A letter to the shareholder describing the action taken explained that market timing is "contrary to Federated's portfolio management philosophy and impairs fund performance" and is "not in the best interest of the funds or other investors." Over time, the "timing police" placed stops on several thousand accounts because of market timing.

14.    However, at the same time that the "timing police" were policing market timing, and prohibiting other shareholders from engaging in it, FIMC and FSC entered into several arrangements to allow market timers to frequently trade in certain Federated Funds.

### Approved Timing Arrangements

### The Canary Capital Arrangement

15.    In January 2003, FIMC and FSC agreed to allow Canary Capital Partners, a hedge fund managed by Edward J. Stern through his investment adviser Canary Investment Management, LLC (collectively "Canary Capital"), to market time six Federated Funds. The arrangement was approved by senior officers of FIMC and FSC.

16.    During the fall of 2002, a former FSC Senior Vice President, with the assistance of others, negotiated the terms of a proposed arrangement to permit Canary Capital to market time six domestic equity funds: Federated Stock Trust, Federated American Leaders Fund, Federated Capital Appreciation Fund, Federated Max-Cap Index Fund, Federated Kaufmann Fund, and Federated Equity Income Fund. In exchange for the market timing capacity, Canary Capital proposed to place as much as $50 million of "sticky assets" in the Federated Short-Term Euro Fund.

17.    Ultimately, Canary Capital was given permission to trade $50 million in two to three "roundtrips" per month in each of the six funds.

18.    In mid-January 2003, Canary Capital invested $28.8 million in a Federated money market fund and began trading in four of the proposed funds. By the end of February, Canary Capital was using more than $84 million to market time five funds. Although Canary Capital was exceeding the agreed market timing amount, no one at FIMC or FSC was monitoring its trading at that time.

19.     During March, the "timing police" independently identified the accounts through which Canary Capital was trading and placed stops on the accounts because the trading violated Respondents' market timing procedures.  FSSC removed the stops within days and permitted Canary Capital to continue trading, at FSC's behest, after a member of the FSC sales group told the "timing police" that a senior officer of FSC had approved Canary Capital's trading.

20.     In early March, Canary Capital requested an increase in the number of roundtrips per month.  Three weeks later, Canary Capital invested approximately $10 million in "sticky assets" in the Euro Fund.  By that time, Canary Capital had almost $125 million in timing assets invested in Federated Funds.  In May, FIMC and FSC increased the number of roundtrips but limited the number of funds in which timing was permitted.  Canary Capital ultimately withdrew all of its assets from the Federated Funds, including the Euro Fund monies, in early July.

21.     In all, from January 2003 to July 2003, Canary Capital conducted more than $1.6 billion in aggregate market timing transactions in the six Federated Funds.  During the less than six months that Canary Capital traded, it conducted a total of 46 roundtrips in the six funds.  When the timing assets were not in the domestic equity funds, they were invested in a Federated money market fund.  Canary Capital's permitted timing trades resulted in substantial dilution to the Federated Funds and harm to shareholders.  Canary Capital earned a total net profit of more than $4.9 million from its trading.

22.     In addition to management fees received from assets being timed by Canary Capital, Respondents received additional fees from the non-timed "sticky assets" placed in the Euro Fund.

### Other Market Timing Arrangements

23.     FIMC and FSC also entered into arrangements with two existing investors to market time high yield bond funds.  Unlike market timing in equity funds, high yield bond fund market timing involves momentum-based trading in which many investors follow the same trading signal.  This trading results in simultaneous purchases and redemptions that create cash flow problems and harm the fund's performance.

24.     The first investor, an adviser to a trust company, entered into an arrangement with FIMC and FSC in March 2002 to market time the Federated High Yield Trust after it was prohibited from trading due to market timing.  The investor was required to provide the fund's portfolio manager with two to three days notice before purchases and one to two days notice before redemptions.  There was no agreement regarding the frequency of trading.

25.     Through July 2003, this investor made seven roundtrip trades in the High Yield Trust in amounts of approximately $18 million.  Total transactions exceeded $219 million.  The investor earned a total net profit of over $2.9 million from its trading.  The trading resulted in substantial dilution to the Federated Funds and harm to shareholders.

6

26.    In April 2003, the investor made a separate $90 million investment of non-timed assets in the Federated Prime Cash Obligations Fund.

27.    In May 2002, FIMC entered into a written agreement under which another investor, a registered broker-dealer, and its affiliated registered investment adviser, were permitted to make four roundtrip transactions per twelve-month period in the Federated High Income Bond Fund on behalf of their customers and clients, respectively. The investor traded in this fund through September 2003, making four roundtrips in amounts of approximately $11 million. Total transactions exceeded $90 million. The trading resulted in substantial dilution to the High Income Bond Fund and harm to shareholders. The investor earned a total net profit of over $1.8 million from its trading.

**Late Trading**

28.    FSSC's mutual fund trade processing system allowed FSSC employees, known as customer service representatives, to improperly process trades received after 4:00 p.m. at the current day's NAV. These customer service representatives incorrectly assigned that day's NAV to hundreds of fund orders placed after 4:00 p.m., exposing the Federated Fund shareholders to potential dilution.

29.    Between June and September 2003, Veras Partners ("Veras"), a Texas hedge fund, while market timing 12 Federated Funds, executed at least 29 late trades that ranged in size from approximately $87,000 to $12 million by placing the trades through the customer service representatives. While Veras was seeking capacity to market time certain Federated Funds, an FSSC administrative level employee told its representatives that orders could be submitted as late as 4:30 p.m. ET and receive that day's NAV. Veras placed some of its trades as late as 4:55 p.m. ET. Veras profited by $240,000 from its late trading.

30.    In addition, between July 1998 and March 2003, a former FIMC and FSSC employee, while trading for his own account, entered at least 240 Federated Fund orders after 4:00 p.m. that received the current day's NAV. The late trades ranged in size from $700 to $27,000. The employee entered the trades either directly into FSSC's mutual fund order processing system or through a customer service representative. The employee profited by more than $4,000 from his late trading.

**D.    Violations**

31.    As a result of the conduct described above, FIMC willfully violated Sections 206(1) and 206(2) of the Advisers Act in that, while acting as an investment adviser, it employed devices, schemes, or artifices to defraud investors or prospective investors, and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon investors or prospective investors. Specifically, FIMC entered into market timing arrangements with Canary and two other investors that created a conflict of interest, which FIMC knowingly or recklessly failed to disclose to the Federated Funds' shareholders and Boards of Trustees. FSC

7

willfully aided and abetted and caused FIMC's violations of Sections 206(1) and 206(2) of the Advisers Act by knowingly providing substantial assistance to FIMC.

32.    As a result of the conduct described above, FIMC and FSC willfully violated Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder, in that FIMC and FSC, as affiliated persons of the Federated Funds acting as principals, effected transactions in connection with joint arrangements in which certain Federated Funds were joint participants with FIMC and FSC in contravention of rules and regulations the Commission has prescribed for the purpose of limiting or preventing participation by registered companies, such as the Federated Funds, on a basis different from or less advantageous than that of such other participants without obtaining a Commission order approving the transactions.  Specifically, FIMC and FSC entered into a joint arrangement with the Federated Funds whereby Canary Capital was permitted to market time certain Federated Funds in exchange for an investment of "sticky assets" without first obtaining an order of the Commission approving the transaction.

33.    As a result of the conduct described above, FSSC willfully violated Rule 22c-1(a) under the Investment Company Act which prohibits registered investment companies issuing any redeemable security, persons designated in such issuer's prospectus as authorized to consummate transactions in such security, and any principal underwriter of, or dealer in any such security from selling, redeeming, or repurchasing any such security except at a price based on the current net asset value which is next computed after receipt of an order to purchase or redeem.  Specifically, FSSC, designated in the Federated Funds' prospectuses as authorized to consummate transactions, accepted orders from investors after 4:00 p.m., and processed the orders at that day's NAV rather than the next day's NAV.

## Remedial Efforts

34.    In determining to accept the Offers, the Commission considered the cooperation afforded the Commission's staff by the Respondents during its investigation.  This cooperation included conducting an independent internal investigation, sharing the results of that investigation with the Commission's staff, and implementing certain remedial measures.  In addition, Respondents paid a total of $8 million to Federated Funds affected by the conduct described in this Order.

## Undertakings

35.    In determining whether to accept the Offers, the Commission has further considered the following undertaking by FIMC, FSC, FSSC and the Federated Funds:

      a.    Fund Governance.  The Federated Funds will operate in accordance with the following governance policies and practices, which the Funds have represented are currently in effect:

           i.    No more than 25 percent of the members of the Board of Trustees of any Federated Fund will be persons who either

8

(a) were directors, officers or employees of FIMC, FSC or FSSC at any point during the preceding 10 years or (b) are interested persons, as defined in the Investment Company Act, of the Federated Funds or of FIMC, FSC or FSSC. (Trustees who do not meet either of the preceding criteria are referred to as "Independent Trustees.") In the event that the Board of Trustees fails to meet this requirement at any time due to the death, resignation, retirement or removal of any Independent Trustee, the Independent Trustees will take such steps as may be necessary to bring the Board in compliance within a reasonable period of time;

ii.    Any person who acts as counsel to the Independent Trustees of any Federated Fund will be an "independent legal counsel" as defined by Rule 0-1 under the Investment Company Act.

b.    <u>Independent Chairman</u>. Within 45 days of the date of this Order, no chairman of the Board of Trustees of any Federated Fund will either (a) have been a director, officer, or employee of any Respondent at any point during the preceding 10 years or (b) be an interested person, as defined in the Investment Company Act, of the Federated Funds or of any Respondent.

c.    <u>Approval by Independent Trustees</u>. No action will be taken by the Board of Trustees or by any committee thereof unless such action is approved by a majority of the Independent Trustees of the Board of Trustees or of such committee, as the case may be. In the event that any action proposed to be taken by and approved by a vote of a majority of the Independent Trustees of a Federated Fund is not approved by the full Board of Trustees, the Federated Fund subject to such action will disclose such proposal and the related board vote in its shareholder report for such period.

36.    <u>Ongoing Cooperation</u>. In determining whether to accept the Offers, the Commission has considered the following undertaking by Respondents:

Each of the Respondents shall cooperate fully with the Commission in any and all investigations, litigations or other proceedings relating to or arising from the matters described in the Order. In connection with such cooperation, FIMC, FSC and FSSC have undertaken:

a.    To produce, without service of a notice or subpoena, any and all nonprivileged documents and other information requested by the Commission's staff;

b.    To use their best efforts to cause their employees to be interviewed by the Commission's staff at such times as the staff reasonably may direct;

9

        c.       To use their best efforts to cause their employees to appear and testify truthfully and completely without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be requested by the Commission's staff; and

        d.       That in connection with any testimony of FIMC, FSC or FSSC to be conducted at deposition, hearing or trial pursuant to a notice or subpoena, Respondents:

              i.      Agree that any such notice or subpoena for FIMC, FSC or FSSC's appearance and testimony may be served by regular mail on: Federated Investors, Inc., 1001 Liberty Avenue, Pittsburgh, PA 15222, Attn: General Counsel.

              ii.     Agree that any such notice or subpoena for any Federated entity's appearance and testimony in an action pending in a United States District Court may be served, and may require testimony, beyond the territorial limits imposed by the Federal Rules of Civil Procedure.

