UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
SECURITIES AND EXCHANGE COMMISSION, :
                                                             :
            Plaintiff,                                       :
                                                             :
                        V.                                   :  Civil No. 07-CV-11275  (JGK/JCF)
                                                             :
                                                             :
DARRYL A. GOLDSTEIN and                                      :
CHRISTOPHER L. O'DONNELL,                                    :
                                                             :
            Defendants.                                      :
-------------------------------------------------------------x


**MEMORANDUM IN SUPPORT OF DEFENDANT CHRISTOPHER L. O'DONNELL'S
MOTION TO DISMISS THE COMPLAINT**

## Table of Contents

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 4

I. THE COMPLAINT FAILS TO STATE A CLAIM FOR FRAUD ............................ 4

 A. O'Donnell Did Not Commit Fraud by Entering Millennium's Trades Using Three FA Numbers ........................................................................................................ 5

 B. O'Donnell Did Not Commit Fraud by Entering Millennium's Trades in Multiple Accounts ........................................................................................................ 9

 C. Trading in Variable Annuities Involved No Fraud or Deception ................................. 12

II. THE COMPLAINT FAILS TO ALLEGE FRAUD WITH PARTICULARITY ........ 12

III. THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER ................... 18

 A. The Complaint Does Not Allege Conscious Misbehavior or Recklessness ................. 19

 B. The Complaint Does Not Allege Motive and Opportunity ........................................ 20

CONCLUSION ............................................................................................................ 23

Christopher L. O'Donnell submits this memorandum of law in support of his motion to dismiss the Complaint filed by the Securities and Exchange Commission ("SEC").

## INTRODUCTION

Chris O'Donnell is a retail stock broker in the highly regulated securities industry where his daily activities are carefully supervised and scrutinized. He has been a broker for over 22 years and has no prior disciplinary history.

The events underlying the Complaint began approximately six years ago, while O'Donnell was employed by Morgan Stanley DW, Inc. ("Morgan Stanley"), and ceased about 15 months later, by July 2003.[1] The Complaint relates to so-called market timing—the frequent trading of mutual funds—by one of O'Donnell's clients, a multi-billion dollar hedge fund named Millennium Partners L.P. ("Millennium").[2] Market timing is a strategy that has been employed by sophisticated investors for many years. It was not and is not illegal. *See, e.g., SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 468 (S.D.N.Y. 2004). Furthermore, all of the trading at issue here occurred before the first public announcement of regulatory scrutiny of market-timing, in September 2003. Prior to that time, some mutual funds had adopted policies designed to regulate market timing, ranging from limiting the number of trades allowed per calendar year to simply reserving the right to reject trades they considered disruptive. But market timing was still permitted to a significant degree in these funds. Compl. ¶ 22.

The SEC claims that O'Donnell—rather than Millennium (which actually controlled the accounts and directed the trades in question)—defrauded various mutual funds by the way in which he processed some of Millennium's mutual fund orders. The SEC alleges that

---

[1] Much of the underlying conduct, including the allegedly "deceptive" trading referenced in the Complaint and Attachment B, occurred before December 14, 2002—rendering that conduct outside the applicable five year statute of limitations period. 28 U.S.C. § 2462.

[2] At the time O'Donnell commenced his relationship with Millennium, and throughout the relevant period, Millennium was a well-respected, well-known hedge fund manager with substantial assets under management and a clean disciplinary history.

O'Donnell's actions were designed to avoid mutual fund trading restrictions by making it more difficult for mutual funds to identify who was actually making trades.  But here, unlike other SEC market-timing-related actions,[3] the SEC does not allege that O'Donnell engaged in late trading, made affirmative misrepresentations to fund complexes, used FA numbers registered solely under another broker's name, processed trades through different branch offices, or used fictitious accounts.  Here, the SEC's fraud theory rests on accurate FA numbers transparently associated with O'Donnell, trading accounts bearing names of real companies owned by O'Donnell's client, and variable annuities contracts.  In the SEC's view, these legal, truthful practices somehow morphed into fraud because Millennium's trades allegedly could have been processed instead through other legal methods that would have been easier for mutual funds to track.

The SEC's theory is that certain funds imposed trading restrictions on O'Donnell and that he deliberately circumvented those restrictions by making subsequent trades using different, but legitimate, FA numbers or account numbers, or by trading in variable annuities.  The SEC claims that the truthful information that he conveyed with the orders he submitted made it more difficult for the funds to associate the later trades with the earlier market-timing activity and thus effectively misled the fund complexes.  This novel theory of fraud fails as a matter of law and is unsupported by the facts alleged.

The SEC's theory fails as a matter of law because the use of multiple accounts established on behalf of real entities or of multiple FA numbers that refer to real brokers or of real variable annuity products cannot be deemed deceptive.  That is true regardless of whether O'Donnell's conduct somehow made it more difficult for certain funds to track his client's

---

[3] *See, e.g.*, Order Instituting Public Administrative Proceedings, Making Findings, and Imposing Remedial Sanctions, *In re Southwest Sec., Inc., Daniel R. Leland, Kerry R. Rigdon, & Kevin J. Walsh*, File No. 3-11793, Sec. Exch. Rel. No. 51002 (Jan. 10, 2005), *available at* http://www.sec.gov/litigation/admin/34-51002.htm.

market-timing activity. O'Donnell's responsibility as a retail broker employed by one of the world's most sophisticated investment banks was to process his clients' orders promptly and in compliance with his employer's policies and procedures. That is exactly what he did.

