Lawrence H. Cooke, II
Treazure R. Johnson
Nancy R. Grunberg
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York  10020
Telephone:  (212) 307-5500
Facsimile:   (212) 307-5598
*Attorneys for Defendant Darryl A. Goldstein*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                                         :
SECURITIES AND EXCHANGE COMMISSION, :
                                                         :
           Plaintiff,              :
                                                         :          No. 07-cv-11275 (JGK/JCF)
           v.                       :          ECF CASE
                                                         :
DARRYL A. GOLDSTEIN and             :
CHRISTOPHER L. O'DONNELL,            :
                                                         :
          Defendants.               :
-----------------------------------------------------------x

### REPLY MEMORANDUM IN FURTHER SUPPORT OF
### DARRYL A. GOLDSTEIN'S MOTION TO DISMISS THE COMPLAINT

 

Dated: New York, New York
      April 24, 2008

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ............................................................. 1

**I.    THE COMPLAINT FAILS TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED** .......................................................... 5

    **A.    Mr. Goldstein Did Not Engage in a Scheme to Defraud** .................................. 5

    **B.    Mr. Goldstein Did Not Make Material Misrepresentations** ........................... 6

    **C.    Mr. Goldstein Had No Duty to Update Truthful Statements** .......................... 8

**II.   THE COMPLAINT FAILS TO PLEAD FRAUD WITH PARTICULARITY PURSUANT TO RULE 9(b)** ......................................................... 8

**III.  THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER** .................. 9

**CONCLUSION** ................................................................................. 10

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Carruthers v. Flaum*, 388 F. Supp. 2d 360, 364 n.4 (S.D.N.Y. 2005)............................................ 4

*Harris v. New York State Dept. of Health*, 202 F. Supp. 2d 143, 173 n.13 (S.D.N.Y. 2002)......... 4

*Initial Public Offering Sec. Lit.*, 241 F. Supp. 2d 281, 322 (S.D.N.Y. 2003)................................. 1

*Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000) ..................................................... 10

*Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) .................................................. 9

*SEC v. Boling*, 2007 WL 2059744 (D.D.C. July 13, 2007) .................................................. 2

*SEC v. Collins & Aikman*, 524 F. Supp. 2d 477, 487-88 (S.D.N.Y. 2007) ......................... 1, 9, 10

*SEC v. Druffner*, 353 F. Supp. 2d 141 (D.Mass. 2005) ............................................... 5, 6

*SEC v. Gann*, WL 616005 (N.D. Tex. Mar. 31, 2008) ............................................... 5, 6

*SEC v. Goldsworthy*, 2007 WL 4730345 (D.Mass. Dec. 4, 2007) ................................. 2

*SEC v. JB Oxford Holdings, Inc.*, No. CV-04-070084, 2004 U.S. Dist. LEXIS 29494
   (C.D.Ca. Nov. 10, 2004)......................................................................................... 5, 6

*SEC v. Parnes*, 2001 WL 1658275, at *5 (S.D.N.Y. Dec. 26, 2001) ............................ 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ..................... 1, 10

*Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ....................................... 8

## PRELIMINARY STATEMENT

The SEC claims that for a short period from January 2002 until August 2003, Goldstein violated the antifraud provisions of the federal securities laws by participating in a market-timing scheme on behalf of two institutional clients, Haidar Capital Management, LLC ("Haidar") and Millennium Partners, L.P. ("Millennium").  The SEC's Complaint should be dismissed because it:  (1) fails to state a claim upon which relief can be granted; (2) fails to plead fraud with the requisite particularity; and (3) fails to adequately allege scienter.

