UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
                                                           :
SECURITIES AND EXCHANGE COMMISSION, :
                                                           :
                Plaintiff,                                 :
                                                           :
                v.                                         :  Civil No. 07-CV-11275  (JGK/JCF)
                                                           :
                                                           :
DARRYL A. GOLDSTEIN and                                    :
CHRISTOPHER L. O'DONNELL,                                  :
                                                           :
                Defendants.                                :
-----------------------------------------------------------x


# REPLY MEMORANDUM IN SUPPORT OF DEFENDANT
# CHRISTOPHER L. O'DONNELL'S MOTION TO DISMISS THE COMPLAINT

## Table of Contents

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

I.    The SEC Misstates Applicable Pleading Requirements ...................................... 2

   A.   The SEC is required to plead fraud with particularity ..................................... 2

   B.   The SEC is bound by the Second Circuit's strong inference standard ............................. 5

II.    The SEC Has Not Addressed The Complaint's Insufficiencies ......................................... 6

   A.   Plaintiff's criticism of O'Donnell's attack on the factual adequacy of the Complaint is without merit ......................................................................................................... 6

   B.   The SEC overstates the significance of mutual fund communications ............................. 7

   C.   Plaintiff has alleged nothing improper about Millenium's trading in variable annuities ... 8

   D.   The SEC has not alleged any affirmative misrepresentation by O'Donnell ....................... 8

CONCLUSION ................................................................................................................. 10

## INTRODUCTION

The SEC's Opposition to Defendant O'Donnell's Motion to Dismiss ("Opposition") relies on broad generalizations and suffers from the same defects as the Complaint. Rather than directly addressing O'Donnell's challenges to the adequacy of the Complaint, including its lack of specific factual allegations and reliance on unreasonable inferences, the SEC argues that the motion is "unsupported" or beyond the scope of a proper motion to dismiss. Opposition at 3-4. In fact, O'Donnell's motion is well grounded and fits within the familiar confines of Rule 12(b)(6).

The SEC incorrectly claims that it need not plead fraud with particularity like any other plaintiff or plead facts demonstrating a "strong inference" of scienter. It therefore invites this Court to relax the pleading requirements and find that, because this case is supposedly in its opening stages, the SEC should be allowed to proceed on the premise that its pleadings reflect the tip of an allegedly fraudulent iceberg.

The SEC is not the typical plaintiff. It should not be allowed deference in this civil enforcement proceeding because it has not yet had the benefits of discovery under the Federal Rules of Civil Procedure. Although the Complaint was filed on December 12, 2007, the SEC has engaged in plenary, one-sided discovery surrounding O'Donnell's conduct for more than four years. *See In the Matter of Certain Mutual Fund Trading Practices*, Order Directing Private Investigation and Designation of Officers to Take Testimony (Sep. 10, 2003), copy attached as Exh. 1. The SEC's extensive investigation—supported by its subpoena power—included: (1) sworn testimony from numerous witnesses, including O'Donnell, his assistants, and countless other Morgan Stanley personnel, (2) substantial volumes of Morgan Stanley and third party e-mails and trading records, and (3) documents and recordings from third parties, including

Millennium. Further, the SEC has obtained documents and information from the mutual funds referenced in the Complaint—the alleged victims.

Yet, the SEC's Complaint contains little more than generalized, vague allegations without the basic facts necessary to inform O'Donnell which of his many lawful activities allegedly constituted fraud. Indeed, the inadequacy of the Complaint—following over four years of pre-litigation discovery—suggests that the SEC may never be able to meet its burden of pleading an adequate, factual record to support fraud allegations against O'Donnell.

## ARGUMENT

I.      **The SEC Misstates Applicable Pleading Requirements**

    A.      **The SEC is required to plead fraud with particularity**

Rule 9(b) requires that the SEC, like every plaintiff, plead its fraud claims with particularity. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 484 (S.D.N.Y. 2007). The Second Circuit has held that Rule 9(b) "is *applied assiduously* to securities fraud" as a "strict pleading requirement." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005) (emphasis added). Indeed, when the SEC argued entitlement to a lesser standard in another case, that court noted "[t]he defendants respond that the SEC's arguments are 'preposterous' and, although the description is a bit overblown, this Court, in essence, concurs." *SEC v. Tambone*, 417 F. Supp. 2d 127, 131 (D. Mass. 2006).

Further, the cases the SEC relies upon for the proposition that it need only plead generalized facts and may then rely on inferences do not stand for that at all. Instead, they merely state that Rule 9(b) does not require a plaintiff to detail each and every fact underlying its claims. *See* Opposition at 13, (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001); *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 335 (S.D.N.Y. 2007)).

Not requiring every factual detail is very different from allowing a complaint with only general and conclusory allegations to survive. Indeed, the Second Circuit has repeatedly rejected complaints alleging securities fraud where they contain insufficient, unparticularized pleadings. *ATSI Commc'ns, Inc.*, 493 F.3d at 103; *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 775 (2d Cir. 1991); *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990). In *Rombach*, for example, even though the complaint "catalog[ed] a number of [allegedly fraudulent] statements made by" the defendants, the Second Circuit found that it failed to allege fraud with particularity because it failed to "explain[] with adequate specificity how those statements were actually false or misleading." 355 F.3d at 172.

The SEC is not entitled to a relaxed pleading standard for any other reason that courts sometimes allow. Contrary to plaintiff's assertion, this is not a case where "the details of a fraudulent scheme may only be known by the defendants." Opposition 14. Indeed, in *Tambone*, the court explicitly rejected such an argument where, as here, the SEC had undertaken an extensive investigation prior to filing its complaint. 417 F. Supp. 2d at 131. The SEC has not and cannot allege that the factual details here are under O'Donnell's control, nor have they met the applicable standards for pleadings based on "information and belief." *See Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir. 1990). In short, the SEC offers no support for its claimed entitlement to a relaxed pleading standard.

Alternatively, the SEC skirts O'Donnell's challenge, and declares that its Complaint satisfies Rule 9(b) because its claims are "supported by detailed factual allegations, comprehensive charts, and specific examples." Opposition at 1. However, O'Donnell's motion demonstrates that those factual allegations lack specificity and the "examples" cited fail to support the conclusory allegations or a reasonable inference that O'Donnell engaged in other "fraudulent" conduct. *See* O'Donnell Memorandum, 7-12. In sum, it is not enough for the SEC

to summarily allege "deception" on one or a handful of occasions, and then ask this Court to infer that the story was the same on hundreds of others.

The SEC also invites this Court to uphold the Complaint because other courts have "denied motions to dismiss where similar market-timing schemes" were alleged. Opposition at 7. However, other than the same underlying subject matter, the SEC has offered no reason why the courts' decisions in those four cases should have any bearing on this Court's decision.[1] While *In re Mutual Funds Investment Litigation,* 384 F. Supp. 2d 845, 862 (D. Md. 2005), addressed only private fraud claims, and so is of limited applicability, that court dismissed claims against two of the broker-dealer defendants involved in market timing. *Id.* at 858-60. In upholding the claims against the other broker defendants, that court recognized that those brokers allegedly did more than "merely assist in facilitating . . . market timing transactions" and instead "participated in *initiating, instigating, and orchestrating* the [market timing] scheme." *Id.* at 862. (emphasis added). The line between basic brokerage services, *e.g.*, order entry, and substantive participation in a fraudulent scheme is thus a significant one.

Aside from the general allegation that O'Donnell "advised [his customer] on how to make deceptive market-timing trades," Compl. ¶ 3, the SEC does not make a single allegation that O'Donnell ever instructed or advised Millennium in any way on whether or how to open any accounts or trade, for example. Despite exhaustive investigation, the SEC cannot point to a single e-mail, telephone call, instant message, facsimile or other communication from O'Donnell instructing Millennium on what to do or how to do it. Ultimately, the only attempt made in the Complaint related to any advice provided to Millennium at all is the previously discredited reference in Compl. ¶ 51 to one e-mail sent by O'Donnell's assistant. The SEC still does not

---

[1] Interestingly, in two of the four cases, complaints were dismissed against certain brokers. *See, e.g., In re Mutual Funds Investment Litigation,* 384 F. Supp. 2d 845, 862 (D. Md. 2005); *SEC v. Druffner et al,* No. 1:03-cv-12154-

explain why that alleged statement should be attributed to O'Donnell or how it is evidence of fraud or decption.  *See* O'Donnell Memorandum at 11.  By its failure to respond, the SEC has abandoned the Complaint's claims with respect to that e-mail, and leaves nothing in its place.

### B.    The SEC is bound by the Second Circuit's strong inference standard

The SEC's assertion that it need not plead a "strong inference" of scienter, *see* Opposition 16-18 & nn.4-6, is contrary to Second Circuit case law.[2]  "The strong inference requirement for pleading scienter . . . applies to all actions brought in [the Second] Circuit that are governed by Rule 9(b)."  *Collins & Aikman Corp.*, 524 F. Supp. 2d at 487.

Further, the Second Circuit has held that the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(2), codified the same "strong inference" standard that it applies under Rule 9(b).  *Novak v Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

Thus, when the Supreme Court interpreted the meaning of "strong inference" in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S. Ct. 2499, 2504-2505 (2007), it necessarily provided a highly relevant and instructive, if not strictly binding, interpretation of that phrase under the Second Circuit's Rule 9(b) standard.[3]  Although the Second Circuit has not ruled on the issue in the few months since *Tellabs* was decided, other courts have unsurprisingly applied the "strong inference" standard articulated in *Tellabs* to fraud actions brought by the SEC.  *See SEC v. Goldsworthy*, No. 06-10012-JGD, 2007 WL 4730345, at *15 (D. Mass. Dec. 4, 2007); *SEC v. Boling*, No. 06-1329 (RMC), 2007 WL 2059744, at *6 (D.D.C. Jul. 13, 2007).

---

NMG (D. Mass. Jun. 14, 2004) (oral order dismissing the SEC's first complaint for failure to plead with particularity required by Rule 9(b)).  An except of the docket sheet reflecting the dismissal is attached as Exh. 2.

[2] Despite this broad assertion, and perhaps in recognition of its weakness, the SEC ultimately concedes that it "need only set forth specific facts that give rise to a reasonable and *strong inference* of O'Donnell's fraudulent behavior." Opposition 24-25 (emphasis added).

[3] Contrary to the SEC's implication, Opposition at 16-18 & n. 4, O'Donnell does not suggest that the PSLRA itself applies to the SEC.  Instead, O'Donnell's position is that "even though the PSLRA does not apply to actions brought by the SEC, the SEC is subject to Rule 9(b) and must therefore plead a 'strong inference' of scienter." *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 487-88 (S.D.N.Y. 2007).

The SEC's separate assertion that its governmental status should somehow alter this analysis to allow for a lower pleading standard, Opposition 18 & n.5, is unprecedented. The Opposition does not contain a single case to support the proposition that the *Tellabs* interpretation of "strong inference" does not apply to the SEC in this case. There is all the more reason to apply the "strong inference" standard where the plaintiff is a federal agency with subpoena power that has pursued over four years of pre-litigation discovery.

The Opposition also does not cure the Complaint's failure to allege that O'Donnell had a financial motive to engage in fraudulent trading. Although the SEC alleges that O'Donnell "earned approximately $390,677 from placing market-timing trades for Millennium," Compl. ¶ 62, the Complaint has not alleged any link between the asset-based fees O'Donnell received as a result of his relationship with Millennium and the volume of Millennium's trades. In fact, the SEC has not alleged that O'Donnell had any incentive to increase trading volume.

This is in sharp contrast to the numerous cases, some of which were cited by the SEC, Opposition at 20-21 & n.8, where brokers received commissions (or investment banks received fees) that are part and parcel of the allegedly fraudulent transactions themselves. Here, because the SEC has not alleged any link between O'Donnell's compensation and the allegedly fraudulent trades, it has not alleged any particularized financial motive for O'Donnell to engage in the fraud. *See Kalnit v. Eichler*, 264 F.3d 131, 139 (2nd Cir. 2001).

II.    **The SEC Has Not Addressed The Complaint's Insufficiencies**

    A.    **Plaintiff's criticism of O'Donnell's attack on the factual adequacy of the Complaint is without merit**

The SEC persists in its "kitchen-sink" approach that sheer numbers are enough to support a fraud claim. Millennium may have engaged in a fair amount of trading and O'Donnell may

have used as many as three FA numbers, but there is nothing inherently fraudulent or even abnormal about such activity.

As for the Complaint's lack of particularity, the SEC's response is mere repetition. Yet, regardless of how many times they are repeated, the SEC's generalized allegations do not pass muster. Repeated recitation of a laundry list of generalized allegations does not make them any more specific. See *Rombach*, 355 F.3d at 172. Further, the SEC side-steps the defects detailed in the memorandum supporting O'Donnell's motion, including that the alleged number of problematic trades is grossly inflated and that the SEC's inferences are contradicted by their own Complaint.

O'Donnell's challenges are not beyond the scope of a Rule 12(b)(6) motion. Opposition at 3-4. In fact, it is well-settled that this Court, in testing the sufficiency of a fraud complaint, need only credit reasonable inferences (*In re NYSE Specialists Securities Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)), is not bound to accept contradictory allegations, O'Donnell Memorandum at 8 (citing *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007)), and may consider facts integral to the Complaint or in plaintiff's possession upon which it has relied, O'Donnell Memorandum at 16 n.12 (citing *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003)).

## B.    The SEC overstates the significance of mutual fund communications

The SEC attempts to attach significance to the number of communications O'Donnell allegedly received from mutual fund companies that it refers to as "block notices." In its Opposition, the SEC increases reliance on the negative inferences it requires the Court to draw from the 94 such communications. Compl. ¶ 59; Opposition at 12 and 24. In addition to the problems previously identified, O'Donnell Memorandum at 7-8, 17-18, the SEC's Opposition presents another significant problem. The SEC attempts to collapse all of the mutual fund

families that Millennium traded with into one homogenous entity simply known collectively as "the mutual funds." Yet, each mutual fund is a distinct legal entity with its own trading tolerances, policies and procedures. It is patently unreasonable to imply that communication from one provided any guidance concerning the tolerances, policies or practices of another. Thus, there is no basis for the SEC's attempted reliance on the "cumulative impact" of all such communications.