37.     <u>Independent Compliance Consultant</u>. FIMC and FSC shall retain, within 60 days of the date of the Order, the services of an Independent Compliance Consultant not unacceptable to the staff of the Commission and a majority of the Independent Trustees of the Federated Funds. The Independent Compliance Consultant's compensation and expenses shall be borne exclusively by the Respondents. FIMC and FSC shall require that the Independent Compliance Consultant conduct a comprehensive review of FIMC and FSC's supervisory, compliance, and other policies and procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by FIMC, FSC and their employees. This review shall include, but shall not be limited to, a review of FIMC and FSC's market timing controls across all areas of their business, a review of Federated Funds' pricing practices that may make those funds vulnerable to market timing, a review of Federated Funds' utilization of short term trading fees and other controls for deterring excessive short term trading, and a review of FIMC and FSC's policies and procedures concerning conflicts of interest, including conflicts arising from advisory services to multiple clients. Prior to conducting its review, the Independent Compliance Consultant will review the Compliance Review Report issued by KPMG, LLP in April 2004 (the "2004 Compliance Report") and FIMC and FSC's implementation of the recommendations made in such report. The Independent Compliance Consultant will exclude from its compliance review any areas that it determines were covered adequately in the 2004 Compliance Report and were responded to appropriately by FIMC and FSC. FIMC and FSC shall cooperate fully with the Independent Compliance Consultant and shall provide the Independent Compliance Consultant with access to their files, books, records, and personnel as reasonably requested for the review.

        a.      FIMC and FSC shall require that, at the conclusion of the review, which in no event shall be more than 120 days after the date of entry of the Order,

10

the Independent Compliance Consultant shall submit a Report to FIMC and FSC, the Board of Trustees of the Federated Funds, and the staff of the Commission. FIMC and FSC shall require the Independent Compliance Consultant to address in the Report the issues described in subparagraph 37 of these undertakings, and to include a description of the review performed, the conclusions reached, the Independent Compliance Consultant's recommendations for changes in or improvements to policies and procedures of FIMC, FSC and the Federated Funds, and a procedure for implementing the recommended changes in or improvements to the FIMC and FSC's policies and procedures.

b.     FIMC and FSC shall adopt all recommendations with respect to FIMC and FSC contained in the Report of the Independent Compliance Consultant; provided, however, that within 150 days from the date of the entry of the Order, FIMC and FSC shall in writing advise the Independent Compliance Consultant, the Board of Trustees of the Federated Funds, and the staff of the Commission of any recommendations that they consider to be unnecessary or inappropriate. With respect to any recommendation that FIMC and/or FSC considers unnecessary or inappropriate, FIMC and FSC need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedure, or system designed to achieve the same objective or purpose.

c.     As to any recommendation with respect to FIMC and FSC's policies and procedures on which FIMC, FSC and the Independent Compliance Consultant do not agree, such parties shall attempt in good faith to reach an agreement within 180 days of the date of entry of the Order. In the event FIMC, FSC and the Independent Compliance Consultant are unable to agree on an alternative proposal acceptable to the staff of the Commission, FIMC and FSC will abide by the determinations of the Independent Compliance Consultant.

d.     FIMC and FSC (i) shall not have the authority to terminate the Independent Compliance Consultant, without prior written approval of the majority of Independent Trustees and the staff of the Commission; (ii) shall compensate the Independent Compliance Consultant, and persons engaged to assist the Independent Compliance Consultant, for services rendered pursuant to the Order at their reasonable and customary rates; and (iii) shall not be in and shall not have an attorney-client relationship with the Independent Compliance Consultant and shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Compliance Consultant from transmitting any information, reports, or documents to the Independent Trustees of the Federated Funds or the Commission.

e.     FIMC and FSC shall require the Independent Compliance Consultant to enter into an agreement that provides that for the period of the engagement and for a period of two years from completion of the engagement, the Independent Compliance Consultant shall not enter into any employment,

11

consultant, attorney-client, auditing or other professional relationship with FIMC and/or FSC, or any of their present or former affiliates, directors, officers, employees, or agents acting in their capacity.  The agreement will also provide that the Independent Compliance Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Independent Compliance Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Commission's Philadelphia District Office, enter into any employment, consultant, attorney-client, auditing or other professional relationship with FIMC and/or FSC, or any of their present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

38.    <u>Periodic Compliance Review</u>.  At least once every three years commencing at the conclusion of the Independent Compliance Consultant's review, described in paragraph 37, FIMC and FSC shall undergo a compliance review by a third party, who is not an interested person, as defined in the Investment Company Act.  At the conclusion of the review, the third party shall issue a report of its findings and recommendations concerning FIMC and FSC's supervisory, compliance, and other policies and procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by FIMC, FSC and their employees in connection with their duties and activities on behalf of and related to the Federated Funds.  Each such report shall be promptly delivered to FIMC and FSC's Internal Compliance Controls Committee and to the Audit Committee of the Board of Trustees.

39.    <u>Independent Distribution Consultant</u>.  The Respondents shall retain, within 60 days of the date of entry of the Order, the services of an Independent Distribution Consultant not unacceptable to the staff of the Commission and to the majority of the Independent Trustees of the Federated Funds.  The Independent Distribution Consultant's compensation and expenses shall be borne exclusively by the Respondents.  The Respondents shall cooperate fully with the Independent Distribution Consultant and shall provide the Independent Distribution Consultant with access to their files, books, records, and personnel as reasonably requested for the review.  The Respondents shall require that the Independent Distribution Consultant develop a Distribution Plan for the distribution of the disgorgement and penalty ordered in Paragraphs IV.H.1 and 2 of the Order, and any interest or earnings thereon, according to a methodology developed in consultation with the Respondents and the Independent Trustees of the affected Federated Funds and acceptable to the staff of the Commission.  The Distribution Plan shall provide for investors in the funds to receive, from the monies available for distribution, in order of priority (i) their proportionate share of losses suffered by the fund due to market timing and late trading, and (ii) a proportionate share of advisory fees paid by funds that suffered such losses during the period of such market timing.

a.    The Respondents shall require that the Independent Distribution Consultant submit a Distribution Plan to the Respondents, the Independent Trustees and the staff of the Commission no more than 160 days after the date of entry of the Order.

12

b.    The Distribution Plan developed by the Independent Distribution Consultant shall be binding unless, within 190 days after the date of entry of the Order, the Respondents, the Independent Trustees or the staff of the Commission advises, in writing, the Independent Distribution Consultant of any determination or calculation from the Distribution Plan that it considers to be inappropriate and states in writing the reasons for considering such determination or calculation inappropriate.

c.    With respect to any determination or calculation with which the Respondents, the Independent Trustees or the staff of the Commission do not agree, such parties shall attempt in good faith to reach an agreement within 220 days of the date of entry of the Order. In the event that the Respondents and the staff of the Commission are unable to agree on an alternative determination or calculation, the determinations and calculations of the Independent Distribution Consultant shall be binding.

d.    Within 235 days of the date of entry of the Order, the Respondents shall require that the Independent Distribution Consultant submit the Distribution Plan for the administration and distribution of disgorgement and penalty funds pursuant to Rule 1101 [17 C.F.R. § 201.1101] of the Commission's Rules Regarding Fair Fund and Disgorgement Plans. Following a Commission order approving a final plan of disgorgement, as provided in Rule 1104 [17 C.F.R. § 201.1104] of the Commission's Rules Regarding Fair Fund and Disgorgement Plans, the Respondents shall require that the Independent Distribution Consultant, with the Respondents, take all necessary and appropriate steps to administer the final plan for distribution of disgorgement and penalty funds. Respondents shall pay all costs and expenses of the distribution, including but not limited to, the expenses of the Tax Administrator, and, if authorized by the Commission, the expenses of seeking a Private Letter Ruling from the Internal Revenue Service regarding various tax issues relating to the distribution of the funds.

e.    The Respondents shall require the Independent Distribution Consultant to enter into an agreement that provides that for the period of the engagement and for a period of two years from completion of the engagement, the Independent Distribution Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with the Respondents, or any of their present or former affiliates, directors, officers, employees, or agents acting in their capacity. The agreement will also provide that the Independent Distribution Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Independent Distribution Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Commission's Philadelphia District Office, enter into any employment, consultant, attorney-client, auditing or other professional relationship with the Respondents, or any of their present or former affiliates, directors, officers, employees, or agents acting in

13

their capacity as such for the period of the engagement and for a period of two years after the engagement.

40.    Certification.  No later than twenty-four months after the date of entry of the Order, the chief executive officers of the Respondents shall certify to the Commission in writing that the Respondents have fully adopted and complied in all material respects with the undertakings set forth in paragraphs 37 through 39 above and with the recommendations of the Independent Compliance Consultant or, in the event of material non-adoption or non-compliance, shall describe such material non-adoption and non-compliance.

41.    Recordkeeping.  The Respondents shall preserve for a period not less than six years from the end of the fiscal year last used, the first two years in an easily accessible place, any record of each of the Respondents' compliance with the undertakings set forth in paragraphs 37 through 39 above.

42.    Deadlines.  For good cause shown, the Commission's staff may extend any of the procedural dates set forth above.

## IV.

In view of the foregoing, the Commission deems it appropriate, in the public interest, and for the protection of investors to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Sections 15(b)(4) and 17A(c)(3) of the Exchange Act, Sections 203(e) and 203(k) of the Advisers Act, and Sections 9(b) and 9(f) of the Investment Company Act, it is hereby ORDERED that:

A.    FIMC is hereby censured.

B.    FSC is hereby censured.

C.    FSSC is hereby censured.

D.    FIMC shall cease and desist from committing or causing any violations and any future violations of Sections 206(1) and 206(2) of the Advisers Act and Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder.

E.    FSC shall cease and desist from committing or causing any violations and any future violations of Sections 206(1) and 206(2) of the Advisers Act and Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder.

F.    FSSC shall cease and desist from committing or causing any violations and any future violations of Rule 22c-1(a) under the Investment Company Act.

G.   The Respondents shall comply with the undertakings enumerated in paragraphs 37 through 41 above.

H.   <u>Disgorgement and Civil Money Penalties</u>

1.   FIMC, FSC and FSSC shall pay, jointly and severally, within 20 days of the entry of this Order, disgorgement in the total amount of $27 million.

2.   FIMC, FSC and FSSC shall pay, jointly and severally, within 20 days of the entry of this Order, a civil money penalty in the amount of $45 million.

3.   Payment of the disgorgement and civil penalty shall be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22132; and (D) submitted under cover letter that identifies FIMC, FSC, and FSSC as Respondents in these proceedings, the file number of these proceedings, a copy of which cover letter, money order or check shall be sent to Daniel M. Hawke, Associate District Administrator, Securities and Exchange Commission, 701 Market Street, Suite 2000, Philadelphia, PA 19106.

4.   The civil money penalty ordered in Paragraph IV.H.2. shall be distributed pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 ("Fair Fund distribution"). Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that they shall not, after offset or reduction in any Related Investor Action based on Respondents' payment of disgorgement in this action, argue that they are entitled to, nor shall they further benefit by offset or reduction of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

15

I.    <u>Other Obligations and Requirements</u>.  Nothing in the Order shall relieve FIMC, FSC, FSSC or any Federated Fund of any other applicable legal obligation or requirement, including any rule adopted by the Commission subsequent to this Order.

By the Commission.


Jonathan G. Katz
Secretary

**EXHIBIT E**

Janus Capital Management LLC - Admin. Proc. Rel. No. IA-2277 / August 18, 2004        Page 1 of 12

Case 1:07-cv-11278-JGK    Document 30-6    Filed 03/14/2008    Page 2 of 13



## U.S. Securities and Exchange Commission

### UNITED STATES OF AMERICA
### Before the
### SECURITIES AND EXCHANGE COMMISSION

**INVESTMENT ADVISERS ACT OF 1940**
**Release No. 2277 / August 18, 2004**

**INVESTMENT COMPANY ACT OF 1940**
**Release No. 26532 / August 18, 2004**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-11590**

| | |
|---|---|
| In the Matter of<br><br>Janus Capital Management LLC<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 203(e) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940 AND SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

### I.

The United States Securities and Exchange Commission (the "Commission") deems it appropriate and in the public interest that administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Janus Capital Management LLC ("JCM", "Janus" or the "Respondent").