Apart from its legal insufficiency, the SEC's theory fails because the SEC has not pleaded sufficient facts to meet its burden of pleading fraud with the required particularity. *See* Fed. R. Civ. P. 9(b). As outlined below, the SEC has failed to explain precisely what trading restrictions were imposed or how O'Donnell's subsequent conduct violated those restrictions, let alone to allege facts giving rise to a strong inference that O'Donnell recklessly or intentionally misled the funds.

Instead of providing these basic details, the SEC's "kitchen sink" Complaint and inadequate Attachment B only compound the confusion by combining O'Donnell's alleged conduct with that of his co-defendant,[4] and by including: (i) accounts in which no specific "deceptive" trading allegedly took place, (ii) mutual funds that were not confronted with any allegedly "deceptive acts," and (iii) accounts unrelated to Millennium. On top of this confusion, the Complaint fails to provide even a cursory explanation of how the trades in Attachment B were "deceptive." Ultimately, the most detailed allegations the Compalint musters are "a few examples" (Compl. ¶ 60) of alleged attempts to avoid restrictions in five different fund complexes. Upon examination, however, none of these examples include sufficient details to suggest that O'Donnell was scheming to evade market-timing restrictions. These references cannot support the SEC's allegations of fraud, nor do they satisfy Rule 9(b), which requires particularity, not example.

---

[4] Although the Complaint repeatedly combines the activities of both defendants and refers to their activities as one alleged "scheme," *see, e.g.*, Compl. ¶ 3, it contains no allegations that the defendants communicated with one another, worked with or for one another, or knowingly collaborated towards any common purpose.

The claims against O'Donnell should be dismissed because the Complaint: (i) fails to allege any actual fraud, deception, or manipulation by O'Donnell, (ii) fails to plead fraud with particularity, as required by Fed. R. Civ. P. 9(b), and (iii) fails to allege facts sufficient to support a "strong inference" that O'Donnell acted with the requisite scienter. *See Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2502 (2007).

## ARGUMENT

## I.      THE COMPLAINT FAILS TO STATE A CLAIM FOR FRAUD

The Complaint fails to allege any cognizable theory of fraud or deception. To plead a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5), the SEC must allege that O'Donnell "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). Section 17(a) of the Securities Act requires essentially the same elements, but only in connection with the "offer or sale" of securities.[5] *Id.*

Critically, in order to establish liability for securities fraud, the plaintiff must prove "a false or misleading statement or material omission." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 376 (1991) (emphasis added). Yet, the Complaint in this case is devoid of any allegations that O'Donnell made a material misrepresentation, failed to disclose material information that he had a duty to disclose, or otherwise engaged in fraudulent, deceptive, or manipulative conduct while executing trades for Millennium. Instead, the Complaint alleges that O'Donnell deceptively circumvented mutual fund trading restrictions by

---

[5] Additionally, Section 17(a) does not require scienter to obtain an injunction under subsections (a)(2) and (a)(3). *Monarch Funding*, 192 F.3d at 308.

entering trades in multiple accounts and through variable annuities using two joint FA numbers, sometimes after receiving correspondence from mutual funds. Although they are entirely lawful and commonplace, the Complaint contends these practices are transformed into fraud because, in the aggregate, they made it more difficult for mutual funds to identify the client behind the trades. Compl. ¶¶ 57, 60. This novel theory and its accompanying allegations fail to state a claim under the securities laws.

### A.    O'Donnell Did Not Commit Fraud by Entering Millennium's Trades Using Three FA Numbers

The SEC concedes, as it must, that brokers frequently use joint FA numbers to share commissions. Compl. ¶ 24. When O'Donnell used a grand total of two joint FA numbers to share compensation with two of his co-workers, however, the SEC would have this Court construe lawful activity as a fraudulent attempt to hide his association with certain trades. To convert common and lawful practices into fraud, the Complaint relies on the hindsight and conclusory assertion that O'Donnell's purpose must have been fraudulent based solely on the number of trades his client made and the sequence in which they were entered. Such allegations do not support any inference of fraud.

O'Donnell did not fabricate a multitude of FA numbers to increase the number of trades he could enter. Nor did he ever use an FA number that was not associated with him to enter Millennium's trades. Indeed, the Complaint concedes that the two joint FA numbers O'Donnell used were authentic and were openly associated with his name. Thus, the Complaint acknowledges that besides his primary FA number (723143),[6] O'Donnell also maintained joint production agreements with David Cusano to create the O'Donnell/Cusano FA number

---

[6] The actual FA numbers allegedly used by O'Donnell are identified in the first column of each table in Attachment B. The persons associated with each FA number can be gleaned by cross-referencing specific trades in Attachment B with the description of those events in ¶ 60 of the Complaint.

(723002), and Michael Gaetano to create the O'Donnell/Gaetano FA number (723011). Compl. ¶53. The Complaint further confirms that each of these junior brokers received 1% of the commissions generated under their respective joint FA numbers. *Id.* ¶ 56. And the Complaint does not dispute that brokers routinely use joint production numbers to track business in which they may have a stake. *Id.* ¶ 52. The Complaint thus raises no doubt that both joint numbers accurately represented the information that all parties understood FA numbers to represent: the names of the brokers associated with, and receiving commissions under, those numbers.