As an initial matter, the SEC incorrectly states that its Complaint need only "(i) include a short and plain statement of the claim showing that the Commission is entitled to relief; and (ii) give Goldstein fair notice of what the Commission's claim is and the grounds upon which it rests."  Plaintiff Securities and Exchange Commission's Opposition to Defendant Goldstein's Motion to Dismiss ("SEC Br.") at 2.  Instead, the heightened pleading standard of Rule 9(b) requires that the SEC plead allegations of fraud with particularity.  *See, e.g., In re Initial Public Offering Sec. Lit.*, 241 F. Supp. 2d 281, 322 (S.D.N.Y. 2003) (noting that the lax pleading standards under the federal rules applies "unless the claim falls into one of the two exceptions set forth in Rule 9").[1]  Moreover, in securities cases the SEC and private plaintiffs alike must allege sufficient facts to support a strong inference of scienter.  *SEC v. Collins & Aikman*, 524 F. Supp. 2d 477, 487-88 (S.D.N.Y. 2007).[2]  Conclusory and factually unsupported allegations like those set forth in the Complaint do not meet this pleading standard.

---

[1] While Goldstein is mindful that the various federal rules should be construed harmoniously, the SEC goes too far when it suggests this harmony should take precedence over the express particularity dictates of Rule 9(b), which it inaccurately characterizes as having "limited breadth."  SEC Br. at 13.

[2] *Collins* is the only SEC enforcement case thus far decided in this District that addresses the Supreme Court's recent decision *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007).  In *Tellabs*, the Court held that when determining whether a strong inference of scienter has been pled, as required in the PSLRA (and the Second Circuit), a court should engage in a comparative analysis and determine whether the facts alleged establishing the inference are at least as likely as any opposing inference.  In *Collins*, the court initially noted the open issue of whether the *Tellabs* analysis applies in SEC enforcement actions, but went on to state that in the case before it the SEC passed the *Tellabs* analysis.  524 F. Supp. 2d at 488.  Two other district courts have recently applied the *Tellabs*

Further, the SEC is wrong when it states that Goldstein's opening brief in support of his motion to dismiss ("Goldstein's Brief") "strays beyond the boundaries of Rule 12(b)(6)" by relying on facts that are not alleged in the Complaint. SEC Br. at 3-4. The facts cited in Goldstein's Brief are supported by citations to the Complaint itself and either were taken directly from the Complaint or were fair inferences drawn from allegations in the Complaint. The only exception is Goldstein's request for the Court to take judicial notice of certain SEC findings in public settled orders concerning other market-timing cases.

For example, the SEC takes issue with the following statement: Goldstein's trading activity was "in compliance with MSDW's policies and his supervisors had unimpeded visibility and actual knowledge of the trading, and never told him to stop." *Id*. at 3. In fact, that statement was based directly on the Complaint at paragraph 5, which alleges:

> Mutual fund companies sent MSDW [Morgan Stanley Dean Witter] numerous notices that barred or imposed trading restrictions on the Defendants or specific accounts associated with the Defendants' customers. These notices were generally sent to representatives in MSDW's Mutual Fund Operation Department ("MF Ops"), who then forwarded the notices to MSDW compliance officers, the offending FA, and the offending FA's branch manager. In fact, from December 2001 until July 2003, MF Ops received at least 225 such notices pertaining solely to the two defendants.

Clearly, Goldstein's supervisors had actual knowledge of the trading because the notices that mutual fund companies sent to Morgan Stanley Dean Witter ("MSDW") referenced the trading, and those notices went, ***per the Complaint itself***, to Goldstein's branch manager and compliance officers. In addition, the statement in Goldstein's Brief that he was acting in compliance with MSDW's policies is supported by the allegation in the Complaint that the Defendants' market-timing did not end until August 2003 "when MSDW enforced new policies and procedures

---

analysis to the SEC in enforcement actions. *SEC v. Boling*, 2007 WL 2059744 (D.D.C. July 13, 2007) and *SEC v. Goldsworthy*, 2007 WL 4730345 (D.Mass. Dec. 4, 2007).

designed to prevent such practices throughout the firm." ¶ 6.[3]  These policies and procedures were new in August 2003, thus it can be inferred that while the alleged market-timing was occurring, Goldstein was not violating any existing policy or procedure.  Indeed, there is no allegation to the contrary in the Complaint.