### C. Plaintiff has alleged nothing improper about Millenium's trading in variable annuities

The Complaint alleges that O'Donnell purchased variable annuities "[i]n an effort to further disguise [his client's] market-timing activities." Compl. ¶ 57. Aside from the fact that all of Millennium's trades were unsolicited, this allegation fails to (a) identify which contracts are allegedly "deceptive," (b) articulate why they are "deceptive," or (c) explain how O'Donnell is allegedly responsible for any such deception. *Cf.* O'Donnell Memorandum at 14. Rather than address these factual inadequacies, the SEC merely repeats its hollow refrain that Millennium supposedly "did not need or want life insurance, nor was it interested in tax-deferred investing or retirement planning benefits." Opposition at 24. Yet, the SEC has never alleged—much less offered any support for—why these are the only permissible uses for variable annuities and why all others are *per se* fraudulent. For example, the SEC has never alleged any facts to support its claim that Millennium, unlike countless other employers, would have no interest in providing retirement benefits to its employees.

### D. The SEC has not alleged any affirmative misrepresentation by O'Donnell

The Complaint does not allege a single affirmative misrepresentation or actionable omission by O'Donnell to a mutual fund. O'Donnell Memorandum at 4. The SEC simply ducks this challenge. *See* Opposition at 15.

Rather than plead the facts related to one or more direct, affirmative misrepresentations, for example, in an e-mail, a telephone call, a facsimile, or some other communication, the SEC theorizes that O'Donnell "made false and misleading statements to mutual fund companies in the account opening process," Opposition 8 (citing to Compl. ¶¶1, 3, & 4), and "concerning his use of multiple accounts and FA identification numbers—when executing trades for Millennium." Opposition 7-8.

These general accusations cannot withstand scrutiny. *See* O'Donnell Memorandum at 5-12. Further, the SEC has not explained how internal Morgan Stanley account opening documents could be construed as "statements" to a mutual fund company. There is no allegation that these documents were ever intended to be, or actually were, shared with any mutual fund company. The mere opening of accounts at Morgan Stanley cannot, without more, be a "statement" to a mutual fund company.

In sum, absence of any particularized factual allegations, especially given the extensive factual record the SEC has already developed, precludes this Court from drawing the inference of deception necessary to salvage the Complaint. *See* O'Donnell Memorandum at 7-8.[4]

---

[4] Indeed, it is dissapointing that the SEC feigns ignorance as to highly relevant facts that contradict its fraud allegations. O'Donnell continues to press this motion under Rule 12(b)(6) and not, as the SEC suggests, under Rule 56. Further, and in light of the SEC's extensive investigation, O'Donnell requests that the Court dismiss this case with prejudice and not grant the SEC leave to amend its complaint. But if the Court were to give the SEC an opportunity to replead, the SEC should be required to plead a complaint that is consistent with the facts developed in the lengthy investigation.

For example, the SEC has obtained sworn testimony from O'Donnell, his assistants, and countless other Morgan Stanley personnel, including his former Branch manager and direct supervisor at the time, Salvatore Samperi. (Mr. Samperi possess an MBA in Finance from New York University, and entered the brokerage business after a distinguished 30 year career with the Port Authority of New York and New Jersey Police Department, retiring from the rank of Deputy Director in 1995. *See* Samperi Testimony 12:15-14:12 (Exh. 4E).) Yet, none one of these key witnesses testified that O'Donnell ever provided untruthful information to a mutual fund company.

To the contrary, O'Donnell and Mr. Samperi, testified that they personally (1) obtained approval for Millennium's trading from senior Morgan Stanley compliance, operations, and senior management (*see, e.g.,* O'Donnell Testimony 27:22-28:17, 64:25-65:13, 166:21-167:22 (Exh. 3A); Samperi Testimony 149:21-150:7, 204:21-204:25, 206:11-208:21, 214:5-217:3, 257:5-258:12 (Exh. 4A)); (2) discussed Millennium's trading with mutual fund employees in order to understand and comply with market-timing rules (*see, e.g.,* O'Donnell Testimony 137:23-142:1, 122:13-123:2 (Exh. 3B); Samperi Testimony, 85:19-86:21, 121:20-122:8, 142:11-143:3 (Exh. 4B)); and (3) discussed

## CONCLUSION

For the foregoing reasons, and for the reasons articulated our opening memorandum, the

Complaint should be dismissed in its entirety as to Mr. O'Donnell with prejudice.

Dated: April 24, 2008

Respectfully submitted,

MAYER BROWN LLP

By: _____
    Stephen J. Crimmins
    Daniel T. Brown
    Tyler E. Gellasch
    1909 K Street, N.W.
    Washington, D.C. 20006-1101
    (202) 263-3000

    Attorneys for Defendant Christopher L.
    O'Donnell

---

Millennium's variable annuities trading with Morgan Stanley and insurance company employees (*see, e.g.,* O'Donnell Testimony, 163:24-166:19 (Exh. 3C); Samperi Testimony, 190:4-192:20 (Exh. 4C)). In addition, Millennium's accounts were all internally linked, (*see* O'Donnell Testimony 83:7-85:1 (Exh. 3D)), thus allowing Morgan Stanley personnel to easily identify them as related. Indeed, mutual funds had no trouble identifying O'Donnell or his client's trading and were able to stop any activities they chose (*see* Samperi Testimony, 129:20-135:12; 143:16-145:21 (Exh. 4D)).

Further, Samperi's testimony on these matters is supported by his detailed, contemporaneous notes. Copies of relevant handwritten notes are included in Exh. 5. (As an aid to the Court, we attach as Exh. 6 a typed transcription of those notes prepared by a Mayer Brown LLP employee.)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of April 2008, a true and complete copy of the foregoing Reply Memorandum in Support of Defendant Christopher L. O'Donnell's Motion to Dismiss the Complaint was served by ECF to counsel of record and by first-class mail, postage pre-paid on the following:

> Christopher R. Conte, Esquire
> Mark J. Kreitman, Esquire
> U.S. Securities and Exchange Commission
> 100 F Street, N.E.
> Washington, D.C. 20549
>
> Robert S. Blackburn, Esquire
> U.S. Securities and Exchange Commission
> 3 World Financial Center
> Room 4300
> New York, NY 10281

> Daniel T. Brown
> Mayer Brown LLP
> 1909 K Street, N.W.
> Washington, DC 20006
> (202) 263-3000

# Exhibit
# 1

# NON-PUBLIC

## UNITED STATES OF AMERICA
Before the
## SECURITIES AND EXCHANGE COMMISSION
September 10, 2003

|  |  |  |
|---|---|---|
| In the Matter of<br>Certain Mutual Fund Trading Practices<br><br>(NY-7220) | :<br>:<br>:<br>:<br>:<br>: | ORDER DIRECTING PRIVATE<br>INVESTIGATION AND<br>DESIGNATING OFFICERS TO<br>TAKE TESTIMONY |

I.

Members of the staff have reported information to the Commission that tends to show that, during the period from at least July 1998 to the present:

A.    Certain persons or entities, including investment companies, investment advisers, broker-dealers, and persons associated therewith, may have engaged in, or aided and abetted others to engage in, certain practices in connection with the trading of mutual fund shares in violation of the federal securities laws.  These practices include (a) enabling or permitting preferred customers to engage in "late trading," that is, place orders to buy or sell mutual fund shares after 4:00 p.m. but receive a price based on the net asset value ("NAV") previously determined by the fund at 4:00 p.m.; (b) enabling or permitting preferred customers to engage in "market timing," that is, the short term buying and selling of mutual fund shares in order to exploit inefficiencies in fund pricing; (c) enabling or permitting preferred customers to sell short, in effect, mutual fund shares by disclosing material nonpublic information concerning the composition of mutual fund portfolios; and (d) improperly creating or destroying required records of instructions relating to the purchase or sale of mutual fund shares.

B.    Certain persons or entities may have, in the offer or sale, or in connection with the purchase or sale, of securities, directly or indirectly:

(1)    employed devices, schemes, or artifices to defraud;

(2)    obtained money or property by means of, or otherwise may have made, untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3)    engaged in transactions, acts, practices, or courses of business which have operated as a fraud or deceit upon purchasers of securities or upon other persons.

In connection with the foregoing activities, such persons or entities may have, directly or indirectly, among other things, made false or misleading statements of material fact and/or failed to disclose material facts about the NAV that was the basis of the price at which mutual fund shares would be bought and redeemed and about the mutual funds' policies and procedures to prevent the adverse effects of market timers. Furthermore, certain persons or entities may have bought or sold securities on the basis of material, nonpublic information concerning mutual fund portfolios obtained in breach of a fiduciary or other duty not to disclose the information.

C.    Certain persons or entities, while acting as investment advisers or as associated persons of investment advisers, may have, directly or indirectly:

1.    employed or may be employing devices, schemes, or artifices to defraud clients or prospective clients; or

2.    engaged or may be engaging in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

In connection with the foregoing activities, such persons or entities may have permitted customers to engage in late trading and market timing in breach of their fiduciary duties and in contravention of certain funds' policies, procedures, and public disclosures.

D.    Certain persons or entities, while acting as brokers or dealers, may have effected, or induced or attempted to induce, the purchase or sale of securities otherwise than on a national securities exchange of which such broker or dealer is a member by means of manipulative, deceptive, or other fraudulent devices or contrivances.

E.    Certain persons or entities, while acting as registered investment advisers, brokers or dealers, or persons associated therewith, may have failed to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the misuse of material, nonpublic information by such investment advisers or brokers or dealers or persons associated therewith.

F.    Certain registered investment companies issuing redeemable securities, persons designated as authorized in the prospectuses of such registered investment companies to consummate transactions in such securities, principal underwriters of, and dealers in, such securities, and other persons and/or entities, may have sold, redeemed or repurchased such securities at a price other than based on the current net asset value of such securities next computed after receipt of tender of such securities for redemption or of an order to purchase or sell such securities. In connection with the foregoing activities, such entities and others may have permitted customers or aided and abetted others to engage in late trading.

G.    Certain affiliated persons of, or principal underwriters for, registered investment companies, or affiliated persons of such person or principal underwriter, acting as principal, may have effected transactions in which such registered investment company is a joint or a joint and several participant with such person, principal underwriter, or affiliated person, in contravention of rules prescribed by the Commission.

H.    Certain affiliated persons of, or principal underwriters for, registered investment companies, or affiliated persons of an investment adviser of, or principal underwriter for, a registered investment company, may have engaged in acts, practices, or courses of business in connection with the purchase or sale, directly or indirectly, by such person of any security held or to be acquired by such registered investment company in contravention of rules adopted by the Commission to define and prescribe means reasonably necessary to prevent, such acts, practices, or courses of business as are fraudulent, deceptive or manipulative.

I.    Certain persons may have willfully destroyed, mutilated, or altered accounts, books, or other documents required to be preserved by registered investment companies.

J.    Certain persons may have made untrue statements of a material fact or omitted to state facts necessary in order to prevent the statements made, in the light of the circumstances under which they were made, from being materially misleading in registration statements, applications, reports, accounts, records, or other document filed with the Commission or the keeping of which is required by registered investment companies.

K.    Certain persons serving or acting as officers, directors, members of any advisory board, investment advisers, principal underwriters, or depositors to registered investment companies may have engaged, or may be about to engage, in acts or practices constituting a breach of fiduciary duty involving personal misconduct with respect to such investment companies.

L.    Certain registered brokers or dealers, investment advisers, or persons associated therewith, may have failed reasonably to supervise, with a view to preventing violations of the provisions of the federal securities statutes, rules, and regulations, another person subject to their supervision who committed such a violation.

M.    Certain registered brokers or dealers, investment advisers, or investment companies may have failed to make and keep and preserve books and records as the Commission prescribes as necessary.

N.    While engaged in the conduct described in paragraphs I.A through I.M above, such persons and entities, directly or indirectly, made use of the means or instruments of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails.

3

II.