### II.

In anticipation of the institution of these proceedings, the Respondent has submitted an Offer of Settlement (the "Offer") that the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or in which the Commission is a party, and without admitting or denying the findings, except those findings pertaining to the jurisdiction of the Commission over it and the subject matter of these proceedings, the Respondent consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 and Sections 9(b) and 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order") as set forth below.

### III.

Janus Capital Management LLC : Admin. Proc. Rel. No. IA-2277 / August 18, 2004

Case 1:07-cv-11275-JGK    Document 30-6    Filed 03/14/2008    Page 3 of 13    Page 2 of 12

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

## Overview

1. This is a proceeding against JCM based on its negotiated, but undisclosed, market timing agreements in which JCM permitted 12 entities (the "Market Timers" or "Timers") to market time certain Janus mutual funds while representing to other shareholders that it did not permit frequent trading or market timing in its mutual funds. Market timing includes (a) frequent buying and selling of shares of the same mutual fund or (b) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing, while not illegal per se, can harm other mutual fund shareholders because it can dilute the value of their shares, if the market timer is exploiting pricing inefficiencies, or disrupt the management of the mutual fund's investment portfolio and can cause the targeted mutual fund to incur costs borne by other shareholders to accommodate frequent buying and selling of shares by the market timer.

2. Some of the timing agreements were entered into with the understanding that the Market Timer would make long term investments, so-called "sticky assets," in certain Janus mutual funds. In addition, JCM waived all redemption fees that would have otherwise been assessed against the Market Timers for their frequent trading activity.

3. The market timing agreements financially benefited JCM in that JCM realized additional advisory fees from the timed funds and sticky assets under its management. Because of JCM's financial interest in the increased assets under management, JCM had a conflict of interest with the Janus mutual funds subject to the market timing agreements. JCM failed to disclose the conflict of interest to the Board of Trustees and the shareholders of the affected mutual funds, thereby breaching JCM's fiduciary duty to the mutual funds.

4. At the same time JCM entered into and maintained market timing agreements, the prospectuses for the funds being timed stated, or at least strongly implied, that JCM did not permit frequent trading or market timing in these funds. In addition to the prohibitions against market timing contained in its prospectuses, JCM regularly monitored and policed market timing and frequent trading in the Janus funds and took steps to stop such trading when it was identified, including barring shareholders from the funds.

## Respondent

5. JCM, a Delaware limited liability company headquartered in Denver, Colorado, is registered with the Commission as an investment adviser pursuant to Section 203(c) of the Advisers Act. JCM serves as the investment adviser to certain mutual funds. JCM is a wholly owned subsidiary of Janus Capital Group Inc. ("JCG"), a public holding company whose stock trades on the New York Stock Exchange.

## Facts

### JCM's Market Timing Agreements

6. Between November 2001 and September 2003, JCM entered into or maintained agreements with 12 Market Timers that allowed those entities

Janus Capital Management LLC : Admin. Proc. Rel. No. IA-2277 / August 18, 2004    Page 3 of 12

Case 1:07-cv-11275-JGK    Document 30-6    Filed 03/14/2008    Page 4 of 13

to "market time" mutual funds for which JCM was the investment adviser. These agreements permitted the Market Timers to trade far more frequently than other shareholders and, in some cases, to make frequent trades of up to tens of millions of dollars each in the mutual funds. Certain members of JCM's senior management and certain portfolio managers knew about, or were reckless in not knowing about, the approved market timing relationships.

7. Certain members of JCM's sales group negotiated the market timing agreements orally or through email communications and did not otherwise document agreements with the Market Timers in written contracts. Under these agreements, JCM usually negotiated a certain number of "round trips" allowed within a given time frame and a maximum dollar amount for each exchange.

8. After negotiating the market timing agreements, the sales group communicated the terms of the agreements to JCM's operations group to help ensure that all approved timing activity was timely processed and not restricted as part of JCM's normal practice of monitoring and restricting market timing in Janus funds. By 2003, JCM's operations group began maintaining a list of approved Market Timers. By June 2003, that list included specific information about the agreements such as the client contact, the names of the funds approved for frequent trading, dollar trade limits, number of approved trades, and total dollar amount invested.

9. Certain Janus funds in which Market Timers engaged in frequent trading assessed redemption fees. These redemption fees were adopted to offset brokerage commissions and other costs associated with changes in the mutual funds' asset level and cash flow due to short-term trading. A single such fund assessed redemption fees for the entire time period from November 2001 through August 2003. Other such funds assessed redemption fees beginning in March or June 2003. As part of its agreements with the Market Timers, JCM waived redemption fees for their trading in these funds.

10. In connection with some of its market timing agreements, JCM required the approved Market Timer to maintain, or "park," "sticky assets" in Janus mutual funds that were not being timed. In other instances, JCM understood that the total amount of a Market Timer's investments in Janus mutual funds would be substantially greater than the daily trade limits set by JCM for that Market Timer.

11. In addition to the management fees it received from assets being timed by the Market Timers, JCM received additional management fees from the non-timed assets that the Market Timers parked in Janus funds.

12. Most of the market timing under the timing agreements occurred within seven Janus funds.

13. Collectively, the timing activity by the Market Timers caused a substantial amount in dilution to the affected Janus mutual funds.

14. JCM breached its fiduciary duty to the mutual funds subject to the timing agreements by failing to disclose its conflict of interest with the mutual funds arising from the market timing agreements.

### JCM's Largest Timer

Janus Capital Management LLC : Admin. Proc. Rel. No. IA-2277 / August 18, 2004        Page 4 of 12

Case 1:07-cv-11275-JGK    Document 30-6    Filed 03/14/2008    Page 5 of 13

15. Between November 2001 and September 2003, JCM's single largest timer (the "Largest Timer") was permitted to time at least seven Janus funds, making more than 500 trades that included total purchases of more than $2.5 billion dollars. By the Summer of 2003, the Largest Timer had as much as $263,000,000 invested in Janus funds at any given time.

16. In November 2001, the Largest Timer initially invested in the Janus Mercury Fund as a result of a friendship between a then portfolio manager at JCM and a principal at the Largest Timer. The Largest Timer began timing the Janus Mercury Fund shortly thereafter, and was permitted to do so by JCM.

17. By April 2002, the Largest Timer began making frequent trades in other Janus funds.

18. During most of the time that it was making frequent trades in Janus mutual funds, the Largest Timer invested additional assets that were substantially greater than the daily trade limits set by JCM for the Largest Timer.

19. JCM did not assess applicable redemption fees against the Largest Timer for its short-term trading activity.

### The Funds' Prospectuses Prohibited, and JCM Actively Policed, Market Timing and Frequent Trading in Janus Mutual Funds at the Same Time that JCM Allowed the Approved Market Timers to Time the Funds

20. During the same time period that JCM entered into agreements with the Market Timers and allowed the Market Timers to make frequent trades in the Janus funds, the prospectuses for these funds stated, or at least strongly implied, that JCM did not permit frequent trading or market timing in these funds. The prospectuses also stated that frequent trading in the funds could disrupt portfolio investment strategies and increase fund expenses for all fund shareholders, and stated that the funds were not intended for market timing or excessive trading.

21. Between November 2001 and September 2003, JCM provided these prospectuses to shareholders and prospective shareholders in the funds and filed registration statements containing these prospectuses with the Commission.

22. In an effort to effectuate the prohibition on market timing set forth in the funds' prospectuses, JCM regularly monitored and policed market timing and frequent trading in the funds and took steps, in certain circumstances, to stop such trading when it was identified, including barring shareholders from the funds. At the same time it was policing market timing and frequent trading, and prohibiting other shareholders from engaging in it, JCM allowed the Market Timers to engage in these practices.

23. In the Fall of 2002, as part of JCM's efforts to combat market timing in Janus mutual funds, JCM's then Chief Executive Officer commissioned an internal study to examine the market timing problem and make recommendations to address the problem. At the conclusion of this study, a report was prepared that highlighted the adverse impacts associated with market timing in mutual funds, identified the fact that JCM had approved market timing agreements, and recommended that these agreements be terminated.

24. More than 30 people at JCM, including several members of senior management, received a copy of this market timing report. Nevertheless, JCM did not terminate its approved market timing relationships at this time and continued to enter into agreements with Market Timers until July 2003.

## Violations

25. As a result of the conduct described above, JCM willfully violated Sections 206(1) and 206(2) of the Advisers Act in that, while acting as an investment adviser, it employed devices, schemes, or artifices to defraud clients or prospective clients, and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients. Specifically, JCM entered into agreements with the Market Timers, which created a conflict of interest that JCM knowingly or recklessly failed to disclose to the Board of Trustees of the funds, and which were inconsistent with the funds' prospectus disclosures.

26. As a result of the conduct described above, JCM willfully violated Section 34(b) of the Investment Company Act in that it made an untrue statement of material fact in a registration statement, application, report, account, record, or other document filed or transmitted pursuant to the Investment Company Act, or omitted to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading. For example, JCM filed several registration statements with the Commission containing prospectuses that falsely stated or otherwise represented that JCM did not permit frequent trading or market timing in its mutual funds.

27. As a result of the conduct described above, JCM, an affiliated person of the timed mutual funds, willfully violated Section 17(d) of the Investment Company Act and Rule 17d-1 thereunder, in that, while acting as a principal, it participated in and effected transactions in connection with joint arrangements in which the funds were participants without filing an application with the Commission and obtaining a Commission order approving the transactions.

## Undertakings

28. In determining to accept the Offer, the Commission has considered the following efforts voluntarily undertaken by JCM:

a. JCM will use its best efforts to cause the Janus funds to operate in accordance with the following governance policies and practices, which the funds have represented are currently in effect:

i. No more than 25 percent of the members of the Board of Trustees of any Janus fund will be persons who either (a) were directors, officers or employees of JCM at any point during the preceding 10 years or (b) are interested persons, as defined in the Investment Company Act, of the fund or of JCM. In the event that the Board of Trustees fails to meet this requirement at any time due to the death, resignation, retirement or removal of any independent Trustee, the independent Trustees will take such steps as may be necessary to bring the Board in compliance within a reasonable period of time;

Janus Capital Management LLC - Admin. Proc. Rel. No. IA-2277 / August 18, 2004     Page 7 of 13

Case 1:07-cv-11278-JGK     Document 30-6     Filed 03/14/2008     Page 6 of 12

ii. No chairman of the Board of Trustees of any Janus fund will either (a) have been a director, officer or employee of JCM at any point during the preceding 10 years or (b) be an interested person, as defined in the Investment Company Act, of the fund or of JCM; and

iii. Any person who acts as counsel to the independent Trustees of any Janus fund will be an "independent legal counsel" as defined by Rule 0-1 under the Investment Company Act.

b. No action will be taken by the Board of Trustees or by any committee thereof unless such action is approved by a majority of the members of the Board of Trustees or of such committee, as the case may be, who are neither (i) persons who were directors, officers or employees of JCM at any point during the preceding 10 years nor (ii) interested persons, as defined in the Investment Company Act, of the fund or of JCM. In the event that any action proposed to be taken by and approved by a vote of a majority of the independent Trustees of a fund is not approved by the Board of Trustees, the fund will disclose such proposal and the related Board vote in its shareholder report for such period.

c. Commencing in 2005 and not less than every fifth calendar year thereafter, each Janus fund will hold a meeting of shareholders at which the Board of Trustees will be elected.

d. The Funds shall comply with rule 38a-1 by the earlier of (i) 45 days from the entry of this Order, or (ii) the October 5, 2004 compliance date for the rule as adopted by the Commission. See Compliance Programs of Investment Companies and Investment Advisers, Investment Company Act Rel. No. 26299 (Dec. 17, 2003) (adopting release). See also Paragraph 30(f), below.