The Complaint also seeks to raise a vague inference of wrongdoing by speculating that the joint FA numbers in this case were not created for their typical purpose of tracking joint production because "O'Donnell received 99% of the revenue earned for business placed under [each] number, leaving the junior FA with only 1%." Compl. ¶ 56. Yet the Complaint does not reveal why a small ratio for a junior broker amounts to fraud. While it suggests that such a split may be facially odd, the Complaint makes no allegation that such a split is uncommon, let alone fraudulent.[7] In fact, the Complaint alleges that Gaetano and Cusano had only minor roles relating to the Millennium accounts, *id.*, which could fully explain the small allocations that they received.

The Complaint also suggests that O'Donnell's use of joint FA numbers was deceptive because it made it more difficult for mutual funds to track the source of market-timing trades. Here, again, O'Donnell's use of genuine joint FA numbers that actually divided commissions does not become fraud merely because mutual funds may have failed to make an allowance for joint production numbers when designing their trade monitoring procedures. The Complaint

---

[7] The SEC's attempt to create an inference that a 99 to 1 split was an aberration, or too small to meaningfully compensate a junior broker, or otherwise track broker performance, is curious. In investigative testimony on Jan. 25, 2007, Cusano testified that he was still employed by Morgan Stanley, and that in his then-new role of "internal regulator," he saw other 99 to 1 splits, and has even seen at least one 99.9 to 0.1 split. Cusano Testimony p.50:20 – 51:4.

admits that FA numbers were used internally by Morgan Stanley for the purpose of tracking and dividing commissions. The Complaint certainly does not allege that O'Donnell or *anyone* at Morgan Stanley ever represented that each broker only had a single FA number. In fact, as stated above, these numbers, when provided to mutual funds, were always associated with O'Donnell and were plainly attributable to him. Indeed, the SEC's own allegations reflect that the production splits all identified O'Donnell by name. Compl. ¶ 53.

As discussed below, the Complaint cites five instances of allegedly deceptive trading activities involving FA numbers. *Id.* ¶ 60. In each instance, the Complaint asks this Court to infer actionable deception or fraud from a chronology in which O'Donnell was first "banned" from trading in a particular fund, and then allegedly made trades with that fund complex using a joint FA number. Aside from their lack of particularity, two fatal flaws render these allegations insufficient to state a claim.

First, the chronologies fail to allege any actual deception or fraud. Even if this Court were to infer that O'Donnell sought to improve his client's chances of having trades accepted by executing some trades using a joint FA number, the Complaint demonstrates that O'Donnell employed no deception or fraud in the process. The FA numbers were all linked to him.

Second, the Complaint does not identify a single instance in which O'Donnell switched to an alternate FA number after his primary number, 723143, was blocked. Absent such an allegation, there is no basis from which to infer that O'Donnell's use of a joint FA number was intended to facilitate a trade that he *might have* believed would otherwise be blocked. The Complaint does generally allege that O'Donnell was "banned" from trading in the five funds identified in ¶ 60, but the more specific trading log in Attachment B reveals that the "ban" extended only to a particular account or to a particular FA number that is not among the three

attributed to O'Donnell.  Thus, the Complaint states that on October 9, 2002, AIM "banned" O'Donnell from trading (Compl. ¶ 60(a)), while Attachment B shows that AIM blocked trading only by "brokers 723-WRCH, 723-010 and all of their accounts" (neither of which is O'Donnell) on that date.  Similarly, the Complaint states that on July 24, 2002, Oppenheimer "banned" O'Donnell from trading (Compl. ¶ 60(b)), while Attachment B shows that Oppenheimer only blocked trading "in accounts 723-060177, -060178, and -060179."  This clarification is more than semantics; the inference of fraud that the SEC intends this Court to draw hinges on the predicate that O'Donnell had to use alternate FA numbers because he was blocked from using his own.  That predicate does not exist.

In this circumstance, the Court is not bound to accept as true such a general allegation that is in conflict with other, more specific allegations in the Complaint.  *See In re IAC/InterActiveCorp Sec. Litig*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007) ("Nor should a court accept allegations that are contradicted or undermined by other more specific allegations in the complaint . . . ."); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) ("General, conclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint.").

Moreover, the trading log actually shows that O'Donnell continued to use his primary FA number after he was supposedly "banned" from trading.  For example, the Complaint asks this Court to infer fraud from O'Donnell's supposedly sudden switch to the O'Donnell/Cusano FA number (723002), after AIM "banned" him on October 9, 2002.  Yet, the trading log shows that O'Donnell made *seven* trades using his *primary* 723143 number between the October 9 "ban" date and November 15, the day he allegedly made four trades using the O'Donnell/Cusano number (723002).  In fact, the trading log shows that O'Donnell's primary 723143 number was

used to trade with AIM on November 15—the very day that O'Donnell supposedly needed to use a joint FA number to evade AIM's trading restrictions.