The SEC also complains that there is no support in the Complaint for Goldstein's statement that joint FA numbers are "common in the industry."  SEC Br. at 3.  Contrary to the SEC's assertion, however, Goldstein's statement again is based directly on allegations contained in paragraphs 24 and 36 of the Complaint, from which the challenged statement is a fair inference.  In those paragraphs, the SEC alleges that joint FA numbers "were also sometimes legitimately assigned to FAs by MSDW" (¶ 24), and "joint FA identification numbers were sometimes used legitimately to share commissions at MSDW ...." ¶ 36.  While literally the SEC's words are "sometimes used," the more significant point is that, based on the SEC's own allegations, no inference of fraudulent intent is appropriate from the mere usage of joint FA numbers.

Finally, the SEC takes issue with Goldstein's statement that "he executed trades at the direction of his clients." SEC Br. at 3.  The Complaint expressly alleges that Goldstein executed trades on behalf of his clients.  ¶¶ 3, 6.  Further, the Complaint also alleges that:  "early in the Haidar and Millennium relationships, the hedge funds told Goldstein that *they* anticipated placing numerous market-timing trades...." ¶ 31 (emphasis added).  To the extent that the SEC's objection is based on trying to paint Goldstein as the main motivator behind the trading strategy, there is no support for that position in the Complaint.  Although the SEC gratuitously states that each Defendant's role was more than mechanical and they actually advised their clients on how to make deceptive trades (¶ 3), this is yet another example of a conclusory allegation devoid of

---

[3] Unless otherwise stated, all "¶" references are references to the SEC's Complaint.

the requisite detail – *i.e.*, who did they instruct, what did they instruct, and when did they instruct – and thus subject to dismissal.

The SEC also has challenged Goldstein's request for the Court to take judicial notice of SEC findings in certain consent orders against his client, Haidar, and five mutual fund investment advisors and their related entities, previously attached to Goldstein's Brief as Exhibits A-F.  SEC Br. 3-4.  These settled orders and their accompanying findings highlight the inconsistent positions the SEC has taken in market-timing cases.  In cases against the mutual funds' advisors, the SEC found that such advisors were the ones who defrauded the funds they managed and their shareholders by permitting, indeed encouraging, market timing in the funds, whereas in this case the SEC alleges that the mutual funds and their shareholders were defrauded by Goldstein's and others' market-timing practices.  Not only may a court take judicial notice of documents filed in other courts to establish the fact of such proceedings and the related filings, but it may also take judicial notice of admissions in pleadings and other documents filed by a party in other proceedings that contradict the party's factual allegations in a subsequent action. *Carruthers v. Flaum*, 388 F. Supp. 2d 360, 364 n.4 (S.D.N.Y. 2005) (citing *Harris v. New York State Dept. of Health*, 202 F. Supp. 2d 143, 173 n.13 (S.D.N.Y. 2002)).  Thus, Goldstein's request of the Court is well within the permissible parameters of judicial notice.  Goldstein renews his request that the Court consider the earlier findings of the SEC in these settled matters not for the truth of their assertions, but for the fact that the SEC has made such inconsistent findings.

I.      **THE COMPLAINT FAILS TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED**

A.      **Mr. Goldstein Did Not Engage in a Scheme to Defraud.**

The SEC argues that the Complaint properly alleges that Goldstein engaged in a fraudulent scheme.  As the SEC correctly notes, "[t]o plead a scheme to defraud, the Commission must allege that Goldstein engaged in a manipulative device or contrivance."  SEC Br. at 5 (omitting citations).  As explained in Goldstein's Brief, however, the use of multiple FA and account numbers to effectuate trades falls far short of a manipulative or fraudulent scheme. Rather, both the use of multiple FA numbers and different account numbers for the same client have legitimate purposes. ¶¶ 34-36.  Moreover, although the SEC argues that it properly pled that "Goldstein knew or was reckless in not knowing that mutual fund companies imposed restrictions on excessive trading and monitored trading in their funds to detect and prevent market timing" (SEC Br. at 6), this allegation is conclusory, unsupported and therefore inadequate.  There was no policy at MSDW prohibiting or limiting such trading activity until August 2003. ¶ 6.  Once MSDW implemented such a policy, Goldstein did not violate it.  *Id.* Also, the SEC has not pled any facts to support the conclusion that anyone from a mutual fund was fooled, let alone defrauded, by the use of multiple FA and account numbers.