The Commission, having considered the staff's report and deeming such acts, transactions, practices, transactions, and courses of business, if true, to be possible violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), Sections 10(b), 15(c)(1)(A), 15(f) and 17(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rules 10b-5, 17a-3 and 17a-4 thereunder, Sections 204, 204A, 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), and Rule 204-2 thereunder, and Sections 17(d), 17(j), 31(a), 34(a) and 34(b) of the Investment Company Act of 1940 ("Investment Company Act"), and Rules 17d-1, 17j-1, 22c-1, 31a-1, 31a-2 and 31a-3 thereunder, and possible breaches of fiduciary duty involving personal misconduct under Section 36(a) of the Investment Company Act, and possible failures to supervise under Section 15(b) of the Exchange Act and Section 203(e) of the Advisers Act, finds it necessary and appropriate and hereby:

ORDERS, pursuant to the provisions of Section 20(a) of the Securities Act, Section 21(a) of the Exchange Act, Section 42(a) of the Investment Company Act, and Section 209(a) of the Advisers Act, that a private investigation be conducted to determine whether the aforesaid persons, or any other persons or entities, have engaged, are engaging, or are about to engage in any of the aforesaid acts, practices, transactions, or courses of business, or in any act, practice, transaction, or course of business of similar purport or object; and

FURTHER ORDERS, pursuant to the provisions of Section 19(c) of the Securities Act, Section 21(b) of the Exchange Act, Section 42(b) of the Investment Company Act and Section 209(b) of the Advisers Act, that for purposes of such investigation, Wayne M. Carlin, Edwin H. Nordlinger, Mark K. Schonfeld, Kay L. Lackey, Gerald A. Gross, James C. Gange, Justin W. Arnold, Craig Carpenito, William Finkel, Mona S. Akhtar, Peter A. Pizzani, Jr., John J. Graubard, Sheldon Mui, Elizabeth S. Goldman, Anthony T. Byrne, Daphna Abrams, Daniel Goldfried, Paul G. Gizzi, Carolyn L. Hiller, Jonathan A. Roberts, Bennett Ellenbogen, Shannon A. Keyes, Gerald Russello, James Farrell, Douglas Scarff, Joseph P. DiMaria, William J. Delmage, Raymond J. Slezak, Thomas C. Verderber, Kenneth O'Connor, Martin Towey, Robert A. Sollazzo, Linda A. Lettieri  Steven C. Vitulano, Ronald R. Krietzman, Doreen Rucci, Grzegorz A. Steckiewicz, Richard Needham, Juan Marcel Marcelino, David Bergers, Madeleine McGrath Blake, John Dugan, Martin Healey, Stuart Feldman, Bradford Ali, Risa King, Sandra Bailey, Beth Lehman, Jai K. Chandrasekhar, Corliss Primavera, Arthur Gabinet, Merri Jo Gillette, David Horowitz, Eustace Francis, Elizabeth Parker, Joy Thompson, William Meck, Mark Dowdell, Frank Thomas, Harold F. Degenhardt, Spencer C. Barasch, Jeff Cohen, Doug Gordimer, Joann Harris, Tom Keltner, David King, Jason Rose, Alan Buie, Robert Long, Adan Araujo, Carol Lowen, Mary E. Keefe, Robert J. Burson, Jane E. Jarcho, Paul A. Montoya, Kara M. Washington, David M. Cole, Carolann Gemski, David M. Dimitri, James A. Davidson, John J. Sikora, Kristen A. Harris, Peter B. Driscoll, Tracy W. Lo, Asheesh Goel, Kent W. McAllister, Jerome P. Tomas, Junaid A. Zubairi, Richard N. Rodelli, Scott J. Hlavacek, Francis J. Cuba, Donald A. Ryba, Evelyn T. Kendra, Luz M. Aguilar, R. Kevin Barrett, Jean M. Javorski, Delia L. Helpingstine, John E. Kustusch, Randall Fons, Donald M. Hoerl, Amy J. Norwood, Jeffrey Lyons, Dale Coffin, Martha Fulford, Helane Morrison, Marc Fagel, Pauline Calande, Ivan Harris, Gary Klein, Christine Lynch, Edward McCutcheon, Randall Lee, Sandra Harris, Michele Layne, Lisa Gok, Kelly Bowers, Diana Tani, Lorraine Echavarria, Andrew Petillon, David Van

Havermaat, Martin Murphy, Victoria Levin, Finola Manvelian, Spencer Bendell, Marshall Sprung, Leslie Hakala, Janet Moser, Cindy Eson, Keri Axel, Jorge DeNeve, Catherine Whiting, Gina Saviola, Janet Moser, Cindy Wong, Michelle Royston, Gilroy Thomas, Mark Tseng, Eric Barker, Jonathan Ngo, Paula Weiser, Michael Levitt, Kevin Goodman, Charles Liao, Kent Ngo, and Harley Nelson be, and each of them hereby are, designated officers of the Commission and empowered to administer oaths and affirmations, subpoena witnesses, compel the attendance of witnesses, take evidence, require the production of any books, papers, correspondence, memoranda, contracts, agreements, or other records deemed relevant or material to the inquiry, and to perform all other duties in connection therewith as prescribed by law.

      By the Commission.

                          Jonathan G. Katz
                          Secretary

                          *Jill M. Peterson*
              By:  Jill M. Peterson
                   Assistant Secretary

# Exhibit

# 2

CM/ECF - USDC Massachusetts Version 3.1.2 as of 12/15/2007    Case 1:07-cv-11275-JGK    Document 38-3    Filed 04/24/2008    Page 2 of 3    Page 1 of 19

APPEAL

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:03-cv-12154-NMG

Securities and Exchange Commission v. Druffner et al
Assigned to: Judge Nathaniel M. Gorton
Case in other court: First Circuit, 07-02532
Cause: 15:78m(a) Securities Exchange Act

Date Filed: 11/04/2003
Jury Demand: Both
Nature of Suit: 850 Securities/Commodities
Jurisdiction: U.S. Government Plaintiff

**Plaintiff**

**Securities and Exchange Commission**

represented by **Beth Lehman**
Securities and Exchange Commission - MA
33 Arch Street
23rd Floor
Boston, MA 02110-1424
617-573-8967
Fax: 617-424-5940
Email: lehmanb@sec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Franklin C. Huntington, IV**
Securities and Exchange Commission
33 Arch Street
23rd Floor
Boston, MA 02110
617-573-8960
Fax: 617-573-4590
Email: huntingtonf@sec.gov
*TERMINATED: 05/23/2007*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey T. Infelise**
U.S. Securities and Exchange Commission
190 F Street NE
Washington, DC 20549-4010
202-551-4904
Fax: 202-772-9362
Email: infelisej@sec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**R. Daniel O'Connor**
Securities and Exchange Commission - MA
33 Arch Street
23rd Floor
Boston, MA 02110-1424
617-573-8979
Fax: 617-573-4590

| 06/08/2004 | 40 | MOTION of Defendant Robert E. Shannon for Leave to File Reply to Opposition to Motion to Dismiss by Robert E. Shannon. (Attachments: # 1 Exhibit A, 1-3 NOT SCANNED)(Stanhope, Don) (Entered: 06/09/2004) |
| 06/10/2004 | 41 | NOTICE of Appearance by Sarah E. Walters, Robert L. Ullmann on behalf of John S. Peffer (Stanhope, Don) (Entered: 06/14/2004) |
| 06/10/2004 | 42 | Defendant Marc J. Bilotti's MOTION for Leave to File Reply to Opposition to Motion to Dismiss by Marc J. Bilotti.(Stanhope, Don) (Entered: 06/14/2004) |
| 06/14/2004 | | Electronic Clerk's Notes for proceedings held before Judge Reginald C. Lindsay : Motion Hearing held on 6/14/2004 re 19 MOTION to Dismiss filed by John S. Peffer, 20 MOTION to Dismiss filed by Martin J. Druffner, Skifter Ajro, 14 MOTION to Dismiss filed by Marc J. Bilotti, 16 MOTION to Dismiss filed by Robert E. Shannon, 23 MOTION for Judgment on the Pleadings filed by Justin F. Ficken. Each motion was granted with leave given to the S.E.C. to re-plead within 30 days. (Court Reporter D. Joyce.) (RCL, law3) (Entered: 06/14/2004) |
| 06/14/2004 | | Judge Reginald C. Lindsay : Electronic ORDER entered granting 40 MOTION of Defendant Robert E. Shannon for Leave to File Reply to Opposition to Motion to Dismiss, 42 Motion of Defendant Bilotti for Leave to File Reply to Opposition to Motion to Dismiss, 14 Motion to Dismiss by Defendant Bilotti, 16 Motion to Dismiss by Defendant Shannon 19 Motion to Dismiss by Defendant Peffer, 20 Motion to Dismiss by Defendants Druffner, Ajro, 23 Motion for Judgment on the Pleadings by Defendant Ficken. The S.E.C. has failed to comply with the requirements of Rule 9(b). The motions are granted with leave given to the S.E.C. to re-plead within 30 days. (RCL, law3) (Entered: 06/14/2004) |
| 06/15/2004 | 43 | Defendant Robert E. Shannon's Reply Memorandum of Law in Further Support of Motion to Dismiss filed by Robert E. Shannon. (Attachments: # 1 Exhibit 1-3 NOT SCANNED)(Stanhope, Don) (Entered: 06/15/2004) |
| 06/15/2004 | 44 | REPLY Memorandum in Support of Defendant Marc J. Bilotti's Motion to Dismiss filed by Marc J. Bilotti. (Stanhope, Don) (Entered: 06/15/2004) |
| 06/24/2004 | 45 | TRANSCRIPT of Hearing held on June 14, 2004 before Judge Lindsay. Court Reporter: Debra M. Joyce. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/737-4410 or the Clerk's Office. (Scalfani, Deborah) (Entered: 06/24/2004) |
| 06/24/2004 | 46 | Notice of Reassignment. Judge Nathaniel M. Gorton added. Judge Reginald C. Lindsay no longer assigned to case. Counsel are directed to the Court's Standing Orders re: Electronic Case Filing. (Stanhope, Don) (Entered: 06/28/2004) |
| 06/25/2004 | | Judge Reginald C. Lindsay : ORDER SEALED entered re 32 SEALED MOTION (Stanhope, Don) (Entered: 06/25/2004) |
| 06/28/2004 | | Judge Reginald C. Lindsay : SEALED ORDER entered amending SEALED ORDER re 32 SEALED MOTION(RCL, law3) (Entered: 06/28/2004) |
| 06/28/2004 | 47 | Letter- regarding the Amended Complaint from Frank C. Huntington. (Stanhope, Don) (Entered: 06/30/2004) |
| 07/14/2004 | 48 | AMENDED COMPLAINT against Skifter Ajro, Marc J. Bilotti, Martin J. Druffner, Justin F. Ficken, John S. Peffer, Robert E. Shannon , filed by Securities and Exchange Commission. (Attachments: # 1 # 2 # 3)(Nicewicz, Craig) (Entered: 07/16/2004) |
| 07/20/2004 | 49 | STIPULATION *To Extend Time for Defendants to Respond to Amended Complaint* by |

# Exhibit

# 3

**8/18/2005  O'Donnell, Christopher**

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:              )

4                                   )  File No. HO-10027-A

5    MORGAN STANLEY                 )

6    WITNESS:  Christopher O'Donnell

7    PAGES:    1 through 226

8    PLACE:    U.S. Securities and Exchange Commission

9              100 F Street, N.E.

10             Suite 1590, Room 8

11             Washington, D.C. 20549

12   DATE:     Thursday, August 18, 2005

13

14        The above-entitled matter came on for hearing, pursuant

15   to notice, at 10:05 a.m.

16

17

18

19

20

21

22

23

24             Diversified Reporting Services, Inc.

25                     (301) 467-9200

# Exhibit
# 3A

**8/18/2005  O'Donnell, Christopher**

1    phone call in March of '02?

2         A    Yes.

3         Q    When was the first time you guys met?

4         A    I'd say probably not that far thereafter.

5    Probably, you know, it was within the next two weeks.

6         Q    Was that meeting at your offices?

7         A    No.  We actually met at the New York Athletic Club.

8         Q    And who was present at that meeting?

9         A    Just Scott Murray, myself, and Jay Doolan.

10        Q    And what was explained at that meeting?

11        A    Just that, you know, they were Millennium, and that

12   they were willing to do business with us.  And they wanted to

13   know if we were going to be able to trade international

14   funds.

15        Q    Any other questions besides just trade

16   international funds?

17        A    Not that I recall.

18        Q    And were you able to answer them right at that

19   meeting?

20        A    No.

21        Q    What did you have to check?

22        A    We had to check -- we still hadn't gotten full

23   approval to do this at our firm yet, so we were waiting for

24   all that to come through.

25        Q    Who did you have to get approval from?

**8/18/2005  O'Donnell, Christopher**

```
1        A    We had to get approval from the compliance side and
2    the sales side.
3        Q    Who was it in the compliance side that you were
4    dealing with?
5        A    Bob Palleschi.
6        Q    Who was it in the sales side that you were dealing
7    with?
8        A    Pretty much everybody.
9        Q    Who was --
10       A    Okay.  Well, Sal Samperi was my manager, Jim
11   Gunther was the complex manager, Bill McMahon was the
12   regional manager, Jeff Standard was his assistant, and Bruce
13   Alonzo, who ran sales.
14       Q    So before you took Millennium on, you had
15   conversations with all of these people?
16       A    Either I had the conversations or Sal had the
17   conversations.
18       Q    So can you tell me what did you explain to them as
19   to what Millennium was looking to do?
20            MS. BRUNE:  Why don't you start with Palleschi
21   first, and then each of the others.
22            THE WITNESS:  Okay.  Should I start with Curry
23   first?
24            MS. BRUNE:  Can I interrupt?  I think it's a little
25   out of order, because they had already sought approval to do
```

**8/18/2005  O'Donnell, Christopher**

1      Q      -- you would have gone to Sal Samperi, and he would

2   have gone to Bruce Alonzo to find out if that was okay?

3      A      No.  He probably wouldn't have gone to -- if it was

4   an institutional account, it would have gone at least to Bill

5   McMahon.

6      Q      Just because they wanted to employ quantitative

7   strategy?

8      A      That's how far that you had to -- to open up an

9   institutional account, you had to get approval from the

10  region.

11     Q      Well, now you're telling me that, basically, to

12  open any institutional account, independent of the strategy

13  they're going to employ, you had to go that far.  Is that

14  what you're saying?

15     A      Yeah, I just did say that.

16            MS. BEATTIE:  He said that when you were out of the

17  room.

18            THE WITNESS:  Yeah.

19            BY MR. FIELDER:

20     Q      Okay.  I'm asking you what it was about a market

21  timing strategy that required it to go all the way to Bruce

22  Alonzo for approval.

23     A      I don't know.

24            BY MR. VAN METER:

25     Q      You had this second meeting with Millennium, and

1   you had to go back to get clearance from Morgan Stanley.

2   Talk to me about how it went up the flagpole in relation to

3   Millennium.

4       A    I mean, it would have been a similar thing.  I came

5   back, talked to Sal, said, "Okay, we have another account

6   that's looking to do this."  "Who are they?"  "Millennium

7   Partners."  And, you know, then we would -- you know, I'd

8   call Bob Palleschi, and then we'd go -- and we would have the

9   same dialogue that we had previously, and then I would go --

10  now, at this time, it isn't -- you know, once it's now been

11  approved that they're going to allow us to do this, these

12  accounts didn't have to go to Bruce Alonzo to be signed off

13  on.  They only had to go to Bill McMahon now to be approved.

14      Q    Even for the very first Millennium account, did

15  that have --

16      A    Every account had to go -- I'm sorry.

17      Q    The very first Millennium account, did that go to

18  Bruce Alonzo?

19      A    I don't know.  I don't know the answer to that for

20  sure.  I don't know the answer to that for sure.