29. *Ongoing Cooperation*. In determining to accept the Offer, the Commission has considered the following efforts voluntarily undertaken by JCM.

JCM shall cooperate fully with the Commission in any and all investigations, litigations or other proceedings relating to or arising from the matters described in the Order. In connection with such cooperation, JCM has undertaken:

a. To produce, without service of a notice or subpoena, any and all documents and other

information reasonably requested by the Commission's staff;

b. To use its best efforts to cause its employees to be interviewed by the Commission's staff at such times as the staff reasonably may direct;

c. To use its best efforts to cause its employees to appear and testify truthfully and completely without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be requested by the Commission's staff; and

d. That in connection with any testimony of JCM to be conducted at deposition, hearing or trial pursuant to a notice or subpoena, JCM:

Janus Capital Management LLC - Admin. Proc. Rel. No. Ia-2277 / August 18, 2004

Case 1:07-cv-11275-JGK    Document 30-6    Filed 03/14/2008    Page 8 of 13    Page 7 of 12

i. Agrees that any such notice or subpoena for JCM's appearance and testimony may be served by regular mail on its attorneys, John Sturc, Esq., Gibson, Dunn & Crutcher LLP, 1050 Connecticut Avenue, N.W., Washington D.C., 20036-5306, or James Clark, Esq., Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California, 90071-3197; and

ii. Agrees that any such notice or subpoena for JCM's appearance and testimony in an action pending in a United States District Court may be served, and may require testimony, beyond the territorial limits imposed by the Federal Rules of Civil Procedure.

30. *Compliance and Ethics Oversight Structure*. JCM shall maintain a compliance and ethics oversight infrastructure having the following characteristics:

a. JCM shall maintain a Code of Ethics Oversight Committee having responsibility for all matters relating to issues arising under the JCM Code of Ethics. The Code of Ethics Oversight Committee shall be comprised of senior managers of JCM's business units. JCM shall hold at least quarterly meetings of the Code of Ethics Oversight Committee to review violations of the Code of Ethics, as well as to consider policy matters relating to the Code of Ethics. JCM shall report on issues arising under the Code of Ethics, including all violations thereof, to the Legal and Regulatory Committee of the Trustees of the Janus funds with such frequency as the Legal and Regulatory Committee may instruct, and in any event at least quarterly, provided however that any material violation shall be reported promptly.

b. JCM shall establish an Internal Compliance Controls Committee to be chaired by JCM's Chief Compliance Officer, which Committee shall have as its members senior managers of JCM's business units. Notice of all meetings of the Internal Compliance Controls Committee shall be given to the independent Trustees of the Janus funds, who shall be invited to attend and participate in such meetings. The Internal Compliance Controls Committee shall review compliance issues throughout the business of JCM, endeavor to develop solutions to those issues as they may arise from time to time, and oversee implementation of those solutions. The Internal Compliance Controls Committee shall provide reports on internal compliance matters to the Legal and Regulatory Committee of the Trustees of the Janus funds with such frequency as the independent Trustees of such funds may instruct, and in any event at least quarterly. JCM shall also provide to the Audit Committee of JCG the same reports of the Code of Ethics Oversight Committee and the Internal Compliance Controls Committee that it provides to the Legal and Regulatory Committee of the Janus funds.

c. JCM shall establish and staff a full-time senior-level position whose responsibilities shall include compliance matters related to conflicts of interests. This officer will report directly to the Chief Compliance Officer of JCM.

d. JCM shall require the Chief Compliance Officer of JCM to report to the independent Trustees of the Janus funds any breach of fiduciary duty and/or the federal securities laws of which he or she becomes aware in the course of carrying out his or her duties, with such

Janus Capital Management LLC 2 Admin Proc. Rel. No. IA-2277 / August 18, 2004     Page 9 of 13     Page 8 of 12

Case 1:07-cv-11275-JGK     Document 30-6     Filed 03/14/2008

frequency as the independent Trustees may instruct, and in any event at least quarterly, provided however that any material breach (i.e., any breach that would be important, qualitatively or quantitatively, to a reasonable Trustee) shall be reported promptly.

e. JCM shall establish a corporate ombudsman to whom JCM employees may convey concerns about JCM business matters that they believe implicate matters of ethics or questionable practices. JCM shall establish procedures to investigate matters brought to the attention of the ombudsman, and these procedures shall be presented for review and approval by the independent Trustees of the Janus funds. JCM shall also review matters brought to the attention of the ombudsman, along with any resolution of such matters, with the independent Trustees of the Janus funds with such frequency as the independent Trustees of such funds may instruct.

f. JCM shall comply with Rule 206(4)-7 by the earlier of (i) 45 days from the entry of this Order, or (ii) the October 5, 2004 compliance date for the rule as adopted by the Commission. *See Compliance Programs of Investment Companies and Investment Advisers*, Investment Company Act Rel. No. 26299 (Dec. 17, 2003) (adopting release). *See also*, Paragraph 28(d), above.

31. *Independent Compliance Consultant*. JCM shall retain, within 90 days of the date of entry of the Order, the services of an Independent Compliance Consultant not unacceptable to the staff of the Commission and a majority of the independent Trustees of the Janus funds. The Independent Compliance Consultant's compensation and expenses shall be borne exclusively by JCM or its affiliates. JCM shall require the Independent Compliance Consultant to conduct a comprehensive review of JCM's supervisory, compliance, and other policies and procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by JCM and its employees. This review shall include, but shall not be limited to, a review of JCM's market timing controls across all areas of its business, a review of the Janus funds' pricing practices that may make those funds vulnerable to market timing, a review of the Janus funds' utilization of short term trading fees and other controls for deterring excessive short term trading, and a review of JCM's policies and procedures concerning conflicts of interest, including conflicts arising from advisory services to multiple clients. JCM shall cooperate fully with the Independent Compliance Consultant and shall provide the Independent Compliance Consultant with access to its files, books, records, and personnel as reasonably requested for the review.

a. JCM shall require that, at the conclusion of the review, which in no event shall be more than 180 days after the date of entry of the Order, the Independent Compliance Consultant shall submit a Report to JCM, the Trustees of the Janus funds, and the staff of the Commission. The Report shall address the issues described in subparagraph 31 of these undertakings, and shall include a description of the review performed, the conclusions reached, the Independent Compliance Consultant's recommendations for changes in or improvements to policies and procedures of JCM and the Janus funds, and a procedure for implementing the recommended changes in or improvements to JCM's policies and procedures.

b. JCM shall adopt all recommendations with respect to JCM contained in the Report of the Independent Compliance Consultant; provided, however, that within 210 days after the date of entry of the Order,

Janus Capital Management LLC - Admin. Proc. Rel. No. IA-2277 (August 18, 2004)    Page 10 of 12    Page 9 of 12

Case 1:07-cv-11275-JGK   Document 50-6   Filed 03/14/2008

JCM shall in writing advise the Independent Compliance Consultant, the Trustees of the Janus funds and the staff of the Commission of any recommendations that it considers to be unnecessary or inappropriate. With respect to any recommendation that JCM considers unnecessary or inappropriate, JCM need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose.

c. As to any recommendation with respect to JCM's policies and procedures on which JCM and the Independent Compliance Consultant do not agree, such parties shall attempt in good faith to reach an agreement within 240 days of the date of entry of the Order. In the event JCM and the Independent Compliance Consultant are unable to agree on an alternative proposal acceptable to the staff of the Commission, JCM will abide by the determinations of the Independent Compliance Consultant.

d. JCM (i) shall not have the authority to terminate the Independent Compliance Consultant, without the prior written approval of the majority of the independent Trustees and the staff of the Commission; (ii) shall compensate the Independent Compliance Consultant, and persons engaged to assist the Independent Compliance Consultant, for services rendered pursuant to the Order at their reasonable and customary rates; and, (iii) shall not be in and shall not have an attorney-client relationship with the Independent Compliance Consultant and shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Compliance Consultant from transmitting any information, reports, or documents to the Trustees or the Commission.

e. JCM shall require that the Independent Compliance Consultant, for the period of the engagement and for a period of two years from completion of the engagement, shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with JCM, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. JCM shall require that any firm with which the Independent Compliance Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the independent Trustees and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with JCM, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

32. *Periodic Compliance Review.* Commencing in 2006, and at least once every other year thereafter, JCM shall undergo a compliance review by a third party, who is not an interested person, as defined in the Investment Company Act, of JCM. At the conclusion of the review, the third party shall issue a report of its findings and recommendations concerning JCM's supervisory, compliance, and other policies and procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by JCM and its employees in connection with their duties and activities on behalf of and related to the Janus funds. Each such report shall be promptly delivered to JCM's Internal Compliance Controls Committee and to the Legal and Regulatory Committee of the Board of Trustees of each Janus fund.

33. *Independent Distribution Consultant*. JCM shall retain, within 90 days of the date of entry of the Order, the services of an Independent Distribution Consultant not unacceptable to the staff of the Commission and the independent Trustees of the Janus funds. The Independent Distribution Consultant's compensation and expenses shall be borne exclusively by JCM. JCM shall cooperate fully with the Independent Distribution Consultant and shall provide the Independent Distribution Consultant with access to its files, books, records, and personnel as reasonably requested for the review. JCM shall require that the Independent Distribution Consultant develop a Distribution Plan for the distribution of all of the disgorgement and penalty ordered in Section IV, Paragraph C of the Order, and any interest or earnings thereon, according to a methodology developed in consultation with JCM and acceptable to the staff of the Commission and the independent Trustees of the Janus funds. The Distribution Plan shall provide for investors to receive, from the monies available for distribution in order of priority, (i) their proportionate share of losses suffered by the fund due to market timing, and (ii) a proportionate share of advisory fees paid by funds that suffered such losses during the period of such market timing.

a. JCM shall require that the Independent Distribution Consultant submit a Distribution Plan to JCM and the staff of the Commission no more than 160 days after the date of entry of the Order.

b. The Distribution Plan developed by the Independent Distribution Consultant shall be binding unless, within 190 days after the date of entry of the Order, JCM or the staff of the Commission advises, in writing, the Independent Distribution Consultant of any determination or calculation from the Distribution Plan that it considers to be inappropriate and states in writing the reasons for considering such determination or calculation inappropriate.

c. With respect to any determination or calculation with which JCM or the staff of the Commission do not agree, such parties shall attempt in good faith to reach an agreement within 220 days of the date of entry of the Order. In the event that JCM and the staff of the Commission are unable to agree on an alternative determination or calculation, the determinations and calculations of the Independent Distribution Consultant shall be binding.

d. Within 235 days of the date of entry of this Order, JCM shall require that the Independent Distribution Consultant submit the Distribution Plan for the administration and distribution of disgorgement and penalty funds pursuant to Rule 1101 [17 C.F.R. § 201.1101] of the Commission's Rules Regarding Disgorgement and Fair Fund Plans. Following a Commission order approving a final plan of disgorgement, as provided in Rule 1104 [17 C.F.R. § 201.1104] of the Commission's Rules Regarding Disgorgement and Fair Fund Plans, JCM shall require that the Independent Distribution Consultant, with JCM, take all necessary and appropriate steps to administer the final plan for distribution of disgorgement and penalty funds.

e. JCM shall require that the Independent Distribution Consultant, for the period of the engagement and for a period of two years from completion of the engagement, not enter into any employment, consultant, attorney-client, auditing or other professional relationship with JCM, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. JCM shall require that any firm with which the Independent Distribution Consultant is affiliated in performance of his or her duties under the

Janus Capital Management LLC - Admin. Proc. Rel. No. IA-2277 / August 18, 2004

Case 1:07-cv-11275-JGK   Document 30-6   Filed 03/14/2008   Page 12 of 13   Page 11 of 12

Order not, without prior written consent of a majority of the independent Trustees and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with JCM, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

34. Certification. No later than twenty-four months after the date of entry of the Order, the chief executive officer of JCM shall certify to the Commission in writing that JCM has fully adopted and complied in all material respects with the undertakings set forth in this section III and with the recommendations of the Independent Compliance Consultant or, in the event of material non-adoption or non-compliance, shall describe such material non-adoption and non-compliance. 35. Recordkeeping. JCM shall preserve for a period not less than six years from the end of the fiscal year last used, the first two years in an easily accessible place, any record of JCM's compliance with the undertakings set forth in this section III. 36. Deadlines. For good cause shown, the Commission's staff may extend any of the procedural dates set forth above.

### IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in JCM's Offer. Accordingly, it is hereby ORDERED that:

A. Pursuant to Section 203(e) of the Advisers Act, JCM is hereby censured.

B. Pursuant to Section 203(k) of the Advisers Act and Section 9(f) of the Investment Company Act, JCM shall cease and desist from committing or causing any violations and any future violations of Sections 206(1) and 206(2) of the Advisers Act and Sections 17(d) and 34(b) of the Investment Company Act and Rule 17d-1 thereunder.

C. JCM shall comply with the undertakings set forth in paragraphs 30 through 35 above.

D. Disgorgement and Civil Money Penalties

1. JCM shall pay disgorgement in the total amount of $50 million and civil money penalties in the amount of $50 million, for a total payment of $100 million.

2. There shall be, pursuant to Section 308(a) of the Sarbanes Oxley Act of 2002, a Fair Fund established for the funds described in Section IV.D.1. Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalties, JCM agrees that it shall not, after offset or reduction in any Related Investor Action for the amount of the disgorgement paid by it, further benefit by offset or reduction of any part of the civil penalties paid by it ("JCM Penalty Offset"). If the court in any Related Investor Action grants such an offset

Janus Capital Management LLC - Admin. Proc. Rel. No. IA-2277 / August 18, 2004    Page 13 of 13    Page 12 of 12

Case 1:07-cv-11275-JGK    Document 30-6    Filed 03/14/2008

or reduction, JCM agrees that it shall, within 30 days after entry of a final order granting the offset or reduction, notify the Commission's counsel in this action and pay the amount of the JCM Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalties imposed against JCM in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against JCM by or on behalf of one or more investors based on substantially the same facts as those set forth in the Order.

3. Pursuant to an escrow agreement not unacceptable to the staff of the Commission, JCM shall, within 30 days of the entry of this Order, pay the funds described in Section IV.D.1. into an escrow account. The escrow agreement shall, among other things: (1) require that all funds in escrow be invested as soon as reasonably possible and to the extent practicable in short-term U.S. Treasury securities with maturities not to exceed six months; (2) name an escrow agent who shall be appropriately bonded; and (3) provide that escrowed funds be disbursed only pursuant to an order of the Commission. JCM shall be responsible for all costs associated with the escrow agreement.

E. Other Obligations and Requirements. Nothing in this Order shall relieve JCM or any Janus fund of any other applicable legal obligation or requirement, including any rule adopted by the Commission subsequent to this Order.

By the Commission.

Jonathan G. Katz
Secretary

**Endnotes**

[1] The findings herein are made pursuant to the Respondent's Offer and are not binding on any other person or entity in this or any other proceeding.

*http://www.sec.gov/litigation/admin/ia-2277.htm*

**EXHIBIT F**



Home | Previous Page

## U.S. Securities and Exchange Commission

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**Investment Advisers Act of 1940**
**Release No. 2213 / February 5, 2004**

**Investment Company Act of 1940**
**Release No 26347 / February 5, 2004**

**Administrative Proceeding**
**File No. 3-11393**

| | |
|---|---|
| **In the Matter of**<br>**MASSACHUSETTS FINANCIAL SERVICES CO., JOHN W. BALLEN AND KEVIN R. PARKE,**<br><br>**Respondents** | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 203(e), 203(f) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940 AND SECTIONS 9(b) AND 9 (f) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Massachusetts Financial Services Co. ("MFS"), John W. Ballen ("Ballen") and Kevin R. Parke ("Parke") (collectively "Respondents").

**II.**

In anticipation of the institution of these proceedings, MFS, Ballen and Parke each have submitted an Offer of Settlement (collectively, the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203 (e), 203(f)and 203(k) of the Investment Advisers Act of 1940 and Sections 9(b) and 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

Massachusetts Financial Services Co., et al.: Admin. Proc. Rel. No. IA-2213 / February 5, 2004     Page 2 of 19

Case 1:07-cv-11275-GCK   Document 80-7   Filed 03/14/2008   Page 3 of 20

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that:

### Summary

1. MFS, Ballen, and Parke willfully violated antifraud provisions of the Investment Advisers Act and the Investment Company Act by allowing widespread market timing trading in certain MFS funds from at least late 1999 through October 2003 in contravention of the funds' prospectus disclosures.

2. MFS is the investment adviser and sponsor of approximately 140 mutual funds, including a group of 104 funds known as the MFS Retail Funds. Beginning as early as September 1999, the prospectuses of the MFS Retail Funds stated that "the MFS funds do not permit market timing or other excessive trading practices. Excessive short-term (market timing) trading practices may disrupt portfolio management strategies and harm fund performance." In early 2002, MFS began to modify this language to state that "the MFS funds do not permit market timing or other excessive trading practices that may disrupt portfolio management strategies and harm fund performance." These statements were misleading because Respondents permitted widespread market timing trading in a group of approximately ten large cap equity, fixed income or money market mutual funds internally designated as the "Unrestricted Funds."

3. Respondents did not disclose in the prospectuses of the MFS Retail Funds, nor did they effectively communicate to the boards of the MFS Retail Funds, MFS's internal policy of allowing market timing trading in its Unrestricted Funds. Respondents also failed to disclose the conflict of interest created by MFS's acceptance of investments from market timers and management fees paid on a percentage of those investments, contrary to the interests of long-term shareholders. Ballen approved and Ballen and Parke implemented MFS's trading policy permitting market timing in its Unrestricted Funds during the same period that they signed registration statements for certain Unrestricted Funds that prohibited market timing.

4. Because all of the Unrestricted Funds were either large cap domestic equity funds or large funds with highly liquid domestic assets, Respondents believed that the Unrestricted Funds were not susceptible to successful exploitation of inefficiencies in mutual fund pricing. Respondents, however, failed to determine whether market timing was causing harm to the Unrestricted Funds. MFS's internal market timing policy led to widespread and substantial short term transactions, including what appears to have been a significant amount of illegal late trading in the Unrestricted Funds. During this period, MFS failed to detect the late trading by a number of the market timers and the full extent of the harm caused to the Unrestricted Funds by market timing generally. The late traders reaped substantial profits at the expense of other fund shareholders.

5. By virtue of the activities alleged herein, MFS, Ballen, and Parke willfully violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") and Section 34(b) of the Investment Company Act of 1940 ("Investment Company Act").

### Respondents

Massachusetts Financial Services Co. et al.: Admin. Proc. Rel. No. IA-2213 / February 5, 2004          Page 3 of 19

Case 1:07-cv-11275-UGK    Document 30-7    Filed 03/14/2008    Page 4 of 20

6. MFS is a Delaware corporation headquartered in Boston, Massachusetts and has
been registered with the Commission as an investment adviser since 1982. MFS is a more than 90 percent owned subsidiary of Sun Life Financial Inc., a Canadian company whose common stock trades on the New York Stock Exchange. MFS is the investment adviser and sponsor of approximately 140 mutual funds in the MFS Family of Funds ("MFS Funds"). The MFS Retail Funds, of which there are 104, are a subset of the MFS Funds. As of August 31, 2003, assets of the MFS Retail Funds were approximately $73 billion. Throughout the relevant time period, MFS mutual funds were continually offered and sold to the public. MFS Retail Funds are sold through unaffiliated broker-dealers or directly to institutional clients. MFS does not sell its funds directly to retail investors.

7. Ballen, age 44, was president of MFS from August 1998 through 2001, and has
been MFS's chief executive officer from 2002 to the present. He also has been a member of the board of trustees for the MFS Retail Funds since 2001.

8. Parke, age 44, was chief equity officer of MFS from August 1998 through early
2001. He was appointed MFS's president in 2002 and chief investment officer in 2001 and has held those positions to the present. He has also been a member of the board of trustees for the MFS Retail Funds since early 2002.

## Facts

### Introduction

9. MFS is the investment adviser to the MFS Retail Funds. MFS had an internal policy not disclosed in its prospectuses that permitted market timing in a group of MFS Retail Funds internally designated as "Unrestricted Funds" from at least late 1999 through October 2003. As of July 2003, the Unrestricted Funds consisted of eleven equity, fixed income or money market funds with approximately $40 billion in assets, as follows:

> MFS Emerging Growth Fund
> MFS Research Fund
> MFS Value Fund
> Massachusetts Investors Trust
> Massachusetts Investors Growth Stock Fund
> MFS Total Return Fund
> MFS Government Securities Fund
> MFS Government Mortgage Fund
> MFS Bond Fund
> MFS Money Market Fund
> MFS Cash Reserves Fund

10. Market timing includes (a) frequent buying and selling of shares of the same mutual fund
or (b) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing, while not illegal per se, can harm other mutual fund shareholders because it can dilute the value of their shares, if the market timer is exploiting pricing inefficiencies, or disrupt the management of the mutual fund's investment portfolio and can cause the targeted mutual fund to incur costs borne by other shareholders to

Massachusetts Financial Services Co., et al.: Admin. Proc. Rel. No. IA-2213, February 5, 2004    Page 4 of 19

Case 1:07-cv-11275-GCK    Document 30-7    Filed 03/14/2008    Page 5 of 20

accommodate frequent buying and selling of shares by the market timer.

11. Because all of the Unrestricted Funds were either large cap domestic equity funds or large funds with highly liquid domestic assets, Respondents believed that the Unrestricted Funds were not susceptible to successful exploitation of inefficiencies in mutual fund pricing. Respondents, however, failed to determine whether market timing was causing harm to the Unrestricted Funds. Following MFS's decision to allow market timing in the Unrestricted Funds, market timing assets in the Unrestricted Funds substantially increased over time, and caused increasing damage and disruption to those funds.

### The Prospectus Disclosures

12. Beginning as early as September 1999, the MFS Retail Funds, including the Unrestricted Funds, adopted the following disclosure concerning market timing in their prospectuses:

> The MFS Funds do not permit market-timing or other excessive trading practices. Excessive short-term (market timing) trading practices may disrupt portfolio management strategies and harm fund performance. As noted above, the MFS funds reserve the right to reject or restrict any purchase order (including exchanges) from any investor. To minimize harm to the MFS funds and their shareholders, the MFS funds will exercise these rights if an investor has a history of excessive trading or if an investor's trading, in the judgment of the MFS funds, has been or may be disruptive to a fund. In making this judgment, the MFS funds may consider trading done in multiple accounts under common ownership or control.

This language appeared in the prospectuses of certain of the Unrestricted Funds as late as March 31, 2003.

13. In April 2002, MFS began to modify the foregoing prospectus disclosure in its MFS Retail Funds, including the Unrestricted Funds, with the following statement:

> The MFS Funds do not permit market timing or other excessive trading practices that may disrupt portfolio management strategies and harm fund performance. As noted above, the MFS Funds reserve the right to reject or restrict any purchase order (including exchanges) from any investor. The MFS funds will exercise these rights, including rejecting or cancelling [sic] purchase and exchange orders, delaying for up to two business days the processing of exchange requests, and restricting the availability of purchases and exchanges through telephone requests, facsimile transmissions, automated telephone services, internet services or any electronic transfer service, if an investors trading, in the judgment of MFS Funds, has been or may be disruptive to a fund. In making this judgment, the MFS Funds may consider trading done in multiple accounts under common ownership or control.