Indeed, the trading log is replete with examples of O'Donnell using all three numbers both before and after he was allegedly "banned,"[8] negating any implication that there is a correlation between a trading "ban" and O'Donnell's use of his two joint FA numbers. The SEC simply ignores such innocent explanations. The SEC's allegations boil down to O'Donnell's use of genuine joint FA numbers, pursuant to authentic commission-sharing arrangements, that accurately reflected his participation, that have no nexus to any apparent trading "bans" applicable to O'Donnell's primary FA number. Such allegations are insufficient to state a fraud claim for violation of the securities laws.

### B.    O'Donnell Did Not Commit Fraud by Entering Millennium's Trades in Multiple Accounts

The Complaint's shortcomings regarding FA numbers are duplicated with respect to Millennium's use of multiple accounts. Although the Complaint concedes that multiple accounts are legitimately used to pursue different investment strategies or segregate assets, the Complaint broadly asserts that O'Donnell—not Millennium, which opened and controlled the accounts—instead used multiple accounts to hide the extent of Millennium's trades. Compl. ¶ 48. In this regard, the Complaint again fails to allege fraud by O'Donnell.

As with the joint FA numbers, the multiple accounts in which Millennium traded were genuine accounts associated with actual limited liability companies ("LLCs") owned or

---

[8] This defect occurs repeatedly in the Complaint. For example, despite the Complaint's heavy reliance on O'Donnell's "switch" to the 723011 number after being "banned" from Oppenheimer on July 24, 2002, Compl. ¶ 60, the trading log shows that O'Donnell used his 723143 number to execute four trades after the "ban." Similarly, O'Donnell made eight purchases in T. Rowe Price using his 723143 number after he was supposedly "banned" from trading on August 9, 2002. And the trading log for Alliance Funds shows the same defect in reverse; while the Complaint places great weight on O'Donnell's supposed "switch" to the 723002 number after being "banned" from trading in Alliance on February 26, 2003, the trading log reveals that the 723002 number was used at least seven times in late 2002, well before the number was allegedly needed to circumvent the "ban."

controlled by O'Donnell's hedge fund-client, Millennium. There is no allegation that O'Donnell ever instructed Millennium to open multiple accounts or how to title them. While the Complaint asserts that the accounts were given names that prevented funds from "easily associating" them with Millennium, the Complaint concedes that O'Donnell did not create those names; rather, Millennium created those names, as each account was named after a "limited liability companies [that] Millennium had formed." Compl. ¶ 48. There is no specific allegation that O'Donnell knew of any infirmity associated with the existence of these LLCs or the use of these multiple accounts.

Second, the Complaint tries to raise an inference of some nefarious purpose by contending that O'Donnell did not use the accounts to pursue different investment strategies or segregate assets. However, O'Donnell's purpose is irrelevant, since his client determined which account to use, not O'Donnell. The Complaint's argument fails on its own terms, as the Complaint confirms that O'Donnell was merely a broker who opened accounts and placed trades at Millennium's direction. Compl. ¶¶ 14, 48. As a broker, O'Donnell's role was limited to the ministerial act of executing the trades that Millennium entered; all references to *O'Donnell's* trading strategy are inapposite.

Moreover, the Complaint's conclusions as to purpose do not reasonably follow from their underlying factual allegations. The Complaint concludes that the accounts were not used to pursue different investment strategies because some of the accounts were routinely used to trade shares of the same mutual funds at roughly the same time. Compl. ¶ 49. This is a non sequitur; of the several Millennium accounts identified in the Complaint, it is not surprising that the investment strategies being pursued through some accounts (with the same investment adviser) would likely coincide. Similarly, the SEC's conclusion that the accounts were not used to

-10-

segregate assets does not follow from its premise that O'Donnell, at Millennium's direction, sometimes transferred money between accounts. *Id.* ¶ 50. It is hardly uncommon for a multi-billion dollar hedge fund manager like Millennium to change investment strategies and shift assets between investment vehicles.

The Complaint also attempts to link O'Donnell to Millennium's trading decisions. But out of all the information the SEC culled in its four-year investigation, the only allegation the SEC musters is that one of O'Donnell's *trading assistants, on one occasion*, recommended that Millennium place trades of significant size through five accounts to maximize the chances that the trades would be accepted. Compl. ¶ 51. O'Donnell's trading assistant is not O'Donnell, however, and the Complaint does not even attempt to explain why the assistant's alleged statement should be attributable to O'Donnell. Regardless, the allegation still fails to constitute fraud or deception. In fact, the allegation suggests that O'Donnell's trading assistant may have been trying to comply with mutual fund directions—not evade them—by tailoring the size and amount of purchases for each account.

Finally, the Complaint weaves the allegations of multiple accounts into the same five chronologies outlined in ¶ 60 that have already been discredited with respect to their implications over the use of joint FA numbers. Yet, in four of the five instances, there is no attempt to allege facts that would imply fraud based on the use of multiple accounts; the examples merely indicate that O'Donnell's client placed trades in several accounts, which remains entirely lawful.

Only for the final example, involving Alliance Funds, does the Complaint allege that a $1.8 million trade in an unspecified Alliance fund was blocked from one Millennium account and the money transferred to another account, which was then used to make four purchases in different funds totaling $700,000. Compl. ¶ 60(e). This instance, however, highlights the

significance of the Complaint's failure to describe the applicable mutual fund rules and correspondence, as required by Rule 9(b)'s particularity mandate. The Complaint does not even generally identify Alliance's trading policies. That a trade for almost $2 million was allegedly blocked in one Alliance fund, for reasons undisclosed, hardly means that the subsequent trades in four different Alliance funds for $700,000—roughly one-third of the original trade—would have violated Alliance's restrictions. Indeed, the reduced size of the subsequent transactions suggests that Millennium may have been trying to comply with Alliance's directions, not evade them.