The SEC cites three prior market timing cases to support the adequacy of its allegations in this case:  *SEC v. Gann*, WL 616005 (N.D. Tex. Mar. 31, 2008); *SEC v. JB Oxford Holdings, Inc.*, No. CV-04-070084, 2004 U.S. Dist. LEXIS 29494 (C.D.Ca. Nov. 10, 2004); and *SEC v. Druffner*, 353 F. Supp. 2d 141 (D.Mass. 2005).  Each of these cases can be distinguished.  In *Gann*, the complaint alleged three highly specific communications between the defendants and their hedge fund clients, wherein they discussed the purpose for the defendants' use of multiple FA numbers, multiple branch codes, and the necessity to break the trades down into smaller monetary amounts to avoid detection. *Gann*, WL 616005 at *4-5.  Here, there are no such

communications alleged.  Similarly, the *Gann* complaint alleged that the defendants kept records

tracking the block letters they received from the various mutual funds, which they shared with

the hedge funds to coordinate the scheme.  *Id*. at *2.  From these allegations, the court was able

to infer that defendants engaged in the allegedly fraudulent market-timing scheme.  *Id*. at *10-11.

These allegations are not present in the SEC's Complaint against Goldstein.

      Similarly in *Druffner*, the complaint alleged that the defendants used multiple accounts

and multiple FA numbers to conduct their clients' trading, but it also alleged that the defendants

continued their trading via these mechanisms after their employer announced a policy prohibiting

such techniques.  353 F. Supp. 2d at 146.  That is significantly different – indeed, quite the

opposite – from the Complaint in this case, which alleges no market-timing trades by Goldstein

after MSDW instituted a policy curtailing market timing.[4]  Finally, the *JB Oxford* case is

similarly inapposite to the present analysis.  In that case, the SEC alleged that the defendants

facilitated both market-timing and late trading.  *JB Oxford Holdings, Inc.*, 2004 U.S. Dist.

LEXIS 29494 at *2-3.  Late trading, which is *per se* illegal, is not at issue in this case.  It is not

surprising that in the face of allegations of *per se* illegal conduct, the court decided that a

deceptive scheme had been adequately pled.  Again, no such facts are alleged in this action.

    **B.**    **Mr. Goldstein Did Not Make Material Misrepresentations.**

      The SEC argues that it has properly alleged that Goldstein made material

misrepresentations to mutual fund companies in the form of his use of multiple account numbers

and multiple FA numbers.  As acknowledged in the Complaint, however, both the use of

multiple accounts and multiple FA numbers have legitimate purposes. ¶¶ 24, 34-36.  Moreover,

the account and FA numbers, approved by MSDW, did not contain misstatements.  The

---

[4] The *Druffner* complaint also included numerous allegations indicative of intent to deceive.  For example, the SEC alleged that the *Druffner* defendants did not legitimately use different joint FA numbers as a tool to apportion commissions differently because, in fact, the same percentage allocations were used for all of the joint FA numbers. Also, Prudential had a policy prohibiting market-timing.  Neither allegation is applicable here.

Complaint does not specify what information was required by the mutual funds in their account opening process and how Goldstein and MSDW ran afoul of that process. Finally, other than its sweeping generalizations in the introduction to the Complaint and the boilerplate language in the cause of action recitations, the SEC does not plead how any employee or representative of a mutual fund was deceived. The SEC pleads vaguely, with no detail or factual support, that by transferring funds from one blocked account into another account and continuing to trade, "they misled mutual fund companies into believing that the subsequent trades were for MSDW brokers or for customers whose trading had not been blocked." ¶ 6. However, there is no factual support for that allegation, and it is not a fair inference to draw from the totality of the allegations.