21      Q    Was there any other further explanations given as

22  to what Millennium would be doing?  Or did anyone ask on the

23  way up the flagpole if Millennium would be doing anything

24  different from Tower Research, or anything we're not --

25      A    No.  We told them we were going to basically do the

1    allowed 10 round trips a year or something like that.  So,

2    you know, as long as you abided by that rule, then, you know

3    --

4         Q    So Millennium bought this VA.  At some point, Sal

5    contacted Brian Keneely.

6         A    No, no.  Brian Keneely used to come into our office

7    all the time.

8         Q    Okay.  Brian Keneely at some point said, "Yeah, we

9    know that Millennium is in this VA.  We don't have any

10   problems with it."

11        A    Well, before we opened the account, we got it all

12   approved.  Before we did anything in regard to anything, we

13   made sure we told everybody everything.  When I tell you

14   that, I can't stress that enough.  I mean, I really want you

15   to understand that when I walk out the door here.  We didn't

16   do anything without everybody knowing exactly what we were

17   doing.  Okay?

18        Q    When you say "we" got it approved --

19        A    Sal and I.

20        Q    Okay.  And Sal and you talked to --

21        A    Before we did any insurance business -- I mean,

22   keep in mind I said to you earlier that I didn't -- my

23   insurance license lapsed when I moved to New York, so I

24   didn't have an insurance license.  So I went out and took the

25   exam and took this to do this.

**8/18/2005  O'Donnell, Christopher**

```
1              Now, I didn't do that until we had been through
2      every level with the firm, once again.  Bob Palleschi, you
3      know, Tony Naccarelli, Bill McMahon, Jeff Standard, Bruce
4      Alonzo.  Again, had to go through that whole thing and get it
5      approved all again, because now this was a different product.
6      Am I boring you?  I'm sorry.
7          Q    No, no.  So you and Sal talked to this Brian
8      Keneely.
9          A    Right.
10         Q    And you told him -- what did you tell him?
11         A    "We're going to do some market timing."
12         Q    And he said okay, so long as you met certain
13     criteria.
14         A    Right.
15         Q    And what were those criteria?
16         A    The criteria was, again, you know, following the
17     rules of those mutual funds.  You know, how many times you
18     could -- you know, I think that, actually, annuities versus -
19     - so like if you went into the Allstate -- I'm just going to
20     -- if you went into the Allstate, I think in the prospectus
21     of Allstate versus even the mutual fund itself said you were
22     allowed 12 round trips in the annuity product.
23         Q    Allstate said you were allowed 12 round trips.
24         A    Yeah.  I'm highly certain.  I'm not positive.  I'm
25     pretty sure that it made that statement, yeah.
```

# Exhibit
# 3B

**8/18/2005  O'Donnell, Christopher**

1      A      Right.

2      Q      Were there any calls that were original?  You know,

3  first requests not to trade?

4      A      No, not that I remember.

5      Q      What was the response from Sal when these stop

6  letters would come in?

7      A      Call the mutual fund and see what they think.

8      Q      Was there any other response other than call the

9  mutual fund and find out what this is about?

10     A      No.  It started there.

11     Q      Was there any time period where the letters

12  increased in frequency?

13     A      Not that I remember.  I don't remember.

14     Q      You're saying, you know, they started like May of

15  2002?  Was there any time, you know, later in 2002 or 2003

16  where you recall getting, you know, maybe like more than one

17  of these a day or anything like that?

18     A      I don't remember.

19     Q      As these block letters came in, would they ask for

20  a specific account to stop trading?

21     A      Not always.  It could be the branch, it could be

22  me, or it could be the account --

23     Q      Did you ever tell these mutual fund companies that,

24  you know, there's 30 or 40 accounts that are all Millennium?

25     A      Sure.  I mean, certainly, the mutual fund companies

1    knew that.

2          Q    You called and you told them?

3          A    The wholesalers would know that.

4          Q    Which wholesalers did you tell that to?

5          A    MFS knew that.  ING knew that.

6          Q    Anyone else?

7          A    AIM knew that.

8          Q    Who at MFS did you say that to?

9          A    I don't remember his name.  John Scully, I think

10   was his name.

11         Q    Who at ING did you say that to?

12              MS. BRUNE:  Wait.  You're asking a question that is

13   not accurate.  He's saying who knew it.  And then your

14   question was who did you say it to.  But I'm thinking that

15   not all the conversations with the mutual funds were between

16   Mr. O'Donnell personally.

17              BY MR. VAN METER:

18         Q    Okay.  Who from Morgan -- let's say either

19   yourself, Cusano, Gaetano, anyone who would be involved.  Who

20   did you contact at these funds?  I'm sorry.  When I say

21   "you," I mean anyone on your team, contacted these funds and

22   tell them that these 30 or 40 accounts are all the same

23   party?

24         A    Wholesalers all came to our office all the time.

25         Q    And who -- you said you did that for MFS.

1       A     Right.

2       Q     Or someone on your team did that for MFS, ING, and

3  AIM.

4       A     Right.

5       Q     You told me John Scully was the contact at MFS.

6       A     Yeah.  I'm trying to think of the guy's name at

7  ING.  I don't know the guy's name at AIM either.  I don't

8  remember their names.  Most of these mutual funds, you know,

9  any of the wholesalers that came to see us all knew exactly

10  that it was Millennium.

11      Q     How do you know that they knew?

12      A     Because I don't think anybody viewed Millennium as

13  a bad group at that point either.

14      Q     When you say "at that point," what point is that?

15      A     The time that you're referring to.

16            MS. BRUNE:  Wait.  But the question is how did the

17  wholesalers know that it was Millennium that was --

18            THE WITNESS:  Because we told them.  We told them.

19            BY MR. VAN METER:

20      Q     "We."  You?

21      A     Right.  Me and Sal and Jay and David, right.

22      Q     But you don't remember -- you told John Scully.  Do

23  you know who you told at ING?

24      A     I don't remember his name.  The wholesaler at ING.

25  The wholesaler at AIM.  The wholesaler at --

**8/18/2005 O'Donnell, Christopher**

1    Q    And there's one wholesaler for all of Morgan
2    Stanley?
3    A    No.  He would be the wholesaler for like a region.
4    So the wholesaler could be the wholesaler for all of New
5    York, and then Westchester County, and maybe up to Boston,
6    something like that.
7    Q    So there's one wholesaler for the region that would
8    encompass your office.
9    A    Right.
10    Q    And there was one guy for ING and one guy for AIM.
11    A    Right.  He had an inside guy and an outside guy.
12    Q    Do you remember if he told the inside guy or the
13    outside guy.
14    A    Both.  Talked to them both.
15    MS. BRUNE:  Are these the same guys or different
16    guys from the ones who would bring the plaques congratulating
17    your desk  --
18    THE WITNESS:  Oh, it was the same guys.
19    MS. BRUNE:  -- congratulating your desk for the
20    assets that you brought to their firm.
21    THE WITNESS:  Right.  Those are the same guys.
22    BY MR. VAN METER:
23    Q    Did you ever tell -- sometimes, you know, as we're
24    looking through these stop letters, they're usually signed by
25    someone.  Did you ever tell the person that signed the stop

**8/18/2005  O'Donnell, Christopher**

```
1     letter that all these different accounts were Millennium?

2          A     I don't remember.

3               MS. BRUNE:  Can we take a break?

4               MR. VAN METER:  Yeah.  Let's take a five-minute

5     break.  Off the record.

6               (A brief recess was taken.)

7               BY MR. VAN METER:

8          Q     Back on the record at 3:00, August 18, 2005.  Mr.

9     O'Donnell, would you agree there were no substantive

10    conversations while we were off the record?

11         A     Yes.

12         Q     Let me show you what's been --

13              MS. BEATTIE:  I think there were questions

14    outstanding.

15              THE WITNESS:  Yeah.  And I'll go -- in regard to --

16    you asked me some questions in regard to these mutual funds,

17    right?  So Ira Cohen is a fellow that -- he was at AIM.  Now,

18    he wasn't a wholesaler, but he was -- you know, he's one of

19    the guys you would see on these letters who later on you see

20    was trying to make some kind of an arrangement with us.  And

21    those were all Millennium accounts.

22              BY MR. VAN METER:

23         Q     I'm sorry.  Could you give me the last name?

24         A     Ira Cohen.  Sorry.

25         Q     C-o-h-e-n?
```

**8/18/2005  O'Donnell, Christopher**

1    A    Yeah, I believe so.

2    Q    Let me show you what's been previously marked as

3    Exhibit 112.  This is a block letter from American Century.

4    It looks like there was an e-mail to you, as well as Betty

5    Martinez and Sal Samperi.  If you go down to the bottom, it

6    says, "We sent a letter dated 7/3/02 and asked that you no

7    longer do business with American Century due to excessive

8    trading, yet we continue to see trades dated 7/16/02,

9    7/24/02, and 8/01/02.  We have placed the stop purchases in

10   the two following bins."

11         So after the letter came on 7/3/02, were subsequent

12   trades then placed on those dates that are cited there in the

13   letter?

14   A    That's what this would indicate, but I don't know

15   that -- I don't know the answer to that.

16   Q    Can you give me any background as to, you know,

17   what happened when this letter came stating that there were

18   subsequent trades after the block letter?

19   A    I don't remember this specific block letter.

20   Q    If you see this, it looks like Betty Martinez

21   forwards it to Ken Curry, Jim Coscia, Tony Naccarelli, and

22   Donna Ginsel.  Did any of these people approach you about

23   this situation?

24   A    Well, not this particular situation, that I

25   remember.

1    this.  So this wasn't -- I didn't have any part of that.

2        Q    Did Tower Research ever get trades rejected for

3    market timing?

4        A    Sure.

5        Q    And what would Tower Research instruct you to do

6    after they got a trade rejected?

7        A    Tower Research was -- I think it was similar to

8    what Millennium did.  But they were -- I'm trying to put this

9    in a nice way.  They were not as -- they didn't trade as

10   frequently as Millennium did, so they didn't have the same

11   issues that Millennium potentially did.  Or as many stop

12   letters, I should probably put it.

13       Q    So when they did receive a stop letter, what would

14   they instruct you to do?

15       A    Well, we would -- again, if we got the stop letter,

16   we'd have a dialogue with Sal, talk to him about it.  I'd

17   call the mutual fund to make sure that, you know, there

18   wasn't a problem.  We'd call them.  And they would ask us to

19   call the mutual fund back to have more dialogue to understand

20   why, because they didn't feel like they were trading outside

21   of the boundaries that were set forth by the mutual fund

22   company.

23       Q    And what ultimately happened with the trade?

24       A    I mean, in some cases, you know, mutual funds would

25   reinstate trades if they felt that was the case.  And then

**8/18/2005  O'Donnell, Christopher**

1    if, you know, they didn't, then they would leave it.  You

2    know, it wouldn't be entered, or the rejection held.

3        Q    You said before that Millennium would ask you to

4    place the trade even after it was rejected.  Did Tower

5    Research ever ask you to do that?

6            MS. BEATTIE:  I think the testimony was that

7    sometimes.

8            BY MR. VAN METER:

9        Q    Okay, sometimes.  Sometimes Millennium would ask

10    you to place the trade.  Tower Research never did that?

11        A    I'm not sure.

12        Q    Let me just be sure about the Millennium situation.

13    Would they ask you to place the trade in the same account

14    that the original trade was placed, or did they ask you to

15    place a trade in one of their other accounts?

16        A    No.  I mean, it could go either way.  It could go

17    either way.

18        Q    When was the last time you opened an account for

19    Millennium?

20        A    I don't know the answer to that.

21            MR. VAN METER:  Could you mark this as 630?

22                        (SEC Exhibit No. 630 was marked for

23                        identification.)

24            THE WITNESS:  You asked me a question here.  Let me

25    think about what you said here.  You said would they ask you

# Exhibit
# 3C

**8/18/2005  O'Donnell, Christopher**

1    account.  You know, your joint of rights of -- you know.

2        Q    Did you ask anyone at Millennium why they started

3    getting involved in these variable annuities?

4        A    We just viewed it more like, you know, more pools

5    of assets.

6            BY MS. HARE:

7        Q    Can I just clarify, did you just make the statement

8    that the variable annuities were purchased in the wrap

9    accounts?

10       A    Yes.  In the choice account.  "Choice" was Morgan

11   Stanley's term for wrap accounts.  Like they have a different

12   name at Merrill, a different name at Prudential.  They called

13   it choice accounts at -- and that was also the arrangement

14   that they made us do at Morgan Stanley.  Those annuities also

15   at first had to be in choice accounts.

16       Q    So that was a Morgan Stanley rule.

17       A    Right, right.

18       Q    It wasn't the choice of Millennium for you to put

19   the variable annuity in a choice account.

20       A    No, that wasn't their choice.  But at the end of

21   the day, that was beneficial to them.  Because it was a wrap

22   account, and they didn't have to pay -- they paid less money.

23           BY MR. VAN METER:

24       Q    Let me show you what's been previously marked as

25   Exhibit 524.  This is a -- I see at the bottom, there's an e-



 1    mail from Paul Brandon to Sal Samperi saying, "Sal, as per

 2    from Paul, any new insurance business purchase for the

 3    premium of 750,000 or greater needs to be questioned to

 4    determine strategy suitability."  It goes on to ask, "The FA

 5    described the strategy behind the purchase."

 6         Leonard Schmidt replies to Paul Brandon saying,

 7    "Lenny, Bob Palleschi and I had a conference call at the

 8    branch regarding this transaction.  The branch manager, Sal

 9    Samperi, indicated that this account did intend to market

10    time within the annuity.  The manager stated he contacted

11    Allstate, and they were okay with this, as long as the branch

12    met certain criteria.  This account had a $5 million wire

13    transfer in 8902, and the manager indicated that the other 3

14    million would also be allocated towards the preferred client

15    VA also.  Please indicate if insurance has any issues with

16    this practice and if Allstate would agree to market timing.

17    This FA is a major market timer of mutual funds.  Please give

18    me a call."

19         Is this -- I'm assuming, since this went to Sal

20    Samperi, your branch manager, are they talking about a

21    Millennium or a Tower Research investment in a variable

22    annuity?