The modified language appeared in the prospectuses for all MFS Retail Funds, variously, until at least November 2003.

14. Respondents Ballen and Parke signed all but one of the registration statements for the Unrestricted Funds during 2002 and 2003. In addition, Ballen signed two

Massachusetts Financial Services Co.: Admin. Proc. Rel. No. IA-2213 / February 5, 2004    Page 5 of 19

Case 1:07-cv-11275-GAK    Document 30-7    Filed 03/14/2008    Page 6 of 20

registration statements for those funds in 2001.

### MFS's Internal Policy Allowed Market Timing

15. The MFS prospectus disclosures described above were misleading because Respondents permitted widespread market timing trading in its Unrestricted Funds from at least late 1999 through October 2003. Because of this internal policy, MFS did not prohibit or limit market timing activity in those funds during the period of its misleading prospectus disclosures.

16. As a result of MFS's internal policies, market timing was widespread within the Unrestricted Funds. According to internal estimates reported to Ballen and Parke in September 2003, known market timers at MFS held approximately $2 billion in assets as of May 31, 2003. This amount constituted approximately 5 percent of all assets in MFS's Unrestricted Funds, which had assets of approximately $40 billion as of April 30, 2003.

17. MFS not only permitted market timing in its Unrestricted Funds, but it also directed known market timers into its Unrestricted Funds. Beginning at least as early as July 2001, MFS routinely provided certain broker-dealers with its internal policy allowing market timing in the Unrestricted Funds, and routinely directed known market timers to the Unrestricted Funds.

### Ballen and Parke Approved and Implemented the Internal Policy

18. Ballen approved the MFS policy permitting market timing in the Unrestricted Funds. In addition, in consultation with portfolio managers, he made the initial determination of which funds to designate as Unrestricted Funds. He also was involved in the process by which certain large-dollar market timing transactions in the Unrestricted Funds were approved. Thus, Ballen played a significant role in creating and applying MFS's internal policy permitting market timing in the Unrestricted Funds.

19. Throughout the relevant period, Ballen reviewed certain of the MFS Retail Fund prospectuses, including the disclosures regarding market timing, before their dissemination. In addition, Ballen signed two registration statements for the Unrestricted Funds in 2001, all but one of the Unrestricted Funds' registration statements in 2002, and all of the registration statements for those funds in 2003. Thus, Ballen knew or recklessly disregarded that disclosures made in MFS Retail Fund prospectuses about market timing from September 1999 through October 2003 were misleading.

20. Parke also played a significant role in shaping and applying MFS's policy permitting market timing in the Unrestricted Funds. Parke had primary responsibility for determining which funds, previously designated as Unrestricted Funds by Ballen, should continue to be designated as Unrestricted Funds. Parke also reviewed MFS's internal market timing policies in mid-January 2003 and affirmatively decided not to make changes to the policies at that time. Parke also approved certain high-dollar market timing transactions.

21. Throughout the relevant period, Parke was aware of the MFS Retail Fund prospectus disclosures regarding market timing. In addition, Parke signed all but one of the registration statements for the Unrestricted Funds in 2002 and all of the registration statements for those funds in 2003. Thus, Parke knew or recklessly disregarded that disclosure statements made in MFS Retail Fund prospectuses about market timing from

September 1999 through October 2003 were misleading.

22. In addition, on at least three occasions between June 2000 and June 2003, MFS employees proposed that MFS consider changing the internal market timing policy of the Unrestricted Funds by banning market timing in those funds. On each such occasion, the policy remained unchanged.

## Harm to the Funds

23. At all relevant times, late trading and other market timing activities in the Unrestricted Funds caused appreciable harm and disruption.

24. During the relevant period, Ballen and Parke became aware of indications that market timing caused potential and actual harm and disruption to the Unrestricted Funds. For example:

(a) In a July 3, 2003 email, Ballen stated that market timing is "very disruptive in lots of places to the organization and in some cases can harm the performance of the funds due to higher trading costs as the funds buy and sell due to the cash changes." In the same email, Ballen acknowledged that market timing activity was increasing.

(b) In October 2002, the MFS chief administrative officer informed Parke that market timing in the MFS Research Fund ("Research Fund") was negatively affecting the fund's net cash flows, and inquired whether the fund should be removed from the Unrestricted List. However, Respondents, including Parke, allowed market timing to continue in the Research Fund through at least October 2003.

(c) An MFS fund known as the Massachusetts Investor Trust Fund ("MIT") suffered disruption from market timing starting at least in the spring of 2003 and continuing at least to August 2003. In or about April 2003, the portfolio manager of MIT informed Parke that MIT on one occasion had been forced to draw on its line of credit as a result of market timing activity in the fund. On April 17, 2003, the same individual notified Parke by email of continuing activity from market timers that was resulting in large swings in cash flow in MIT. In about May and June 2003, MIT continued to experience cash flow problems as a result of market timers, including additional days on which the fund experienced disruptions resulting from redemption requests by market timers leaving the fund. Market timing activity continued in the MIT fund through at least August 2003.

(d) In about January 2003, Parke learned of market timing disruption to an MFS fund known as the MFS Government Mortgage Fund ("GMF"). The GMF Fund nonetheless remained on the Unrestricted Funds list. In July 2003, the GMF portfolio manager informed Parke of problems caused by market timing in that fund. In an internal e-mail to a top-level executive at an MFS subsidiary, Parke wrote, "[t]imers in the Government Mortgage Fund have become an increasingly large problem. The size and frequency has increased. This is adding complexity to the portfolio management process. Can we take this fund off the timer list?" Ultimately, however, the Respondents, including Parke, allowed market timing to continue in GMF and the other Unrestricted Funds through October 2003.

25. During the relevant period, there were additional indications that market timing caused

Massachusetts Financial Services Co., et al.: Admin. Proc. Rel. No. IA-2213/February 5, 2004    Page 7 of 19

Case 1:07-cv-11279-JGK    Document 30-7    Filed 03/14/2008    Page 8 of 20

potential and actual harm and disruption to the Unrestricted Funds. For example:

> (a) As early as June 2000, a senior MFS employee included in a presentation a chart entitled "Market Timing Wheel of Terror." The presentation warned that "[l]ong term investors are being penalized" by market timers and recommending specific actions to eliminate timing in all of MFS's funds, including a recommendation to notify brokers that MFS would not accept any market timing assets.

> (b) In early 2002, MFS's market timing monitor and others began to remove the MFS Emerging Growth Fund ("MEG") from the Unrestricted Funds list due to disruption to the fund. The fund was not removed, however, at least in part because two senior executives from an MFS subsidiary requested in January 2002 that "certain timers be allowed to continue to add money to [MEG]." In approximately June 2002, an overdraft in MEG caused the fund's portfolio manager to state to another MEG portfolio manager "a big part of the problem with MEG cash is that all the `timers' have migrated to this fund. [A portfolio manager] and others have effectively tossed them from their funds, and Ballen was willing to have the timers focus on MEG." Despite the disruption, however, Respondents allowed market timing to continue in the MEG fund through at least October 2003.

26. Late traders, or those who place mutual fund trades after the close of the market
but illegally receive fund prices calculated for trades placed prior to the market's close, were among those engaging in excessive trades in the Unrestricted Funds. Certain late traders reaped substantial profits from their transactions in the Unrestricted Funds. Indeed, it appears that the majority of the harm caused to shareholders in the Unrestricted Funds was the result of illegal late trading by a number of market timers. Respondents did not detect the late trading and further did not identify the full extent of the harm caused to the Unrestricted Funds by market timing transactions that were allowed in contravention of the funds' prospectus disclosures.

### Respondents Benefitted from Market Timing

27. Acceptance of market timing money was profitable to MFS as it generated millions of dollars in management fees. Such fees are based on a percentage of assets under management. Thus, MFS received advisory fees on market timing assets that it would not otherwise have received had MFS barred market timing trading pursuant to the policy stated in its prospectus disclosures. Respondents Ballen and Parke also benefitted from approving the receipt of market timing assets. Because the MFS bonus pool during the relevant period was determined as a percentage of MFS income, increased management fees generated by investment of market timing money increased the size of the bonus pool paid to MFS employees, including Ballen and Parke. Over the course of four years this increased the bonuses paid to Ballen by $57,736.56 and the bonuses paid to Parke by $58,853.02

28. Respondents failed to disclose the conflict of interest created by MFS's acceptance of investments from market timers and management fees paid on a percentage of those investments, contrary to the interests of long-term shareholders. Respondents did not disclose publicly to shareholders of the MFS Retail Funds, nor did they effectively communicate to the boards of the MFS Retail Funds, MFS's internal policy of allowing market timing trading in its Unrestricted Funds. Respondents Ballen and Parke approved

Massachusetts Financial Services Co., et al.: Admin. Proc. Rel. No. IA-2213 / February 5, 2004    Page 8 of 19

Case 1:07-cv-11273-JGK    Document 30-7    Filed 03/14/2008    Page 9 of 20

and implemented MFS's trading policy permitting market timing in its Unrestricted Funds during the same period that they signed registration statements for certain Unrestricted Funds that prohibited market timing. At all times material hereto, MFS acted through Ballen and Parke, and the misconduct of Ballen and Park is attributed to MFS.

## Violations

29. As a result of the conduct described in Section III above, MFS, Ballen and Parke willfully violated Sections 206(1) and 206(2) of the Advisers Act in that they, while acting as investment advisers, employed devices, schemes, or artifices to defraud clients or prospective clients; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients. Specifically, MFS, Ballen and Parke permitted widespread market timing trading in certain MFS mutual funds in contravention of those funds' prospectus disclosures, with knowledge or reckless disregard of the fact that the internal policy was harmful or potentially harmful to the funds' long-term shareholders.

30. As a result of the conduct described in Section III above, MFS, Ballen and Parke willfully violated Section 34(b) of the Investment Company Act in that they made an untrue statement of material fact in a registration statement, application, report, account, record, or other document filed or transmitted pursuant to the Investment Company Act, or omitted to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.