### C.    Trading in Variable Annuities Involved No Fraud or Deception

As discussed below, the Complaint fails to allege that O'Donnell's placing of trades inside variable annuities involved fraud or deception. Instead, the Complaint vaguely alleges that trading in variable annuities was, by itself, somehow "deceptive."

The variable annuities allegedly traded by Millennium were designed to allow for trading in separate accounts that cloned the holdings of designated mutual funds and there is no allegation that Millennium's trading in these variable annuities was, by itself, unlawful. Trading inside variable annuities is neither fraudulent nor deceptive, and these claims should be dismissed.

## II.    THE COMPLAINT FAILS TO ALLEGE FRAUD WITH PARTICULARITY

A securities fraud complaint must allege the "circumstances constituting fraud" with "particularity." Fed. R. Civ. P. 9(b); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). To comply with this heightened pleading requirement, a complaint must (1) specify what deceptive, fraudulent, or manipulative acts were performed; (2) identify the party performing the acts; (3) state where and when the acts were performed, and (4) explain why the acts were deceptive, fraudulent, or manipulative. *See ATSI Commc'ns*, 493 F.3d at 99. "Legal conclusions, deductions, or opinions couched as factual allegations" are insufficient to

meet this burden. *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (internal quotation marks omitted) *petition for cert. filed,* 76 U.S.L.W. 3406 (U.S. Jan. 16, 2008)(No. 07-946); *see also ATSI Commc'ns*, 493 F.3d at 99 ("Allegations that are conclusory or unsupported by factual assertions are insufficient."). "To succeed on [a securities fraud] claim, plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

The SEC has failed to carry its heightened pleading burden as to O'Donnell and the Complaint should be dismissed.

First, the Complaint and Attachment B contain improper and irrelevant allegations against O'Donnell that serve only as filler to hide the Complaint's meager substance. The Complaint opens with a highly misleading "Summary" of conclusory allegations that combines O'Donnell's alleged activities with those of his co-defendant, whom O'Donnell has never met. Compl. ¶ 1. *See supra* at 4-5. "Such sweeping, undifferentiated allegations clearly do not satisfy Rule 9(b)," which "does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations . . . [to] inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Apace Commc'ns, Ltd. v. Burke*, 522 F. Supp. 2d 509, 517 (W.D.N.Y. 2007) (internal quotation marks and brackets omitted).

In an attempt to support its broad allegations that O'Donnell "placed approximately 1,360 market-timing trades for Millennium," Compl. ¶ 46, the Complaint attaches a "data dump" listing 373 "deceptive" Millennium trades.[9]  *See* Attach. B.  Even if this raw data could be construed as a basis for fraud, Rule 9(b) is not satisfied by merely listing an unexplained mass of data unaccompanied by any indication of how it supports the Complaint's allegations. *Cf.*

---

[9] Neither the Complaint nor Attachment B contain any details for the other 987 alleged trades.

*Crystal v. Foy*, 562 F. Supp. 422, 425-26 (S.D.N.Y 1983) ("Simply listing a mass of documents does not satisfy Rule 9(b). Plaintiff must indicate how these sources provide the requisite factual support for the complaint's accusations and must link the sources to subsequent allegations in the pleading." (internal quotation marks, brackets, and ellipses omitted)). Attachment B purports to reflect "deceptive trading," but fails to provide any explanation of why those trades are relevant to a discussion about O'Donnell's work for Millennium or how they were "deceptive."

While the Complaint vaguely alleges three types of "deceptive acts" – (1) trading in variable annuities, (2) trading using multiple accounts, and (3) trading using different FA numbers – in each case, it fails to allege specific details. *See* Compl. ¶ 1; *see also id.* ¶¶ 46 – 58.

For example, the Complaint is devoid of *any* particularized allegations relating to O'Donnell's allegedly fraudulent use of variable annuities. The annuities-related allegations state only vaguely that O'Donnell made ten unidentified annuities trades while knowing that they were more difficult for mutual funds to track. Compl. ¶¶ 57, 58. But, while the Complaint only details instances of fraudulent trading "outside of the annuity context," *id.* ¶ 60, O'Donnell is left to speculate why it refers to variable annuities at all. Because the Complaint fails to identify any specific fraudulent acts performed in the annuities context, much less the "where" and "when" of those acts or the reasons why they were fraudulent, the Complaint's annuities-related claims must be dismissed under Rule 9(b). *See ATSI Commc'ns*, 493 F.3d at 99; *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1248 (2d Cir. 1982); *In re Parmalat Sec. Litig.*, 383 F. Supp. 616, 622 (S.D.N.Y. 2005).