In fact, the text of several block letters belies the assertion that Goldstein employed multiple FA numbers and opened numerous accounts in order to deceive the mutual funds. First, it is clear that each mutual fund had its own "market-timing" policies—some allowed a certain number of market-timing trades (s*ee e.g.*, AIM block letters allowing up to ten short-term trades within a calendar year (Exhibit A)), while others had varying procedures regarding potential market-timing. *See e.g.*, Alliance block letters dated February 29, 2002, freezing accounts, and August 15, 2002, canceling trades, both due to "market-timing." Exhibits B and C, respectively. Second, within each mutual fund, the market-timing policies and procedures are far from consistent. *See e.g.*, AIM block letters (referenced in Attachment A to the SEC's Complaint) regarding one Millennium account that within a two-week period was first allowed only one more trade, then the account was blocked, but then later allowed two more trades. Third, the block letters indicate that the mutual funds understood the connection between Goldstein and a particular account, regardless of the name of the account holder. *See e.g.*, AIM block letter dated June 27, 2002, wherein a Riverview Group account is "stopped" and it is noted that the Riverview Group was "previously stopped under separate account numbers with your dealer."

Exhibit D.  Thus, the block letters the SEC cites do not support its argument that multiple FA

numbers and accounts deceived the mutual funds.  Indeed, a more compelling inference to be

drawn from the pattern of the mutual funds' usage of block letters is that the mutual fund

companies frequently chose to limit the trading on an account by account basis, rather than

immediately blocking all trades from a particular FA, office or customer, and thus permitted the

trading to continue.  The facts alleged in the Complaint are simply inadequate to support an

inference that Goldstein's use of multiple FA and account numbers, all of which were approved

by MSDW, defrauded any mutual funds.

### C.    Mr. Goldstein Had No Duty to Update Truthful Statements.

The SEC correctly states that "[a]n omission is actionable under federal securities laws

when the defendant is subject to a duty to disclose the omitted facts."  SEC Br. at 9 (citing *In re

Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).  It then attempts to manufacture a

duty on Goldstein's part where none exists.  While the SEC may be correct that conduct that

amounts to a scheme to defraud creates an independent duty to disclose, a prerequisite for the

imposition of such a duty is, by definition, a scheme to defraud, which the SEC has failed to

allege in this case.  Similarly, the SEC argues that there is a duty to disclose any information

necessary to make an individual's voluntary statements not misleading, but again, this

presupposes misleading voluntary statements, which are not adequately alleged.

### II.    THE COMPLAINT FAILS TO PLEAD FRAUD WITH PARTICULARITY PURSUANT TO RULE 9(b)

The SEC incorrectly states that its pleading need only be a short statement of the claim

and provide notice of the claim and its grounds.  SEC Brief at 2.  In fact, the SEC is subject to

the heightened pleading standard of Rule 9(b).  The SEC erroneously likens the Rule 9(b)

heightened pleading standard to the notice pleading standard of Rule 8(a) (SEC Br. at 13) and in

support of that position, it argues that "[b]ecause the details of a scheme may only be known by the defendants, courts in this circuit apply a relaxed pleading standard." *Id*. at 14.[5]

The SEC lists several paragraphs that it contends support a properly pled scheme to defraud. SEC Br. at 14-15. The list focuses primarily on the following two elements: Goldstein (1) used multiple FA numbers, that had been processed and approved by MSDW, and (2) opened various limited liability companies on his clients' behalf. The Commission does not, however, adequately plead facts demonstrating "why the statements or omissions were fraudulent." *Id*. at 15 (citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). As explained above, use of joint FA numbers has a valid purpose, and the SEC concedes as much with respect to multiple accounts as well – for asset segregation and to pursue differing investment strategies. ¶ 24.

The Complaint also fails to allege with the requisite specificity facts demonstrating that Goldstein made any fraudulent statements or misleading omissions to the mutual funds. Relying on the same alleged fraudulent conduct – the use of multiple FA numbers and misrepresentations or omissions in the account opening process – the SEC concludes that its allegations "far exceed the Rule 9(b) pleading requirements." SEC Br. at 16. The SEC nowhere explains, however, what information was lacking or misleading, and without such additional factual detail, it cannot be inferred that these legitimate practices were misleading.