23    A    I mean, I guess you could look back at the account

24    and try to determine whether that's a Tower or Millennium

25    account, right?  I mean, so I --

**8/18/2005  O'Donnell, Christopher**

```
 1              MS. BRUNE:  Well, that's the --
 2              THE WITNESS:  Okay.
 3              BY MR. VAN METER:
 4       Q    Well, what's your recollection?
 5       A    Well, that's probably my recollection.  Probably.
 6       Q    Is that you placed the trade --
 7       A    I don't know for sure that this is a Millennium or
 8    Tower account, because it doesn't say the name on it.  But --
 9       Q    Did Millennium buy an Allstate annuity for the
10    purpose of market --
11       A    Yes, yes.  I don't know if this one, but they did
12    buy -- sorry.  I'm sorry.
13       Q    Was there an agreement with Allstate that buying a
14    variable annuity for market timing would be okay, as long as
15    certain criteria were met?
16       A    Yes.
17       Q    Who did you have the agreement with?  Who did
18    Millennium have the agreement with?
19       A    Well, Allstate itself.  But our wholesaler was a
20    Brian Keneely.
21       Q    Did you negotiate this agreement?
22       A    There didn't need to be an agreement.  I mean, they
23    didn't -- you know, they said to -- it wasn't an agreement.
24    It was the same prospectus in a mutual fund that it would be
25    for any, you know, mutual fund.  So it's the same -- you're
```

1      allowed 10 round trips a year or something like that.  So,

2      you know, as long as you abided by that rule, then, you know

3      --

4          Q     So Millennium bought this VA.  At some point, Sal

5      contacted Brian Keneely.

6          A     No, no.  Brian Keneely used to come into our office

7      all the time.

8          Q     Okay.  Brian Keneely at some point said, "Yeah, we

9      know that Millennium is in this VA.  We don't have any

10     problems with it."

11         A     Well, before we opened the account, we got it all

12     approved.  Before we did anything in regard to anything, we

13     made sure we told everybody everything.  When I tell you

14     that, I can't stress that enough.  I mean, I really want you

15     to understand that when I walk out the door here.  We didn't

16     do anything without everybody knowing exactly what we were

17     doing.  Okay?

18         Q     When you say "we" got it approved --

19         A     Sal and I.

20         Q     Okay.  And Sal and you talked to --

21         A     Before we did any insurance business -- I mean,

22     keep in mind I said to you earlier that I didn't -- my

23     insurance license lapsed when I moved to New York, so I

24     didn't have an insurance license.  So I went out and took the

25     exam and took this to do this.

# Exhibit
# 3D

**8/18/2005  O'Donnell, Christopher**

1      MS. BRUNE:  Chris, you've got to testify about what

2  you know about, not what you're speculating about.

3      THE WITNESS:  All right.  Okay.

4      MR. VAN METER:  I'm sorry.  Do you want to finish?

5      MS. BRUNE:  What's the question again?  I'm sorry.

6      BY MR. VAN METER:

7   Q    The question was although you had already ran up

8  the flagpole with the general idea of what Millennium was

9  going to do, you had said certainly Sal Samperi and, to your

10  knowledge, Bill McMahon, approved each individual account.

11  Did either Sal or Bill McMahon ask any more questions about

12  what the purposes were of these accounts?

13   A    When we were opening the accounts, he would ask,

14  you know, "Is this a Millennium account?"  You know, "Are we

15  going to do the same thing?"

16   Q    And you gave -- was that the only question asked,

17  was this a Millennium account?

18   A    "Is this a Millennium account?  Is this the same

19  thing?  Are we going to do market timing?"

20   Q    And there were no other questions other than that?

21   A    Not that I can recall.

22   Q    Within Morgan Stanley systems, was there anything

23  that would automatically notify Morgan Stanley that these,

24  you know, 30 to 40 accounts are all just Millennium?

25   A    Well, I believe they had a system that would --

**8/18/2005  O'Donnell, Christopher**

1    that could notify -- I don't know for sure, though.  But I'm

2    pretty certain that you would know exactly who -- you know,

3    it would be like if you had a family account.  You had yours

4    and your wife's account and your kids' accounts and an IRA

5    account.  It would all go under that.

6           BY MS. HARE:

7       Q    Like a household account?

8       A    Right, like a household type of thing.  So you

9    could see which -- you know, what accounts were -- I'm highly

10   certain.

11          BY MR. VAN METER:

12      Q    Do you know for a fact that all Millennium accounts

13   were householded?

14      A    No.  I think householding is different than -- but

15   I think they were all categorized as Millennium accounts.

16      Q    But you said each time they would open an account,

17   Sal would ask, "Is this a Millennium account," and you would

18   say yes.

19      A    Yeah.

20      Q    So Sal knew --

21      A    Yeah.  I mean, Sal wasn't going to sign his name to

22   anything unless he was a hundred percent sure on what it was.

23      Q    So he knew all 40 of these accounts were --

24      A    Oh, yes.

25      Q    Did Bill McMahon know all 40 of these --

**8/18/2005  O'Donnell, Christopher**

1      A    Yes.

2      Q    Let me ask, between these different accounts, was

3   money ever journaled between the accounts?

4      A    Yeah, they would do that.

5      Q    Why would they journal money between the accounts?

6      A    Maybe there was -- again, I didn't do this.  This

7   was -- I didn't run operations.  Dave Cusano and Jay Doolan

8   did this.  But money did -- no, I don't think they ever -- I

9   think -- well, I'm not positive.  I'm really not.

10     Q    You said before that yeah, they did it?

11     A    I don't think that they journaled money from this

12  account.  I don't think they ever did that.  Actually, I

13  don't think they did.  I'm not positive, but I don't think

14  they did.

15     Q    Would there be journaling records at Morgan

16  Stanley?

17     A    Yeah.

18     Q    And how would that work?  Would you just compare

19  account numbers and see --

20     A    Yeah.  You'd look at the account and see what -- I

21  mean, just look at the activity page to see where -- what was

22  journaled.

23     Q    Did you ever have to look at these records to see

24  if money was journaled?

25     A    No, I didn't do that.

# Exhibit
# 4

1

2

3

4    NEW YORK STOCK EXCHANGE, INC.
     DIVISION OF ENFORCEMENT
5    -------------------------------------x

6    In the Matter of:

7           MORGAN STANLEY DW, INC. and
            MORGAN STANLEY & COMPANY
8
     Testimony of:
9
            SALVATORE SAMPERI
10
     -------------------------------------x
11
                              14 Wall Street
12                            New York, New York

13                            July 26, 2005
                              10:20 a.m.
14

15   A P P E A R A N C E S:

16
     For the Division of Enforcement:
17
            ROBERT K. BUTANI,
18               Senior Principal Enforcement
                 Investigator
19
            MARIANNE PAOLI, ESQ.,
20               Trial Counsel

21          CHUN LI,
                 Litigation Analyst
22               (a.m. session)

23          TRACY TIMBERS, ESQ.,
                 Enforcement Director
24               (a.m. session)

25

                                                    2

1

# Exhibit

# 4A

93068.txt

2    this thing?

3         Some would say, unlimited.  You can do as
4    many turns that you want.  The only control we will
5    put on you is the size of the trade.

6         Q    Was a record ever kept of those
7    conversations?

8         A    Between him and the mutual fund fund
9    companies?

10        Q    Yes.

11        A    He may have kept them.  I certainly did
12   not.

13        Q    There was no list kept of the number of
14   turns in a particular mutual fund?

15        A    No.  He may have done that -- Doolan may
16   have done that for his own benefit, so that when he
17   got to the limit he would know what it was and he
18   would stop.

19        It was his benefit to know that kind of
20   stuff.

21        Q    With respect to market timing you had
22   spoken with your regional director, you had spoken
23   with your branch office manager in White Plains.

24        Did you continue to have conversations --
25   and you also had spoken with compliance.

150

1                    Samperi

2         A    Right.

3         Q    Did you continue to have conversations
4    with those same individuals regarding O'Donnell's

93068.txt

```
 5   market timing activity or market timing activity at
 6   your branch office?
 7       A    Yes.
 8       Q    Could you tell me what those issues
 9   were?  If you could do it in a chronological order,
10   if you can.
11       A    The first stop letter we got was from
12   American Century.
13            They, I think, first contacted external
14   fund operations.
15            They in turn contacted Palleschi.
16            Palleschi sends me an e-mail and he
17   copies McMahon.
18            I have a conversation with Palleschi.  I
19   have a conversation with McMahon.
20            That would be one example.
21       Q    What are you informed of?
22       A    Stay within the rules.
23       Q    From each McMahon and Palleschi, they
24   both reiterate that same information?
25       A    Correct.
```

151

```
 1                    Samperi
 2       Q    Do you express any other concerns to them
 3   at that point?
 4       A    I said, look, our process is when this
 5   happens we stop.  We are not going to do another
 6   trade in American Century.  They don't want the
 7   business, we are not going to do it.  And we didn't.
```

93068.txt

10 The capacity was -- it was 50 basis points.

11   I don't care what their capacity was.

12 Mine was 50 basis points.

13   50 basis points did not give you a lot of

14 capacity into annuities.  He was trying to get those

15 annuities that were beyond what we were already

16 into.

17  Q Using that same 50 basis point formula?

18  A Yes.

19  Q Why did you reject that idea

20 automatically?

21  A I didn't reject it automatically.

22   I just said, we don't do anything until

23 everybody approves it.

24   He called Pyndus and I called Pyndus and

25 Palleschi and had conversations.

            205

1     Samperi

2  Q Was the first conversation between you

3 and Pyndus or did Mr. O'Donnell reach out to

4 Mr. Pyndus?

5  A I think O'Donnell spoke to him first and

6 he spoke to Palleschi first.

7  Q Who was this client?

8  A I don't recall.

9  Q What was the amount of investment that he

10 was proposing?

11  A I don't think he had a specific amount at

12 that time.

93068.txt

13        Q     You had a conversation first with

14  Mr. Pyndus?

15        A     Pyndus or Palleschi, one or the other.

16        Q     What do you recall Mr. Pyndus saying to

17  you?

18        A     He wasn't entirely opposed to the idea

19  but that he wanted us to do some basic research so

20  he could evaluate it and he asked us if we would

21  give him the single case exception companies that we

22  thought we would like to get his approval on.

23        Q     Did Mr. O'Donnell have a list of single

24  case exception companies?

25        A     Not at that time.  He started doing some

206

1                    Samperi

2   homework.

3              Maybe he came up with, like, two or

4   three.

5         Q     Do you know what criteria Mr. O'Donnell

6   used to depict those three, two or three?

7         A     They had the biggest mutual fund menus in

8   their annuity.

9              So it gave you a broader base to place

10  the funds.

11        Q     Did Mr. Pyndus express any concerns that

12  he might have had with respect to this type of

13  activity?

14        A     His concern primarily was the single case

15  exception issue.

93068.txt

16          As it turned out, I don't recall all the

17     names but one of the companies was American

18     Skandia.

19          John's objection to it was its credit

20     rating.

21          He didn't want to put client money into

22     an insurance company that had -- I forget what their

23     credit rating was.  It was well below what was

24     required to have a sales agreement with Morgan

25     Stanley.


                                                        207

1                    Samperi

2          That was off the table.

3      Q    What were the other two?

4      A    I don't recall the names of the other

5      two.

6          He had, I think, two out of the three he

7      just outright dismissed based on credit ratings and

8      the third one -- it was like borderline and he

9      didn't want to make a decision.

10          We kind of bounced it back and forth.

11          Bob said, you need his okay.

12          John wanted to talk to Bob and finally it

13     all headed towards a meeting we were going to have,

14     all of us together.

15          I said, this is crazy, we are all on the

16     telephone, let's sit down at a table and figure out

17     if we were or were not going to do this.

18     Q    Did you have such a meeting?

93068.txt

19      A    Yes.

20      Q    When did you have that, do you recall?

21      A    October 10, 2002.

22      Q    Someone is prepared well.

23           MR. MAYNARD:  No comment.

24      Q    Or you have a very good memory.

25           MR. MAYNARD:  No comment.

208

1                    Samperi

2           THE WITNESS:  I messed that one up.

3           MS. PAOLI:  I would like to show you --

4    we are going back now to your notes which are in

5    evidence as Exhibit 3.

6           (Document handed to the witness.)

7           If you could turn to page, what is Bates

8    stamped ending in 13, which is page 13.

9       A    9502?

10      Q    Yes.  Go to line 4.

11      A    Yes.

12      Q    "Jackie Maz"?

13      A    The real name is Mazelli.  "In branch.

14   Told her of 5/29 plan from VK" Van Kampen.  "Unable

15   to be networked.  No credit for office funds.

16   Reviewed 9/30 asset based summary.  Planning for

17   Westchester Hills Golf Club -- asset based --"

18   excuse me, "asset based submit.  Planning for

19   Westchester Hills Golf Club.  Working with O'Donnell

20   on getting okay for market timing in annuities.  No

21   go until Pyndus hears from Palleschi."

93068.txt

5      Q    Please continue reading.

6           What is the second path he was choosing?

7      A    "Two, work something out with carriers

8    that makes it doable.  Without blowing up

9    subaccounts, ala Third Avenue."

10     Q    Do you know what that means?

11     A    Yes.  He was referring to that Pacific

12   Growth fund we had discussed earlier.

13     Q    Was that a single-case exception?

14     A    No.

15     Q    That was general market timing in

16   annuities that resulted...

17     A    Yes.

18     Q    Please continue reading.

19     A    "Will be okay on having us explore

20   program with insurance carriers.  Keep him posted.

21   Some have particular sensitivities; EG muni life.

22   Suggested COD would follow-up to describe on a list

23   of six carriers or so --"

24          MR. MAYNARD:  Decide or describe?

25          THE WITNESS:  Describe.  Or decide.  Hold

0

214

1                    Samperi

2    on.  I am not sure.

3           I think it was -- it looks like decide.

4    It could be describe.

5           In any event, O'Donnell was going to work

6    up a list of carriers that he, Pyndus, clears and we

7    can have further conversations within the carriers.