## Certain Remedial Efforts and Undertakings

31. In determining to accept the Offers, the Commission further considered the following efforts voluntarily undertaken by MFS:

   a. MFS shall use its best efforts to cause the MFS Retail Funds to continue to operate in accordance with the following governance policies and practices:

   i. No more than 25 percent of the members of the board of trustees of any MFS Retail Fund will be persons who either: (A) were directors, officers or employees of MFS at any point during the preceding 10 years; or (B) are interested persons, as defined in the Investment Company Act, of the fund or of MFS, provided that no current trustee shall be removed before January 1, 2005 for failure to meet the 10-year requirement. In the event that the board of trustees fails to meet this requirement at any time due to the death, resignation, retirement or removal of any independent trustee, the independent trustees will take such steps as may be necessary to bring the board in compliance within a reasonable period of time;

   ii. No chairman of the board of trustees of any MFS Retail Fund will either: (A) have been a trustee, officer or employee of MFS at any point during the preceding 10 years; or (B) be an interested person, as defined in the Investment Company Act, of the fund or of MFS; and

Massachusetts Financial Services Co., et al.: Admin. Proc. Rel. No. IA-2213 / February 5, 2004    Page 9 of 19

Case 1:07-cv-12275-JGK    Document 30-7    Filed 03/14/2008    Page 10 of 20

iii. Any person who acts as counsel to the independent trustees of any MFS Retail Fund will be an "independent legal counsel" as defined by Rule 0-1 under the Investment Company Act and will not have any employment, consultant, attorney-client, auditing or other professional relationship with MFS.

b. No action will be taken by the board of trustees of any MFS Retail Fund or by any committee thereof unless such action is approved by a majority of the members of the board of trustees or of such committee, as the case may be, who are not either: (i) persons who were directors, officers or employees of MFS at any point during the preceding 10 years; or (ii) interested persons, as defined in the Investment Company Act, of the fund or of MFS. In the event that any action proposed to be taken by and approved by a vote of a majority of the independent trustees of a fund is not approved by the full board of trustees, the fund will disclose such proposal and the related board vote in its shareholder report for such period.

c. Commencing in 2005 and not less than every fifth calendar year thereafter, each MFS Retail Fund will hold a meeting of shareholders at which the board of trustees will be elected.

d. Each MFS Retail Fund will designate an independent compliance officer reporting to its board of trustees as being responsible for assisting the board of trustees and any of its committees in monitoring compliance by MFS with the federal securities laws, MFS's fiduciary duties to fund shareholders and its Code of Ethics in all matters relevant to the operation of the MFS Retail Funds. The duties of this person will include reviewing all compliance reports furnished to the board of trustees or its committees by MFS, attending meetings of MFS's Internal Compliance Controls Committee to be established pursuant to MFS's undertakings set forth in paragraph IV.B.1.b below, serving as liaison between the board of trustees and its committees and the chief compliance officer of MFS, making such recommendations to the board of trustees regarding MFS's compliance procedures as may appear advisable from time to time, and promptly reporting to the board of trustees any material breach of fiduciary duty, breach of the Code of Ethics and/or violation of the federal securities laws of which he or she becomes aware in the course of carrying out his or her duties.

e. Ongoing Cooperation. MFS shall cooperate fully with the Commission in any and all
investigations, litigations or other proceedings relating to or arising from the matters described in the Order. In connection with such cooperation, MFS has undertaken:

i. To produce, without service of a notice or subpoena, any and all documents and other information reasonably requested by the Commission's staff;

ii. To use its best efforts to cause its employees to be interviewed by the Commission's staff at such times as the staff reasonably may direct;

iii. To use its best efforts to cause its employees to appear and testify truthfully and
completely without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be requested

Massachusetts Financial Services Co. et al.: Admin. Proc. Rel. No. IA-2213 / February 5, 2004     Page 10 of 19

Case 1:07-cv-11275-JGK     Document 30-7     Filed 03/14/2008     Page 11 of 20

by the Commission's staff; and

iv. That in connection with any testimony of MFS to be conducted at deposition, hearing or trial pursuant to a notice or subpoena, MFS:

A. Agrees that any such notice or subpoena for MFS's appearance and testimony may be served by regular mail on its attorney, Donald K. Stern, Esq., Bingham McCutchen, LLP, 150 Federal Street, Boston, Massachusetts 02210-1726; and

B. Agrees that any such notice or subpoena for MFS's appearance and testimony in an action pending in a United States District Court may be served, and may require testimony, beyond the territorial limits imposed by the Federal Rules of Civil Procedure.

## IV.

In view of the foregoing, including the cooperation afforded the staff by Respondents and the special committee of MFS's board of directors during the course of its investigation, the Commission deems it appropriate and in the public interest to impose the sanctions specified in Respondents' Offers.

Accordingly, it is hereby ORDERED:

A. Pursuant to Sections 203(k) of the Advisers Act and 9(f) of the Investment Company Act, Respondents MFS, Ballen and Parke shall cease and desist from committing or causing any violations and any future violations of Sections 206(1) and 206(2) of the Advisers Act and Section 34 (b) of the Investment Company Act.

**Undertakings**

It is further ORDERED that:

B. General Compliance. MFS shall comply with the following undertakings:

1. MFS shall maintain a compliance and ethics oversight infrastructure having the following characteristics:

a. MFS shall maintain a Code of Ethics Oversight Committee having responsibility for all matters relating to issues arising under the MFS Code of Ethics. The Code of Ethics Oversight Committee shall be comprised of senior executives of MFS's operating businesses. MFS shall hold at least quarterly meetings of the Code of Ethics Oversight Committee to review violations of the Code of Ethics, as well as to consider policy matters relating to the Code of Ethics. MFS shall report on issues arising under the Code of Ethics to the extent relating to fund business, including all violations thereof, to the Compliance or Audit Committee of the trustees of the MFS Retail Funds with such frequency as the Compliance or Audit Committee may instruct, and in any event at least quarterly, provided however that any material violation shall be reported promptly to the Compliance or Audit Committee of MFS.

b. MFS shall establish an Internal Compliance Controls Committee to be chaired by MFS's chief compliance officer, which Committee shall have as its members senior executives of MFS's operating businesses. Notice

Massachusetts Financial Services Co. et al.: Admin. Proc. Rel. No. IA-2213 / February 5, 2004    Page 11 of 19

Case 1:07-cv-11278-JGK    Document 30-7    Filed 03/14/2008    Page 12 of 20

of all meetings of the Internal Compliance Controls Committee shall be given to the independent compliance officer of the trustees of the MFS Retail Funds, who shall be invited to attend and participate in such meetings provided that the involvement of the independent compliance officer shall be limited to compliance issues relating to the MFS Retail Funds. The Internal Compliance Controls Committee shall review compliance issues throughout the business of MFS, endeavor to develop solutions to those issues as they may arise from time to time, and oversee implementation of those solutions. The Internal Compliance Controls Committee shall provide reports on internal compliance matters to the Compliance or Audit Committee of the trustees of the MFS Retail Funds with such frequency as the independent trustees of such funds may instruct, and in any event at least quarterly. MFS shall also provide to the Risk Review or Audit Committee of Sun Life Financial Inc. the same reports of the Code of Ethics Oversight Committee and the Internal Compliance Controls Committee that it provides to the Compliance or Audit Committee of the MFS Retail Funds.

2. MFS shall at its own expense establish and staff a full-time senior-level position whose responsibilities shall include compliance matters related to conflicts of interests. This officer will report directly to the chief compliance officer of MFS.

3. MFS shall require that MFS's chief compliance officer or a member of his or her staff review compliance with the policies and procedures established to address compliance issues under the Investment Advisers Act and Investment Company Act and that any violations be reported to the Internal Compliance Controls Committee.

4. MFS shall require the chief compliance officer of MFS to report to the independent directors of the MFS Retail Funds any breach of fiduciary duty and/or the federal securities laws to the extent relating to fund business of which he or she becomes aware in the course of carrying out his or her duties, with such frequency as the independent directors may instruct, and in any event at least quarterly, provided however that any material breach (i.e., any breach that would be important, qualitatively or quantitatively, to a reasonable director) shall be reported promptly.

5. MFS shall establish a corporate ombudsman to whom MFS employees may convey concerns about MFS business matters that they believe implicate matters of ethics or questionable practices. MFS shall establish procedures to investigate matters brought to the attention of the ombudsman, and these procedures shall be presented for review and approval by the independent directors of the MFS Retail Funds. MFS shall also review matters to the extent relating to fund business brought to the attention of the ombudsman, along with any resolution of such matters, with the independent directors of the MFS Retail Funds with such frequency as the independent directors of such funds may instruct.

C. Distribution of Disgorgement and Penalty. MFS shall also comply with the following undertakings:

1. MFS shall retain, within 30 days of the date of entry of the Order, the services of an Independent Distribution Consultant acceptable to the staff of the Commission and the independent directors of the MFS Retail Funds. The Independent Distribution Consultant's compensation and expenses shall be borne exclusively by MFS. The Independent Distribution Consultant

shall develop a Distribution Plan for the distribution of the total disgorgement and penalty ordered in paragraphs IV.S through IV.U below to the mutual funds and their shareholders to compensate fairly and proportionately the funds' shareholders for losses attributable to late trading and other market timing trading activity during the relevant period, according to a methodology developed in consultation with MFS and the independent trustees of the affected MFS Retail Funds and acceptable to the staff of the Commission. The Distribution Plan shall provide for fund investors to receive, in order of priority, (i) their aliquot share of losses suffered by the fund due to late trading and market timing trading activity, and (ii) a proportionate share of advisory fees paid by such fund during the period of such late trading and other market timing trading activity. MFS shall cooperate fully with the Independent Distribution Consultant and shall provide the Independent Distribution Consultant with access to its files, books, records, and personnel as reasonably requested for the review.

2. To require the Independent Distribution Consultant to submit to MFS and the staff of the Commission the Distribution Plan no more than 120 days after the date of entry of the Order.

3. With respect to any determination or calculation of the Independent Distribution Consultant with which MFS or the staff of the Commission does not agree, such parties shall attempt in good faith to reach an agreement within 150 days of the date of entry of the Order. In the event that MFS and the staff of the Commission are unable to agree on an alternative determination or calculation, within 180 days of the date of entry of the Order, they shall each advise, in writing, the Independent Distribution Consultant of any determination or calculation from the Distribution Plan that it considers to be inappropriate and state in writing the reasons for considering such determination or calculation inappropriate.

4. Within 195 days of the date of entry of this Order, the Independent Distribution Consultant shall submit the Distribution Plan for the administration and distribution of disgorgement and penalty funds pursuant to Rule 610 [17 C.F.R. § 201.610] of the Commission's Rules of Practice. Following a Commission order approving a final plan of disgorgement, as provided in Rule 613 [17 C.F.R. § 201.613] of the Commission's Rules of Practice, the Independent Distribution Consultant and MFS shall take all necessary and appropriate steps to administer the final plan for distribution of disgorgement and penalty funds.

5. To require the Independent Distribution Consultant to enter into an agreement that provides that, for the period of the engagement and for a period of two years from completion of the engagement, the Independent Distribution Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with MFS, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. The agreement will also provide that the Independent Distribution Consultant will require that any firm with which the Independent Distribution Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the independent directors and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with MFS, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

D. Excess Recovery. MFS shall also undertake to disgorge and pay to the Commission all funds in excess of $175 million that it obtains, through

settlement, final judgment or otherwise, from individuals or entities alleged to have engaged in late trading and/or market timing in any of MFS Retail Funds. Such funds shall be distributed pursuant to the Distribution Plan referenced in paragraph IV.C.1 above.

E. Independent Compliance Consultant. MFS shall also comply with the following undertakings:

1. MFS shall retain, within 30 days of the date of entry of the Order, the services of an Independent Compliance Consultant acceptable to the staff of the Commission and the independent trustees of the MFS Retail Funds. The Independent Compliance Consultant's compensation and expenses shall be borne exclusively by MFS or its affiliates. The Independent Compliance Consultant shall conduct a comprehensive review of MFS's supervisory,compliance, and other policies and procedures designed to prevent and detect conflicts of interest, breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by MFS and its employees. This review shall include, but shall not be limited to, a review of MFS's market timing and late trading controls across all areas of its business, a review of the MFS Retail Funds' pricing practices that may make those funds vulnerable to market timing, a review of the MFS Retail Funds' utilization of short term trading fees and other controls for deterring excessive short term trading, a review of possible governance changes in the MFS Retail Funds' boards to include committees organized by market sector or other criteria so as to improve compliance, and a review of MFS's policies and procedures concerning conflicts of interest. MFS shall cooperate fully with the Independent Compliance Consultant and shall provide the Independent Compliance Consultant with access to its files, books, records, and personnel as reasonably requested for the review.

2. At the conclusion of the review, which in no event shall be more than 120 days after the date of entry of the Order, MFS shall require the Independent Compliance Consultant to submit a Report to MFS, the trustees of the MFS Retail Funds, and the staff of the Commission. The Report shall address the issues described in paragraph IV.E.1 of these undertakings, and shall include a description of the review performed, the conclusions reached, the Independent Compliance Consultant's recommendations for changes in or improvements to policies and procedures of MFS and the MFS Retail Funds, and a procedure for implementing the recommended changes in or improvements to MFS's policies and procedures.