Similarly, although the Complaint alleges that "O'Donnell opened at least 50 MSDW accounts for Millennium as part of the deceptive scheme," Compl. ¶ 48, it only provides even

basic trading details for 31 of the 48 unique account numbers[10] listed in ¶ 48.  *Compare id.*, *with*
Attachment B.  Indeed, the Complaint's allegation that all 48 unique accounts listed in ¶ 48 were
"part of" the "deceptive scheme" is irreconcilable with Attachment B's assertion that only 31 of
those accounts allegedly engaged in "deceptive trading."  Other than the conclusory assertion
that the additional 17 accounts were "part of" a broader "deceptive scheme," Compl. ¶ 48, the
Complaint contains no other allegations with respect to these accounts.

  At bottom, once the unsupported, vague, and irrelevant allegations from the Complaint
and Attachment B are stripped away, all that remains are the SEC's claims that O'Donnell used
joint FA numbers and that his client used multiple accounts in five allegedly fraudulent
instances, which are identified in ¶ 60,[11] and which we discussed above.  Each of these instances
is styled to suggest fraud based only upon a chronology of trading events in which (1) O'Donnell
was allegedly "banned" from placing trades in a mutual fund or a mutual fund trade was
canceled, and (2) O'Donnell allegedly subsequently used a joint FA number or alternate account
to place a trade with the fund.  But aside from failing to describe any fraudulent behavior by
O'Donnell—a point addressed in Part I of this memorandum—these allegations are insufficiently
particularized to satisfy Rule 9(b).

  Importantly, if the SEC is to allege that O'Donnell's conduct was intended to and did
deceive mutual funds into permitting more of his client's trading than they would have
otherwise, the SEC must, at a minimum, allege what the "circumvented" restrictions were.
However, the Complaint fails to describe the substance of most of the mutual fund trading
restrictions or the communications that supposedly implemented those restrictions.  Instead, the

---

[10] Although ¶ 48 of the Complaint appears to enumerate fifty separate accounts, two of the accounts (numbers 723-060246-011 and 723-060242-011) appear on that list twice.
[11] The arguments that follow apply with equal force to the trades listed in Attachment B, if the Court decides to consider that raw data.

Complaint explains generally that trading restrictions varied, with some funds adopting a policy against market timing without specific restrictions, others imposing quantitative restrictions such as a "maximum of 10 exchanges per calendar year," and others adopting no policies or restrictions but reserving the right to reject particular "excessive" or "abusive" trades. Compl. ¶ 22. As if these allegations were not vague enough, the Complaint only links these policies to four of the seventeen mutual funds identified, and even for those four funds, the Complaint does not explain if the restrictions limited trades by a particular broker, by a beneficial owner, or from a particular account. *See* Compl. ¶ 60 & Attach. B.

Nor does the Complaint describe the scope of the "block letters" invoking these restrictions to reject trades. As the SEC has acknowledged in Attachment B, some communications were account-specific and others were FA number-specific. The scope of each is critical to analyze the substance of any subsequent mutual fund trading in that complex. If a mutual fund complex sought to limit trading from certain individual accounts, but did not prohibit additional trades by the same owner from alternate accounts, trading from those accounts would comply fully with the fund complex's request. For example, the AIM "block" notice described at Complaint ¶ 60(a) states that "AIM's policy limits *a shareholder* to ten exchanges a year, *per account*." See Exhibit 1.[12] The letter explicitly contemplated shareholders having more than one account, and stated that AIM's policy was to treat each account separately. In such circumstances, trading in one account by a client may be restricted while trading in

_____

[12] As the Compliant provides details of the letter and relies upon it to support its allegations, we have attached a copy here as Exhibit 1 for the Court's review. *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356 (S.D.N.Y. 2003) ("In deciding a Rule 12(b)(6) motion, the Court may consider the following materials: (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.") (footnotes omitted).

another account by that same client may be permitted. Particularized allegations explaining the nature and scope of the trading restrictions that O'Donnell encountered are thus necessary to explain how his conduct was contrary to the mutual fund communication. *See, e.g., ATSI Commc'ns*, 493 F.3d at 99.

This inadequate pleading of the details of the communications is fatal to the Complaint, which depends on the chronologies to support the inference that O'Donnell's use of joint FA numbers and his client's use of multiple accounts *after* receipt of a letter containing some form of trading restriction *ipso facto* constitutes fraud and must have been intended as a deceptive measure to circumvent the restriction. Without explaining the correspondence the mutual funds sent O'Donnell and his client through Morgan Stanley, which may not have even addressed, much less barred, his client's subsequent trades, it is impossible to draw any inference that O'Donnell resorted to fraud.

Two sets of examples are illustrative, although these deficiencies apply to all of the trades listed in the Complaint and its Attachment B. First, the Complaint alleges that after being "banned" from trading in AIM funds on October 9, 2002, O'Donnell used multiple accounts and a joint FA number to make five mutual fund purchases on January 2, 2003—the inference being that O'Donnell resorted to using the joint FA number to get around the ban on his own number. Compl. ¶ 60(a). Yet, AIM explicitly permitted up to "10 exchanges per calendar year," *Id.* ¶ 22, meaning that the purchases on January 2—the first trading day of the calendar year—were facially permissible and do not support the SEC's allegations.[13]

Second, while ¶ 60 of the Complaint states that O'Donnell was "banned" from trading in the five cited fund complexes on particular dates, the trading log makes clear that the "bans" were little more than blocks on trading from specific accounts or by other brokers. For example,