## III.    THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER

Even if the SEC is not subject to the PSLRA, it is still subject to the requirement that it specifically plead facts giving rise to a "strong inference" of intent included in that legislation because that is the same standard applicable to ***all*** securities fraud actions brought within this Circuit, irrespective of the identity of the plaintiff. *SEC v. Parnes*, 2001 WL 1658275, at *5 (S.D.N.Y. Dec. 26, 2001) (citations omitted); *Collins*, 524 F. Supp. 2d at 487-88. In fact, the

---

[5] This investigation began in at least 2005, three years ago, so it is curious why after so much time the SEC would profess the need for laxity in pleading its case.

PSLRA simply codified this Circuit's existing scienter standard. *See e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000); *Tellabs*, 127 S. Ct. at 2509. The issue of whether this strong inference standard has been met should be determined with reference to the analysis set forth in the Supreme Court's recent *Tellabs* decision. In *Tellabs*, the Court did not devise a new standard; rather, it established a new framework for determining when the pre-existing and familiar standard in this Circuit – the strong inference of intent – has been met. In doing so, the *Tellabs* Court recognized that "the strength of an inference cannot be decided in a vacuum" but rather requires a comparative exercise involving other competing inferences. 127 S. Ct. at 2510. This fact is constant irrespective of whom the plaintiff is. There is simply no logical reason that the manner for determining a legal standard should vary depending on the identity of the plaintiff. Two other district courts already have recognized this fact (*see* note 2, above) and the *Collins* court in this District, while not expressly adopting the *Tellabs* test for SEC enforcement actions, still appeared to apply the *Tellabs* analysis to the case before it. *Collins*, 524 F. Supp. 2d at 493.

## <u>CONCLUSION</u>

Mr. Goldstein respectfully renews his request that this Court dismiss the Complaint with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

Dated:  New York, New York
        April 24, 2008

Respectfully submitted,


*/s/ Lawrence H. Cooke II*
Lawrence H. Cooke II (LC8884)


*/s/ Nancy R. Grunberg*
Nancy R. Grunberg (admitted *pro hac vice*)


VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas
25th Floor
New York, New York  10020
Telephone:  (212) 307-5500
Facsimile:   (212) 307-5598
E-mail:  lhcooke@venable.com

***Counsel for Defendant***
***Darryl A. Goldstein***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of April 2008, a true and complete copy of the

foregoing *Reply Memorandum in Further Support of Darryl A. Goldstein's Motion To Dismiss*

*the Complaint* was served by the Court's ECF system on the following ECF-registered parties:

> Jordan A. Thomas, Esquire
> U.S. Securities & Exchange Commission
> 100 F Street, N.E.
> Washington, D.C.  20549

> Tyler Emil Gellasch, Esquire
> Daniel T. Brown, Esquire
> Mayer Brown LLP
> 1909 K Street, N.W.
> Washington, D.C.  20006

and by first-class mail, postage pre-paid, on the following parties not registered with the Court's

ECF service:

> Christopher R. Conte, Esquire
> Mark J. Kreitman, Esquire
> U.S. Securities & Exchange Commission
> 100 F Street, N.E.
> Washington, D.C.  20549

> Robert B. Blackburn, Esquire
> U.S. Securities & Exchange Commission
> 3 World Financial Center
> Room 4300
> New York, NY 10281

> */s/ Nancy R. Grunberg*
> Nancy R. Grunberg (admitted *pro hac vice*)

# EXHIBIT A

| From: | "Martinez, Betty" |
|---|---|
| Sent: | 5/7/2002 2:56:29 PM |
| To: | "Goldstein, Darryl" , "Friedman, Ed" |
| CC: | "Naccarelli, Tony" , "Curry, Kenneth" , "Rivera, Maria" |
| Subject: | FW: 8 exch warning ltr- 622026141 |