93068.txt

8    Q    You said on October 10 there was a
9  meeting?

10    A    Yes.

11    Q    Why don't you tell me what happened at
12  that meeting?

13    A    It was in Bob Palleschi's office.

14          Bob was there, Tony Naccarelli, Paul
15  Brandon, myself and O'Donnell.

16    Q    What was discussed?

17    A    Mr. Pyndus was supposed to be there.

18          The meeting did not start for about ten
19  or 15 minutes.  He doesn't show up.

20          Palleschi calls him, can't find him.  He
21  never showed up.

22          Bob took the occasion to go over
23  everything that was happening out there and we
24  reviewed what we were doing in terms of the controls
25  and reactions and the general kind of summary.

0

215

1                    Samperi

2          He said, can't do anything without
3  Pyndus.  Maybe we will have another meeting another
4  day, something to that effect.

5    Q    Let's look at your October 10th entries.

6          MR. MAYNARD:  So you know, the last page
7  relates to that as well.  Page 57.

8          MS. PAOLI:  Page 57 of?

9          MR. MAYNARD:  Of Exhibits 3.

10          MS. PAOLI:  Thank you.

93068.txt

11      Q      Let's go to page 15 of Exhibit 3?

12      A      Yes.

13      Q      The lines 1 through 4 refer to the

14  meeting.

15             What about lines 5 through 14?

16      A      That was something to do with the

17  Bloomberg machine.

18      Q      Line 4 it says, "John Pyndus never..."

19      A      Showed.

20      Q      What do you have after that?

21      A      "(See notes)".

22      Q      Turning to page 57 of Exhibit 3?

23      A      Yes.

24      Q      Are those the notes that you referred to?

25      A      Correct.


                                              216


1                       Samperi

2       Q      If you could read that second paragraph,

3   which is the body of your notes.

4              Could you read that to me because I

5   cannot make out anything?

6       A      I will read it from the top.

7              "Meeting New York City compliance office

8   Bob Palleschi, Tony Naccarelli, Paul --

9       Q      You can skip down where it says

10  "remind."

11      A      "Reviewed current status of mutual fund

12  trading activity, 50 beeps is working.  Good control

13  limit.  Number of turns when specified also adds the

93068.txt

14  control.  Bob reiterates what we are doing is not in
15  violation of regs.  Stay within the rules.  Believes
16  this is a mutual fund issue.  Said to hold off on
17  external VAs until JP gives okay.  Attempted to call
18  him but no response.  JP is only one who can sign
19  off on single exception external annuities.  Will
20  follow up with JP."
21      Q    What is your understanding of what
22  Mr. Palleschi meant when he said, "this is a mutual
23  fund issue."
24      A    That encapsulates his feeling any time
25  the mutual funds wanted to shut down this activity

0

217

1                    Samperi
2  they could.  It was well within their power to do
3  so.
4      Q    Did Mr. Palleschi ever make any type of
5  representation that the funds should be made aware
6  of all of the FA numbers associated with a
7  particular FA?
8      A    Should we be proactive and just give it
9  to them?
10      Q    Correct.
11      A    Not that I recall.
12      Q    What about all of the account numbers
13  associated with a particular customer?
14      A    I don't understand the question.
15      Q    You will have a customer who can have
16  more than one account, correct?

93068.txt

8          It could be just the fund that they were

9     stopping, not the account.

10         Q    You don't know?

11         A    I don't.

12         Q    You received this document?

13         A    Yes.

14         Q    How did you address the AIM matter?

15         A    Stop it.

16         Q    Did you investigate this any further to

17    see what was going in this case, that you recall?

18         A    Not that I recall.

19              MS. PAOLI:  Let's take a five-minute

20    break.

21              (Recess taken.)

22              MS. PAOLI:  Back on the record.

23    Mr. Samperi, there were no substantive discussions

24    while we were off the record; is that correct?

25              THE WITNESS:  That is correct.

1                    Samperi

2         Q    I believe we had discussed earlier

3     American Century.

4         A    Yes.

5         Q    As December came along did you ever have

6     any discussions -- let me ask you this.  Who is Sam

7     Turvey?

8         A    Director of compliance.

9         Q    He was the director of compliance from

10    September through December of 2002?

93068.txt

11      A    I don't know when he came on board.

12      Q    Was he there in November and December of

13  2002?

14      A    Yes.  Around that time.  It was the end

15  of 2002 he came on board.

16      Q    Did you ever have any discussions with

17  Sam Turvey regarding market timing?

18      A    Yes.

19      Q    When did that occur?

20      A    In March prior to the release of the

21  policy statement.

22      Q    In March?

23      A    Yes.

24      Q    Where did that conversation take place?

25      A    In his conference room.

□

258

1                   Samperi

2      Q    Who was present?

3      A    Myself, Chris O'Donnell, James Doolan,

4  Sam Turvey, Bob Palleschi.

5           I believe that was who was there.

6      Q    At whose request was this meeting taking

7  place?

8      A    I think it was O'Donnell called Turvey

9  but...  I just don't recall who the spearhead was

10  for the meeting.

11          O'Donnell and Turvey had a conversation,

12  let's get together and hash it out.

13      Q    Prior to this meeting, were there any

# Exhibit
# 4B

```
 1                    Samperi
 2   rules of the mutual funds were?
 3        A    Well, for instance, they would
 4   specifically say in a 12-month period of time you
 5   could have so many buys and sells.
 6        Q    Where did you learn that from?
 7        A    Either from the fund, the wholesaler, the
 8   prospectus.
 9             There would be any number of sources.
10   They would tell you themselves.
11             Wholesalers would come into the branch
12   all the time every day.
13        Q    This information was relayed to you from
14   Mr. Palleschi, I believe you had said to stay within
15   the funds?
16        A    To stay within the rules.
17        Q    Did you pass that on to Mr. O'Donnell?
18        A    Yes.
19        Q    What did you personally do to find out
20   what the rules were in the funds in which
21   Mr. O'Donnell was employing this market timing
22   strategy?
23             MR. MAYNARD:  Initially or throughout?
24             This has turned into a kind of a
25   longer --
```

```
 1                    Samperi
```

93068.txt

2          MS. PAOLI:  NO.  Initially.

3      A    My biggest source of information were the

4   wholesalers from the mutual funds.

5          They would come into the office.  I would

6   sit them down in my office and I would say, make me

7   smart about this.

8          ,  What are the trigger points?  What do you

9   guys don't want, what can we do, what can't we do?

10         They would tell us what the situation

11   was.

12     Q    The wholesalers worked directly for the

13   mutual funds?

14     A    Yes.

15     Q    They were based in the mutual funds'

16   offices?

17     A    They would be wholesalers.  They would

18   make the round of the branches, visit us, try to get

19   us to sell their funds.

20         They would put a presentation on about a

21   particular fund.

22     Q    When Mr. O'Donnell brought that idea to

23   you and then you asked Mr. Gunther and then you

24   asked Mr. McMahon, there came a time when

25   Mr. Palleschi became involved also, correct?

87

1                    Samperi

2      A    Correct, yes.

3      Q    That was early on, also?

4      A    Yes.

93068.txt

13    A    Summer of 2002.

14    Q    Late summer?

15    A    I don't know.

16    Q    Summer?

17    A    I would say summer.   July.

18    Q    What prompted you to place this amount

19  control?

20    A    Two things.   The wholesalers said the too

21  sensitivities on the fund size was the amount of the

22  trade and the number of turns.

23         In terms of the amount, trying to figure

24  out where is this amount that the funds would not be

25  sensitive to, discussion with the wholesalers,

0

122

1              Samperi

2  wholesalers' discussion with fund people getting

3  back to me, it was like a consensus that if you did

4  your trades at 50 basis points at the fund value,

5  you are going to be okay.

6         That was a reasonable standard to adopt,

7  preclude funds from being disrupted or having a

8  negative impact by doing those kind of trades.

9    Q    Did you monitor or did you review

10  anything to determine whether or not Mr. O'Donnell

11  was complying --

12    A    Yes.

13    Q    -- with your 50 basis points control?

14    A    Yes.

15    Q    What did you do?

93068.txt

10    exchanges that was permitted with that particular

11    mutual fund?

12        A    At the beginning I just referenced them

13    to see what was in there.

14            I came away with the sense that they were

15    like fingerprints.

16            Every mutual fund had different language

17    in their prospectus to govern this.

18            Some I couldn't even find it, other than

19    a general phrase, "we reserve the right to reject

20    any transaction that we feel is not in the best

21    interest of the firm."

22            But some had very specific.  12 turns in

23    12 months.  Six in six months or something like

24    that.

25        Q    Do you know whether or not Mr. O'Donnell

0

142

1                    Samperi

2    or any of the sales assistants or FAs who were

3    engaging in this type of business with him reviewed

4    prospectuses to determine what their limit was?

5        A    I don't know if it was so much reviewing

6    prospectuses as getting the information from the

7    wholesalers or funds themselves about what they

8    would permit.

9        Q    Was a list ever kept?

10        A    Not that I can recall.

11        Q    I understand that you would speak with

12    some of the wholesalers or you might have reviewed

93068.txt

13    some of the prospectuses but did you do anything to

14    determine whether or not Mr. O'Donnell had reviewed

15    anything or spoken with anyone to know what his

16    limits were in a fund in which he was about to

17    engage in market timing?

18        A    Yes, he did.

19        Q    How do you know?

20        A    He told me and the people he spoke to

21    would speak to me sometimes.

22        Q    There was no sort of review mechanism

23    that you had in place that you could -- he would

24    give you a number and you could check it?

25        A    If you told me, Templeton Fund, I

143

1                    Samperi

2    couldn't tell you what the terms were, or something

3    like that.

4            Like I said earlier, there was not a

5    standard statement in mutual fund prospectuses that

6    you could point to.  All over the lot.

7        Q    Each prospectus was different?

8        A    Yes.

9        Q    For each fund?

10        A    Yes.

11        Q    Some might have similar language or might

12    have the same number of turns, as you described it?

13        A    Yes.

14        Q    But others would be different, correct?

15        A    Yes.

# Exhibit
# 4C

1                          Samperi

2        A     Yes.  We just reviewed it in my

3   Daytimer.

4        Q     And then it goes on "Lenny, Bob Palleschi

5   and I had a conference call with the branch

6   regarding this transaction.  The branch manager, Sal

7   Samperi indicated that this account did intend to

8   market time within the annuity.  The manager stated

9   he contacted Allstate and they were okay with this

10  as long as the branch met certain criteria."

11             Is that all true what I have just read

12  within the body of that paragraph?

13       A     Yes.

14       Q     You contacted Allstate?  When they refer

15  to the manager, they are referring to you?

16       A     Yes.

17       Q     You were allowed to market time within

18  the annuity as long as you met certain criteria.

19             What was that criteria?

20       A     It was the controls that we had spoken

21  about earlier with respect to the size of the trades

22  and how they would conduct themselves with respect

23  to moving money back and forth within the

24  subaccounts, and the turns and things like that.

25       Q     When you say the turns, did you discuss

0

1                          Samperi

93068.txt

2  with Allstate specifically that you would be

3  executing a certain number of turns?

4       A    According to their policy.  Whatever

5  their policy was as stated would be our guideline.

6       Q    The amount invested would be not greater

7  than 50 basis points?

8       A    Of the subaccount.

9       Q    Who did you speak to at Allstate, do you

10  recall?

11       A    It was the wholesaler for Allstate.  At

12  the time they were called Northbrook.

13            Brian somebody.  I don't recall his last

14  name.

15       Q    Did you ever speak with portfolio

16  managers?

17       A    No.

18       Q    Any particular reason why not?

19       A    The wholesaler in most cases would be the

20  ones that would interact with the portfolio

21  managers.

22       Q    Do you know whether the wholesalers were

23  communicating with the portfolio managers?

24       A    Yes.

25       Q    That was represented to you?

0

192

1                    Samperi

2       A    Yes.

3       Q    With respect to this instance, the

4  Allstate matter that is referred to in this e-mail,

93068.txt

5  do you know whether or not this particular

6  wholesaler communicated with the portfolio manager?

7       A    Yes.  He was very specific about that.

8       Q    What was the name of the wholesaler that

9  you had spoken with?

10      A    I don't recall his last name.

11           His first name was, I believe, Brian.

12      Q    Would he be the wholesaler for an entire

13  region?

14           Could you describe how wholesalers, if

15  you know --

16      A    It varies.  They are definitely given,

17  not just the branch, but a large geographic area.

18           He might be responsible for Westchester,

19  southern Connecticut, Rockland County, parts of

20  northern New Jersey.

21           I don't know what his area was but it was

22  typically a number of branches within a kind of

23  contiguous geographic area.

24      Q    Let's take a look at the next sentence.

25           "This account had a $5 million wire

193

1                    Samperi

2  transfer on August 9 of '02 and the manager

3  indicated that the other 3 million will also be

4  allocated towards the preferred client VA also."

5           VA stands for variable annuity, I am

6  assuming?

7       A    That is correct.

# Exhibit
# 4D

93068.txt

5     Q   When you say early, you mean between what

6  time frame?

7     A   May, June, July.

8         Probably July was the biggest month.

9         MR. MAYNARD:  2002?

10       THE WITNESS:  2002, yes.

11     Q   Let's talk about the types of complaints

12  you would have received.

13         In what form would they come?

14     A   The majority would be sent to external

15  mutual fund operations by the external funds.

16         And then someone in external mutual fund

17  operations would copy the branch.

18         Copy O'Donnell, copy me, copy both of

19  us.

20     Q   When did you first begin receiving -- was

21  there a typical type of complaint that would be

22  received by you from the --

23     A   It would be categorized.

24         If I could categorize them for you, some

25  of the complaints would say, we are canceling that

130

1              Samperi

2  trade.  We don't want the trade.

3         They are not saying stop, they are just

4  saying we don't want that trade.

5         Tomorrow they may take that fund.  On

6  that day for that fund, we are canceling the trade.

7         Some would say they would be warnings.

8       You have already used ten of your 12

9   turns for this year, you only have two left.

10      They tell us we had two left.

11      Some would be stop, we don't want your

12  business.  We are blocking you, Mr. O'Donnell, we

13  don't want any trades from 723, 143.  Boom, just

14  stop.