3. MFS shall adopt all recommendations with respect to MFS contained in the Report of the Independent Compliance Consultant; provided, however, that within 150 days after the date of entry of the Order, MFS shall in writing advise the Independent Compliance Consultant, the trustees of the MFS Retail Funds and the staff of the Commission of any recommendations that it considers to be unnecessary or inappropriate. With respect to any recommendation that MFS considers unnecessary or inappropriate, MFS need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose.

4. As to any recommendation with respect to MFS's policies and procedures on which MFS and the Independent Compliance Consultant do not agree, such parties shall attempt in good faith to reach an agreement within 180 days of the date of entry of the Order. In the event MFS and the Independent Compliance Consultant are unable to agree on an alternative proposal acceptable to the staff of the Commission, MFS will abide by the

Massachusetts Financial Services Co. et al.: Admin. Proc. Rel. No. IA-2213 / February 5, 2004    Page 14 of 19

Case 1:07-cv-11275-JGR    Document 35-7    Filed 03/14/2008    Page 15 of 20

determinations of the Independent Compliance Consultant.

5. MFS: (i) shall not have the authority to terminate the Independent Compliance Consultant, without the prior written approval of the independent trustees of the MFS Retail Funds and the staff of the Commission; (ii) shall compensate the Independent Compliance Consultant, and persons engaged to assist the Independent Compliance Consultant, for services rendered pursuant to the Order at their reasonable and customary rates; and (iii) shall not be in and shall not have an attorney-client relationship with the Independent Compliance Consultant and shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Compliance Consultant from transmitting any information, reports, or documents to the directors or the Commission.

6. To require the Independent Compliance Consultant to enter into an agreement that provides that, for the period of the engagement and for a period of two years from completion of the engagement, the Independent Compliance Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with MFS, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. The agreement will also provide that the Independent Compliance Consultant will require that any firm with which the Independent Compliance Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the independent directors of MFS's Board of Directors and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with MFS, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

F. Periodic Compliance Review. Commencing in 2006, and at least once every other year thereafter, MFS shall undergo a compliance review by a third party, who is not an interested person, as defined in the Investment Company Act, of MFS. At the conclusion of the review, the third party shall issue a report of its findings and recommendations concerning MFS's supervisory, compliance, and other policies and procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by MFS and its employees in connection with their duties and activities on behalf of and related to the MFS Retail Funds. Each such report shall be promptly delivered to MFS's Internal Compliance Controls Committee and to the Compliance or Audit Committee of the board of trustees of each MFS Retail Fund.

G. Certification. No later than twenty-four months after the date of entry of the Order, the chief executive officer of MFS shall certify to the Commission in writing that MFS has fully adopted and complied in all material respects with the undertakings set forth in this section IV and with the recommendations of the Independent Compliance Consultant or, in the event of material non-adoption or non-compliance, shall describe such material non-adoption and non-compliance.

H. Recordkeeping. MFS shall preserve for a period not less than six years from the end of the fiscal year last used, the first two years in an easily accessible place, any record of MFS's compliance with the undertakings set forth in this section IV.

I. Deadlines. For good cause shown, the Commission's staff may extend

Massachusetts Financial Services Co., et al.: Admin. Proc. Rel. No. IA-2213 / February 5, 2004    Page 15 of 19

Case 1:07-cv-cr275-JGK:    Document 30-7    Filed 03/14/2008    Page 16 of 20

any of the procedural dates set forth above.

J. Other Obligations and Requirements. Nothing in this Order shall relieve MFS or any MFS Retail Fund of any other applicable legal obligation or requirement, including any rule adopted by the Commission subsequent to this Order.

**Suspensions and Prohibitions**

It is further ORDERED that:

K. Pursuant to Section 203(f) of the Advisers Act, that Respondent Ballen be, and hereby is, suspended from association with any investment adviser for a period of nine (9) months from the second Monday after the date of this Order.

L. Pursuant to Section 9(b) of the Investment Company Act, Respondent Ballen be prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor or principal underwriter for a period of nine (9) months from the second Monday after the date of this Order.

M. For a period of 27 months after the suspension described in paragraph IV.K has been completed, Ballen:

1. Shall not serve as an employee, officer or trustee of the MFS Funds or any other registered investment company;

2. Shall not serve as chairman or a member of the board of directors of MFS or any other investment adviser;

3. Shall not serve as chief executive officer, president or any other officer of MFS or any other investment adviser;

4. Shall not perform any duties for MFS or any other investment adviser relating to prospectus or other public disclosures, distribution, institutional or retail sales of MFS Funds or the funds of any other registered investment company, compliance matters, internal audit functions, or shareholder trading activities; and

5. May, to the extent such duties are not prohibited in paragraph IV.M.4 immediately above, (i) perform duties involving strategic planning, business analysis and business planning; (ii) be employed by and act as a portfolio manager of a registered investment company and/or manage other investment personnel with respect to investment and personnel decisions and (iii) participate in the marketing of non-mutual fund business of MFS or of such other investment adviser as may then employ Ballen.

N. Pursuant to Section 203(f) of the Advisers Act, that Respondent Parke be, and hereby is, suspended from association with any investment adviser for a period of six (6) months from thesecond Monday after the date of this Order.

O. Pursuant to Section 9(b) of the Investment Company Act, Respondent Parke be prohibited from serving or acting as an employee, officer, director,

Massachusetts Financial Services Co. et al.: Admin. Proc. Rel. No. IA-2213 / February 5, 2004    Page 16 of 19

Case 1:07-cv-11275-JGK    Document 30-7    Filed 03/14/2008    Page 17 of 20

member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor or principal underwriter for a period of six (6) months from the second Monday after the date of this Order.

P. For a period of 30 months after the suspension described in paragraph IV.N has been completed, Parke:

1. Shall not serve as an employee, officer or trustee of the MFS Funds or any other registered investment company;

2. Shall not serve as chairman or a member of the board of directors of MFS or any other investment adviser;

3. Shall not serve as chief executive officer, president or any other officer of MFS or any other investment adviser.

4. Shall not perform any duties for MFS or any other investment adviser relating to prospectus or other public disclosures, distribution, institutional or retail sales of MFS Funds or the funds of any other registered investment company, compliance matters, internal audit functions, or shareholder trading activities, and

5. May, to the extent such duties are not prohibited in paragraph IV.P.4 immediately above, (i) perform duties involving strategic planning, business analysis and business planning; (ii) be employed by and act as a portfolio manager of a registered investment company and/or manage other investment personnel with respect to investment and personnel decisions and (iii) participate in the marketing of non-mutual fund business of MFS or of such other investment adviser as may then employ Parke.

Q. Ballen and Parke shall provide to the Commission, within 30 days from the end of their respective suspension and prohibition periods described in paragraphs IV.K, IV.L, IV.N and IV.O above, an affidavit that each has complied fully with the sanctions described therein.

R. Ballen and Parke shall provide to the Commission, within three years from the date of this Order, an affidavit that each has complied fully with the restrictions described therein.

**Disgorgement and Civil Money Penalties**

It is further ORDERED that:

S. MFS shall, within 30 days of the entry of this Order, pay $175 million in disgorgement plus a civil money penalty of $50 million for a total payment of $225 million. Such payment shall be: (1) made by United States postal money order or wire transfer, certified check, bank cashier's check or bank money order; (2) made payable to the Securities and Exchange Commission; (3) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Alexandria, Stop 0-3, VA 22312; and (4) submitted under cover letter that identifies MFS as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to David P. Bergers, Associate District Administrator, Boston District Office, Securities and Exchange Commission, 73 Tremont Street, Suite 600, Boston,

Massachusetts Financial Services Co. et al.: Admin. Proc. Rel. No. IA-2213 / February 5, 2004    Page 17 of 19

Case 1:07-cv-11275-JSR    Document 30-7    Filed 03/14/2008    Page 18 of 20

Massachusetts, 02108-3912. Such civil money penalty may be distributed pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 ("Fair Fund distribution"). Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, MFS agrees that it shall not, in any Related Investor Action, benefit from any offset or reduction of any investor's claim by the amount of any Fair Fund distribution to such investor in this proceeding that is proportionately attributable to the civil penalty paid by MFS ("MFS Penalty Offset"). If the court in any Related Investor Action grants such an offset or reduction, MFS agrees that it shall, within 30 days after entry of a final order granting the offset or reduction, notify the Commission's counsel in this action and pay the amount of the MFS Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed against MFS in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against MFS by or on behalf of one or more investors based on substantially the same facts as alleged in the Order in this proceeding.

T. Ballen shall, within 30 days of the entry of this Order, pay $57,736.56 in disgorgement, prejudgment interest of $6,322.32, plus a civil money penalty of $250,000 for a total payment of $314,058.88. Such payment shall be: (1) made by United States postal money order, certified check, bank cashier's check or bank money order; (2) made payable to the Securities and Exchange Commission; (3) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Alexandria, Stop 0-3, VA 22312; and (4) submitted under cover letter that identifies Ballen as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to David P. Bergers, Associate District Administrator, Boston District Office, Securities and Exchange Commission, 73 Tremont Street, Suite 600, Boston, Massachusetts, 02108-3912. Such civil money penalty may be distributed pursuant to the Fair Fund distribution. Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Ballen agrees that he shall not, in any Related Investor Action, benefit from any offset or reduction of any investor's claim by the amount of any Fair Fund distribution to such investor in this proceeding that is proportionately attributable to the civil penalty paid by Ballen ("Ballen Penalty Offset"). If the court in any Related Investor Action grants such an offset or reduction, Ballen agrees that he shall, within 30 days after entry of a final order granting the offset or reduction, notify the Commission's counsel in this action and pay the amount of the Ballen Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed against Ballen in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Ballen by or on behalf of one or more investors based on substantially the same facts as alleged in the Order in this proceeding.

U. Parke shall, within 30 days of the entry of this Order, pay $58,853.02 in disgorgement, prejudgment interest of $6,230.97, plus a civil money penalty of $250,000 for a total payment of $315,083.99. Such payment

Massachusetts Financial Services Co. et al.: Admin. Proc. Rel. No. IA-2213 / February 5, 2004    Page 18 of 19

Case 1:07-cv-12275-JGR    Document 30-7    Filed 03/14/2008    Page 19 of 20

shall be: (1) made by United States postal money order, certified check, bank cashier's check or bank money order; (2) made payable to the Securities and Exchange Commission; (3) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Alexandria, Stop 0-3, VA 22312; and (4) submitted under cover letter that identifies Parke as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to David P. Bergers, Associate District Administrator, Boston District Office, Securities and Exchange Commission, 73 Tremont Street, Suite 600, Boston, Massachusetts, 02108-3912. Such civil money penalty may be distributed pursuant to the Fair Fund distribution. Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Parke agrees that he shall not, in any Related Investor Action, benefit from any offset or reduction of any investor's claim by the amount of any Fair Fund distribution to such investor in this proceeding that is proportionately attributable to the civil penalty paid by Parke ("Parke Penalty Offset"). If the court in any Related Investor Action grants such an offset or reduction, Parke agrees that he shall, within 30 days after entry of a final order granting the offset or reduction, notify the Commission's counsel in this action and pay the amount of the Parke Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed against Parke in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Parke by or on behalf of one or more investors based on substantially the same facts as alleged in the Order in this proceeding.

**Censure**

It is further ORDERED that:

V. Pursuant to Section 203(e) of the Advisers Act, that MFS be censured.

By the Commission.


                    Jonathan G. Katz
                    Secretary


---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other persons or entities in this or any other proceeding.

Case 1:07-cv-11275-JGK    Document 30-7    Filed 03/14/2008    Page 20 of 20