---

[13] The trading log does not identify any other AIM trades in January 2003.

although the Complaint at ¶ 60(b) alleges that "[o]n July 24, 2002, Oppenheimer . . . banned O'Donnell from trading in their funds," the log clarifies that on that date, "Oppenheimer blocked future purchases and exchanges *in accounts 723-060177, -060178 and -060179* because of unauthorized market timing." Attach. B (emphasis added). Clearly, O'Donnell remained free after the "ban" to submit trades under his primary FA number, negating any nefarious implication from O'Donnell's post-"ban" use of a joint FA number to make a few trades. Even when trading "blocks" arguably applied, the trading log demonstrates that they were often temporary. The log is replete with instances in which an account was "blocked" only to have trades allowed shortly thereafter. *Id.* Despite its repeated inconsistencies and inadequate explanation of "block letters," the Complaint *never once* alleges how a specific trade circumvented a specific, clear and unambiguous trading prohibition.

Absent a description of guidance (and lack thereof) that O'Donnell received, and considering the highly supervised environment in which he operated, it is impossible for the SEC to contend that he engaged in fraud. The Complaint fails to allege any factual basis from which a reasonable inference can be drawn that O'Donnell's lawful business conduct morphed into fraud simply because his client was an active trader and had more than one account. Because the Complaint fails to comply with Rule 9(b), it must be dismissed.

## III.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER

The Complaint must also be dismissed for its failure to adequately allege that O'Donnell acted with the requisite scienter. The Supreme Court has defined the requisite scienter as an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). But "a pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent is insufficient to support the inference that the defendant[] acted

recklessly or with fraudulent intent." *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (internal quotation marks omitted).

Instead, the SEC "must allege facts that give rise to a strong inference of fraudulent intent." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (internal quotation marks omitted). "A plaintiff can establish this intent either (a) by alleging facts to show that [a] defendant[] had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks omitted). Moreover, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2502 (2007).[14] "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *ATSI Commc'ns*, 493 F.3d at 99 (quoting *Tellabs*, 127 S. Ct. at 2510).

### A.    The Complaint Does Not Allege Conscious Misbehavior or Recklessness

To plead scienter through the "conscious misbehavior or recklessness" approach, the SEC must show that it "alleged reckless conduct" by O'Donnell, which is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to [O'Donnell] or so obvious that [O'Donnell] must have been aware of it." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation marks omitted). The Complaint does not even come close.

---

[14] While the Court in *Tellabs* was interpreting the "strong inference" requirement of section 101(b) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(2), the Second Circuit has recognized that the PSLRA codified the same "strong inference" standard that the Second Circuit applies under Rule 9(b). *See Novak*, 216 F.3d at 311 ("[W]e hold that the PSLRA adopted our 'strong inference' standard."); *see also SEC v. Goldsworthy*, 2007 WL 4730345, at *15 (D. Mass. Dec. 4, 2007) (explicitly adopting the "strong inference" standard of *Tellabs* in an action by the SEC); *SEC v. Boling*, 2007 WL 2059744, at *6 (D.D.C. Jul. 13, 2007) (applying the "strong inference" standard of *Tellabs* in an action by the SEC).

The Complaint fails to allege facts sufficient to show that O'Donnell's conduct was "highly unreasonable" and "an extreme departure from the standards of ordinary care" such that he knew there was a risk of fraud. As discussed in Part I, O'Donnell openly used genuine FA numbers and, to his knowledge, his client properly traded in multiple accounts. All of his activity was completely transparent and required the facilitation of numerous Morgan Stanley departments and personnel to be effectuated. It is inconceivable that any fraud or deception on O'Donnell's part would have gone unnoticed in such an environment. Moreover, even if the multiple FA numbers and client accounts *unwittingly* misled some mutual fund complexes (despite their knowledge of his and his clients' identities), that consequence does not evidence O'Donnell's intent. Indeed, O'Donnell had a fiduciary duty to his client to "make every reasonable effort to execute [its orders] promptly and fully," and he knew that he would be legally and financially liable if he did not do so. *See In re Application of Eichler et al. for Review of Disciplinary Action Taken by the NASD*, 47 SEC 692, 1982 WL 31935, at *2 (1982) (upholding the sanctioning of a broker who failed to execute a client's trades), *aff'd*, 757 F.2d 1066 (9th Cir. 1985). The Complaint's allegations do not come close to alleging the extreme recklessness required to plead scienter.

### B.    The Complaint Does Not Allege Motive and Opportunity

The "bare invocation of magic words such as 'motive and opportunity'" is insufficient to create a strong inference of scienter; instead, the Complaint must allege "facts showing the type of particular circumstances that [the] case law has recognized will render motive and opportunity probative of" that inference. *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000). Thus, to sufficiently plead motive a plaintiff must allege "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000) (internal quotation marks omitted). And "[t]he motive

alleged must be sufficiently particularized," meaning that a generalized motive that could be imputed to any similarly situated person engaging in legal practices is insufficient to create a strong inference of scienter. *Rothman*, 220 F.3d at 93.