FYI
-----Original Message-----
From: Castro, Belinda A [mailto:Belinda_Castro@AIMFUNDS.COM]
Sent: Tuesday, May 07, 2002 2:53 PM
To: Martinez, Betty
Subject: 8 exch warning ltr- 622026141

May 7, 2002

Morgan Stanley Dean Witter Inc
Attn: Betty Martinez
Mutual Fund Operations
34 Exchange Plaza
Harborside Fincl Center, Plaza 3, 6th Fl
Jersey City NJ 07311-0000

Reference: AIM Account Number: 5065589540
Your Account Number: 622026141

Ms. Martinez,

Over the past few months, we have closely monitored the effects of market timing and short-term trading within our family of funds. We have determined that these activities, if not properly addressed, may hinder our ability to achieve desirable long-term investment results for our shareholders; therefore, we can no longer accommodate these activities. In accordance with the prospectus, all shareowners are restricted to a maximum of 10 exchanges. Additionally, if an AIM Fund or the distributor determines, in its sole discretion that your short-term trading (buys and sells) is excessive, it may reject any of your purchase orders.

As of May 7, 2002, this account has already exchanged 8 times this year. Please note that this account will be permitted only two more exchanges this year. After the tenth exchange a stop code will be placed on the account preventing further exchanges and purchases in 2002. However, the account will be allowed to redeem or go into money market as a final exchange.

While AIM appreciates your client's business, we hope you will understand that the exchange restrictions we impose are designed to protect the interest of all shareholders of our funds.

Sincerely,


Ira Cohen

CONFIDENTIAL TREATMENT REQUESTED BY MORGAN STANLEY

MS  10859

Sr  Vice President

c: Patti Hefley
c: Laura Slowensky

CONFIDENTIAL TREATMENT REQUESTED BY MORGAN STANLEY

# EXHIBIT B

| | |
|---|---|
| **From:** | "Curry, Kenneth" |
| **Sent:** | 2/19/2002 5:01:29 PM |
| **To:** | "Bergdoll Jr, Fred " , "Plotkin, Marc" , "Stephens, Bryan" , "Slater, Charles" , "Goldstein, Darryl" , "Glassman, Chris" |
| **CC:** | "Moy, Mark" , "Martinez, Betty" |
| **Subject:** | FW: Market Timers |

Please note as per the letter in the attachment the postions attached have been frozen by Alliance. before any redemption or exchange to money market you must call Hank Brennan at Alliance

-----Original Message-----
From: Curry, Kenneth
Sent: Tuesday, February 19, 2002 4:28 PM
To: Curry, Kenneth
Subject: FW: Market Timers

-----Original Message-----
From: Joseph.M.King@morganstanley.com
[mailto:Joseph.M.King@morganstanley.com]
Sent: Tuesday, February 19, 2002 4:17 PM
To: Curry, Kenneth
Subject: Market Timers
(See attached file: Market Timers Letter.doc)

Please let me know if you need more information.

Thanks
Joe King
201-938-6809

Morgan Stanley Trust
Harborside Financial Center
Plaza Two
Jersey City, NJ 07311-3977

# Morgan Stanley

[TIME]

Ken Curry
Morgan Stanley
75 Varick Street
New York, NY 10048

Dear: Ken

Please notify the following Financial Advisors that Alliance funds has identified them for market timing. The accounts will be prohibited from future purchases, exchanges into other variable priced funds, and transfers. Redemptions and exchanges into money markets are permitted. If the financial advisors need more information as to why the accounts are frozen have them call Hank Brennan at Alliance Funds 1-800-247-4154 ext.3071. The financial advisors will need to contact Hank Brennan before any future transactions are processed in their accounts.  Hank will then advise me on whether we can lift the freeze on the accounts so that trades can be processed.