15      Q    For you, personally, Mr. O'Donnell?

16      A    Yes.  And they would list the numbers.

17  The 143 and 743 and the partnerships.

18      Q    How would they have those numbers?

19      A    On the external mutual fund fund system.

20  Or they would just ask for them.  Some of the

21  communications from the funds would have it right on

22  their communication.

23      Q    It is your testimony that the mutual

24  funds, the external mutual funds had the ability to

25  see all of Mr. O'Donnell's -- or any FA number

131

1                   Samperi

2   associated with Mr. O'Donnell?

3       A    If they asked for it, yes.

4       Q    If they asked for it.

5       A    Yes.

6       Q    But they would not see it when the trade

7   came in?

8       A    No.  Let me take that back.

9       Yes, part of the trade is the

10  identification number.

93068.txt

11        Q    Would the identification number also have

12   the FA's name?

13        A    It would depend.  If they plugged them

14   in.

15             Some of the funds they would not stop

16   them at first, but they said, who is this guy?

17             And they would get the chapter and verse

18   on his numbers, his name.

19             When they did stop him, they knew exactly

20   who they were going to stop.

21        Q    Initially, when a mutual fund would

22   receive an order from the firm, an external mutual

23   fund, do you have any sense or do you know what

24   information they received in connection with that

25   trade that identified the FA?


0

132


1                        Samperi

2        A    I don't know.

3             I just don't know, Marianne -- when the

4   FA puts the order in, he goes into that order entry

5   system, his branch, the account, and his ID number

6   are part of that order.

7             Any mutual fund out there, and I can tell

8   you a number of them did it -- when they wanted to

9   zero in on the broker, they simply said to external

10   mutual fund operations, whose account is this.

11            The account would come back 143,

12   O'Donnell.

13            Putting a block on 143 O'Donnell, no more

14    trades.

15            When the order entry system comes in,

16    743, 143, trade blocked.

17    BY MS. TIMBERS:

18        Q    Do you know who in mutual fund operations

19    provided those names to the mutual funds?

20        A    It could have been any of the staff

21    there -- Terry --

22        Q    Stacy.

23        A    Stacy, I am sorry.  I remembered the T.

24            The head of the mutual fund operations is

25    a guy named Ken Curry.

0

133

1                    Samperi

2            His backup was Betty Martinez.

3            There were, maybe, four or five other

4    people that had day-to-day, daily hookups with

5    mutual fund companies.

6            They definitely could have.

7            Many of them asked me.

8            They would call me up.

9            Who is this broker?

10           Chris O'Donnell.

11           What is his number?

12       Q    Did Mr. O'Donnell have a problem with you

13    giving out his name to the mutual funds?

14       A    No.  Some of the mutual funds would

15    communicate with him directly.  Wouldn't even copy

16    me on it.

93068.txt

17       Q    Do you know whether Mr. O'Donnell had a

18  problem with anybody in mutual fund operations

19  giving out his name?

20       A    No.  It was part of the business, Tracy.

21            It was part of the business from the

22  standpoint that some mutual funds wanted the

23  business and some didn't.

24            There were some in between.

25            They had half the foot in the door and a

                                                    134

1                      Samperi

2   half the foot out the door.

3             Part of the learning process was to find

4   out who would permit it, at what level and under

5   what circumstances.

6             The ones that didn't want it, stay away

7   from them because they didn't want the business.

8             We found out by putting in a trade.

9             Boom, stop.  We don't want your

10  business.

11       Q    You are not aware of any instance where

12  Mr. O'Donnell was not happy that his name was given

13  out to a mutual fund?

14       A    It is common -- it is a fairly common

15  practice that someone in the business wants to find

16  out who did that trade.

17            They could find out.

18            I certainly could find out.  Any mutual

19  fund that is doing business with Morgan Stanley, you

20    call the external mutual fund operation.

21          We got some letters, the letters were

22    addressed to Chris O'Donnell.  They used his name

23    frequently through a lot of these processes.

24    BY MS. PAOLI:

25          Q    Were any mutual fund market timing trades

135

1                          Samperi

2    placed under David Cusano's FA number?

3          A    No.  Any trade that he would have done

4    could have only been put in through the joint

5    production agreement.

6          Q    But it would have a different ID number,

7    the joint production agreement would have a

8    different ID number than Chris O'Donnell's

9    personal --

10          A    Right.  Chris O'Donnell was literally on

11    every account.  I would not allow him to hide his

12    name anywhere.

13          Every joint production agreement has 143

14    as part of the agreement.

15          Q    David Cusano was not an FA but he was

16    registered, right?

17          A    Correct.

18          Q    He was a sales assistant?

19          A    Yes.

20          Q    Do you know whether or not he was ever

21    identified by American Century as a market timer, or

22    having engaged in market timing business?

93068.txt

16      Q      Indeed, there were instances in which

17  Mr. O'Donnell received communication from, maybe not

18  directly from the funds but through your mutual fund

19  operation department in which he was notified that

20  he had exceeded the number of turns in a particular

21  fund?

22      A      Correct.  Or he might find out from the

23  fund directly too.

24      Q      In those instances, you were copied on

25  those letters, correct?

                                                        144

1                      Samperi

2      A      Sometimes.

3      Q      When you learned that, would you have

4  conversations with Chris O'Donnell about that?

5      A      Yes.

6      Q      What would you say to him?

7      A      Tell him to stop.  Look, you are out of

8  turns.  No more trades with this fund.

9      Q      Did you determine whether or not he had

10  reviewed the prospectus with respect to that

11  particular fund to determine the number of turns he

12  was permitted?

13              MR. MAYNARD:  Is this a hypothetical

14  question still?

15              MS. PAOLI:  It is not a hypothetical.

16  Mr. Samperi, I believe, you have already testified

17  that you did receive letters.

18              THE WITNESS:  Yes.
                      Page 130

93068.txt

19      Q      Saying that you have exceeded the number
20  of trades, right?
21      A      Correct.
22      Q      It is not a hypothetical, you did receive
23  those types of letters?
24      A      Oh, yes.
25      Q      What I want to know is, can you remember

145

1                       Samperi
2   what you said to Mr. O'Donnell on those --
3       A      Whenever we received a letter from a fund
4   that told us to stop -- they didn't want any more
5   trades, we had done too many or sometimes we didn't
6   even reach their maximum number of turns, they were
7   moving too fast.
8              No, we don't want that kind of business.
9   Stop.
10             Whenever that occurred in any form of
11  communication, I told O'Donnell to stop and he did,
12  for the most part.
13             Sometimes he would ask another question
14  but, Chris, stop.  And he would stop.
15      Q      Did you become concerned at all that
16  Chris perhaps was not following your instructions
17  for the controls that you had in place?
18      A      No.
19      Q      At any point in time.
20      A      Every now and then it wasn't perfect.
21  One would slip up.
                        Page 131

# Exhibit
# 4E

93068.txt

1                    Samperi
2        Q    When was the last time you testified in
3    connection with your former employer?
4        A    In 1995.
5        Q    Other than that, other than your
6    testimony with the Port Authority?
7        A    No.
8        Q    I would like to now ask you some
9    questions regarding your educational background.
10       A    Yes.
11       Q    Did you graduate from high school?
12       A    Yes.
13       Q    College?
14       A    Yes.
15       Q    What college did you go to?
16       A    Fordham.
17       Q    Did you graduate?
18       A    Yes.
19       Q    What degree did you receive?
20       A    BS.
21       Q    I am sorry?
22       A    Bachelor of Science degree.
23       Q    Do you hold any other advanced degrees?
24       A    Yes.
25       Q    Could you please --

☐

                                                    13


1                    Samperi
2        A    New York University, MBA finance.
3        Q    You can continue if there are others.

93068.txt

```
 4        A    No, that is it.
 5        Q    Do you hold any licenses or
 6   certifications?
 7        A    In connection with my current employment,
 8   yes.
 9       .Q    Could you describe those?
10        A    Series 7, Series 8, 63, 65, 31 and life
11   insurance for life and health.
12        Q    Are all of those licenses current?
13        A    Yes.
14        Q    I would like to now go through your
15   employment history.
16             You had just described to me that you had
17   worked with the Port Authority as a deputy director
18   of public safety, in the public safety department.
19             How long were you in the employ of the
20   Port Authority?
21        A    30 years.
22        Q    Could you just -- I want to go back to
23   your education.  When did you obtain your degree in
24   finance?
25        A    1969.
```

                                                      14

```
 1                       Samperi
 2             MR. MAYNARD:  The MBA or the --
 3             MS. PAOLI:  The MBA in finance.
 4        Q    I believe you had a BS degree from
 5   Fordham?
 6        A    1962.
```

93068.txt

```
 7        Q      Did you retire from the Port Authority?
 8        A      Yes.
 9        Q      What did you do as the deputy director of
10   public safety department?
11        A      I was the number two person in the Port
12   Authority Police Department.
13        Q      What did you do?  Did you handle any of
14   the business activities or financing side --
15        A      Everything.
16        Q      You did everything?
17        A      Yes.  I didn't go on patrol or
18   investigate crimes but I supervised just about every
19   unit there.
20               The only one I did not supervise --
21        Q      What I am trying to find out is did you
22   have any type of work experience with the Port
23   Authority that related to finance at all?
24        A      Not really.
25               MR. MAYNARD:  Budgets and stuff.
```

0

15

```
 1                     Samperi
 2               THE WITNESS:  Yes.  Nothing in finance in
 3   terms of investments, if you want to categorize it
 4   as that.
 5        Q      But you handled budgets?
 6        A      Yes.
 7        Q      You were there until 1995, 1995 you
 8   voluntarily retired?
 9        A      Yes.
```

# Exhibit

# 5

7/31/02

Prepared by:
Date: Wednesday

Verbal complaint — Mrs. Josephine Caruso
against Michael Gaetano (see notes) does not
want to go into details at this time — some
interested in transferring assets (put ch
Oldsten Fin Alert — & Ed Jones court sell — given
her procedure to have it sent back)
10:30 AM Train to NYC for Region
Br Mgrs Conf at Shelburne 37th & Lex
Discussion with CP – AB – RR at Motrvls
Discussion with Bill McM — Jeff S —
and rep. — Jackie Mazzzello / Jim VK fund
for MS Time accts — OK — Barri is struck
to MS Funds. Can do discretionary for self
firms even though MS funds are under as sub
accounts — H – NB (billable) etc. can't for
Aff Funds – 4 mo. goal — be sure to stay within
rules. check with CPC — wholesale —
Related to supv for annuity cmts – pool.

MS-NYSE-DUP 000006
Confidential Treatment
Requested

Annual CPL Audit — CE Meeting at 4:15 PM.
trust: 1354 4th class NYSDATA COMP.)  8/12/02

Prepared by: 1304
Date: Monday

early week — 10 AM

1. E-Mail from Bill McMahon — call him on Bob P e-mail from Friday.

3. Called Bill McM — someone in his office - Tracy — (WCB)

5. Call to Chuck Patton — not available — (WCB)

6. Rick Leong: CPL Auditor arrives Branch apx 090 to conduct annual audit.

8. Bro Trotta: Buy 50.000 FHL 4.25% '06 in 11440.

10. Bill McMahon — briefed on American Century e-mail to stop mkt. timing transactions in their funds

13. Interaction with auditor all day — questions, request for documents (e.g. McNear discretionary account approvals, etc.)

16. John Palma: Sell out entire account on Tom Lowell (chads not passed — down to 7% equity, Tom claims foul-up with transferring funds — instructed Tom to sell out account — sell Checkpoint Software — could NOT sell Concord EFS (CEPT) E class (No Buy / No Sell) restriction on stk for employees — will probably be lifted tomorrow — Called John Palma back + informed on restriction.

25. Bob Palleschi + Paul Brandon on $2MM annuity ticket dropped on Friday. Bob felt that mkt came from another office put Pacific Growth (MS) into deficit situation — pool of ...

MS-NYSE-DUP 000009
Confidential Treatment
Requested

②

in annuity put — accounts smaller than fund pool in general. But reviewed rules other fund families both gave us to continue mkt timing business described rules in general — said we are sensitive to prospectus — size of fund — no disruption or neg. impact — They object no good

MS-NYSE-DUP 000010
Confidential Treatment
Requested



Prepared by: 1304.
Date: Tuesday

8/13/02

1. 0930 – Reg. Conf. Call – (See Notes)
2. Call from Bill McMahon / Jeff Stemmel –
3. question on $75MM in new external fund
4. purchases from 8/1 – 9/that Rye Branch – NOT
5. Correct – probably reflects ins/outs of market
6. timing from mmkt to Fund – fund to fund
7. new money into Branch from 8/1 – 9 Between 5+
8. 10MM. – 5 of which is in an annuity. Going to
9. conf. call in 3 min on subject.
10. ☐ Call to Chuck Patton ──── (WCS)
11. Jackie Morielli – John Pyndus – head of Insurance
12. nervous that mkt timers in annuities – he went to
13. Allstate and said whats going on – Brian McNeely
14. our wholesaler may be involved – (suspect
15. Paul Brendin – CPI Ins – may have given
16. Brian's name to Pyndus who in turn gave it
17. to Allstate since we said it was ok with
18. Allstate if we followed their rules. More
19. fallout from 13 rd Ave firms on Pacific
20. Growth. Jackie admits to held off on doing
21. any investing with funds in annuity until
22. dust settles and clear picture emerges and/or I don't
23. Call from George Murphy from Chris Amos
24. office – was on conf. call w/m Bill +
25. Jeff – response for tracking off. funds maybe
26. 150 mm in regular or ext funds (3 rd Ave + f.
27. Can't show) Rye 75mm – how is not possible
28. explained how it could happen – Marks to Fur

(2)

counts as new $, but not NEW assets, etc.
Gorchein bkgn'd on entire market timing
operation — referred him to Ken Curry for
mechanics of cust. fund reporting. Will call
if he needs additional info.