Under these principles, the SEC has failed to allege that O'Donnell had the requisite motive for scienter. Aside from the type of conclusory allegations of intent that the Second Circuit has rejected, *see Rombach*, 355 F.3d at 176, the Complaint indicates that O'Donnell sought to earn commissions or asset-based fees from trades that allegedly involved deception (although these allegations are not specific to O'Donnell and are thus not pleaded with particularity). Compl. ¶ 1. The Second Circuit has held that such "[g]eneral allegations that the defendant[] acted in [his] economic self-interest are not enough" to sufficiently allege motive for purposes of the scienter requirement. *Ganino*, 228 F.3d at 170. If scienter could be pleaded on the sole basis of a broker's economic motivation to earn fees from executing trades on behalf of his client, virtually every broker in the country could be forced to defend against fraud. *See Rombach*, 355 F.3d at 176. Indeed, an inference of fraud from O'Donnell's mere economic interest in earning commissions (or fees) is in no way "at least as compelling," *Tellabs*, 127 S. Ct. at 2510, as the opposing, common-sense inference that O'Donnell was merely doing his job.

Moreover, the Complaint fails to support its conclusory assessment of O'Donnell's motive with sufficient supporting facts. *See Rothman*, 220 F.3d at 90 (requiring "an allegation of facts showing the type of particular circumstances" sufficient to plead motive). The Complaint states that O'Donnell (actually, Morgan Stanley) was "paid quarterly asset-based fees . . . of 1.00% of the accounts' assets" for managing mutual funds—in other words, a flat rate for servicing the accounts; he was not paid on the basis of trading activity. Compl. ¶ 25. Since O'Donnell had no incentive to generate more trades, the Complaint fails to allege any

particularized motive on his part to maximize trading activity through fraud or deception. *See Kalnit*, 254 F.3d at 139 ("[P]laintiffs must assert a *concrete and personal benefit* to the individual defendant[] *resulting from the fraud*." (emphasis added)). This conclusion is not altered by the argument that O'Donnell had an economic motive to satisfy his client and improve the account's value over time through fraud. A non-particularized economic motive to maximize a client's investment returns, which is shared by every broker in the industry, fails to meet the Second Circuit's standards. *See, e.g., Ganino*, 228 F.3d at 170 ("General allegations that the defendant[] acted in [his] economic self-interest are not enough."); *Rombach*, 355 F.3d at 177 (holding that motive was not alleged by a claim that "defendants artificially inflated [their company's] stock price to increase their personal compensation"). Further, market timing is a lawful practice, allowed but regulated by many mutual fund complexes. The general allegation that O'Donnell could have made more money by facilitating market-timing trades through fraud is insufficient to establish that he did so. As the Second Circuit has made clear, "[a] strong inference of scienter is not raised by alleging that a legitimate investment vehicle . . . creates an opportunity for profit through manipulation." *ATSI Commc'ns*, 493 F.3d at 104.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed, in its entirety, as to Mr. O'Donnell with prejudice.

Dated: March 14, 2008

Respectfully submitted,

MAYER BROWN LLP

By: _____

Stephen J. Crimmins
Daniel T. Brown
Tyler E. Gellasch
1909 K Street, N.W.
Washington, D.C. 20006-1101
(202) 263-3000

Attorneys for Defendant Christopher L. O'Donnell

-23-

# EXHIBIT 1

| From: | "Martinez, Betty" |
|---|---|
| Sent: | 10/9/2002 2:34:19 PM |
| Received: | 10/9/2002 2:33:56 PM |
| To: | "O'Donnell, Chris" , "Doolan, James " , "Samperi, Salvatore " |
| CC: | "Naccarelli, Tony" , "Curry, Kenneth" , "Coscia, James" , "Genzale, Donna" |
| Subject: | FW: Stop Broker Letter./ Aim Fds / Br.723 |

Important Notice please read attachment...

-----Original Message-----
From: Sepulveda, Maria D [mailto:Maria_Sepulveda@Aimfunds.com]
Sent: Wednesday, October 09, 2002 12:21 PM
To: Martinez, Betty
Subject: Stop Broker Letter.
Attached you will find a Market Timing Letter. Please review and call the
number listed above if you have any questions.

Thank You.

AIM Funds Services, Inc.
Maria_Sepulveda@AimFunds.com
Dealer Services.
800-949-4246 x4732
Fax 713-214-7632

<<1009 broker stop letter.doc>>

MS-SEC 00316418

[TIME]

Morgan Stanley Dean Witter Inc
Attn: Betty Martinez
Mutual Fund Operations
34 Exchange Plaza
Harborside Fincl Center, Plaza 3, 6th Fl
Jersey City NJ 07311-0000

RE:     Broker: 723-WRCH, 723-010
        Branch: 000000723

Ms. Martinez:

In the past, we have contacted the above-stated broker regarding "market timing activities" and the effects his excessive money movement has on our funds. AIM's policy limits a shareholder to ten exchanges a year, per account. It is AIM's discretion to terminate a relationship with a broker, at any time if their excessive trading might have adverse effects on our funds.

Please accept this letter as formal notice that the above-stated broker will no longer be permitted to exchange his clients accounts within the A I M Family of Funds. This restriction applies to all accounts for which he is the broker of record.

While AIM appreciates your firm's business, we hope you will understand that the trading restrictions we impose on certain brokers are designed to protect the interests of all shareholders of our funds.

Sincerely,


Ira Cohen
Vice-President


C: Michael Walton
C: Laura Slowensky

MS-SEC 00263430