2/19/2002   New Accounts

| Account | Broker Number | Broker | Fund |
|---|---|---|---|
| 625014526 | 10 | Fred Bergdoll | AALAX |
| 622026786 | 36 | Marc Plotkin | ALIFX |
| 622024023 | 119 | Byran Stephans | ANEAX |

2/13/2002   Original accounts sent over

| Account | Broker Number | Broker | Fund |
|---|---|---|---|
| 708-010126 | 25 | Charles Slater | ALIFX |
| 622-026141 | 114 | Darryl Goldstein | AIPAX |
| 633-022586 | 141 | William Glassman | AWPAX |

Sincerely,

Joseph King

MS-SEC 00237329

# EXHIBIT C

| | |
|---|---|
| **From:** | "Moy, Mark" |
| **Sent:** | 8/15/2002 1:33:26 PM |
| **Received:** | 8/15/2002 1:33:16 PM |
| **To:** | "Plotkin, Marc" , "Goldstein, Darryl" , "Tartaglia, Thomas" |
| **Subject:** | Alliance trades |

Good Afternoon,

Per my conversation with Alliance, the following trades will be cancelled due to market-timing:

539-041105 ANEAX BUY $187,000.00 TRADE DATE: 8/14/02
539-041114 ANEAX BUY $186,400.00 TRADE DATE: 8/14/02
622-024179 ANEAX BUY $188,000.00 TRADE DATE: 8/14/02

Please contact Hank Brennan at Alliance (1-800-247-4154 ext. 3071) with any questions.

CONFIDENTIAL TREATMENT REQUESTED BY MORGAN STANLEY

MS  11030

# EXHIBIT D

| From: | "Martinez, Betty" |
|---|---|
| Sent: | 6/28/2002 12:36:51 PM |
| Received: | 6/28/2002 12:36:47 PM |
| To: | "Plotkin, Marc" , "Goldstein, Darryl" , "Stephens, Bryan" , "Polanco, Sherry" , "Friedman, Ed" |
| CC: | "Curry, Kenneth" , "Coscia, James" , "Genzale, Donna" , "Naccarelli, Tony" |
| Subject: | FW: STOP LETTERS |

FYI

-----Original Message-----
From: Vu, Nhu [mailto:Nhu_Vu@AIMFUNDS.COM]
Sent: Friday, June 28, 2002 11:39 AM
To: Martinez, Betty
Cc: 'kenneth.curry@morganstanley.com'
Subject: STOP LETTERS
Dear Betty - Attached you will find today's Market Timing letters. Signed
copies have been sent via fax.

<> <>
<>
Best regards,
<<...OLE_Obj...>> Nhu Vu
BOSS Senior Analyst
1-800-347-1919 ext 5199
nhu_vu@aimfunds.com

CONFIDENTIAL TREATMENT REQUESTED BY MORGAN STANLEY

MS 10946

[TIME]

Morgan Stanley Dean Witter Inc
Attn: Betty Martinez
Mutual Fund Operations
34 Exchange Plaza
Harborside Fincl Center, Plaza 3, 6th Fl
Jersey City NJ 07311-0000

Reference: AIM Account Number: 5067766245
Your Account Number: 622024183
Dean Witter FBO Riverview Group LLC

Ms. Martinez,

Over the past few months, we have closely monitored the effects of market timing and short-term trading within our family of funds. We have determined that these activities, if not properly addressed, may hinder our ability to achieve desirable long-term investment results for our shareholders; therefore, we can no longer accommodate these activities. In accordance with the prospectus, all shareowners are restricted to a maximum of 10 exchanges. Additionally, if an AIM Fund or the distributor determines, in its sole discretion that your short-term trading (buys and sells) is excessive, it may reject any of your purchase orders.

As of June 27, 2002, this account has been identified as having excessive short-term trading activity for the year. In addition, the Riverview Group has been previously stopped under separate account numbers with your dealer. Please note that this account has been stopped and will no longer be permitted orders in 2002. However, the account will be allowed to redeem or go into money market as a final exchange.

While AIM appreciates your business, we hope you will understand that these restrictions are designed to protect the interest of all shareholders of our funds.

Sincerely,

Ira Cohen
Sr. Vice President

C: Patti Hedley
C: Laura Slowensky

CONFIDENTIAL TREATMENT REQUESTED BY MORGAN STANLEY

MS 10948