☐ Called Jeff Stewart to debrief him (WCB)

☐ Called Chuck Patton — on the phone (WCB) #2.
  total of 3 calls over past 2 days - no return call

◁ Submitted Branch Plan of Activity for
  making goal of $3.2 mm in Agg Fund in
  4 mos - Aug - Nov. No receual.

☐ Called WT+GC (Kevin Burke) on Sep 30th
  date — left v mail on tel

  Mary Goldstein — Sell Tryon Bond (+5000 purps) + put
  it into bal fund - fund. bonds - BINBX.

_Tuesday_

Prepared by: 1301
Date: 9/10/02

1. Chuck Patton / Frank Rizzo on 2003 Budget.
2. First attempt to send to CP — Hold — message
3. Server is not avail (0900 +)
4. Second attempt at 0941 — successful — 2003
5. Budget at CP — will get back if any question
6. Reg. Conf Call 1100 — To Review IAS 200
7. Fin Adv Comp Plan. — prep for 9/12/02 4:15p
8. Off DVS TV briefing by Bruce Alvins on
9. analyst
10. John Pyndus — head of insurance — on doing
11. mkt. trading in external annuities — said he
12. is going down two paths — one — CPL/INS
13. to meet and discuss — two — work something
14. out with carriers that makes it doable with
15. flowing up sub accounts (ale 3rd hr) Will
16. be OK on having us explain program with a
17. carriers — keep him posted — some have partner
18. sensitivities (e.g. Manulife) Suggested CO'D
19. would follow up to decide on a list of 6
20. carriers or so that he clears and live can
21. have further conversation with the carriers
22. Mark Schindler — MSCDX — Jim Bahn
23. Sends MMKT Bal — will avd tomorrow

MS-NYSE-DUP 000014
Confidential Treatment
Requested

Thursday

| Prepared by: | |
|---|---|
| Date: | 10/10/02 |

Bob Pellerin — meet 2 PM — NYC — w/
CO'D to discuss mkt timing deres and reful
+ mkt timin 20/1 I . (Tiny Brccalli, Paul
Blandon — John Pyndus never showed ) (see notes

E-Mails to Debr D'Ambrisis on Bloomberg acct
close out for CO'D — billed us for 4 months of the
term (4/02) at 1400 + a mo + an 8000 + p
close out when it should have been, according to
Bloomberg + MS estimate — half the amt abt 4600
ALSO — my e-mail of 8/26 to DD'A said
DO NOT PAY BILL UNTIL RESOLVED. —
However, they still went ahead + paid it . A
series of e-mails today attempting to rectify. No
firm tomorrow .

cho. Omts.

fr PAS

## Thursday

Prepared by: 1289
Date: 10/31/02

FA Meeting 0830 (a
1. Reg. Conf. Call (discussion on Int z Br-).
2. Holiday Party - 12/12/02 5³⁰-8³⁰ WCC.
   Conjunction with Wh. Pls Br.
3. New RMD "unified" Table for calc. RMDs.
4. Ret. Plan notification on new max amounts.
5. FA Brochures.

Call to Bill O'Meara on new account for
Exmoor LTD C/o Millennium Partners LLC.
OK to approve — Millennium a hedge fund — does?
frequently — had the issue [?] up before — [?]
(1316).

Ida May on RMD — will send form — calc. amt
from new RMD unified table

Dick Mace — Sell 1900 QQQ, 500 CSCO — proceeds
into money market.

MS-NYSE-DUP 000016
Confidential Treatment
Requested

(2)  1/15/03  con't.

personality conflict with new BM (Carlos Viella) was basis for departure.

Briefed Ros LoP on background checks — said to e-mail Bill McMahon — update him on process and report OK to him. — SENT E/Mail.

Bob Pellecchia on Chris Schuch account from COID on accessing N-ld Mutual Funds — did not have Bus Plan — e-mailed it to him — will review and get back — HOWEVER he believes the whole issue of mutt t mros is a hot bottom item — policy comm set-up and mostly led to INS. letter — more to come — attempt to develop policy + definition — being driven by product types — [RECOMMENDS] — we hold off moving the Schuch model until we see what comes out of Policy Comm. — AGREED with Bob — briefed COID — we are on HOLD. — Signed RCB.

KENDREA

3/11/03
Tuesday

Meeting with Sam Turney, Bob Pellecchia, C'OD,
J Dorken and myself at NYC CPC office
to discuss CO'Ds Mtming program — after
reviewing the activity ST made it very clear
that a policy was going to be coming out shortly
that would put a stop to this Type of activity.
Only item that he would "think about" was
the possibility of some form of transition for
CO'D because of the impact on his earnings
that this was going to cause. He promised to
get back to us. Meeting ended on a good
note.

MS-NYSE-DUP 000019
Confidential Treatment
Requested

# Exhibit
# 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
                                                           :
SECURITIES AND EXCHANGE COMMISSION, :
                                                           :
                Plaintiff,                                 :
                                                           :
                v.                                         :   Civil No. 07-CV-11275  (JGK/JCF)
                                                           :
                                                           :
DARRYL A. GOLDSTEIN and                                    :
CHRISTOPHER L. O'DONNELL,                                  :
                                                           :
                Defendants.                                :
-----------------------------------------------------------x


### DECLARATION OF CAITLIN M. STAFFORD IN SUPPORT OF DEFENDANT CHRISTOPHER L. O'DONNELL'S MOTION TO DISMISS


I, Caitlin M. Stafford, declare as follows:

1. I am a legal assistant with the law firm of Mayer Brown LLP, counsel for Defendant Christopher L. O'Donnell.
2. I submit this declaration in support of Defendant Christopher L. O'Donnell's Motion to Dismiss the Complaint.
3. Attached hereto is a typed transcription, prepared by me, of handwritten notes of Salvatore Samperi.
4. The attached transcription was prepared to the best of my ability.

I declare under penalty of purjury that the forgoing is true and correct.

Executed this 24th day of April, 2008, in Washington, District of Columbia.

_Caitlin M. Stafford_
Caitlin M. Stafford

### 7/31/02 - Wednesday

Verbal complaint - Mrs. Josephine Caruso against Michael Gaetano (see notes) does not want to go into detail at this time - more interested in transferring assets (prob. with [**O__?__  F__?__**] Alert - Ed Jones cannot sell - give her procedures to have it sent back).

10:30 a.m. Train to NYC for Regional Br. Manager Conf. at Shelbourne 37th and Lexington. Dinner with CP, AB, FR at Morton's.  Discussion with Bill McM - Jeff S. - and sep. - Jackie Mazzelli on VK funds for MTim. accts. - OK - ban is strictly on MS funds.  Can do annuities for mkt. timing even though MS funds are [**__?__**] as sub accounts -- H - NB (Allstate) etc. [**__?__**].

Affil. funds - 4 month goal - be sure to stay within rules.  Check with CPL - wholesaler.  Relate to size of annuity sub-pools.

1304

### 8/12/02 – Monday

Annual CPL Audit – CE Meeting at 4:15pm

([_?_] : 1354.40 close on NASDAQ comp.)

(**In margin**) Marty Massy Funeral 10AM

E-mail from Bill McMahon – call him on Bob P e-mail from Friday.

Called Bill McM – someone in his office – [T__?__] WCB

Call to Chuck Patton – not available – WCB

Rick Leong: CPL Auditor arrived Branch apx. 0900 to conduct annual audit.

Bob Trotten: Buy 50,000 FHL 4.25%, '06 in [__?__] 11440

Bill McMahon – briefed on American Century e-mail to stop mkt. timing transactions in their funds.

Interaction with auditor all day – questions, requests for documents (e.g. McNear discrectionary account approvals, etc.)

John Palma: Sell out entire account or Tom [__?__] Lowell (clocks not passed – down to 7% equity, Tom claims foul-up with transferring funds – instructed Tom to sell out account – sold Checkpoint Systems – could NOT sell Concord EFS (CEFT) E class (No Buy/ No Sell) restrictions on stk. For employees – will probably be [__?__] tomorrow – called John Palma back & informed on restriction.

Bob Palleschi & Paul Brandon on $2MM annuity ticket dropped on Friday. Bob related that mkt. timing from another office put Pacific Growth (MS) into deficit situation – pool of funds

### 8/12/02- page 2

in annuity sub-accounts smaller than fund pool in general. Bob reviewed rules other fund families have given to us to continue mkt. timing business – discussed rules in general – said we were sensitive to prospectus – size of funds – no disruption or neg. impact – if they object no good.

1304

### 8/13/02 - Tuesday

0930 - Reg. Conf. Call - (see notes).

Call from Bill McMahon/Jeff Standard - question on $75 MM in new external fund purchases from 8/1 - 8/9 at Rye Branch - NOT CORRECT - probably reflects ins/outs of market timers from MMKT to Fund and fund to fund . New money into Branch from 8/1 - 9 between 5-10M - 5 of which is in an annuity. Going to conf. call in 3 min. on subject.

Call to Chuck Patton - WCB

Jacki Mazzelli - John Pyndus - Head of Insurance nervous about market timers in annuities - he went to Allstate and said what's going on - Brian McNeely our wholesaler may be in trouble - (suspect Paul Brandon) - CPL INS - may have given Brian's name to Pyndus who in turn gave it to Allstate since we said it was OK with Allstate if we followed these rules.  More fallout from 3rd Ave. fiasco in Pacific Growth.  Jackie advises to hold off on doing any investing with funds in annuity until dust settles and clear picture emerges on do's and don't's.

Call from George Murphy from Chris Amo's office - was in on conf. call with Bill.  Jeff - response for trading aff. funds [__?__] 150M in [__?__] on ext. funds (3rd Ave. and [_?_] Lions' shares) Rye 75MM – how is that possible explained how it could happen – MMKT to Fund.

### 8/13/02 ( Page 2)

Counts as new buy, but not NEW assets, etc.  Gave him background on entire market timing operation - referred him to Ken Curry for mechanics of ext. fund reporting.  Will call if he needs additional info.

Called Jeff Standard to debrief him - WCB.

Called Chuck Patton - on the phone - WCB #2, total of 3 calls over past two days no ret. call.

Submitted Branch Plan of Activities for making goal of $3.2m I Aff. Funds in 4 mos. - Aug - Nov.  Ni received.

Called WHGC (Kevin Burke) on Sep. 30 date - left vmail on tel.

Mary Goldstein - Sell Toyota Brand (+ 5000 profit) put it into balanced fund – pred. bonds - BINBX.

1301

## 9/10/02 - Tuesday

Chuck Patton/Frank Rizzo on 2003 Budget. First attempt to send to CP - blocked - message services not avail. (0900 +).

Second attempt at 0941 - successful - 2003 Budget at CP - will get back if any questions.

Regional Conference Call 1100 - TO REVIEW IAS 200 FIN. ADV. COMP. PLAN - prep. for 9/12/02 4:15 p.m. BUS. TV. briefing by Bruce Alonzo on [_?_] subject.

John Pyndus - head of insurance - in doing mkt. timing in external annuities - said he is going down two paths - one - CPL/INS to meet and discuss - two-work something out with carriers that makes it doable without blowing - up sub accounts (ala 3rd Ave.). Will be OK on having us explore program with ins. carriers - keep him posted - some have particular sentiments (e.g. Manulife). Suggested CO'D would follow-up to describe on a list of 6 carriers or so that he clears and we can have further conversation with the carriers.

Mark Schiedler - MDCDX - for [J__ B__?] [__?__] MMKT Bal. - will call tomorrow.

<u>10/10/02 - Thursday</u>

Bob Palleschi - meet 2 p.m. - NYC - with CO'D to discuss mkt. timing deals with m.fund and market times 20/IT. (Tony Naccarelli, Paul Brandon - John Pyndus never showed) (see notes).

Emails to Debra D'Ambrosio in Bloomberg acct. closed out for CO'D - billed us for 4 months after term (4/02) at 1400 + a mo. and 8000 + for close out when it should have been, according to Bloomburg + MS estimate - half the amt. about 4000. ALSO, my email of 8/26 to DD'A said DO NOT PAY BILL UNTIL RESOLVED. However, they still went ahead and paid it. A series of emails today attempting to rectify. [**M___?__ ___?__**] tomorrow.

### 10/31/02 - Thursday

(**In margin**) [_?_] amts. for FAs.

FA Meeting 0830

1)      Reg. Conf. Call (discussion on [_?_] of Br.)

2)      Holiday Party - 12/12/02  5:30-8:30 WCC.  In conjunction with Wh. Pl. Br.

3)      New RMD "unified" table for calc. RMDs.

4)      Ret. Plan not [__?__] on new max. amounts

5)      FA Brochures.

Call to Bill O'Meara on new account for Exmoor Ltd. c/o Millenium Partners LLC.  OK to approve - Millenium a hedge fund - does frequently - had the issue brought up before its [_?_] (12316).

Ida May on RMD - will send form – calc. amt. from new RMD unified table.

Jack Mace - Sell 1900 QQQ, 500 CSCO - proceed with money market.

<u>1/15/03 (page 2) cont'd</u>

personality conflict with new BM (Carlos Viella) was basis for departure.  Briefed Rob LOP on background checks - said to email Bill McMahon - update him on process and request OK to hire. - SENT EMAIL.

Bob Palleschi on Chas. Schwabb account for CO'D on accessing N-Ld. Mutual Funds - did not have Bus. Plan - e-mailed it to him - will review and get back - HOWEVER, he believes the whole issue of mkt. timers is a hot button item - policy comm. set-up and meeting led to Ins. letter - more to come - attempting to develop policy and definition - being driven by product types - RECOMMENDS - we hold off moving on Schwabb model until we see what comes out on Policy Comm. - AGREED with Bob - briefed CO'D - we are on HOLD - Informed RCO.

Kendrea

<u>3/11/03 - Tuesday</u>

Meeting with Sam Turvey, Bob Palleschi, C'OD, J. Doolan and myself at NYC Cpl. office to discuss CO'Ds M. Timing program – after reviewing the activity, ST made it very clear that a policy was going to be coming out shortly that would put a stop to this type of activity.  Only item that he would "think about" was the possibility of some form of transition for CO'D because of the impact on his earnings that this was going to cause.  He promised to get back to us.  Meeting ended on a good note.